# IN THE UNITED STATES DISTRICT COURT FOR THE DISTRICT OF MARYLAND
## NORTHERN DIVISION

BRITTNEY GOBBLE PHOTOGRAPHY, LLC,

                    Plaintiff,

          v.

SINCLAIR PORTLAND LICENSEE, LLC; KATV LICENSEE, LLC; SINCLAIR BAKERSFIELD LICENSEE, LLC; SINCLAIR BOISE LICENSEE, LLC; SINCLAIR EUGUNE LICENSEE, LLC; SINCLAIR YAKIMA LICENSEE, LLC; KEYE LICENSEE, LLC; KGBT LICENSEE, LLC; KHQA LICENSEE, LLC; SINCLAIR LEWISTON LICENSEE, LLC; SINCLAIR SEATTLE LICENSEE, LLC; SINCLAIR RADIO OF SEATTLE LICENSEE, LLC; KRCG LICENSEE, LLC; KTUL LICENSEE, LLC; KTVL LICENSEE, LLC; KTVO LICENSEE, LLC; KUTV LICENSEE, LLC; KVII LICENSEE, LLC; WACH LICENSEE, LLC; WFXL LICENSEE, LLC; WGXA LICENSEE, LLC; WJAR LICENSEE, LLC; WKRC LICENSEE, LLC; GRAY TELEVISION LICENSEE, LLC; WLUK LICENSEE, LLC; WNWO LICENSEE, LLC; WOAI LICENSEE, LLC; WPBN LICENSEE, LLC; WPDE LICENSEE, LLC; WSET LICENSEE, LLC; WSTQ LICENSEE, LLC; WTOV LICENSEE, LLC; WTVC LICENSEE, LLC; WZTV LICENSEE, LLC; SINCLAIR TELEVISION OF PORTLAND, LLC; KATV, LLC; THE TENNIS CHANNEL, INC.; SINCLAIR MEDIA OF BOISE, LLC; SINCLAIR MEDIA OF OREGON, LLC; SINCLAIR MEDIA OF WASHINGTON, LLC; SAN ANTONIO TELEVISION, LLC; CHESAPEAKE MEDIA I, LLC; SINCLAIR TELEVISION 2 OF ILLINOIS, LLC; SINCLAIR MEDIA OF SEATTLE, LLC; SINCLAIR RADIO OF SEATTLE, LLC;

Case No. 1:18-cv-03403-RDB (Lead Case)

Case No. 1:18-cv-03384-RDB
Case No. 1:19-cv-00559-RDB
Case No. 1:19-cv-00606-RDB

**PLAINTIFF'S MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF MOTION TO STRIKE DEFENDANT SINCLAIR'S CORPORATE DESIGNEE'S (DAVID BOCHENEK) PURPORTED CHANGES TO HIS DEPOSITION TESTIMONY**

SINCLAIR COMMUNICATIONS, LLC;
KTUL, LLC; WSMH, INC.; HARRISBURG
TELEVISION, INC.; SINCLAIR MEDIA III,
INC.; SINCLAIR TELEVISION STATIONS,
LLC; KMPH LICENSEE, LLC; KMTR
TELEVISION, LLC; KPTM LICENSEE,
LLC; HSH FLINT (WEYI) LICENSEE,
LLC; NEW AGE MEDIA OF
GAINESVILLE LICENSEE, LLC;
DEERFIELD MEDIA (ROCHESTER)
LICENSEE, LLC; ACC LICENSEE, LLC;
GOCOM MEDIA OF ILLINOIS, LLC;
SINCLAIR TELEVISION OF FRESNO,
LLC; SINCLAIR TELEVISION OF
OREGON, LLC; SINCLAIR TELEVISION
OF OMAHA, LLC; KOKH, LLC; and
WGME, INC.

**Defendants.**

## TABLE OF CONTENTS

Page

I.   PROCEDURAL POSTURE ........................................................................... 1

II.   APPLICABLE LAW .................................................................................... 1

III.   ARGUMENT .............................................................................................. 3

A.   Changes that Materially Alter and/or Contradict Bochenek's Deposition Testimony Should Be Stricken. ................................................................. 4

Changes to "I Don't Recall" Responses ..................................................... 4
1.   Disputed Change No. 1: Page 26, Line 4 ..................................... 4
2.   Disputed Change No. 2: Page 26, Line 7 ..................................... 4
3.   Disputed Change No. 3: Page 26, Line 10 ................................... 5
4.   Disputed Change No. 4: Page 29, Line 1-2 .................................. 5
5.   Disputed Change No. 5: Page 29, Line 6 ..................................... 6
6.   Disputed Change No. 6: Page 32, Line 8 ..................................... 6
7.   Disputed Change No. 7: Page 32, Line 14 ................................... 7
8.   Disputed Change No. 8: Page 32, Line 17 ................................... 7
9.   Disputed Change No. 9: Page 34, Line 9 ..................................... 7
10.   Disputed Change No. 10: Page 42, Line 4 ................................... 8
11.   Disputed Change No. 11: Page 42, Line 15 ................................. 8
12.   Disputed Change No. 12: Page 42, Lines 19-20 .......................... 8
13.   Disputed Change No. 13: Page 44, Line 4 ................................... 9
14.   Disputed Change No. 14: Page 49, Line 15 ................................. 9
15.   Disputed Change No. 15: Page 49, Line 21 ................................. 9
16.   Disputed Change No. 16: Page 50, Line 10 ............................... 10
17.   Disputed Change No. 17: Page 51, Line 1 ................................. 10
18.   Disputed Change No. 18: Page 61, Line 22 ............................... 10
19.   Disputed Change No. 19: Page 62, Line 9 ................................. 11
20.   Disputed Change No. 20: Page 67, Line 14 ............................... 11
21.   Disputed Change No. 21: Page 81, Lines 10-11 ........................ 11
22.   Disputed Change No. 22: Page 82, Line 4 ................................. 12
23.   Disputed Change No. 23: Page 83, Lines 11-12 ........................ 12
24.   Disputed Change No. 24: Page 84, Lines 3-4 ............................ 12
25.   Disputed Change No. 25: Page 84, Lines 10-13 ........................ 13
26.   Disputed Change No. 26: Page 89, Lines 16-17 ........................ 13
27.   Disputed Change No. 27: Page 91, Line 9 ................................. 13
28.   Disputed Change No. 28: Page 109, Line 18 ............................. 14
29.   Disputed Change No. 29: Page 118, Line 12 ............................. 14
30.   Disputed Change No. 30: Page 119, Line 16 ............................. 14
31.   Disputed Change No. 31: Page 123, Lines 20-21 ...................... 15
32.   Disputed Change No. 32: Page 129, Line 6 ............................... 15
33.   Disputed Change No. 33: Page 133, Line 17 ............................. 15
34.   Disputed Change No. 34: Page 134, Lines 17-18 ...................... 16
35.   Disputed Change No. 35: Page 136, Lines 14-18 ...................... 16
36.   Disputed Change No. 36: Page 136, Line 22 through Page 137, Line 1 ........................................................................................ 17
37.   Disputed Change No. 37: Page 140, Line 13 ............................. 17
Completely Changing Substantive Responses ......................................... 17
38.   Disputed Change No. 38: Page 39, Line 10 ............................... 18

i

39.    Disputed Change No. 39: Page 40, Line 18 through Page 41, Line 1 .......19
40.    Disputed Change No. 40: Page 41, Lines 13-15........................................19
41.    Disputed Change No. 41: Page 44, Line 19 through Page 45, Line 2 .......20
42.    Disputed Change No. 42: Page 59, Line 8.................................................20
43.    Disputed Change No. 43: Page 60, Line 2.................................................21
44.    Disputed Change No. 44: Page 75, Line 3.................................................21
45.    Disputed Change No. 45: Page 105, Line 15.............................................21
46.    Disputed Change No. 46: Page 107, Line 17.............................................22
47.    Disputed Change No. 47: Page 139, Line 12-13 ......................................22
48.    Disputed Change No. 48: Page 139, Line 18.............................................23
49.    Disputed Change No. 49: Page 140, Line 18.............................................23
50.    Disputed Change No. 50: Page 141, Line 20.............................................23
B.    Changes That Are Not Adequately Explained Should Be Stricken......................24

IV.    CONCLUSION...........................................................................................................24

# TABLE OF AUTHORITIES

**Page**

## Federal Cases

*Ashmore for Wilson v. Sullivan*,
   No. 8:15-CV-00563, 2018 WL 507792 (D.S.C. Jan. 23, 2018) ................................................2

*Crawford v. Mare Mortg., LLC*,
   No. 4:05-CV-186, 2006 WL 1892072 (S.D. Miss. July 10, 2006).........................................24

*Donald M. Durkin Contracting, Inc. v. City of Newark*,
   2006 WL 2724882 (D. Del. Sept. 22, 2006)..........................................................................18

*E.I. du Pont de Nemours & Co. v. Kolon Indus., Inc.*,
   277 F.R.D. 286 (E.D. Va. 2011) ..............................................................................................2

*Green v. Wing Enters., Inc.*,
   No. 1:14-CV-01913, 2015 WL 506194, (D. Md. Feb. 5, 2015).........................................3, 24

*Harden v. Wicomico County*,
   263 F.R.D. 304 (D. Md. 2009).............................................................................................2, 24

*Holland v. Cedar Creek Min., Inc.*,
   198 F.R.D. 651 (S.D. W.Va. 2001)........................................................................................24

*Paul Harris Stores, Inc. v. PricewaterhouseCoopers, LLP*,
   No. 1:02-CV-1014, 2006 WL 2644935 (S.D. Ind. Sept. 14, 2006)....................................4, 17

*Rios v. Bigler*,
   847 F. Supp. 1538 (D. Kan. 1994) .......................................................................................2, 3

*Wyeth v. Lupin*,
   252 F.R.D. 295 (D. Md. 2008)............................................................................................2, 18

## Federal Rules

Fed. R. Civ. P. 30............................................................................................................4, 17, 24

Fed. R. Civ. P. 30(e) ...............................................................................................3, 4, 17, 24

Fed. R. Civ. P. 30(e)(1)(B) ....................................................................................................24

Fed. R. Civ. P. 30(e)(1)..............................................................................................................1

Fed. R. Civ. P. 30(f)(1) ............................................................................................................2

**PLAINTIFF'S MEMORANDUM OF LAW IN SUPPORT OF
MOTION TO STRIKE DEFENDANT SINCLAIR'S CORPORATE DESIGNEE'S
(DAVID BOCHENEK) PURPORTED CHANGES TO HIS DEPOSITION TESTIMONY**

Many jurisdictions, including this one, have held that "a deposition is not a take-home exam," and the right to read and sign a deposition is not an opportunity to "substantially re-write" testimony given under oath in an effort to "deflect potentially detrimental testimony." Yet that is exactly what Defendant Sinclair Broadcasting Group, Inc.'s ("Sinclair") corporate designee, David Bochenek ("Bochenek"), has attempted to do by substantively changing 50 of his responses. These changes should be stricken because they are not of the type permitted and because they are not adequately explained.

## I.    PROCEDURAL POSTURE

On August 1, 2019, pursuant to Notice (**Exhibit A**), Plaintiff Brittney Gobble Photography, LLC ("Gobble") took the videotaped deposition of Sinclair by its designated corporate representative, Bochenek. Then, on September 18, 2019, Sinclair submitted an errata sheet that purported to correct, clarify or simply change answers to over 50 different questions that its designee Bochenek had fully answered at his video deposition. (*See* **Exhibit B** (errata sheet)).

Upon review of the errata sheet, Gobble's counsel advised Sinclair's counsel that Gobble could not accept 50 responses because Bochenek drastically changed his sworn testimony "without providing a valid reason in violation of FRCP 30(e)(1)." (*See* **Exhibit C** (letter dated September 19, 2019). Gobble's counsel proposed that either Sinclair withdraw each of the substantive changes or, in the alternative, set a time to meet and confer prior to filing this Motion. Counsel met and conferred on October 4, 2019, and Sinclair's counsel agreed to review the errata sheets and email Gobble's counsel with the changes that Sinclair would withdraw. Counsel conferred again on October 29, 2019 to, among other things, check the status of that email. Sinclair's counsel now has refused to voluntarily withdraw any of Bochenek's errata changes. Consequently, Gobble brings this motion on the substantive errata changes Sinclair made in violation of Fed. R. Civ. P. 30(e)(1).

## II.    APPLICABLE LAW

Federal Rule of Civil Procedure 30(e) provides:

(e) REVIEW BY THE WITNESS; CHANGES.

(1) *Review; Statement of Changes.* On request by the deponent or a party before the deposition is completed, the deponent must be allowed 30 days after being notified by the officer that the transcript or recording is available in which:

    (A) to review the transcript or recording; and

    (B) if there are changes in form or substance, to sign a statement listing the changes and the reasons for making them.

(2) Changes Indicated in the Officer's Certificate. The officer must note in the certificate prescribed by Rule 30(f)(1) whether a review was requested and, if so, must attach any changes the deponent makes during the 30-day period.

Courts in the Fourth Circuit have had occasion to consider the nature and extent of substantive changes, and have repeatedly foreclosed changes that materially alter or contradict the deposition testimony. *See, e.g.*, *Ashmore for Wilson v. Sullivan*, No. 8:15-CV-00563, 2018 WL 507792, at *3 (D.S.C. Jan. 23, 2018) (disallowing "the requested substantive changes to be made because they are purported to be based on unfavorable deposition testimony"); *E.I. du Pont de Nemours & Co. v. Kolon Indus., Inc.*, 277 F.R.D. 286, 297 (E.D. Va. 2011) ("[T]he errata process . . . [cannot] be used to allow post-deposition revision of testimony to conform a witness' testimony to enhance a party's case.").

In this District, then-Magistrate Gauvey addressed the issue in *Wyeth v. Lupin*, 252 F.R.D. 295 (D. Md. 2008). The *Wyeth* Court expressly rejected the notion that the Rule permitted a party to "'undo' the testimony of its 30(b)(6) witness by adding errata," and expressly adopted the line of cases that struck "wholesale changes" to deposition testimony which were "really no more than 'lawyers' statements,' attempting to deflect potentially detrimental testimony." *Id.* at 297 (citations omitted). Judge Gauvey approvingly cited *Rios v. Bigler*, 847 F. Supp. 1538, 1545-47 (D. Kan. 1994), which characterized purported "clarifications" to deposition testimony as "akin to a student who takes her in-class examination home, but submits new answers only after realizing a month later that the import of her original answers could possibly result in a failing grade." *Id.*

Judge Grimm reached the same conclusion in *Harden v. Wicomico County*, 263 F.R.D. 304 (D. Md. 2009), where defendant sought to limit the holding of *Wyeth* to after-the-fact "wordsmithing" of an answer, as opposed to the supposedly permitted practice of changing an answer "based on reconsideration of the question posed." *Id.* at 306. Judge Grimm rejected the distinction and struck the

2

errata sheet on substantive grounds because it "lacks an adequate reason, and is not the type of substantive change that Fed. R. Civ. P. 30(e) contemplates." *Id.*

More recently, in *Green v. Wing Enters., Inc.*, No. 1:14-CV-01913, 2015 WL 506194, (D. Md. Feb. 5, 2015), Judge Coulson observed, "where the proposed changes do not correct misstatements or clarify existing answers but instead materially change the answers or fully supplant them, such changes will be stricken and the deponent will be barred from utilizing the revised testimony at trial." *Id.* at *2. Based on this reasoning, the *Green* court did not permit certain proposed changes where the deponent substituted lengthy discussion about product safety or misuse in the place of previous concise responses. *Id.* Judge Coulson further found that "conclusory" reasons for proposed changes would be stricken. *Id.* at *8 ("[T]he reason stated does not provide any explanation for the changes and the text of the change itself merely suggests that Mr. Wing wanted to provide more support for his answer.").

Thus, in this jurisdiction, the Rule is not viewed as an unfettered opportunity to convert a deposition into an open-book take-home exam, where testimony can be wordsmithed and dramatically changed with the help of counsel. Rather, substantive changes are permitted if and only if they are of the type contemplated by the Rule, and they are adequately explained. Changes that do not meet both criteria are not permitted.

As shown below, 50 of Bochenek's proposed changes are not the type allowed by the Rule and are not adequately explained.

## III.   ARGUMENT

Bochenek's errata sheet makes wholesale changes to 50 questions asked at his corporate designee's deposition, in a transparent attempt to diminish the effect of potentially detrimental testimony. These changes are not of the kind permitted under Rule 30(e), and they are not adequately explained.

The sworn testimony Bochenek actually gave, the conflicting testimony that he and counsel wish he had given instead, and the purported reason for the changes, are set forth below.

3

**A.      Changes that Materially Alter and/or Contradict Bochenek's Deposition Testimony Should Be Stricken.**

**Changes to "I Don't Recall" Responses**

Gobble disputes all of the following proposed changes to answers such as "I don't know" and "I don't recall" because in all cases, Bochenek has essentially attempted to convert the deposition into a take-home exam that is open-book and with the help of counsel. These are wholesale changes to prior testimony that are in clear violation of Rule 30. *See Paul Harris Stores, Inc. v. PricewaterhouseCoopers, LLP*, No. 1:02-CV-1014, 2006 WL 2644935, at *3 (S.D. Ind. Sept. 14, 2006) (refusing to allow a 30(b)(6) witness to change his testimony because "[a] deposition is not a take home examination"). This objection applies to Disputed Change Nos. 1-37.

The following proposed changes do not clarify Bochenek's testimony, but instead add answers where previously there were none. To allow this type of correction would undermine Rule 30(e) and the case law prohibiting Bochenek from turning the deposition into a take-home exam.

**1.      Disputed Change No. 1: Page 26, Line 4**

**Original:**

```
1  Q.   What percentage would you say of the
2       advertisements on Sinclair websites are O&O
3       displays versus national?
4  A.   I don't recall.
```

**Proposed Change.** Bochenek would like line 4 to instead read:

"As a rough approximation, 60% national/programmatic and 40% sold by local sales staff."

**2.      Disputed Change No. 2: Page 26, Line 7**

**Original:**

```
1  Q.    What percentage would you say of the
2        advertisements on Sinclair websites are O&O
3        displays versus national?
4  A.    I don't recall.
5  Q.    Is it about half? I am just looking
6        for an approximation.
7  A.    I haven't studied that figure.
```

**Proposed Change.** Bochenek would like line 7 to instead state:

"As previously mentioned, it is a rough approximation, 60% national/programmatic and 40% sold by local sales staff."

**3.      Disputed Change No. 3: Page 26, Line 10**

**Original:**

1 Q.    What percentage would you say of the
2        advertisements on Sinclair websites are O&O
3        displays versus national?
4 A.   I don't recall.
5 Q.   Is it about half? I am just looking
6        for an approximation.
7 A.   I haven't studied that figure.
8 Q.   Okay. Do you know which one is
9        greater?
**10  A.  No, I do not.**

**Proposed change.** Bochenek would like line 10 to instead read:

"As previously mentioned, it is a rough approximation, 60% national/programmatic and 40% sold by local sales staff."

**4.      Disputed Change No. 4: Page 29, Line 1-2**

**Original:**

19 Q.  If a salesman at a local station
20        generates O&O display revenue, that revenue is
21        recorded -- is that revenue recorded at the
22        local station general ledger level or at the
1 corporate general ledger level?
[. . .]
11 Q.  Well, if it's a national -- so how
12        does that work then? If it's a national ad,
13         each of the ads that are on the particular
14        local station is somehow divvied up and then
15        that portion of that income goes to the local
16        general ledger?
[. . .]
**1 A.    There is a formula.   I don't recall**
**2        what the exact formula is.**

**Proposed change.** Bochenek would like line 1-2 to instead read:

"We calculate a percentage for each station based upon station impressions (meaning, 'hits' or 'views' for that station's websites during the relevant time period) relative to total impressions to all stations at issue during the relevant time period."

5.     **Disputed Change No. 5: Page 29, Line 6**

**Original:**

    3  Q.    I mean, in layman's terms, is there
    4         a general way you could describe how the
    5         formula works?
    **6  A.    I don't recall the specifics.**

**Proposed change.** Bochenek would like line 6 to instead read:

"We calculate a percentage for each station based upon station impressions (meaning, 'hits' or 'views' for that station's websites during the relevant time period) relative to total impressions to all stations at issue during the relevant time period."

6.     **Disputed Change No. 6: Page 32, Line 8**

**Original:**

    18  Q.   So when it says that: "Additional
    19        payments beyond the initial retained
    20        commissions may be paid," how are those
    21        reflected and what are the circumstances
    22        surrounding when those payments need to be
    1         made?
    2  A.    It would be reflected as an expense
    3          in our financial statements and it depends on
    4         an agreement, but there may be certain clauses
    5         allowing them to get additional fees.
    6  Q.    Why would -- why would the agency be
    7         entitled to additional payments?
    **8  A.    I don't recall.**

**Proposed change.** Bochenek would like line 8 to instead read:

"The language that you quoted needs to be revised. It should say, 'An agency may withhold an amount greater than the 14-15% if it determined that the advertising schedule did not run as ordered and demanded a sales adjustment.' In that case, it would simply withhold the additional funds required. Typically, however, if a make-good is necessary, it is accomplished with additional advertising at a future date (in-kind compensation)."

7.      **Disputed Change No. 7: Page 32, Line 14**

**Original:**

9  Q.    Is there a range that you can
10       provide of when the agency is entitled to an
11       additional payment, what -- let me back up.
12       Is it usually based on a percentage
13        or is it on a flat fee or could it be either?
**14  A.  I don't recall.**

**Proposed change.** Bochenek would like line 14 to instead read:

"It was based on the agreed upon value of what was not delivered as ordered."

8.      **Disputed Change No. 8: Page 32, Line 17**

**Original:**

15  Q.  Is there a range of amounts that
16       these are typically incurred?
**17  A.  I don't recall.**

**Proposed change.** Bochenek would like line 17 to instead read:

"It was based on the agreed upon value of what was not delivered as ordered."

9.      **Disputed Change No. 9: Page 34, Line 9**

**Original:**

6  Q.    So there was no trailing percentage
7        of revenue that was paid to Sinclair once WLUC
8        was sold?
**9  A.   I don't recall the specifics.**

**Proposed change.**      Bochenek would like line 9 to instead read:

"Sinclair subsidiaries had a transition services agreement with Gray, which included operating the WLUC website for a couple of months after closing on the sale. Any compensation for services would be as set out in the transition services agreement. Additionally, following a sale, there is typically a closing pro-ration adjustment that includes an estimate for advertising receivables, for which there would be a post-closing finalization."

10.     **Disputed Change No. 10: Page 42, Line 4**

**Original:**

20  Q.   So -- so if I understand correctly
21        then, Exhibit 37 represents the web advertising
22        revenue specifically related to the pages upon
1         which either the -- one of the articles or the
2         images at issue in this case appeared?
[. . .]
**4   THE WITNESS: I don't recall.**

**Proposed change.** Bochenek would like line 4 to instead read:

"That's correct, it does not relate to the cat photos and articles."

11.     **Disputed Change No. 11: Page 42, Line 15**

**Original:**

10  Q.  So it's not the case that the
11        reverse is true. It's not possible that 1.6
12        million represents the income specifically
13        related to the cat photos and the articles.
14        That can't -- that doesn't make any sense.
**15  A.  I don't recall.**

**Proposed change.** Bochenek would like line 15 to instead read:

"Neither Exhibit 37 nor Exhibit 38 represents revenue specifically related to the cat photos and articles. The Exhibit 38 figure is larger because it lists digital revenue for all Sinclair stations as opposed to only website revenue for the stations at issue in this case, which is listed on Exhibit 37."

12.     **Disputed Change No. 12: Page 42, Lines 19-20**

**Original:**

16  Q.  Just so -- all right. So Exhibit
17        37, you don't know what this revenue
18        represents?
**19  A.  I don't recall. I don't recall what
20        the difference is between the two.**

**Proposed change.** Bochenek would like lines 19-20 to instead read:

"The revenue reported on Exhibit 37 is the gross advertising website revenue (net of agency commissions, as I discussed previously) for the stations, calculated as was stated in the Answer to Interrogatory No. 19."

13.     **Disputed Change No. 13: Page 44, Line 4**

**Original:**

1       What does it mean when it says:
2       "Digital revenue does not include any journal
3       entries from the bridge."
**4  A.   I don't recall.**

**Proposed change.** Bochenek would like line 4 to instead read:

"It means that this data does not include immaterial, infrequent miscellaneous journal entries that were recorded in the general ledger but not reflected in the traffic system. These entries represent less than 0.25% of the total. The entries would represent reclassifications."

14.     **Disputed Change No. 14: Page 49, Line 15**

**Original:**

8  A.   A preroll would be a video component
9       of an ad in an internet video, so let's say you
10      have a news story and you first clicked the
11      news story, a preroll ad would appear first.
12      That's the first ad you see in a web story.
13  Q.  So are the prerolls limited to news
14      stories?
**15  A.   I do not know.**

**Proposed change.** Bochenek would like line 15 to instead read:  "Pre-rolls are

limited to video stories."

15.     **Disputed Change No. 15: Page 49, Line 21**

**Original:**

19  Q.  Is there ever a preroll video prior
20      to watching another video of an ad?
**21  A.   I don't recall.**

**Proposed change.** Bochenek would like line 21 to instead read:  "No."

9

**16.**  **Disputed Change No. 16: Page 50, Line 10**

**Original:**

```
22  Q.  So if there was an ad that was a
 1        video as opposed to just a static image, would
 2        -- what category would that be in?
 3  A.  What type of category? What do you
 4        mean by category?
 5  Q.  Well, the category -- as you refer
 6        to them as the verticals, so if there was an
 7        advertisement that wasn't just a static
 8        advertisement, but was a video advertisement,
 9        which vertical would that be part of?
10  A.  I am not sure which one.
```

**Proposed change.** Bochenek would like line 10 to instead read:

"It would be the O and O Video vertical."

**17.**  **Disputed Change No. 17: Page 51, Line 1**

**Original:**

```
16  Q.  Is it possible that a video ad --
17        that revenue from a video ad would be in a
18        category in the first column other than the
19        three highlighted here?
[. . .]
22  Q.  On 2359.
 1  A.  I don't know.
```

**Proposed change.** Bochenek would like line 1 to instead read:

"Yes, revenue from a video ad would be in the O and O Video vertical in that first column."

**18.**  **Disputed Change No. 18: Page 61, Line 22**

**Original:**

```
17  Q.  Are you aware of any specific costs
18        that relate solely to the reproduction of the
19        images or the article in connection with their
20        display on the website at any of the stations?
[. . .]
22        THE WITNESS: I don't recall.
```

**Proposed change.** Bochenek would like line 22 to instead read:

"The fees paid to WENN to obtain photos from WENN."

19.     **Disputed Change No. 19: Page 62, Line 9**

**Original:**

2 Q.   Well, I am just asking if you are
3       aware -- are there any types of costs that you
4       can think of that are associated specifically
5       to the display and reproduction and use of the
6       article and images on the websites at each of
7       the stations?
[…]
**9      THE WITNESS: I don't remember any.**

**Proposed change.** Bochenek would like line 9 to instead read:

"The fees paid to WENN to obtain photos from WENN."

20.     **Disputed Change No. 20: Page 67, Line 14**

**Original:**

8 A.    They are two different departments
9       within our digital group that we track costs
10      for, because they provide different types of
11      services.
12 Q.   Okay. So the DI content services,
13      what do they provide?
**14 A.  I don't -- I don't recall.**

**Proposed change.** Bochenek would like line 14 to instead read:

"The DI Content Services supports best practices in posting content on our station websites and social media sites."

21.     **Disputed Change No. 21: Page 81, Lines 10-11**

**Original:**

6 Q.    So, okay. So in 2018, there is a
7       separate number for national sales. Where --
8       is that -- why is that there? Why is that --
9       why is that the only entry for that row?
**10 A.  It could be various reasons. I**
**11      don't recall the specific reason.**

**Proposed change.** Bochenek would like lines 10-11 to instead read:

"Prior to 2018, DI Sales Hub included both Sales and National Sales Expenses, it was not tracked separately. In 2018, we started to break out those expenses."

11

22.     **Disputed Change No. 22: Page 82, Line 4**

**Original:**

> 22 Q.  And I notice that DI content
> 1       services had no entries for 2015, but then
> 2       started having entries in 2016. Do you know
> 3       why that is?
> **4 A.   I don't recall.**

**Proposed change.** Bochenek would like line 4 to instead read:

> "We did not track DI content services separately prior to 2016."

23.     **Disputed Change No. 23: Page 83, Lines 11-12**

**Original:**

> 6 Q.   So I guess my question is: Why
> 7       didn't the same methodology apply for
> 8       technology and content services considering
> 9       that in 2359, there were other digital income
> 10      types not at issue in this case?
> **11 A.  I am trying to recall and I don't**
> **12      recall right now.**

**Proposed change.** Bochenek would like lines 11-12 to instead read:

> "DI Technology and DI Content Servies Hubs only support our apps and websites therefore all of their costs are applicable to our O&O assets."

24.     **Disputed Change No. 24: Page 84, Lines 3-4**

**Original:**

> 21 Q.   So wouldn't it be appropriate then
> 22      to provide a similar percentage attributable to
> 1       website advertising to total revenue as it is
> 2       for sales and national sales?
> **3 A.   I just don't recall how we landed at**
> **4       the hundred percent.**

**Proposed change.** Bochenek would like lines 3-4 to instead read:

> "Upon further review, there is an argument that the 100% is slightly overstated. Their servies may also maintain our other O&O assets and we have recalculated that to average approximately 86-89% in lieu of 100% allocation."

**25.     Disputed Change No. 25: Page 84, Lines 10-13**

**Original:**

> 5  Q.    Okay. But looking at this now,
> 6        doesn't it seem appropriate that there should
> 7        be a reduction based upon the percentage
> 8        attributable to website advertising to total
> 9        revenue?
> **10  A.  I don't recall because I don't**
> **11       remember why we came up with that and I know**
> **12       there was a reason and I just don't recall**
> **13       right now.**

**Proposed change.** Bochenek would like lines 10-13 to instead read:

> "Upon further review, there is an argument that the 100% is slightly overstated. Their services may also maintain our other O&O assets and we have recalculated that to average approximately 86-89% in lieu of 100% allocation."

**26.     Disputed Change No. 26: Page 89, Lines 16-17**

**Original:**

> 12  A.  Yes. These are costs that we incur
> 13        in order to serve the particular ads onto our
> 14        digital websites.
> 15  Q.  How are these costs incurred?
> **16  A.  Through a -- specifically, I don't**
> **17       know.**

**Proposed change.** Bochenek would like lines 16-17 to instead read:

> "We are charged a fee for display from Google DFP."

**27.     Disputed Change No. 27: Page 91, Line 9**

**Original:**

> 1  Q.    Oh. Okay. Got it. Did the
> 2        expenses -- and I forgot to ask you this. Did
> 3        the expenses that we saw include taxes?
> 4  A.   What type of taxes?
> 5  Q.    Income tax?
> 6  A.   No.
> 7  Q.    Does it -- what type of taxes would
> 8        it include?
> **9  A.   I don't recall.**

**Proposed change.** Bochenek would like line 9 to instead read:

"The hub expenses include payroll taxes."

28.    **Disputed Change No. 28: Page 109, Line 18**

**Original:**

15  Q.  Okay. Again, you don't know what
16       digital revenue will not include any journal
17       entries from the bridge means?
**18  A.  No, I don't know why that is there.**

**Proposed change.** Bochenek would like line 18 to instead read:

"This data does not include immaterial, infrequent miscellaneous journal entries that were recorded in the g/l but not reflected in the traffic system. These entries represent less than 0.25% of the total. The entries would represent reclassifications."

29.    **Disputed Change No. 29: Page 118, Line 12**

**Original:**

9        Can you tell me the significance of
10       the highlighting in yellow in the first column
11       on 2491?
**12  A.  I cannot recall.**

**Proposed change.** Bochenek would like line 12 to instead read:

"Those were intended to indicate posts where photos were still visible as of July 2019."

30.    **Disputed Change No. 30: Page 119, Line 16**

**Original:**

12  Q.  Okay. 2492. Again, we have
13       highlighted cells in the left-hand-most column,
14       and you don't know why those are highlighted on
15       2492?
**16  A.  I do not.**

**Proposed change.** Bochenek would like line 16 to instead read:

"Those were intended to indicate posts where photos were still visible as

of July 2019."

14

31.     **Disputed Change No. 31: Page 123, Lines 20-21**

**Original:**

18  Q.  What does it mean at the bottom, it
19       says: "No KTXS, KTSX?"
**20  A.  I would be speculating. I don't**
**21       know.**

**Proposed change.** Bochenek would like lines 20-21 to instead read:

"There was not any revenue associated with KTXS and we wanted to ensure there was no transposition error with KTSX. Upon review of the website, KTXS was the correct call letters and did not have revenue associated."

32.     **Disputed Change No. 32: Page 129, Line 6**

**Original:**

1  Q.  So it says on 2608, it says: "Note,
2       DI tech and DI content were captured a hundred
3       percent in website advertising calculation as
4       same stations named."
5       What does that mean?
**6  A.  I don't know.**

**Proposed change.** Bochenek would like line 6 to instead read:

"Upon further review, there is an argument that the 100% is slightly overstated. Their services may also maintain our other O&O assets and we have recalculated that to average approximately 86-89% in lieu of 100% allocation."

33.     **Disputed Change No. 33: Page 133, Line 17**

**Original:**

13  Q.  And then there is another entity
14       called San Antonio Television, LLC. Would that
15       be the entity, the parent entity that owns both
16       the licensing and the operating company?
**17  A.  I am not sure.**

**Proposed change.** Bochenek would like line 17 to instead read:

"San Antonio Television, LLC is the operating entity for KABB. It does not own KABB Licensee, LLC."

**34.**     **Disputed Change No. 34: Page 134, Lines 17-18**

**Original:**

12  Q.  And, for instance, when Sinclair
13       sold WLUC to Gray, did they sell both the -- or
14       did they sell both the licensee entity and the
15       operating entity to Gray or would they only
16       sell the licensee?
**17  A.  I don't recall if it was a stock**
**18       sale or an asset sale and we sell stations in**
**19       both fashions, so it could be either/or.**

**Proposed change.** Bochenek would like lines 17-19 to instead read:

"I don't recall if it was a stock sale or an asset sale and we sell stations in both fashions, so it could be either/or. But WLUC was no longer a Sinclair station after the sale, so the purchasing company operated WLUC and owned the license."

**35.**     **Disputed Change No. 35: Page 136, Lines 14-18**

**Original:**

8  Q.  Now there is another one for station
9       KB -- KPIC. It says KPIC O&O, which I assume
10      means owned and operated but then it has a
11      partner name Roberts Media.
12      Can you help me understand what that
13      means?
**14  A.  I know that we have a JSA-related**
**15       arrangement in that market. I believe that is**
**16       Eugene, and I cannot recall which specific call**
**17       letters are the JSA arrangements with Larry**
**18       Roberts.**

**Proposed change.** Bochenek would like lines 14-18 to instead read:

"KPIC is not a JSA arrangement with Roberts Media."
Bochenek's proposed change is materially different from his prior sworn testimony. If Bochenek is allowed to change his sworn testimony, Plaintiff's counsel should have the opportunity to question him further on this topic, for example about what specifically the arrangement is if it is not JSA.

36.      **Disputed Change No. 36: Page 136, Line 22 through Page 137, Line 1**

**Original:**

19  Q.  It says: "The licensee name is
20        Southwest Oregon TV Broadcasting Corporation."
21        Does that help?
**22  A.  No. I don't recall who the owner of
1        that entity is, if that's Roberts or not.**

**Proposed change.** Bochenek would like page 136, line 22 through page 137, line

1 to instead read:

"KPIC is operated by South West Oregon Television Broadcasting
Corporation, which is owned 50% by Sinclair Television Media, Inc. and
50% by California Oregon Broadcasting, Inc."

37.      **Disputed Change No. 37: Page 140, Line 13**

**Original:**

11        So would each of the local stations
12        operate each of the local station's websites?
**13  A.  I'm not sure.**

**Proposed change.** Bochenek would like line 13 to instead read:

"The technical aspect of the websites is operated by Sinclair Broadcast
Group, Inc., which also posts content through the National Desk. Each
local Sinclair subsidiary may also post content to its station website."

**Completely Changing Substantive Responses**

Gobble disputes all of the following proposed changes that materially change the substance of

responses, including from "no" to "yes" (or vice versa), or supplement a response with a new and

detailed explanation. Bochenek has essentially attempted to convert this deposition into a take-home

exam that is open-book and with the help of counsel. These are wholesale changes to prior testimony

that are in clear violation of Rule 30. *See Paul Harris Stores,* 2006 WL 2644935, at *3 (refusing to allow

a 30(b)(6) witness to change his clarify his testimony because "[a] deposition is not a take home

examination"). This objection applies to Disputed Change Nos. 38 through 50.

The following proposed changes do not clarify Bochenek's testimony, but instead completely

change his prior responses. To allow this type of correction would undermine Rule 30(e) and the case

law prohibiting Bochenek from turning the deposition into a take-home exam. It is also clear that these changes reflect knowledge that Bochenek acquired *after* the deposition with help from counsel. As a 30(b)(6) designee, Bochenek was required to be prepared to testify completely and knowledgeably on the designated topics. *See Wyeth*, 252 F.R.D. at 297 (striking purported changes where "30(b)(6) witness gave honest answers based on the documents before her and the questions presented" and her counsel had opportunity to clear up the record); *Donald M. Durkin Contracting, Inc. v. City of Newark*, 2006 WL 2724882 at *5 (D. Del. Sept. 22, 2006) (observing that a company's designee has "an affirmative obligation to be prepared on the noticed topics so that she could give complete, knowledgeable, and binding answers on behalf of the party").

      **38.**    **Disputed Change No. 38: Page 39, Line 10**

      **Original:**

```
 2  Q.   I see. So when it says: "Total DI
 3        revenue by selected market," by selected
 4        market, it means stations involved in this
 5        matter?
 6  A.   Yes.
 7  Q.    Oh, okay. Now do these numbers
 8        correlate to the numbers of Exhibit 37 that we
 9        were just looking at?
10  A.   Yes.
```

      **Proposed change.** Bochenek would like line 10 to instead read:

      "'No.' The revenue on Exhibit 37 is a subset of the revenue on Exhibit 38."

39.   **Disputed Change No. 39: Page 40, Line 18 through Page 41, Line 1**

**Original:**

> 7   Q.   2018, I am seeing $1,664,853; is
> 8        that right?
> 9   A.  Yes.
> 10  Q.  And then -- but on Exhibit 37, it
> 11       says for 2018, 451,935.
> 12       A.      Correct.
> 13  Q.   So what is the difference between
> 14       these two numbers?
> 15  A.  So the revenue on Exhibit 38, the 1
> 16       million, was it 664 that you quoted?
> 17  Q.  Let's just call it 1.6 million.
> **18  A.  1.6 million is the revenue that was**
> **19       associated with the products that were sold**
> **20       that had the cat pictures with them.**
> **21       So if there was a product sold with**
> **22       the cat picture on it, this was the revenue**
> **1        related to that cat picture.**

**Proposed change.** Bochenek would like page 40, line 18 through page 41, line  to

instead read:

"The revenue reported on Exhibit 37 is the gross advertising website revenue (net of agency commissions, as I discussed previously) for the stations that are at issue in this case, calculated as was stated in the Answer to Interrogatory No. 19. Exhibit 38 is a calculation that was done to determine how to allocate a percentage of hub expenses relative to the operation of the websites at issue in this case. Specifically, we calculated total digital revenue for the stations at issue in this case as a percentage of total digital for all Sinclair stations. $1.6 million is the total digital revenue for KEYE for 2018, which represents all verticals sold by digital including the verticals related to websites as well as other verticals not relating to websites."

40.   **Disputed Change No. 40: Page 41, Lines 13-15**

**Original:**

> 10       What does the -- I'm just going to
> 11       round it, 450,000 on Exhibit 37, what does that
> 12       represent?
> **13  A.  I misspoke. It was Exhibit 37**
> **14       represents the cat revenue from the different**
> **15       ads.**

**Proposed change.** Bochenek would like lines 13-15 to instead read:

> "I misspoke. Exhibit 37 represents the gross advertising website revenue for the stations at issue in this case, calculated as was stated in the Answer to Interrogatory No. 19."

41.   **Disputed Change No. 41: Page 44, Line 19 through Page 45, Line 2**

**Original:**

```
15  Q.   I am showing you Exhibit 39,
16        SBG_2359, entitled: "DI sales goals trend."
17        Can you explain to me what this
18        document is?
19  A.   This is a document showing our
20        revenue by month for various digital verticals.
21        The three highlighted in yellow are the three
22        verticals I mentioned earlier from which we
1         derived revenue that would have had cat
2         pictures associated with them.
```

**Proposed change.** Bochenek would like page 44, line 19 through page 45, line 2

to instead read:

> "Exhibit 39 is a calculation that was done to determine how to allocate a percentage of hub expenses relative to the operation of the websites at issue in this case. Specifically, we calculated total revenue generated by website advertising for all Sinclair stations as a percentage of total digital revenue for all Sinclair stations."

42.   **Disputed Change No. 42: Page 59, Line 8**

**Original:**

```
2         Can you, by looking at 2362,
3         determine how much of these or which categories
4         of these costs would have been incurred even if
5         the pages with the images and articles had
6         never appeared and which ones are related to
7         inclusion of those pages on the website?
8  A.    We do not track that.
```

**Proposed change.** Bochenek would like line 8 to instead read:  "No."

43.     **Disputed Change No. 43: Page 60, Line 2**

**Original:**

> 21  Q.  Do all of the costs in yellow and
> 22        orange represent all of the costs of all of the
> 1          websites owned or controlled by Sinclair?
> **2   A.   Yes.**

**Proposed change.** Bochenek would like line 2 to instead read:

"Yes and other digital activities."

44.     **Disputed Change No. 44: Page 75, Line 3**

**Original:**

> 13  Q.  Yes. I had asked you if there was a
> 14        way that you could determine what -- what
> 15        percentage of the local number, of the 58
> 16        million, was derived solely from the article
> 17        and the - solely from pages that included the
> 18        article or one of the images, and you said not
> 19        from this page, so my question is: Can you
> 20        determine it from another page?
> 21  A.  No.
> 22  Q.   Can you determine it from any
> 1          information that you have in your accounting
> 2          system?
> **3   A.   No.**

**Proposed change.** Bochenek would like line 3 to instead read:

"No. We would have to look at data that shows the number of hits on the cat images and articles versus total website hits through, for instance, Google analytics data, which is not maintained in the accounting system."

45.     **Disputed Change No. 45: Page 105, Line 15**

**Original:**

> 12  Q.  Okay. So you don't know what the
> 13        left columns that go most of the pages do, or
> 14        what it means?
> **15  A.   Correct.**

**Proposed change.** Bochenek would like line 15 to instead read:

"The columns on the left of 2383 to 2472 are the raw data for Facebook programmatic revenue. We then created a pivot table (Excel function which allows aggregation and summarization of large volumns [*sic*] of data) for ease of use, which is represented by the columns to the right."

46.     **Disputed Change No. 46: Page 107, Line 17**

**Original**

14      Do all the station listed here in
15      the right-hand column, are those all of the
16      stations owned or controlled by Sinclair?
**17  A.  Whether it's has an X or not, yes.**

**Proposed change.** Bochenek would like line 17 to instead read:

"Whether it has an X or not, those are stations that are owned and operated by Sinclair subsidiary entities, or to which a Sinclair subsidiary entity provides services."

47.     **Disputed Change No. 47: Page 139, Line 12-13**

**Original:**

8  Q.   Which entity or which entities own
9       the rights to use the websites at each of the
10      stations?
[. . .]
**12      THE WITNESS: To my knowledge, it's**
**13      the operating entities.**

**Proposed change.** Bochenek would like line 12-13 to instead read:

"The websites for the stations are owned by Sinclair Broadcast Group Inc."

48.    **Disputed Change No. 48: Page 139, Line 18**

**Original:**

> 8  Q.   Which entity or which entities own
> 9        the rights to use the websites at each of the
> 10       stations?
> [. . .]
> 12       THE WITNESS: To my knowledge, it's
> 13       the operating entities.
> [. . .]
> 15  Q.  The operating entities own the
> 16       websites?
> [. . .]
> **18 THE WITNESS: To my knowledge, yes.**

**Proposed change.** Bochenek would like line 18 to instead read:

> "No, Sinclair Broadcast Group, Inc. owns the websites."

49.    **Disputed Change No. 49: Page 140, Line 18**

**Original:**

> 14  Q.  What about for the stations for
> 15       which Sinclair does not control the
> 16       programming? Who would operate the websites
> 17       for those stations?
> **18  A.  Sinclair.**

**Proposed change.** Bochenek would like line 18 to instead read:

> "The technical aspect of the websites is operated by Sinclair Broadcast
> Group, Inc., which also posts content through the National Desk. Each
> local Sinclair subsidiary that provides services to the non-Sinclair licensee
> may also post content to that station's website."

50.    **Disputed Change No. 50: Page 141, Line 20**

**Original:**

> 19  Q.  So even though -- who would then
> 20       decide the content that populated the websites
> 21       for the stations for which Sinclair does not
> 22       control the programming of the stations?
> [. . .]
> **20       THE WITNESS: Sinclair.**

**Proposed change.** Bochenek would like line 20 to instead read:

"Sinclair Broadcast Group, Inc. posts content through the National Desk. Each local Sinclair subsidiary that provides services to the non-Sinclair licensee may also post content to that station's website."

## B.     Changes That Are Not Adequately Explained Should Be Stricken.

Setting aside the fact that Bochenek's changes are improperly material or contradictory, he still has not complied with the Rule 30. *See* Fed. R. Civ. P. 30(e)(1)(B). All of the disputed changes above are explained on conclusory grounds, stating simply "correction of testimony" or "clarification of testimony." (*See* **Exhibit B** (errata sheet).) However, these explanations are inadequate. Based on these three-word explanations, it is impossible to know what aspect of his testimony Bochenek is attempting to correct or clarify. Bochenek fails to explain why he was unable to provide complete and accurate answers during his deposition, but could provide new material and substantive responses weeks later, only after he had "an opportunity to study the transcript, consult with counsel, and reflect on the adverse impact that his original answer may have had." *See Harden*, 263 F.R.D. at 307 (observing that lack of explanation as to what specifically led deponent to change his answer was conclusory, and therefore insufficient); *see also Crawford v. Mare Mortg., LLC*, No. 4:05-CV-186, 2006 WL 1892072, at *1 (S.D. Miss. July 10, 2006) (granting motion to strike because Rule 30(e) "requires more rationale than the word 'correction'"). For example, Bochenek could have, but did not, explain precisely why he was concerned that his answers could be misconstrued or misinterpreted. *See Green*, 2015 WL 506194 at *4 (accepting proposed changes that are precisely explained); *see also Holland v. Cedar Creek Min., Inc.*, 198 F.R.D. 651, 653 (S.D. W.Va. 2001) (striking proposed changes because witness did not state specific reasons for each change).

Therefore, Bochenek's conclusory or nonexistent explanations are sufficient grounds to strike his proposed changes.

## IV.     CONCLUSION

For the foregoing reasons, Gobble respectfully requests that this Court strike the proposed changes to Page 26, Line 4; Page 26, Line 7; Page 26, Line 10; Page 29, Line 1-2; Page 29, Line 6; Page

32, Line 8; Page 32, Line 14; Page 32, Line 17; Page 34, Line 9; Page 42, Line 4; Page 42, Line 15;

Page 42, Lines 19-20; Page 44, Line 4; Page 49, Line 15; Page 49, Line 21; Page 50, Line 10; Page 51,

Line 1; Page 61, Line 22; Page 62, Line 9; Page 67, Line 14; Page 81, Lines 10-11; Page 82, Line 4;

Page 83, Lines 11-12; Page 84, Lines 3-4; Page 84, Lines 10-13; Page 89, Lines 16-17; Page 91, Line 9;

Page 109, Line 18; Page 118, Line 12; Page 119, Line 16; Page 123, Lines 20-21; Page 129, Line 6;

Page 133, Line 17; Page 134, Lines 17-18; Page 136, Lines 14-18; Page 136, Line 22 through Page 137,

Line 1; Page 140, Line 13; Page 39, Line 10; Page 40, Line 18 through Page 41, Line 1; Page 41, Lines

13-15; Page 44, Line 19 through Page 45, Line 2; Page 59, Line 8; Page 60, Line 2; Page 75, Line 3;

Page 105, Line 15; Page 107, Line 17; Page 139, Line 12-13; Page 139, Line 18; Page 140, Line 18;

Page 141, Line 20, and preclude Bochenek from relying on the these portions of the errata sheet at trial.

Further, if any of the 50 disputed changes are allowed, Gobble asks that it be allowed to re-open

Bochenek's deposition, at Sinclair's sole cost and expense, to inquire further with respect to any allowed

change.

Respectfully submitted,

November 20, 2019                    By:  ___/s/ Robert E. Allen_____
                                              Robert E. Allen

C. Justin Brown
Maryland State Bar No. 28110
brown@cjbrownlaw.com
Brown Law Firm
1 N. Charles St., Suite 1301
Baltimore, Maryland 21201
Telephone: (410) 244-5444

C. Dale Quisenberry (admitted *pro hac vice*)
Texas State Bar No. 24005040
dale@quisenberrylaw.com
Quisenberry Law PLLC
13910 Champion Forest Drive, Suite 203
Houston, Texas 77069
Telephone: (832) 680-5000

Robert E. Allen (admitted *pro hac vice*)
Cal State Bar No. 166589
rallen@glaserweil.com
Glaser Weil Fink Howard Avchen & Shapiro LLP
10250 Constellation Blvd., 19th Fl.
Los Angeles, CA 90067
Telephone: (310) 282-6280

*Counsel for Brittney Gobble Photography, LLC*