# Exhibit A

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF MARYLAND**
**NORTHERN DIVISION**

| | |
|---|---|
| **BRITTNEY GOBBLE PHOTOGRAPHY, LLC,** | **Case No. 1:18-cv-03403-RDB (Lead Case)** |
| *Plaintiffs,* | **Case No. 1:18-cv-03384-RDB** |
| | **Case No. 1:19-cv-00559-RDB** |
| **v.** | **Case No. 1:19-cv-00606-RDB** |
| **SINCLAIR BROADCAST GROUP, INC.,** *et al.,* | |
| *Defendants/Third-Party Plaintiffs,* | **JURY TRIAL DEMANDED** |
| **v.** | |
| **USA ENTERTAINMENT NEWS, INC. d/b/a "WENN" and "WORLD ENTERTAINMENT NEWS NETWORK,"** | |
| *Third-Party Defendant.* | |

## NOTICE OF VIDEO TAPED DEPOSITION OF CORPORATE DESIGNEE OF DEFENDANT SINCLAIR BROADCASTING GROUP, INC.

Please take notice that pursuant to Rule 30(b)(6) of the Federal Rules of Civil Procedure, the deposition of the Corporate Designee of Sinclair Broadcasting Group, Inc. ("SBG") will be taken on Wednesday, July 31, 2019 at 9:00 a.m., continuing from day to day through and including, Friday, August 2, 2019, at 1 N. Charles St., Suite 1301, Baltimore, MD 21201, and then on Monday, August 5, 2019 at 601 Pennsylvania Avenue NW, South Tower, Suite 700, Washington, DC 20004, and/or until termination of the deposition by undersigned counsel, for the purpose of discovery or as evidence in this action, before a notary public or some officer authorized to administer oaths. Such deposition will be recorded by videotape and stenographic means.

1

The corporate deponent is required to designate one or more officers, directors, or managing agents or other persons, who will testify on its behalf and who will be prepared to identify the matters about which that person will testify with respect to the Topics listed in the attached Appendix A.

Respectfully submitted,

| July 17, 2019 | By: */s/ Robert E. Allen*_____ |
| | |
| | C. Justin Brown |
| | Maryland State Bar No. 28110 |
| | brown@cjbrownlaw.com |
| | Brown Law Firm |
| | 1 N. Charles St., Suite 1301 |
| | Baltimore, Maryland 21201 |
| | Telephone: (410) 244-5444 |
| | Facsimile: (410) 934-3208 |
| | |
| | C. Dale Quisenberry (admitted *pro hac vice*) |
| | Texas State Bar No. 24005040 |
| | dale@quisenberrylaw.com |
| | Quisenberry Law PLLC |
| | 13910 Champion Forest Drive, Suite 203 |
| | Houston, Texas 77069 |
| | Telephone: (832) 680-5000 |
| | Facsimile: (832) 680-5555 |
| | |
| | Robert E. Allen (admitted *pro hac vice*) |
| | Cal State Bar No. 166589 |
| | rallen@piercebainbridge.com |
| | Pierce Bainbridge Beck Price & Hecht LLP |
| | 355 S. Grand Avenue, 44th Floor |
| | Los Angeles, CA 90071 |
| | Telephone: (213) 516-8351 |
| | |
| | *Counsel for Brittney Gobble Photography LLC* |

## APPENDIX A

## <u>DEFINITIONS</u>

The following definitions are incorporated by reference into each Interrogatory below:

A.      "Plaintiff," "Defendant" as well as a party's full or abbreviated name or a pronoun referring to a party, means the party and, where applicable, its officers, directors, employees, partners, corporate parent, subsidiaries or affiliates.

B.      "BGP" means, individually and collectively, Brittney Gobble Photography LLC and all of its agents and representatives, including, without limitation, Brittney Gobble and Johnny Gobble.

C.      "SBG" means Sinclair Broadcasting Group, Inc.

D.      "Stations" means each of the defendants in the consolidated action, other than SBG.

E.      "Tennessee Lawsuit" means BGP's copyright infringement action against WENN in the Eastern District of Tennessee, Case No. 3:16-cv-306.

F.      "WENN" means USA Entertainment News, Inc., d/b/a "WENN" and "World Entertainment News Network" and WENN Limited, each named as a defendant in the Tennessee Lawsuit.

G.      "Gross Receipts" means all amounts, fees, or other consideration received by, or paid or credited in any way to SBG and/or the Stations.

H.      "Images" means, individually and collectively, the photographs specified in paragraph 82 of the First Amended Complaint.

I.      "Infringing Materials" means, individually and collectively, any Document that includes, embodies, uses, reproduces, displays publicly or otherwise exploits any of the Images, including, without limitation, digital files, webpages, advertisements or other materials.

J.　　　"Communication" means the transmittal of information (in the form of facts, ideas, inquiries, or otherwise).

K.　　　"Document" is defined to be synonymous in meaning and equal in scope to the usage of this term in Fed. R. Civ. P. 34(a).  A draft or non-identical copy is a separate document within the meaning of this term.

L.　　　"Identify" or "the identity of" (with respect to Persons) means to give, to the extent known, the person's full name, present or last known address, and, when referring to a natural person, the present or last known place of employment.

M.　　　"Identify" or "the identity of" (with respect to Entities) means to give the Entity's full name and principal place of business.

N.　　　"Identify" or "the identity of" (with respect to documents) means to give, to the extent known, the (a) type of document; (b) general subject matter; (c) date of the document; and (d) author(s), addressee(s), and recipient(s).

O.　　　"Person" or "Entity" is defined as any natural person or any business, legal, or governmental entity or association.

P.　　　"Concerning" means referring to, describing, evidencing, or constituting.

Q.　　　The words "and" and "or" shall be construed conjunctively or disjunctively, in the manner which makes the request most inclusive.

**APPENDIX A**

**TOPICS FOR EXAMINATION**

1.      The factual bases for all allegations contained in SBG's Answer and Affirmative Defenses to BGP's Complaint and First Amended Complaint in the district court litigation (1:18-CV-03403-RDB).

2.      SBG's responses and objections to BGP's discovery requests, including BGP's First Set of Interrogatories and First Set of Requests for Production to SBG and to the Stations.

3.      SBG's policy, practice and custom with respect to preserving and storing Documents and Communications, including all electronic documents and emails.

4.      SBG's knowledge of the retention, organization, collection, preservation, and production of documents relevant to BGP's allegations in its Complaint and First Amended Complaint and SBG's Answer thereto, including the Documents produced in response to BGP's First Request for the Production of Documents.

5.      How and where SBG stores emails, electronic data, hard copy documents, other electronic documents, and other sources used to store any information relevant to the claims and defenses of SBG and BGP.

6.      SBG's collection, preservation and production of Documents and Communications in this case, consistent with its obligations under Rule 26 of the Federal Rules of Civil Procedure from and in response to the following events:  (a) email exchange between Brittney Gobble and Scott Sistek on or about November 8, 2015; (b) receipt of the "kill notice" from WENN on or about November 13, 2015; (c) receipt of the subpoena from BGP in the Tennessee Lawsuit on or about September 25, 2017; (d) filing of the Complaint against certain of the Stations in the District of Delaware, Case No. 1:18-cv-01720 on October 31, 2018; (e) filing of the Complaint against

certain of the Stations in the District of Maryland, Northern Division, Case No. 1:18-cv-03384 on October 31. 2018; (f) filing of the Complaint against certain of the Stations in the District of Nevada, Case No. 2:18-cv-02096 on November 1, 2018; (g) filing of the Complaint against SBG in the District of Maryland, Northern Division, Case No. 1:18-cv-03403 on November 2. 2018; and (h) in response to BGP's First Request Set of Interrogatories and BGP's First Request for the Production of Documents, served on December 31, 2018.

7.      Litigation hold notices SBG sent to its employees and other custodians of relevant Documents and Communications from and in response to the following events:  (a) email exchange between Brittney Gobble and Scott Sistek on or about November 8, 2015; (b) receipt of the "kill notice" from WENN on or about November 13, 2015; (c) receipt of the subpoena from BGP in the Tennessee Lawsuit on or about September 25, 2017; (d) filing of the Complaint against certain of the Stations in the District of Delaware, Case No. 1:18-cv-01720 on October 31, 2018; (e) filing of the Complaint against certain of the Stations in the District of Maryland, Northern Division, Case No. 1:18-cv-03384 on October 31. 2018; (f) filing of the Complaint against certain of the Stations in the District of Nevada, Case No. 2:18-cv-02096 on November 1, 2018; (g) filing of the Complaint against SBG in the District of Maryland, Northern Division, Case No. 1:18-cv-03403 on November 2. 2018; and (h) in response to BGP's First Request Set of Interrogatories and BGP's First Request for the Production of Documents, served on December 31, 2018.

8.      Actions taken (including, without limitation, investigations, notices and change of policies) from and in response to the following events:  (a) email exchange between Brittney Gobble and Scott Sistek on or about November 8, 2015; (b) receipt of the "kill notice" from WENN on or about November 13, 2015; (c) receipt of the subpoena from BGP in the Tennessee

Lawsuit on or about September 25, 2017; (d) filing of the Complaint against certain of the Stations in the District of Delaware, Case No. 1:18-cv-01720 on October 31, 2018; (e) filing of the Complaint against certain of the Stations in the District of Maryland, Northern Division, Case No. 1:18-cv-03384 on October 31. 2018; (f) filing of the Complaint against certain of the Stations in the District of Nevada, Case No. 2:18-cv-02096 on November 1, 2018; (g) filing of the Complaint against SBG in the District of Maryland, Northern Division, Case No. 1:18-cv-03403 on November 2. 2018; and (h) in response to BGP's First Request Set of Interrogatories and BGP's First Request for the Production of Documents, served on December 31, 2018.

9.      SBG's organization structure with respect to the groups involved in the reproduction, public display and distribution of the Images and the Infringing Materials, and the identity of SBG's employees with knowledge relating thereto.

10.     Ownership and control of each of the servers on which the Images and the Infringing Materials were stored, including the identity of the owner during the period commencing when the Images were initially reproduced onto the servers through the present and the identity of the owner during the period commencing when the Infringing Materials were initially created and stored on the servers through the present, and who had access to each of the servers to add, modify or delete the Images and/or the Infringing Materials.

11.     SBG's reproduction, public display, distribution and use of Images in any way, including, without limitation, who reproduced the Images onto SBG's servers and when, who created the pages on the websites incorporating the Images and when, when the pages incorporating the Images were available for access and display, when such pages were altered and by whom, and when those pages were no longer available for access and display.

12.     SBG's decision to adopt, use, reproduce, publicly display, and distribute Images in connection with the Infringing Materials, including without limitation, on or in connection with SBG or Stations' websites.

13.     SBG's involvement in reproducing, distributing, or otherwise making available the Images to the Stations, including, without limitation, who distributed the Images to the Stations and when such distribution was done.

14.     SBG's reproduction, public display or distribution of Images within SBG.

15.     Any license or alleged licensed, whether oral or written, granted to SBG relating to the Images, including SBG's rights to grant sub-licenses to any Images and the scope of such rights, any restrictions on the use of the Images communicated to SBG, and any steps taken by SBG to comply with any such restrictions or conditions.

16.     All internal communications within SBG or external communications between SBG and any third party, including WENN, relating to the maintenance, reproduction, display, distribution, making available, modification, alteration, exploitation or use of the Images, including, without limitation, any applicable restrictions.

17.     All contracts and/or agreements between SBG and any third-party relating to licenses or sublicenses of the Images, including implied licenses and alleged confirmatory sub-license agreements.

18.     SBG's corporate policies, guidelines or general practices concerning copyrighted or copyrightable works, the use of copyrighted works by SBG, responding to kill notices or third party complaints of copyright infringement relating to images posted on any of its affiliated stations, and SBG's compliance therewith.

19.     SBG's corporate policies, guidelines or general practices concerning reproducing, displaying, distributing or otherwise making images (including, without limitation, the Images) available to others, including the Stations, and the monitoring or review of the uses by these other parties.

20.     Agreements, including agreements in which SBG is a party, relating to Images.

21.     All communications and/or decisions relating to the use of the Images in connection with the Infringing Materials.

22.     All Gross Receipts derived from the use or exploitation of the Infringing Materials, including, without limitation, Gross Receipts received from third parties for the right to advertise on websites owned or controlled by SBG or any of the Stations during the time the Infringing Materials were displayed publicly, and how such amounts are calculated.

23.     All net receipts derived from the use or exploitation of the Infringing Materials, including, without limitation, net receipts received from third parties for the right to advertise on websites owned or controlled by SBG or any of the Stations during the time the Infringing Materials were displayed publicly, and how such amounts are calculated.

24.     All costs incurred by SBG and/or the Stations in connection with the use or exploitation of the Infringing Materials, including, without limitation, costs incurred from the advertisements on websites owned or controlled by SBG or any of the Stations during the time the Infringing Materials were displayed publicly, and how such amounts are calculated.

25.     All profits derived from the use or exploitation of the Infringing Materials, including, without limitation, profits derived from third parties for the right to advertise on websites owned or controlled by SBG or any of the Stations during the time the Infringing Materials were displayed publicly, and how such amounts are calculated.

26.     SBG's creation, design and posting of Infringing Materials, including the location and identity of individuals involved with SBG and/or Stations in this activity.

27.     Documents and Communications pertaining to the selection, licensing, payment, use or infringement of each of the Images.

28.     Documents and Communications with BGP concerning the selection, licensing, payment, use or infringement of each of the Images.

29.     Documents and Communications with WENN concerning the selection, licensing, payment, use or infringement of each of the Images.

30.     Communications and Documents between or among SBG and the Stations regarding BGP's claims, including, without limitation, any requests that the Stations cease using the Images and/or Infringing Materials.

31.     Communications and Documents between or among SBG and the Stations relating to the Images, including Communications and Documents relating to the use of the Images and/or the substitution or replacement of the Images on the Infringing Materials.

## CERTIFICATE OF SERVICE

The undersigned hereby certifies that the above and foregoing document was served by electronic mail on this 17th day of July, 2019 on Defendants' following counsel of record:

Francis R. Laws
flaws@tandllaw.com
Margaret L. Argent
margent@tandllaw.com
Andrew K. O'Connell
aoconnell@tandllaw.com
Scott H Marder
shmarder@tandllaw.com
THOMAS & LIBOWITZ, PA
100 Light Street, Suite 1100
Baltimore, Maryland 21202

/s/      *Herbert Nacion*
Herbert Nacion

# Exhibit B

Deposition of David Bochenek
August 1, 2019
Errata Sheet

**CONFIDENTIAL**

| Page / Line | Change from | Change to | Reason |
|---|---|---|---|
| 2/2, 6/7 | "Broadcasting" | "Broadcast" | Correction of company name |
| 12/1-3 | "I don't recall the exact date. I want to say it's been two or three years at this time." | "I have been Senior Vice President/Chief Accounting Officer since 2013, Controller since 2018." | Correction of testimony |
| 24/5 | "KNTR" | "KMTR" | Correction of call letters |
| 26/4 | "I don't recall." | "As a rough approximation, 60% national/programmatic and 40% sold by local sales staff." | Correction of testimony |
| 26/7 | "I haven't studied that figure." | "As previously mentioned, it is a rough approximation, 60% national/programmatic and 40% sold by local sales staff." | Correction of testimony |
| 26/10 | "I don't know." | "As previously mentioned, it is a rough approximation, 60% national/programmatic and 40% sold by local sales staff." | Correction of testimony |
| 29/1-2 | "There is a formula. I don't recall what the exact formula is." | "We calculate a percentage for each station based upon station impressions (meaning, 'hits' or 'views' for that station's websites during the relevant time period) relative to total impressions to all stations at issue during the relevant time period." | Correction of testimony |
| 29/6 | "I don't recall the specifics." | "We calculate a percentage for each station based upon station impressions (meaning, 'hits' or 'views' for that station's websites during the relevant time period) relative to total impressions to all | Correction of testimony |

1

Deposition of David Bochenek
August 1, 2019
Errata Sheet

**CONFIDENTIAL**

| | | | |
|---|---|---|---|
| | | stations at issue during the relevant time period." | |
| 30/1 | "WLUC was a station that we had sold." | "WLUC was a station that was sold by subsidiaries of Sinclair." | Clarification of testimony |
| 30/6-7 | "I don't recall the exact date but I'm going to say in 2015 or '16." | "The sale closed on February 16, 2016, effective February 15, 2016." | Clarification of testimony |
| 32/8 | "I don't recall." | "The language that you quoted needs to be revised. It should say, 'An agency may withhold an amount greater than the 14-15% if it determined that the advertising schedule did not run as ordered and demanded a sales adjustment.' In that case, it would simply withhold the additional funds required. Typically, however, if a make-good is necessary, it is accomplished with additional advertising at a future date (in-kind compensation)." | Correction of testimony |
| 32/14 | "I don't recall." | "It is based on the agreed upon value of what was not delivered as ordered." | Correction of testimony |
| 32/17 | "I don't recall." | "It is based on the agreed upon value of what was not delivered as ordered." | Correction of testimony |
| 34/5 | "No, I don't believe so." | "The Sinclair subsidiaries that sold WLUC did not retain any financial interest or ownership in WLUC." | Clarification of testimony |
| 34/9 | "I don't recall the specifics." | "Sinclair subsidiaries had a transition services agreement with Gray, which included operating the WLUC website for a couple of months after closing on the sale. Any compensation for services | Correction of testimony |

Deposition of David Bochenek
August 1, 2019
Errata Sheet

**CONFIDENTIAL**

| | | would be as set out in the transition services agreement. Additionally, following a sale, there is typically a closing pro-ration adjustment that includes an estimate for advertising receivables, for which there would be a post-closing finalization." | |
|---|---|---|---|
| 37/10, 14, 19 | "WVAL" | "WVAH" | Correction of call letters |
| 37/12 | "I do not." | "The WVAH website is not named in the pending lawsuit." | Correction of testimony |
| 39/10 | "Yes." | "No." The revenue on Exhibit 37 is a subset of the revenue on Exhibit 38." | Correction of testimony |
| 39/19 | "KEYS" | "KEYE" | Correction of call letters |
| 39/19 | "218" | "2018" | Correction of date |
| 40/18- 41/1 | "1.6 million is the revenue that was associated with the products that were sold that had the cat pictures with them. So if there was a product sold with the cat picture on it, this was the revenue related to that cat picture." | "The revenue reported on Exhibit 37 is the gross advertising website revenue (net of agency commissions, as I discussed previously) for the stations that are at issue in this case, calculated as was stated in the Answer to Interrogatory No. 19. Exhibit 38 is a calculation that was done to determine how to allocate a percentage of hub expenses relative to the operation of the websites at issue in this case. Specifically, we calculated total digital revenue for the stations at issue in this case as a percentage of total digital for all Sinclair stations. $1.6 million is the total digital revenue for KEYE for 2018, which represents all verticals sold by digital including the | Correction of testimony |

**CONFIDENTIAL**

| | | verticals related to websites as well as other verticals not relating to websites." | |
|---|---|---|---|
| 41/13-15 | "I misspoke. It was Exhibit 37 represents the cat revenue from the different ads." | "I misspoke. Exhibit 37 represents the gross advertising website revenue for the stations at issue in this case, calculated as stated in the Answer to Interrogatory No. 19." | Correction of testimony |
| 42/4 | "I don't recall." | "That's correct, it does not relate to the cat photos and articles." | Correction of testimony |
| 42/15 | "I don't recall." | "Neither Exhibit 37 nor Exhibit 38 represents revenue specifically related to the cat photos and articles. The Exhibit 38 figure is larger because it lists digital revenue for all Sinclair stations as opposed to only website revenue for the stations at issue in this case, which is listed on Exhibit 37." | Correction of testimony |
| 42/19-20 | "I don't recall. I don't recall what the difference is between the two." | "The revenue reported on Exhibit 37 is the gross advertising website revenue (net of agency commissions, as I discussed previously) for the stations, calculated as was stated in the Answer to Interrogatory No. 19." | Correction of testimony |
| 44/4 | "I don't recall." | "It means that this data does not include immaterial, infrequent miscellaneous journal entries that were recorded in the general ledger but not reflected in the traffic system. These entries represent less than 0.25% of the total. The entries would represent reclassifications." | |
| 44/19-45/2 | "This is a document showing our revenue by month for various | "Exhibit 39 is a calculation that was done to determine how to allocate a | Clarification of testimony |

Deposition of David Bochenek
August 1, 2019
Errata Sheet

**CONFIDENTIAL**

| | | | |
|---|---|---|---|
| | digital verticals. The three highlighted in yellow are the three verticals I mentioned earlier from which we derived revenue that would have had cat pictures associated with them." | percentage of hub expenses relative to the operation of the websites at issue in this case. Specifically, we calculated total revenue generated by website advertising for all Sinclair stations as a percentage of total digital revenue for all Sinclair stations." | |
| 49/15 | "I do not know." | "Pre-rolls are limited to video stories." | Correction of testimony |
| 49/21 | "I don't recall." | "No." | Correction of testimony |
| 50/10 | "I am not sure which one." | "It would be the O and O Video vertical." | Correction of testimony |
| 51/1 | "I don't know." | "Yes, revenue from a video ad would be in the O and O Video vertical in that first column." | Correction of testimony |
| 59/8 | "We do not track that." | "No." | Clarification of testimony |
| 60/2 | "Yes." | "Yes and other digital activities." | Clarification of testimony |
| 61/22 | "I don't know." | "The fees paid to WENN to obtain photos from WENN." | Correction of testimony |
| 62/9 | "I don't remember any." | "The fees paid to WENN to obtain photos from WENN." | Correction of testimony |
| 67/14 | "I don't recall." | "The DI Content Services supports best practices in posting content on our station websites and social media sites." | Correction of testimony |
| 75/3 | "No." | "No. We would have to look at data that shows the number of hits on the cat images and articles versus total website hits through, for | Clarification of testimony |

Deposition of David Bochenek
August 1, 2019
Errata Sheet

**CONFIDENTIAL**

| | | instance, Google analytics data, which is not maintained in the accounting system." | |
|---|---|---|---|
| 81/10-11 | "It could be various reasons. I don't recall the specific reason." | "Prior to 2018, DI Sales Hub included both Sales and National Sales Expenses, it was not tracked separately. In 2018, we started to break out those expenses." | Correction of testimony |
| 82/4 | "I don't recall." | "We did not track DI content services separately prior to 2016." | Correction of testimony |
| 83/11-12 | "I am trying to recall and I don't recall right now." | "DI Technology and DI Content Services Hubs only support our apps and websites therefore all of their costs are applicable to our O&O assets." | Correction of testimony |
| 84/3-4 | "I just don't recall how we landed at the hundred percent." | "Upon further review, there is an argument that the 100% is slightly overstated.  Their services may also maintain our other O&O assets and we have recalculated that to average approximately 86-89% in lieu of 100% allocation." | Correction of testimony |
| 84/10-13 | "I don't recall because I don't remember why we came up with that and I know there was a reason and I just don't recall right now." | "Upon further review, there is an argument that the 100% is slightly overstated.  Their services may also maintain our other O&O assets and we have recalculated that to average approximately 86-89% in lieu of 100% allocation." | Correction of testimony |
| 89/16-17 | "Through a -- specifically, I don't know." | "We are charged a fee for display from Google DFP." | Correction of testimony |
| 91/6 | "No." | "No federal or state income tax." | Clarification of testimony |

6

Deposition of David Bochenek
August 1, 2019
Errata Sheet

**CONFIDENTIAL**

| 91/9 | "I don't recall." | "The hub expenses include payroll taxes." | Correction of testimony |
|---|---|---|---|
| 91/11 | "It could." | "Yes." | Clarification of testimony |
| 105/15 | "Correct." | "The columns on the left of 2383 to 2472 are the raw data for Facebook programmatic revenue. We then created a pivot table (Excel function which allows aggregation and summarization of large volumns of data) for ease of use, which is represented by the columns to the right." | Correction of testimony |
| 107/17 | "Whether it's has an X or not, yes." | "Whether it has an X or not, those are stations that are owned and operated by Sinclair subsidiary entities, or to which a Sinclair subsidiary entity provides services." | Clarification of testimony |
| 109/18 | "No, I don't know why that is there." | "This data does not include immaterial, infrequent miscellaneous journal entries that were recorded in the g/l but not reflected in the traffic system. These entries represent less than 0.25% of the total.  The entries would represent reclassifications." | Correction of testimony |
| 118/12 | "I cannot recall." | "Those were intended to indicate posts where photos were still visible as of July 2019." | Correction of testimony |
| 119/16 | "I do not." | "Those were intended to indicate posts where photos were still visible as of July 2019." | Correction of testimony |
| 123/20-21 | "I would be speculating. I don't know." | "There was not any revenue associated with KTXS and we | Correction of testimony |

7

Deposition of David Bochenek
August 1, 2019
Errata Sheet

**CONFIDENTIAL**

| | | | |
|---|---|---|---|
| | | wanted to ensure there was no transposition error with KTSX. Upon review of the website, KTXS was the correct call letters and did not have revenue associated." | |
| 124/4 | "I do not." | "KOMO SR stands for KOMO Seattle Refined which is a branded lifestyle content digital magazine." | Correction of testimony |
| 129/6 | "I don't know." | "Upon further review, there is an argument that the 100% is slightly overstated. Their services may also maintain our other O&O assets and we have recalculated that to average approximately 86-89% in lieu of 100% allocation." | Correction of testimony |
| 133/17 | "I am not sure." | "San Antonio Television, LLC is the operating entity for KABB. It does not own KABB Licensee, LLC." | Correction of testimony |
| 134/17-18 | "I don't recall if it was a stock sale or an asset sale and we sell stations in both fashions, so it could be either/or." | "I don't recall if it was a stock sale or an asset sale and we sell stations in both fashions, so it could be either/or. But WLUC was no longer a Sinclair station after the sale, so the purchasing company operated WLUC and owned the license." | Clarification of testimony |
| 135/5-8 | "It is a type of agreement that we entered into with other owners of licensees whereby we would operate on behalf of them, their station." | "It is a type of agreement that we entered into with other owners of licensees whereby we would provide certain services to their station." | Clarification of testimony |
| 135/17 | "Correct." | "The Sinclair subsidiary provides certain services to the station." | Clarification of testimony |
| 136/14-18 | "I know that we have a JSA-related arrangement in that | "KPIC is not a JSA arrangement with Roberts Media." | Correction of testimony |

Deposition of David Bochenek
August 1, 2019
Errata Sheet

**CONFIDENTIAL**

| | | | |
|---|---|---|---|
| | market. I believe that is Eugene, and I cannot recall which specific call letters are the JSA arrangements with Larry Roberts." | | |
| 136/22-137/1 | "No. I don't recall who the owner of that entity is, if that's Roberts or not." | "KPIC is operated by South West Oregon Television Broadcasting Corporation, which is owned 50% by Sinclair Television Media, Inc. and 50% by California Oregon Broadcasting, Inc. | Correction of testimony |
| 139/12-13 | "To my knowledge, it's the operating entities." | "The websites for the stations are owned by Sinclair Broadcast Group, Inc." | Clarification of testimony |
| 139/18 | "To my knowledge, yes." | "No, Sinclair Broadcast Group, Inc. owns the websites." | Correction of testimony |
| 140/13 | "I'm not sure." | "The technical aspect of the websites is operated by Sinclair Broadcast Group, Inc., which also posts content through the National Desk. Each local Sinclair subsidiary may also post content to its station website." | Correction of testimony |
| 140/18 | "Sinclair." | "The technical aspect of the websites is operated by Sinclair Broadcast Group, Inc., which also posts content through the National Desk. Each local Sinclair subsidiary that provides services to the non-Sinclair licensee may also post content to that station's website." | Clarification of testimony |
| 141/20 | "Sinclair." | "Sinclair Broadcast Group, Inc. posts content through the National Desk. Each local Sinclair subsidiary that provides services to the non- | Clarification of testimony |

Deposition of David Bochenek
August 1, 2019
Errata Sheet

**CONFIDENTIAL**

| | | | |
|---|---|---|---|
| | | Sinclair licensee may also post content to that station's website." | |

Deposition of David Bochenek
August 1, 2019
Errata Sheet

**CONFIDENTIAL**

**ACKNOWLEDGMENT OF DEPONENT**

I, David R. Bochenek, do hereby certify that I have read the foregoing transcript of my testimony taken on August 1, 2019, and further certify that it is a true and accurate record of my testimony (with the exception of the corrections listed on the foregoing Errata Sheet).

_____     September 18, 2019
David R. Bochenek

Subscribed and sworn to before me this ___18th___ day of September, 2019.

My commission expires: _April 20, 2020_

_____
Notary Public

> **SHARON L PICKERAL**
> NOTARY PUBLIC
> BALTIMORE CITY
> MARYLAND
> MY COMMISSION EXPIRES Apr. 20, 2020

11

# Exhibit C

# PIERCE BAINBRIDGE

**Robert E. Allen**
Partner
Pierce Bainbridge Beck Price & Hecht LLP
355 S. Grand Avenue, 44th Floor
Los Angeles, CA 90071
rallen@piercebainbridge.com
(213) 516-8351

September 19, 2019

**Via email margent@tandllaw.com**
Margaret L. Argent
Thomas & Libowitz, P.A.
100 Light Street, Suite 1100
Baltimore, Maryland, 21202-1053

> *Re:*  Brittney Gobble Photography, LLC v. Sinclair Broadcast Group, Inc., et al.,
>        Case No. 1:18-cv-03403-RDB (lead case)

Dear Maggie:

I write to address several discovery matters.

1. **Deposition of Jeffrey Sedlik.**  Jeff has confirmed that he is available October 29, 2018 in Los Angeles.

2. **Additional Search Terms and Custodians.**  In accordance with our discussion, I have reviewed SBG's supplemental interrogatory responses related to social media and have added those named individuals to the custodian list.  Please see the attached revised lists.

3. **Follow up Information From Depositions.**  Scott Marder had agreed to look into the following matters from the following depositions:
   a.  *Kevin Cotlove*
       i.   The unproduced Cotlove email (Cotlove Dep. at 134:4-11);
       ii.  Metadata stripped from Exhibit 18 (*id.* at 149:1-8);
       iii. Photos not produced (*id.* at 151:3-10); and
       iv.  Photo not produced (*id.* at 214:7-11).
   b.  *Dave Bochenek*
       i.   2018 Sales, not inclusive of December (Bochenek Dep. at 35:17-36:1); and
       ii.  A copy of 2488 (Ex. 42) showing numbers in the last column (*id.* at 102:2-13).
   c.  *Matthew Immler*
       i.   Copies of Sinclair's document retention policy, both before and after 2016 (Immler Dep. at 23:1-5);

4. **Unprepared Witnesses**.  Sinclair presented witnesses that were not prepared and had performed no investigation on topics on which such witness was designated.  Accordingly, we will need to discuss how best to obtain this information at Sinclair's expense, including through additional depositions.
   a.  *Mr. Cotlove*

PIERCE BAINBRIDGE

     i.   Topic 2 / Topic 11 – Downloading of Images (Cotlove Dep. at 22:16-35:4; 259:9-260:2);

    ii.   Topic 6 - SBG's collection, preservation and production of Documents and Communications in this case in response to the 2017 subpoena (*id.* at 249:20-250:1);

   iii.   Topic 8 - Actions taken (including investigations) in response to the 2017 subpoena (*id.* at 273:8-274:1); and

   iv.   Topic 16 – Communications with WENN related to the Images (*id.* at 274:11-275:2).

   b.  *Mr. Immler*

     i.   Topic 3 - Defendant P&G's policy, practice and custom with respect to preserving and storing Documents and Communications (Immler Dep. at 33:4-34:9);

    ii.   Topic 6 - SBG's collection, preservation and production of Documents and Communications in this case. (*id.* at 42:6-44:21); and

   iii.   Topic 7 - Litigation hold notices SBG sent to its employees and other custodians of relevant Documents and Communications (*id.* at 46:4-47:4).

5. **Downloading of Images.** Topic 11 included SBG's reproduction of the Images in any way, which includes downloading them. SBG designated Kevin Cotlove on this topic. When asked how the Images were downloaded on November 9 from WENN using Aileen Graef's account, Mr. Cotlove responded that he did not know. (Cotlove Dep. at 23:9-12). Mr. Cotlove was not only speaking for himself but as the 30(b)(6) witness on behalf of SBG. However, when Mr. Fantis was asked this question, *he acknowledged that he recently became aware of how those photos were downloaded.* (Fantis Dep. at 23:19-21), but Mr. Marder instructed Mr. Fantis not to answer on the grounds that doing so would reveal attorney-client privileged information. (*id.* at 23:22-24:15). Clearly, SBG knows the facts concerning how those Images were downloaded that day. It cannot shield that information through the attorney-client privilege. Accordingly, unless SBG provides a written explanation as to all of the facts surrounding this issue, we intend to move to compel SBG to do so.

6. **Substantive Changes to Testimony**. We are in receipt of Errata sheets for Kevin Cotlove, Susan Domozych and Dave Bochenek. These Errata sheets significantly change the substance of each of the witness's testimony, and have done so without providing a valid reason in violation of FRCP 30(e)(1). These changes are improper and we intend to move to strike each of the Errata sheets with respect to the changes not resulting from a transcription error. Please let us know that you are withdrawing each of them as to those changes or alternatively your availability to meet and confer prior to our filing a motion to strike.

Sincerely,

Robert E. Allen