## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MARYLAND

| | |
|---|---|
| **BRITTNEY GOBBLE PHOTOGRAPHY, LLC,** | |
| *Plaintiff,* | |
| v. | **Case No. 1:18-cv-03403-SAG** |
| **SINCLAIR BROADCAST GROUP, INC., *et al.*,** | Consolidated Case Nos.: 1:18-cv-03384-SAG 1:19-cv-00559-SAG 1:19-cv-00606-SAG |
| *Defendants/Third-Party Plaintiffs,* | |
| v. | |
| **USA ENTERTAINMENT NEWS, INC. d/b/a "WENN" and "WORLD ENTERTAINMENT NEWS NETWORK",** | |
| *Third-Party Defendant.* | |

## DEFENDANT SINCLAIR BROADCAST GROUP, INC.'S MEMORANDUM OF LAW IN OPPOSITION TO PLAINTIFF'S MEMORANDUM IN SUPPORT OF MOTION TO STRIKE ERRATA SHEET OF DAVID BOCHENEK

Defendant Sinclair Broadcast Group, Inc. ("Sinclair" or "SBG") submits the following memorandum in opposition to the Plaintiff's Memorandum of Points and Authorities in Support of Motion to Strike Defendant Sinclair's Corporate Designee's (David Bochenek) Purported Changes to His Deposition Testimony (ECF 76) ("Memorandum").

### I.   INTRODUCTION

Plaintiff seeks to strike errata changes in the deposition of David R. Bochenek, Sinclair's Senior Vice President/Chief Accounting Officer and Controller. Mr. Bochenek testified as one of multiple corporate designees in response to Plaintiff's Rule 30(b)(6) deposition notice issued to

Sinclair. Mr. Bochenek was designated to testify regarding the financial topics identified in the Notice. Mr. Bochenek was questioned extensively about complex and detailed financial issues relating to Sinclair's website and social media advertising revenue and expenses for a multi-year period relating to over 50 television stations.[1] Plaintiff's deposition notice to Sinclair on financial issues was broad in nature but requested granular detail. In an effort to provide Plaintiff the information sought, Sinclair was required to have its accounting staff make numerous calculations, not kept in the ordinary course of business, from Sinclair's accounting systems. The breadth of the information produced is best demonstrated by the fact that Sinclair produced over 200 ledger-sized pages of calculations showing thousands of entries with gross advertising website revenue totaling over $69,000,000 and related website expenses over $42,000,000. Website expenses were calculated and set out using eleven ledger spreadsheets. Social media revenue and expense calculations required 21 ledger spreadsheets.

Plaintiff's counsel asked numerous deposition questions that were outside of the scope of topics for which Mr. Bochenek was designated. Mr. Bochenek did his best to answer those questions despite the fact that he was not obligated to prepare to testify about these additional areas.

Counter to Plaintiff's contentions, as explained herein, each revision has a reasonable and justifiable basis. The revisions are not attempts to re-write damaging testimony, as Plaintiff asserts. In fact, Plaintiff has made no genuine argument that any of the revisions are consequential to the merits of the case or are anything other than attempts to supplement and/or clarify the record. The errata revisions are not the type of errata revisions this Court has found reason to strike in other

---

[1] Sinclair's content is delivered on multiple platforms, including over-the-air, multi-channel video program distributors, and digital platforms.

matters. The revisions made in Mr. Bochenek's errata sheet seek to enhance the truth-finding goal of discovery, not to undermine it. For the reasons stated herein, Plaintiff's motion should be denied.

## II. PROCEDURAL BACKGROUND AND FACTUAL CONTENTIONS

Plaintiff's claims relate to the alleged use of a gallery of 51 cat photos ("Photos") by Sinclair and its affiliates or contractual services clients at over 50 television stations and one radio station (the "Station Defendants").[2] The Photos at issue were posted on websites beginning in November 2015 and continuing for approximately three years thereafter. Plaintiff seeks over 400 million dollars in statutory damages for infringement. ECF 36 at 4. In the alternative, Plaintiff seeks over 30 million dollars in hypothetical license fees as well as claimed profits of the Defendants. Plaintiff also seeks additional statutory damages for violation of 17. U.S.C. § 1202 for falsification of copyright management information because Plaintiff asserts that Sinclair did not properly credit the photographer.

Photos were obtained from a stock photo/syndication company called USA Entertainment News, Inc. ("WENN") with whom Sinclair had a blanket contract to obtain and use photos. WENN obtained the Photos from the photographer, Brittney Gobble, following correspondence with her husband in November 2015. ECF 44 ¶¶ 96, 97, 99-103. The Gobbles allowed widespread use of the photos without charge in conjunction with their cat breeding business. *Id.* at ¶ 80.

Plaintiff disputes the terms of the Gobbles' permission to WENN and contends that WENN did not have the right to syndicate the photos to its customers. *Id*. at ¶ 103. Plaintiff also contends that WENN issued a "kill" notice to all its customers requiring that they remove the photos. *Id*. at

---

[2] Plaintiff originally filed its claims in four separate suits in three U.S. District Courts (two in the District of Maryland, one in the District of Nevada, and one in the District of Delaware). By agreement of the parties, the District of Nevada and District of Delaware cases were transferred to this Court and all four cases were consolidated. ECF 28.

¶ 104. Sinclair contends that it never received a kill notice from WENN. ECF 55 ¶ 104.

Plaintiff sued WENN in the Eastern District of Tennessee in 2016. It is undisputed that Plaintiff never issued a cease and desist letter to Sinclair even though it knew that the photos remained displayed on the Sinclair's station websites. In September 2017, Plaintiff issued a subpoena to Sinclair in the WENN action and Sinclair produced documents in response. Plaintiff filed its four suits against Sinclair and the Station Defendants just before the three-year statute of limitations expired.

### III. DISCOVERY REGARDING SINCLAIR'S WEBSITE ADVERTISING REVENUE.

In written discovery requests, Plaintiff sought information regarding advertising revenues obtained by Sinclair and the Station Defendants relative to its claim for Defendants' business profits. Plaintiff first requested that Sinclair provide its advertising revenue for the website pages where the Photos had appeared, however, Sinclair does not track advertising revenue by website page. Next, Plaintiff requested that Sinclair provide its total revenues. Following discovery conferences between the parties' counsel, Sinclair produced a chart showing its gross website advertising revenues in annual increments for each of the relevant stations. For the period originally at issue, November 2015 through December 2018, this figure totaled $69,561,543. The specific history is as follows.

On March 10, 2019, Plaintiff served its Interrogatory No. 20, which stated, "For each ADVERTISEMENT, state the amount of gross revenue corresponding to the ADVERTISEMENT, and identify any deductible expenses and the elements of profit attributable to factors other than the Lykoi cat image(s) appearing with the ADVERTISEMENT that you claim pursuant to 17 U.S.C. § 504(b)." (Plaintiff's Fourth Set of Interrogatories to Defendant, attached hereto as Exhibit 5 at p.3.) Plaintiff defined "ADVERTISEMENT" as "each advertisement displayed on any

website owned or controlled by YOU or by any radio or television station owned or controlled by YOU on the same page as any of the Lykoi cat images at issue in this lawsuit ….” *Id.* at pp. 2-3. Sinclair responded as follows on April 17, 2019:

> **SBG does not track data for the “amount of gross revenue corresponding” to each ADVERTISEMENT or to all ADVERTISEMENTS (as defined) displayed on the same page as the photographs at issue in this case on any website owned or controlled by SBG. Website advertising revenues are not tracked relative to each separate ADVERTISEMENT or each separate website posting. Similarly, SBG does not track expense data as to each ADVERTISEMENT or as to all ADVERTISEMENTS displayed on the same page as the photographs at issue in this case on any website owned or controlled by SBG.** In general, deductible expenses to generate website advertising gross revenues include, but are not limited to: Personnel (software engineering, designers, news producers, support, sales staff, ad-ops, etc.), bandwidth, server infrastructure, ad-serving expenses, real property and office leases, legal costs, third-party software licenses and analytics services.

Defendant Sinclair Broadcast Group, Inc.’s Answers to Plaintiff’s Interrogatory No. 20, attached hereto as Exhibit 6 at p.3 (emphasis added).

Plaintiff next sought to obtain information regarding all of Sinclair’s gross revenue “by month and year for the period during which any of the Lykoi cat images at issue . . . were displayed” on any Sinclair station websites. Sinclair objected to the request in its June 10, 2019 response. Answer to Interrogatory No. 21, attached hereto as Exhibit 7.

Following discovery conferences during which Plaintiff took the position that its Interrogatory No. 19 sought total gross website advertising revenues (as opposed to the revenues derived solely from the pages that displayed Plaintiff’s cat photos), Sinclair provided a chart of gross website revenues on July 3, 2019 (SBG 2202-2203, attached hereto as Exhibit 8) and supplemented its answer to Interrogatory No. 19 to provide the following information:

> Based upon Plaintiff’s clarification that Interrogatory No. 19 seeks information regarding gross website advertising revenues for the websites at issue during the period of potential alleged infringement, Defendant responds as follows:

See gross advertising website revenue figures for November 2015 – December 2018, SBG 2202-2203, previously provided to Plaintiff's counsel on July 3, 2019. The revenue figures were compiled from account records maintained in Sinclair's traffic system, also known as the sub-ledger. These entries hit account 41510 (Internet Revenue) and consist of the following verticals (products sold): News App, O&O Display, and National Sold Exchanges. News App refers to the mobile apps that are tied to Sinclair's news content delivery. O&O Display refers to client display advertisement on station websites sold locally. National Sold Exchanges refers to client display advertisement on station websites sold programmatically.

The only variance in this process was in determination of the values provided for WLUC. The WLUC data was obtained from traffic data as above, however, the vertical detail was not available. Consequently, an estimate of 30% of the total account values for account 41510 revenues was used because this percentage represents the company average of those specific verticals to the overall internet revenues.

Finally, the figures provided are net of advertising agency commissions (typically 14 – 15%) that are retained upon payment of advertising revenues to Sinclair. The commissions are not paid to Sinclair, but are retained by the agency. In certain cases, advertising agencies may be entitled to additional payments beyond the initial retained commissions, and those additional payments would constitute additional advertising costs.

Defendant Sinclair Broadcast Group, Inc.'s Supplemental Answer to Plaintiff's Interrogatory 19, attached hereto as Exhibit 8 at pp. 3-4.

## IV. PLAINTIFF'S CORPORATE DESIGNEE DEPOSITION NOTICE.

Plaintiff issued a Rule 30(b)(6) Notice of Deposition to Sinclair containing thirty-one Topics of Examination. (Ex. A to Memorandum, ECF 76-1, pp. 1-11). The Topics for Examination covered a wide range of areas, requiring Sinclair to designate five individuals to testify on behalf of the company. Topics of Examination for which Sinclair designated Mr. Bochenek were the following:

22. All Gross Receipts derived from the use or exploitation of the Infringing Materials, including, without limitation, Gross Receipts received from third parties for the right to advertise on websites owned or controlled by [Sinclair] or any of the Stations during the time the Infringing Materials were displayed publicly, and how such amounts are calculated.

23. All net receipts derived from the use or exploitation of the Infringing

Materials, including, without limitation, net receipts received from third parties for the right to advertise on websites owned or controlled by [Sinclair] or any of the Stations during the time the Infringing Materials were displayed publicly, and how such amounts are calculated.

24.    All costs incurred by [Sinclair] and/or the Stations in connection with the use or exploitation of the Infringing Materials, including, without limitation, costs incurred from the advertisements on websites owned or controlled by [Sinclair] or any of the Stations during the time the Infringing Materials were displayed publicly, and how such amounts are calculated.

25.    All profits derived from the use or exploitation of the Infringing Materials, including, without limitation, profits received from third parties for the right to advertise on websites owned or controlled by [Sinclair] or any of the Stations during the time the Infringing Materials were displayed publicly, and how such amounts are calculated.

Additionally, Mr. Bochenek was designated to testify regarding: Topic 1 (factual bases for allegations in Sinclair's answer and affirmative defenses) and Topic 2 (Sinclair's responses and objections to discovery requests), to the extent that the facts under either topic related to the financial area.[3] Finally, Mr. Bochenek was designated to testify to Topic 9 (organizational structure with respect to groups involved in the reproduction of cat photos), but only as to general organizational structure. (Corporate designee designation chart, Cotlove Depo. Ex. 2, attached hereto as Exhibit 3).[4]

Prior to Mr. Bochenek's deposition on August 1, 2019 and in preparation for the deposition, Sinclair produced over 25 pages of ledger spreadsheets to provide calculations of Sinclair's

---

[3] Topic No. 1 was as follows: "The factual Bases for all allegations contained in SBG's Answer and Affirmative Defenses to BGP's Complaint and First Amended Complaint in the district court litigation (1:18-CV-03403-RDB)." Topic No. 2 was as follows: "SBG's responses and objections to BGP's First Set of Interrogatories and First Set of Requests for Production to SBG and to the Stations."

[4] Topic No. 9 was: "SBG's organizational structure with respect to the groups involved in the reproduction, public display and distribution of the Images and the Infringing Materials, and the identify of SBG's employees with knowledge relating thereto."

expenses for operating the websites at issue.[5] Additionally, because Sinclair had recently discovered that some of the cat photos had also appeared in social media posts or links (Facebook or Twitter), Sinclair also produced the requested revenue and expense information for Station Defendants' Facebook and Twitter feeds. These covered over 200-pages of ledger spreadsheets.[6] Finally, Sinclair provided a 2-page chart showing the Bates numbers of documents produced for calculation of "Website Expenses," "Social Media Revenue and Expenses – 2015 – 2018," and "Social Media Revenue and Expenses – 2019" along with the spreadsheet titles associated with each batch of Bates-numbered documents. Bochenek Ex. 41, Exhibit 15 hereto.

## V. MR. BOCHENEK'S DEPOSITION TESTIMONY.

A significant portion of the deposition was spent reviewing the website advertising revenue and expense spreadsheets produced by Sinclair. The versions of spreadsheets initially used as deposition exhibits, printed by Plaintiff's counsel, were very small print, as noted on the record by Plaintiff's counsel, D. Bochenek Deposition, August 1, 2019, attached hereto as Exhibit 1[7], Tr. 38:4-7, and Mr. Bochenek had difficulty reading them. (Tr. 40:1-2, "Bear with me, I am struggling with the sizing.") Mr. Bochenek even asked Plaintiff's counsel if he was allowed to use a phone to magnify the numbers. (Tr. 45:6-7, "May I get my phone out to magnify the numbers?") Additionally, the spreadsheets were not presented to Mr. Bochenek all at once. (Tr. 41:5-7. "If I am remembering this correctly. I am struggling because I don't have all of the worksheets in front of me at once.") Spreadsheets were also initially presented to Mr. Bochenek out of order with respect to how they were tabbed in the original document.

Early in the deposition, Mr. Bochenek reviewed Sinclair's supplemented answer to

---

[5] The spreadsheets were produced as SBG 2355-2380, Bochenek Exhibit 40, Ex. 14 hereto.
[6] Bochenek Exhibits 42 and 43, Exhibits 16 and 17 hereto.
[7] References to Mr. Bochenek's deposition are designated hereafter as "Tr.____."

Interrogatory No. 19 quoted above at page 3 (Ex. 8 hereto, Bochenek Ex. 35) and the advertising revenue chart, SBG 2202-2203. Ex. 7 hereto, Bochenek Ex. 37. Mr. Bochenek had signed the supplemental answer on behalf of Sinclair. (Tr. 17:10-12). Mr. Bochenek answered questions about how the revenue calculations had been made and provided details about Sinclair's website advertising. (Tr. 17 – 33). For instance, Mr. Bochenek explained that the revenue figures listed on SBG 2202-2203 were obtained from Sinclair's "traffic system," a system that records "all transactions related to sales of commercials or advertising on the internet, and so it tracks the advertiser, what they bought, the amounts, the schedule, when it would run and air." (Tr. 19:17-22; 20:5-8). The traffic system is also referred to as a "subledger" because it is a subledger to Sinclair's general ledger. (Tr. 20:5-8). Mr. Bochenek further defined the term "vertical" as the "products that we sell, so think of a vertical as the different products that are for sale to a potential advertiser." (Tr. 20:16-19). He then went on to answer questions about the three that generate website advertising revenue relevant to the cat photos. For example, "News app" refers to mobile device apps for station websites containing advertisements. (Tr. 21:2-7). "O&O display" refers to station website advertising sold by sales representatives at the local stations. (Tr. 21:11-21). O&O display revenue is recorded at that local station level, as is "national sold exchanges" revenue. (Tr. 27:19-28:10).

Mr. Bochenek identified the chart SBG 2202-2203, Bochenek Ex. 37, as representing "the internet revenue on the Sinclair stations associated with this case." (Tr. 34:10-17). Plaintiff's counsel then noted that the revenue chart showed an entire year of revenue for 2018. (Tr. 35:5-8). Because a previous Sinclair 30(b)(6) deponent, Kevin Cotlove, had testified that the cat photos had been removed from station websites at the end of November 2018, Plaintiff's counsel requested that Sinclair recalculate the 2018 revenue to remove the December 2018 revenue from

the chart. (Tr. 35:17-36:2).[8]

Mr. Bochenek next reviewed various spreadsheets that related to website expense calculations claimed by Sinclair. (Tr. at 38). In order to make the calculations, Sinclair had to allocate portions of "hub costs" to the website advertising income. Mr. Bochenek explained that a "hub" is a "centralized function that is for the benefit of the entire company, and so it's an aggregation of people that provide services to multiple entities within the organization." (Tr. 60:9-15). A "digital hub provides services to the digital team." (Tr. 60:15). In doing so, it provides services beyond the operation and maintenance of the station websites. (Tr. 60: 16-19). Hub costs are not tracked by verticals. (Tr. 61:1-7). Additionally, calculations for the allocation of sales commissions were necessary. (Tr. 70-72).

During this part of the deposition, when Mr. Bochenek was being asked to review single spreadsheets out of order and in small type, Plaintiff's counsel showed Mr. Bochenek Exhibit 38, SBG 2355, Ex. 12 hereto, the second to last[9] of the supporting spreadsheets that Sinclair prepared to calculate website expenses. (Tr. 38). As stated in Mr. Bochenek's errata for Tr. 40:18-41:1:

> Exhibit 38 is a calculation that was done to determine how to allocate a percentage of hub expenses relative to the operation of the websites at issue in this case. Specifically, we calculated total digital revenue for the stations at issue in this case as a percentage of total digital revenue *for all Sinclair stations*.

Ex. 2 hereto at p. 4. As discussed above, Exhibit 37 showed website revenue only for certain verticals, but not for all digital revenue. Consequently, revenue figures shown on Exhibit 38 are

---

[8] Following Mr. Bochenek's deposition, Plaintiff's counsel included this request in his September 19, 2019 letter, Ex. ECF 76-1 at p. 26. Defendant's counsel, by email dated September 23, 2019, Exhibit 9, hereto, agreed to produce revised revenue and expense charts that removed the December 2018 information. On October 18, 2019, Sinclair supplemented its prior answer to Interrogatory No. 19, referencing the updated revenue chart produced as SBG 3389-3391. Exhibits 10, 11 hereto.
[9] Bochenek Exhibit 41, Exhibit 15 hereto, is a chart showing the correct order of the supporting spreadsheets with Bates numbers.

larger because "Exhibit 38 lists digital revenue for all Sinclair stations as opposed to only website revenue for the stations at issue in this case, which is what is listed on Exhibit 37." Errata entry for Tr. 42:15, *id*. at p. 5.

## VI. MR. BOCHENEK'S ERRATA CHANGES.

Mr. Bochenek's errata changes fall into several categories.

### A.  Information Outside Topics of Examination.

Twenty-five of the errata revisions relate to Topics of Examination that were outside the scope of the financial topics for which Mr. Bochenek was designated. Because these questions were outside the Topics of Examination, Mr. Bochenek had not specifically prepared to testify regarding these areas. Mr. Bochenek has obtained and provided the requested information. The revisions were made in a conscientious effort to provide accurate errata and in accordance with the Discovery Guidelines of this Court, which promote cooperation of counsel and parties "to facilitate the just, speedy, and inexpensive conduct of discovery in civil cases ...." U.S. District Court of for the District of Maryland, Local Rules, Guideline 1(a).

The areas in which Mr. Bochenek made revisions to supplement or clarify include:

- The percentage of advertisements on websites that there were O&O (locally-sold) versus nationally sold (Tr. at 26:4, 26:7, 26:10);

- Why an advertising agency might be entitled to additional payments (Tr. at 32:8, 32:14, 32:17);

- The terms of the sale of WLUC to Gray Television (Tr. 34:9, 134:17-18);

- The details of preroll advertising (a video component of an ad) and revenue (Tr. 49:15, 49:21; 50:10; 51:1);

- The operational role of DI content services, a Sinclair website and social media support, and issues related to DI content services (Tr. 67:14; 81:10-11, 82:4, 83:11-12);

- The manner in which costs are incurred to place ads electronically onto station website

pages (Tr. 89:16-17); and

- The details of assets owned, or service agreements between, various licensee or subsidiary entities (Tr. 133:17; Tr. 136:14-18; Tr. 136:22-137:1).

Contrary to Plaintiff's assertion, ECF 76 at 6, Mr. Bochenek did not "fully" answer any of the above questions at deposition. In response to questions about these areas, Mr. Bochenek indicated that he did not recall, did not know the answer, or had not studied the matter.[10]

With regard to questions about the ownership and operation of station websites, Mr. Bochenek provided the following revisions to supplement and/or clarify his testimony:

- That station websites are owned by Sinclair, not the operating entities (Tr. 139:12-13, 18);

- That the technical aspect of the websites for Sinclair-owned stations is operated by Sinclair and that content is posted by Sinclair's National Desk *and* the Sinclair operating subsidiary for the station (Tr. 140:13); and

- That the technical aspect of the websites for stations for which the Sinclair subsidiary does not hold the broadcast license is operated by Sinclair and that content is posted by Sinclair's National Desk *and* the Sinclair operating subsidiary that contracts with the license owner (Tr. 140:18, 20).

## B. Revision of Some Calculations.

Following the deposition, Mr. Bochenek determined that certain calculations should be revised (thereby *reducing* the expenses claimed by Sinclair offset against income, an outcome favorable to Plaintiff's argument). For consistency, Mr. Bochenek revised testimony that was inconsistent with this concession. Specifically, at 84:3-4, 84:10-13, and 129:6, Mr. Bochenek agreed that using a percentage of 100 was too high and that the figures should be revised to between 86-89%. Consistent with this concession, following Mr. Bochenek's deposition, Sinclair served

---

[10] Plaintiff has not contended that Mr. Bochenek was unprepared for the deposition. It thus appears that Plaintiff does not dispute that these questions were outside the Topics of Examination for Mr. Bochenek.

revised calculations showing this change favorable to Plaintiff. Ex. 10.

### C. Revisions Relating to Exhibits 37 and 38.

Mr. Bochenek also clarified his testimony regarding the revenue figures contained in Exhibits 37 and 38. The ambiguity obviously arose from Mr. Bochenek's difficulty reading the small type,[11] incomplete sets of spreadsheets, and the spreadsheets being taken apart and presented out of order and separately. His revisions are not contradictory taken in the context of his entire deposition and the history of the revenue and expense information provided in this case, as set forth above. The changes sought are the following (shown in italics with prior testimony shown in bold):

<u>Change at Tr. 39:10:</u>

At Tr. 39, Mr. Bochenek is being shown Exhibit 38 and asked to compare Exhibit 38 to Exhibit 37, as follows:

> Q.      Oh, okay. Now do these numbers correlate to the number of Exhibit 37 that we were just looking at?
>
> A.      ~~**Yes**~~. *No. The revenue on Exhibit 37 is a subset of the revenue on Exhibit 38.*

While Plaintiff contends that this change is contradictory, the simpler issue is clarification of the meaning of the word "correlate." Mr. Bochenek's change simply clarifies that one revenue is a "subset" of the other.

<u>Changes at Tr: 40:18 – 41:1 and 41:13 – 15:</u>

---

[11] Plaintiff's counsel asserted that the small type size was due to the fact that spreadsheets had been produced to Plaintiff by Sinclair in pdf rather than Excel format. Tr. 38:8-12. In fact, the problem was that Plaintiff's counsel had printed out ledger-sized documents (11 inches by 17 inches) on letter-sized paper. During the deposition, Sinclair's counsel had larger copies (printed on ledger size paper) brought for use. The copies produced for the hard copy of this memorandum and exhibits delivered to chambers pursuant to Local Rule ____ will be produced in the exact size as the actual exhibits so that the Court can see the difference in print size.

At Tr. 40, Mr. Bochenek is shown both Exhibits 37 and Exhibit 38 and asked to explain the difference between revenue numbers for a particular station, KEYE, which showed revenue of about $451,000 on Exhibit 37 and revenue of about $1,664,000 on Exhibit 38 for 2018:

Q.      So what is the difference between these two numbers?

A.      So the revenue on Exhibit 38, the 1 million, was it 664 that you quoted?

Q.      Let's just call it 1.6 million.

A.      *The revenue reported on Exhibit 37 is the gross advertising website revenue (net of agency commissions, as I discussed previously) for the stations that are at issue in this case, calculated as was stated in the Answer to Interrogatory No. 19. Exhibit 38 is a calculation that was done to determine how to allocate a percentage of hub expenses relative to the operation of the websites at issue in this case. Specifically, we calculated total digital revenue for the stations at issue in this case as a percentage of total digital for all Sinclair stations.* **1.6 million is the** *total digital revenue for KEYE for 2018, which represents all verticals sold by digital including the verticals related to websites as well as other verticals not relating to websites.* ~~revenue that was associated with the products that were sold that had the cat pictures with them.~~

~~So if there was a product sold with the cat picture on it, this was the revenue related to that cat picture.~~

Q.      The 1.6  million?

A.      Yes.

Q.      Okay.

A.      If I am remembering this correctly. I am struggling because I don't have all the worksheets in front of me at once.

Q.      Right. Well, so --- okay. So that what that number represents.

What does the – I'm just going to round it, 450,000 on Exhibit 37, what does that represent?

**A.      I misspoke.** ~~It was~~ **Exhibit 37 represents the** ~~cat~~ *gross advertising* **website revenue** ~~from the different ads~~ *for the stations at issue in this case, calculated as was stated in Answer to Interrogatory No. 19.*

The numbers that appear on the spreadsheets are not opinions of the witness, but simply numbers derived in specific ways from Sinclair's accounting systems. Mr. Bochenek's errata merely clarify the details (which, admittedly, are not simple to explain). It is unclear what Plaintiff hopes to gain by preventing Mr. Bochenek from providing these errata changes which simply seek to clarify testimony regarding what exactly the two exhibits show. The spreadsheets are simply calculations made from accounting records and Mr. Bochenek only seeks to describe this information accurately.

Changes at Tr. 42:4, 15, and 19-20:

In light of the above, Mr. Bochenek revised the three "I don't recall" answers during this portion of the deposition, Tr. 42:4, 15, and 19-20, to provide the requested information and clearly explain the differences between Exhibits 37 and 38. The errata are consistent with his prior testimony at Tr. 17-19, that Exhibit 37 shows "gross advertising website revenue (net of agency commissions, as I discussed previously) for the stations, calculated as was stated in the Answer to Interrogatory No. 19,"  Errata for Tr. 42:19-20, Ex. 2 at p. 5. Further, Mr. Bochenek seeks to make clear that the revenue figures in Exhibit 38 are larger than those in Exhibit 37 because Exhibit 38 "lists digital revenue for all Sinclair stations as opposed to only website revenue for the stations at issue in this case, which is listed on Exhibit 37."

**D.  Other Revisions to Provide Information Requested.**

Finally, Mr. Bochenek's errata sheet provides detailed information about accounting issues and clarifies his testimony on related issues, as follows:

- Providing the specifics of the formula that is used to allocate national advertising revenue to individual stations (Tr. 29:1-2, 6);

- Explaining a notation on a spreadsheet about digital revenue and "journal entries from the bridge" (Tr. 44:4; 109:18);

- Revising the specifics of his identification of Exhibit 39, a supporting spreadsheet for the allocation of hub expenses (Tr. 44:19-45:2);[12]

- Clarifying his answer about categories of costs incurred even if the cat photos had not been posted from an answer of "We do not track that" to a simple "No" (Tr 59:8);

- Clarifying that costs on a particular spreadsheet in yellow and orange represent costs of websites *and* other digital activities (Tr. 60:2);

- Clarifying that fees paid to WENN were a specific cost relative to the cat photos (Tr. 61:22, 62:9);

- Clarifying that information required to determine percentage of certain revenue that is attributable to the cat photos is available through Google analytics data, but not Sinclair's accounting system (Tr. 75:3);

- Clarifying the taxes that are included in hub expenses (Tr. 91:9, 11);

- Clarifying that a certain list of stations includes both owned and operated stations *and* stations to which Sinclair provides services (Tr. 107:17);

- Explaining the significance of highlighting on one of the charts, a matter which was later clarified on the record by Sinclair's counsel at Tr. 122:9-18 (Tr. 118:2; 119:16); and

- Explaining the significance of a reference on a chart regarding station KTXS (Tr. 123:20-21).

These changes are all mundane revisions of specific objective facts regarding details of the spreadsheet calculations and accounting systems. There is no reason to strike them from Mr. Bochenek's errata sheet.

## VII.     LEGAL ARGUMENT

### A. Mr. Bochenek's Revisions Are Not Improper.

Plaintiff asserts that Mr. Bochenek's errata falls into a category of changes that seek to revise "unfavorable deposition testimony" in order to "enhance a party's case," thereby

---

[12] Exhibit 39 is yet another ledger-sized spreadsheet that was printed on letter paper. Exhibit 13 hereto.

"attempting to deflect potentially detrimental testimony" (quoting language used by Plaintiff, ECF 76 at 6). Although Plaintiff asserts that Mr. Bochenek's revisions are an attempt to "substantially re-write" his testimony, Plaintiff does not explain how any one of the revisions does so. In the same vein, Plaintiff makes no argument that any specific testimony that Mr. Bochenek revised is a damaging admission for which an *artful* errata change is offered.

The above review of Mr. Bochenek's proposed changes evidences the opposite. For instance, Mr. Bochenek's revisions to provide requested information about details of accounting records do not constitute the re-writing of an answer by counsel to avoid the detrimental consequences of testimony. Mr. Bochenek's correction of testimony regarding Exhibits 37 and 38 – which are simply spreadsheets of calculations derived from Sinclair's accounting records – cannot be improper when the changes made are consistent with his earlier deposition testimony, consistent with the discovery provided in this case, and are not subjective opinions but constitute objective facts (for instance, clarification of how certain calculations were made from Sinclair's accounting records or of the meaning of certain notations on spreadsheets). Finally, at least some of Mr. Bochenek's errata changes clearly *favor* Plaintiff's positions, demonstrating Defendant's goal of providing accurate information to the Plaintiff.

Rule 30(e) allows a deponent to review and revise the transcript of his deposition. The Rule provides:

> *Review; Statement of Changes*. On request by the deponent or a party before the deposition is completed, the deponent must be allowed 30 days after being notified by the officer that the transcript or recording is available in which:
>
> (A) to review the transcript or recording; and
>
> (B) if there are changes in form or substance, to sign a statement listing the changes and the reasons for making them.

As this Court has recognized, the "majority of courts interpret Rule 30(e) literally to allow for any timely, substantive change for which a reason is given." *Harden v. Wicomico County*, 263 F.R.D. 304, 307 (D. Md. 2009). The Second Circuit Court of Appeals has long recognized that:

> Rule 30(e) allows deponents to make "changes to form or substance" to their testimony and to "append any changes [that are] made" to the filed transcript. Fed. R. Civ. P. 30(e). A deponent invoking this privilege must "sign a statement reciting such changes and the reasons given … for making them," … , but "[t]he language of the Rule place no limitations on the type of changes that may be made[,] … nor does the Rule require a judge to examine the sufficiency, reasonableness, or legitimacy of the reasons for the changes" – even if those reasons "are unconvincing."

*Podell v. Citicorp Diners Club, Inc.*, 112 F.3d 98, 103 (2d Cir. 1997) (citing *Lugtig v. Thomas*, 89 F.R.D. 639, 641 (N.D. Ill. 1981)).[13]

Where it is clear that a deponent is well-intentioned and simply providing accurate answers, this Court should apply the strict reading of the Second Circuit.[14] Here, there is no evidence or argument that Mr. Bochenek is attempting an artful transformation of damaging testimony. A careful review of the errata demonstrates that Mr. Bochenek is simply trying to provide the Plaintiff with accurate and complete information.

---

[13] The Second Circuit has noted that errata changes do not eliminate the testimony previously provided – the original answer to the deposition questions will remain part of the record and can be read at the trial and the original answers are not to be stricken. *Podell*, 112 F.3d at 103 (citing *Lugtig*, 89 F.R.D. at 641-642).

[14] In *Changzhou Kaidi Electric Co. v. Okin America, Inc.*, 102 F. Supp. 3d 740 (D. Md. 2015), a case in which an expert attempted to re-write damning admissions, the Court recognized that prior decisions from the Court had applied the minority interpretation of Rule 30(e) but also noted, and ultimately seems to have applied, the Third Circuit's "nuanced approach" to the minority interpretation. *Id.* at 746 n.8 (citing *EBC, Inc. v. Clark Bldg. Sys., Inc.*, 618 F.3d 253, 268 (3d Cir. 2010)). As observed in *Changzhou*, the Third Circuit "emphasis[ed] that it would not 'proscribe a one-size-fits-all rule,'" and, instead, adopted an interpretation of Rule 30(e) that gives the trial court the discretion to permit substantive errata changes "'as the circumstances may warrant.'" *Id.* (quoting *EBC, Inc.*, 618 F.3d at 268); *see also Maryland Elec. Indus. Health Fund v. MESCO, Inc.*, ELH-12-505, 2014 WL 853237, at *16, n.17 (D. Md. Feb. 28, 2014) (connecting the purpose of the minority interpretation of Rule 30(e) to the purpose of the sham affidavit rule, which exists to limit efforts revise prior deposition testimony for the purpose of manufacturing a factual dispute to survive summary judgment).

The cases cited by Plaintiff are distinguishable in that they all relate to this Court's rejection of *artful* changes designed to *reverse* the consequences of deposition testimony that placed the deponent party's case in a bad light. In *Harden v. Wicomico County*, 263 F.R.D. 304 (D. Md. 2009), a Title VII retaliation case, the witness reviewed a personnel manual and acknowledged that, if the plaintiff's contentions were true, the witness's conduct would "'in all likelihood' fall within the scope of the prohibited activity listed in the County's sexual harassment policy," an admission obviously important to the plaintiff's claim against the defendant county. *Id*. at 308. The court found that the proposed errata change "would change [the witness's] acknowledgment of a violation of the policy if Plaintiff's version of the facts is proved, to a denial, based on the explanation, likely supplied by his counsel, that 'the elements necessary to establish a sexual harassment claim do not exist.'" *Id*.

In *Green v. Wing Enterprises, Inc.*, 1:14-CV-01913- RDB, 2015 WL 506194 (D. Md. 2015), a products liability case regarding a claimed unsafe ladder, the deponent, testifying on behalf of the defendant ladder manufacturer, sought to add very lengthy revisions to his testimony. The court noted that "changes that substitute lengthy general discussions reasserting the purported safety of the product or misuse by [the plaintiff] for the previous concise responses by [the witness] require particular scrutiny." *Id*. at *2.

In *Wyeth v. Lupin, Ltd*., 252 F.R.D. 295 (D. Md. 2008), a patent infringement case, the court ruled that the proposed changes "do indeed represent lawyerly fixing of potentially problematic testimony for Lupin." *Id*. at 297. The errata sheet changes either limited a simple "yes" answer with "a qualification apparently consistent with [Lupin's] view of the case" or "were a similar lawyerly amendment of the answers to comport with Lupin's theory of the case." *Id*. In so ruling, the *Wyeth* court looked at cases discussing *disingenuous* changes designed to save

deponents from damaging testimony. *Id.* at 297. In *Greenway v. International Paper Co.*, 144 F.R.D. 322, 325 (W.D. La. 1992), a litigant effectively submitted "new answers only after realizing a month later that the import of her original answers *could possibly result in a failing grade*" (emphasis added). In *Paul Harris Stores, Inc. v. PricewaterhouseCoopers, LLP*, 1:02-cv-1014-LJM-VSS, 2006 WL 2644935, at *3 (S.D. Ind. Sept. 14, 2006), the errata changes were "really no more than 'lawyers' statements,' attempting to deflect *potentially detrimental testimony*" (emphasis added). In *Eckert v. Kemper Fin. Servs., Inc.*, 95-C-6831, 1998 WL 699656, at * 5 (N.D. Ill. Sept 30, 1998), the changes were "wholesale changes to previous sworn testimony" that was, in fact, a "*damaging [party] admission*" (emphasis added).

The Court in *Harden* and *Green* expressly limited its applications of the "minority" interpretation to the (egregious) facts and errata changes sought in the specific cases before each Court. *Harden*, 263 F.R.D. at 309 ("*On the record before me, this case* presents an example of where the minority interpretation of Rule 30(e) *is more appropriate* than the majority view . . . ." (emphasis added)), *Green*, 2015 WL 506194, at *2 (applying the "minority" rule, stating, "*[s]pecifically with respect to this case*, in this Court's opinion, [the] proposed changes . . . require *particular scrutiny*" (emphasis added)). The *Wyeth* Court, which was the first to apply the minority approach in this District, did so after observing that courts "are split on the latitude to be afforded" under Rule 30(e) and acknowledging that there was no "controlling" Fourth Circuit authority on the issue. *Wyeth*, 252 F.R.D. at 296; *see Harden*, 263 F.R.D. at 307-08 (citing *Wyeth* as a court applying the minority interpretation).

Notably, this U.S. District Court has only granted motions to strike errata changes under Rule 30(e) in cases like *Wyeth*, *Harden*, and *Green*, where the errata sheets provided *directly contradictory, artful changes*. *See Changzhou Kaidi Elec. Co., v. Okin Am., Inc.*, 102 F. Supp. 3d

740, 745-47 (D. Md. 2015) (striking errata changes of expert testimony that attempted to re-write an important admission, rejecting the apparently bogus explanation provided by the witness that he was confused by the question when all other evidence indicated to the contrary); *Huggins v. Prince George's County*, AW-07-825, 2009 WL 10685425, at *2 (D. Md. May 27, 2009) (striking "sweeping" errata changes to multiple 30(b)(6) deponents' prior testimony that materially altered the prior testimony, illustrated "artful answers, word-smithing and lawyer-crafted parsing," and were submitted as "supplements to their deposition testimonies" in opposition to a motion seeking sanctions for the unpreparedness of those same 30(b)(6) deponents); *see also Lane v. Sys. Application & Techs., Inc.*, DKC 13-3566, 2015 WL 1013449, at *3 (D. Md. Mar. 6, 2015) (*pro se* plaintiff deponent did not "provide clear or convincing reasons for making the substantive [and belated] changes in her proposed errata sheet" that were submitted in response to defendant's summary judgment motion, many of which "suggested" that the *pro se* plaintiff was improperly seeking "to elaborate" on her deposition response).

Indeed, neither *Wyeth*, *Harden*, nor *Green* represent mandatory, controlling authority. Significantly, their reasoning supports the application of the rule of liberal amendment to the specific errata changes being made by Mr. Bochenek in this case.[15] Nevertheless, Plaintiff asks this Court to apply the minority interpretation of Rule 30(e) and strike Mr. Bochenek's errata changes. This interpretation not only narrowly construes a deponent's rights to make errata

---

[15] A number of courts in this Circuit have adopted the majority view, or some form of it. For instance, in *Foutz v. Town of Vinton, Virginia.,* 211 F.R.D. 293, 294-95 (W.D. Va. 2002), the Court held that Rule 30(e) allows for substantive, contradictory changes provided that the deposition is reopened to give the opposing party the opportunity to impeach the deponent with his contradictory answers. Similarly, the Court in *Holland v. Cedar Creek Mining, Inc.*, 198 F.R.D. 651, 652 (S.D.W.Va. 2001) held that substantive changes are permitted.

changes, it ignores the plain unambiguous language of Rule 30(e) which permits the type of errata changes made by Mr. Bochenek.

As the Supreme Court has stated, "[w]e give the Federal Rules of Civil Procedure their plain meaning … and generally with them as with a statute, '[w]hen we find the terms . . . unambiguous, judicial inquiry is complete.'" *Pavelic & LeFlore v. Marvel Entm't Group*, 493 U.S. 120, 123 (1989) (internal citation omitted). Moreover, the Federal Rules of Civil Procedure "should be liberally construed, but they should not be expanded by disregarding plainly expressed limitations." *Schlagenhauf v. Holder*, 379 U.S. 104, 121 (1964). Indeed, "the deposition-discovery rules are to be accorded a broad and liberal treatment" in favor of discovery. *Hickman v. Taylor*, 329 U.S. 495, 507 (1947), *cited in Nat'l R.R. Passenger Corp. v. Ry. Express, LLC*, 268 F.R.D. 211, 215 (D. Md. 2010); *see Gowan v. Mid Century Ins. Co.*, 5:14-CV-05025-LLP, 2016 WL 126746, at *4 (D.S.D. Jan. 11, 2016) ("Rule 30 is to be 'liberally construed to carry out the purposes of discovery.'").

The plain, unambiguous language of Rule 30(e) states that a deponent may make "changes in form *or substance*" to his/her deposition testimony (emphasis added). The Second Circuit's majority interpretation construes Rule 30(e)'s language and purpose to liberally allow deponents to clarify prior deposition testimony within 30 days of receiving the transcript. *See Podell*, 112 F.3d at 103; *Harden*, 263 F.R.D. at 309 (recognizing that the majority view "interpret[s] Rule 30(e) literally"). Where, as here, there is no suggestion that the deponent's errata changes attempt to manufacture a dispute of fact or constitute wholesale altering of testimony to bolster or subvert a position, application of the standard that Plaintiff advocates is clearly inapposite to the spirit and language of Rule 30(e). It is also, to say the least, inapposite to the truth-finding purpose of discovery. In the present case, the standard that Plaintiff advocates should not be applied.

**B. Deponent's Reasons for Transcript Changes**.

It is obvious from the details and context of Mr. Bochenek's deposition and errata revisions that his changes provide objective information or clarify or supplement his testimony. These types of revisions certainly do not justify any heightened scrutiny, including any examination of the reasons provided. In the alternative, and to the extent that this Court determines that any of the deponent's revisions are suspect so that he *should* provide further details than as have been provided on his errata chart, Sinclair requests that the Court allow him the opportunity to provide a revised errata sheet as to those specific entries.

## VIII.   CONCLUSION.

For the foregoing reasons, Defendant Sinclair Broadcast Group, Inc. respectfully requests that the Court deny the Plaintiff's Motion to Strike Defendant Sinclair's Corporate Designee's (David Bochenek) Purported Changes to His Deposition Testimony.

Dated: December 18, 2019                    Respectfully submitted,

                                            *Margaret L. Argent*
                                            Francis R. Laws (Bar No. 02596)
                                            Scott H. Marder (Bar No. 28789)
                                            Margaret L. Argent (Bar No. 06132)
                                            THOMAS & LIBOWITZ, P.A.
                                            25 S. Charles Street, Suite 2015
                                            Baltimore, Maryland 21201
                                            Tel:  (410) 752-2468
                                            Fax:  (410) 752-0979
                                            FLaws@tandllaw.com
                                            SHMarder@tandllaw.com
                                            MArgent@tandllaw.com

                                            *Attorneys for Defendants*

## <u>CERTIFICATE OF SERVICE</u>

I HEREBY CERTIFY that on this 18th day of December, 2019, a copy of the foregoing document, and all attachments thereto, was filed electronically. Notice of the filing will be sent to all parties who have appeared by operation of the Court's electronic filing system. Parties may access this filing through the Court's system.

I FURTHER HEREBY CERTIFY that on the 19th day of December, 2019, I caused a copy of the foregoing document, without confidential exhibits, and proposed order to be served via First Class U.S. Mail, postage prepaid, on Third-Party Defendant USA Entertainment News, Inc.:

USA Entertainment News, Inc.
c/o Frankfurt Kurnit Klein & Selz, P.C.
488 Madison Avenue, 10th Floor
New York, NY 10002
Attn: Mike Dolan

USA Entertainment News, Inc.
c/o Lloyd Beiny, Registered Agent
4A Tileyard Studios
Tileyard Road
London N7 9AH
UNITED KINGDOM

Upon request, Defendants will make the confidential exhibits available to Third-Party Defendant USA Entertainment News, Inc. via secure fileshare.

_/s/_____
Margaret L. Argent