# EXHIBIT K

# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MARYLAND
## BALTIMORE DIVISION

| | |
|---|---|
| BRITTNEY GOBBLE PHOTOGRAPHY, LLC<br><br>Plaintiff,<br>v.<br><br>SINCLAIR BROADCAST GROUP, INC.<br><br>Defendant. | No. 1:18-cv-03403-RDB<br>(Lead case) |
| BRITTNEY GOBBLE PHOTOGRAPHY, LLC<br><br>Plaintiff,<br>v.<br><br>KABB Licensee, LLC et al.<br><br>Defendants. | No. 1:18-cv-03384-RDB<br>(Consolidated) |
| BRITTNEY GOBBLE PHOTOGRAPHY, LLC<br><br>Plaintiff,<br>v.<br><br>KMPH LICENSEE, LLC et al.<br><br>Defendants. | No. 1:19-cv-00559-RDB<br>(Consolidated) |
| BRITTNEY GOBBLE PHOTOGRAPHY, LLC<br><br>Plaintiff,<br>v.<br><br>SINCLAIR PORTLAND LICENSEE, LLC et al.<br><br>Defendants. | No. 1:19-cv-00606-RDB<br>(Consolidated) |

## PRELIMINARY EXPERT REPORT OF PROFESSOR JEFFREY SEDLIK

Submitted April 12, 2019

I have been engaged by plaintiff Brittney Gobble Photography, LLC. ("BGP") to provide expert testimony in the following four lawsuits brought by BGP: (1) *Brittney Gobble Photography, LLC v. Sinclair Broadcast Group, Inc.*, Case No. 1:18-cv-03403-RDB, United States District Court for the District of Maryland, Baltimore Division ("the '3403 lawsuit"); (2) *Brittney Gobble Photography, LLC v. KABB Licensee, LLC et al.*, Case No. 1:18-cv-03384-RDB, United States District Court for the District of Maryland, Baltimore Division, now consolidated with the '3403 lawsuit ("the '3384 lawsuit"); (3) *Brittney Gobble Photography, LLC v. KMPH Licensee, LLC et al.*, originally filed as Case No. 1:18-cv-01720-UNA in the United States District Court for the District of Delaware, but now transferred to the United States District of Maryland, Baltimore Division as Case No. 1:19-cv-00559 and consolidated with the '3403 lawsuit ("the '559 lawsuit"); and (4) *Brittney Gobble Photography, LLC v. Sinclair Portland Licensee, LLC et al.*, originally filed as Case No. 2:18-cv-02096 in the United States District Court for the District of Nevada, but now transferred to the United States District of Maryland, Baltimore Division as Case No. 1:19-cv-00606 and consolidated with the '3403 lawsuit ("the '606 lawsuit").   The Complaints in the '3403 lawsuit, the '3384 lawsuit, the '559 lawsuit and the '606 lawsuit are collectively referred to herein as the "Sinclair Complaints."

The defendants (collectively, "Defendants") in the four above-listed lawsuits include Sinclair Broadcast Group, Inc. ("Sinclair") and 51 entities corresponding to 51 radio or television station websites on which some or all of the Photographs were displayed[1]:  Sinclair Portland Licensee, LLC; KATV Licensee, LLC; Sinclair Bakersfield Licensee, LLC; Sinclair Boise Licensee, LLC; Sinclair Eugene Licensee, LLC; Sinclair Yakima Licensee, LLC; KEYE Licensee, LLC; KGBT Licensee, LLC; KHQA Licensee, LLC; Sinclair Lewiston Licensee, LLC; Sinclair Seattle Licensee, LLC; Sinclair Radio of Seattle Licensee, LLC; KRCG Licensee, LLC; KTUL Licensee, LLC; KTVL Licensee, LLC; KTVO Licensee, LLC; KUTV Licensee, LLC; KVII Licensee, LLC; WACH Licensee, LLC; WFXL Licensee, LLC; WGXA Licensee, LLC; WJAR Licensee, LLC; WKRC Licensee, LLC; Gray Television Licensee, LLC; WLUK Licensee, LLC; WNWO Licensee, LLC; WOAI Licensee, LLC; WPBN Licensee, LLC; WPDE Licensee,

---

[1] '3403 Complaint, ¶¶ 2, 29 and 36-86; '3384 Complaint, ¶¶ 2-10 and 48-108; '559 Complaint, ¶¶ 2-9 and 46-102; and '606 Complaint, ¶¶ 2-35 and 72-333.

LLC; WSET Licensee, LLC; WSTQ Licensee, LLC; WTOV Licensee, LLC; WTVC
Licensee, LLC; WZTV Licensee, LLC; KMPH Licensee, LLC; KMTR Television, LLC;
KPTM Licensee, LLC; HSH Flint (WEYI) Licensee, LLC; New Age Media of Gainesville
Licensee, LLC; Deerfield Media (Rochester) Licensee, LLC; ACC Licensee, LLC;
Gocom Media of Illinois, LLC; KABB Licensee, LLC; KOKH Licensee, LLC;
Chesapeake Television Licensee, LLC; Birmingham (WABM-TV) Licensee, Inc.;
WGME Licensee, LLC; WICS Licensee, LLC; Portland (WPFO-TV) Licensee, Inc.;
WSYX Licensee, LLC; and Columbus (WTTE-TV) Licensee, Inc.

I understand that as of this writing, the complaints in the four above lawsuits are
being amended to name additional defendants. I understand that the new
defendants were identified during discovery as the owners and operators of the
radio and television stations corresponding to the website screenshots shown in the
Exhibits to the above-listed complaints.  As my opinions expressed herein are based
on the images and false credits shown in those website screenshots, my opinions
will apply to the new defendants with respect to their corresponding station
websites on the assumption that those new defendants are found to be liable for
the alleged copyright infringements and DMCA violations alleged in the matters. In
the event that additional defendants are named, I may amend or supplement this
report to opine on damages (if any) applicable to alleged acts of copyright
infringement and DMCA violations by those defendants.

I have been asked by BGP to provide expert opinions on damages and other issues
related to BGP's claims of copyright infringement and DMCA violations by
Defendants. My opinions are based in part on more than 25 years of service in
high-level positions in trade associations and standard-setting bodies in the
photography, advertising, product marketing, technology, and design industries. I
have been an internationally recognized advertising photographer for more than 30
years, working with many clients, observing and interacting with large numbers of
professional photographers, advertising agencies, design firms, corporate clients,
model agencies, stock agencies, product manufacturers, and others in the United
States and abroad. I have served as Project Manager in projects involving
development, operation, and maintenance of websites, web applications, and other

applications. I have also owned and operated a publishing company, producing and selling photography-related products for more than 20 years.

In addition to my personal knowledge, my opinions are based on an independent examination of documents and materials produced in the matters to date. Should additional relevant information become available, I respectfully reserve the right to amend or supplement my opinions as necessary.

This Preliminary Expert Report ("Report") has been prepared in connection with the above-referenced matters. Section VI of the Report outlines my opinions.

If called upon as a witness in the matters, I could and would make the following statements of my own personal knowledge and experience.

## I.   QUALIFICATIONS

I currently serve as the President and CEO of the PLUS Coalition. "PLUS" is an acronym for "Picture Licensing Universal System." The PLUS Coalition is a non-profit, international standards body and trade association representing the shared business interests of all industries involved in the creation, licensing, and use of photography and illustration, including photographers, illustrators, advertisers, advertising agencies, graphic design studios, publishers, artists' representatives, museums, libraries, stock photo agencies and all other image licensees and licensors. The PLUS Coalition develops, propagates, and maintains universal standards for use by licensees and licensors in transactions involving photography and illustration. As a founding member of the PLUS Board of Directors, I developed the core concept of the Coalition and its copyright licensing standards.

I am the past National President of the Advertising Photographers of America ("APA"), the leading trade association for commercial photographers in the United States. I also served APA as Chief National Advisor on Licensing and Copyright, and provided leadership level guidance on topics, including copyright, photography, advertising, and modeling, industry standards, contract terms, model release terms, and business practices. I represented the APA in discussions with the United

States Copyright Office and worked with organizations across the world to develop and maintain standards for licensing, modeling, and other image-related business matters. On a local basis, I also served on the Board of Directors and Legal Affairs Committee of the Los Angeles Chapter of the APA.

I currently serve on the Photo Metadata Working Group for the International Press Telecommunications Council ("IPTC"), the global standards body for photography metadata. In the past I have served on the Digital Image Submission Guidelines Working Group for Universal Digital Image Guidelines ("UPDIG"), and as an "Invited Expert" on the Permissions and Obligations Working Group of the World Wide Web Consortium ("W3C"). I currently serve as a Director of the Linked Content Coalition ("LCC"), a global non-profit organization dedicated to facilitating and expanding the legitimate use of content through interoperable identifiers and metadata. I have also been a partner in the Rights Data Integration initiative, focusing on the integration of systems that manage and trade intellectual property rights online across all types of content, usage and media.  I also currently serve as a Director of the American Society for Collective Rights Licensing ("ASCRL"), a collective management organization for the visual arts. For the American Society of Media Photographers ("ASMP"), I serve on their copyright speakers bureau, and authored the "Photography Licensing" chapter of their publication, "Professional Business Practices in Photography."

I am frequent speaker at copyright events hosted by the US Copyright Office, the US Patent Office, and the US Department of Commerce. At the request of the Register of Copyrights, I served as a guest instructor at Stanford Law School in conjunction with a US Copyright Office sponsored Copyright Practicum. I have been a faculty member of the American Law Institute for Continuing Legal Education events, providing insights on licensing practices and on the practical application of copyright law in the visual arts. I have been a guest speaker on copyright law for many institutions and organizations, including Duke University Law School, New York University Law School, and the Copyright Society of the United States. In addition, I have testified before Congress on copyright law, and worked closely with legislators, stakeholder groups, and the United States Copyright Office on

4

legislation, regulations, and policy issues related to copyright protections, registration, and remedies. I have assisted legislators and government agencies in drafting and revising copyright legislation. I am an active participant in the Copyright Alliance, serving on both the Creators Advisory Board and the Academic Advisory Board.

Adobe Systems, creator of Photoshop and other digital image and design software, selected me to be a member of its "Prerelease Team", and its Adobe Photographers' Council, a group of twelve leading photographers to advise the company on trends in digital photography and the photography industry at large.

Selected honors include the 2005 Industry Leadership Award from the International Photography Council of the United Nations, the 2006 PhotoMedia Photographer of the Year award, the 2007 APA Industry Advocacy Award, and in 2008, an honorary Master's Degree from the Brooks Institute of Photography.

I am a long-time faculty member and Professor at the Art Center College of Design in Los Angeles, where I sit on the Intellectual Property Committee and teach advanced courses on the artistic, technical, production, legal, and business aspects of traditional and digital photography. Legal topics include copyright law, copyright registration, copyright licensing and contract interpretation. Technical topics include digital techniques and advanced lighting for photography of people, products and automobiles. I also provide instruction on advertising, marketing and branding.

After more than 30 years as an award-winning commercial photographer and studio owner, I continue to operate an advertising and entertainment photography production company in California, with a client list that includes such companies as Nike, Federal Express, Farmers Insurance, SBC, GTE, NBC, Sony, AT&T, Blue Cross, Epson, IKEA, United Airlines, Warner Brothers, Toyota, Nestlé, Disney, Bank of America, and others. My publishing company, Mason Editions, produces and distributes fine photographic reproductions.

I frequently provide forensic image analysis in civil and criminal matters, and provide consulting services to organizations and individuals on issues related to copyright, licensing, negotiating, and business practices and procedures related to photography, advertising, and modeling. I have testified as an expert witness in litigation involving photography, illustration, product design, copyright, metadata, advertising, branding, graphic design, right of publicity/privacy, breach of contract, criminal matters, and other topics. The cases in which I have testified at trial or by deposition within the last four years are:

Andrew Paul Leonard v. Stemtech Health Sciences, Inc.
US District Court, District of Delaware
Case # 08-67-LPS-CJB Consolidated

G. Mitchell Davis v Tampa Bay Arena, Ltd
US District Court, Middle District of Florida, Tampa Division
Case # 8:12-cv-60-T-30MAP

Nouveau Model & Talent Management v JAKKS Pacific, Inc.
Superior Court of the State of California, County of Los Angeles
Case # SC111112

American Apparel v Alyssa Ferguson
JAMS Consolidated Arbitration
JAMS Reference #1220042480

eVox Productions, LLC v Gabriels Technology Solutions, Inc.
US District Court, Central District of California, Southern Division
Case # CV 13-00846-CJC(RZx)

Tiffany Laurence v Beats Electronics, LLC
Superior Court for the State of California, County of Los Angeles
Case # BC 510035

Steven M. Gardner v Cafepress Inc.
United States District Court, Southern District of California
Case # 13CV1108 GPC JMA

Joseph Tomelleri v Zazzle, Inc.
United States District Court, District of Kansas
Case # 13-CV-2576 EFM/DJM

Stephen Kennedy v Gish Sherwood & Friends, Inc.
United States District Court, Eastern District of Missouri, Eastern Division
Case # 4:13-cv-02236-JAR

In Re: Multiple Listing Service Real Estate Photo Litigation
United States District Court, Southern District of California
Case # 3:14-cv-01158-BAS-JLB

Brian Harness v Forever 21 Retail, Inc.
United States District Court, Northern District of Texas, Dallas Division
Civil Action # 3:14-cv-01316

EVOX Productions, LLC v California Rent-A-Car, Inc.
United States District Court, Central District of California, Western Division
Case # 15-CV-08046 MWF (RAOx)

Timed Out, LLC v 13359 Corp
Superior Court of the State of California, County of Los Angeles
Case # BC583739

Jerome Turner v Metals USA, Inc.
24th Judicial District Court for the Parish of Jefferson, State of Louisiana
Case # 751-431

TC Reiner v Ryon Nishimori et al.
United States District Court, Middle District of Tennessee, Nashville Division
Case # 3:15-cv-00241

David McNeese v Access Midstream Partners, L.P.
United States District Court, Western District of Oklahoma
Case # CIV-14-503-D

VHT, Inc. v Zillow Group, Inc.
United States District Court, Western District of Washington, at Seattle
Case # 2:15-cv-1096-JLR

EVOX Productions, LLC v Kayak Software Corporation
United States District Court, Central District of California, Western Division
Case # CV15-05053-PSG (AGR)

Under-A-Foot Plant, Co. v Exterior Design, Inc.
United States District Court, District of Maryland
Civil # BPG-15-871

Sustainable Sourcing, LLC v Brandstorm, Inc. et al.
United States District Court, District of Massachusetts, Western Division
Case # 12-CV-30093

Dana Ruth Lixenberg v Bioworld Merchandising, Inc.; et al.
United States District Court, Central District of California
Case # 2:15-cv-07242 MWF-MRW

Capri Krakana, Johan Krakana
Arizona Superior Court, Maricopa County
Case #JSS18301

Osram Sylvania v Photographic Illustrator Corporation v Brooks Electrical et al.
American Arbitration Association
Case # 01-16-0000-2652

Capri Krakana D.O.B. 12/18/2009, Johan Krakana D.O.B. 09/12/2007
United States Superior Court of the State of Arizona, in and for the County of
Maricopa
Case # FC2016-050246

Nelson Araujo, et al v City of San Jacinto et al.
Superior Court of California, Riverside County
Case # RIC1411590

Laspata Decaro Studio Corporation v Rimowa GmbH et al.
United States District Court, Southern District of New York
Case # 16-cv-00934-LGS

Glen Craig v UMG Recordings, Inc. et al.
United States District Court, Southern District of New York
Case # 16 Civ. 5439 (JPO)

Brittney Gobble Photography, LLC v WENN Limited et al.
United States District Court, Eastern District of Tennessee, Knoxville Division
Case # 3:16-cv-00306

The Andy Warhol Foundation for the Visual Arts, Inc. v Goldsmith et al.
United States District Court, Southern District of New York
Case # 1:17cv2532

Jason Putsche v Alley Cat Allies, Inc.

United States District Court, Southern District of Maryland

Case No. 8:17-cv-00255-PWG

Yves Michel Fontaine v MMLery LLC, 61-73 Ellwood, LLC, 533 41st Street

Realty, LLC and Sharp Management Corp.

Supreme Court of the State of New York, County of Kings

Case No. 6580/12

My publication list is included in my curriculum vitae, a copy of which is attached to the Report as Exhibit A.

## II.    COMPENSATION

My work on the matters is being billed at my standard rate of $650.00 per hour. My compensation is not contingent upon, dependent upon, or related in any way to the outcome of the matters.

## III.    MATERIALS CONSIDERED

In preparation for the Report and for the expert testimony that I may be called on to provide, I have considered the materials listed in Exhibit B.

## IV.    ASSUMPTIONS

Retaining counsel instructed that I rely on the following assumptions in forming my opinions in the matters. As the scope of my engagement does not include verification of the accuracy of the assumptions, my reliance on the assumption/s does not reflect a lack of rigor in the formation of my opinions. If any assumption is determined to be incorrect, I may revise my opinions. If later asked to verify the accuracy of the assumptions, I will do so where possible. I have been instructed to:

A. Assume that Brittney Gobble is the author of the 51 photographs at issue in the matters (the "Photographs").[2]

B. Assume that by assignment, Brittney Gobble Photography, LLC ("BGP") is the sole and exclusive copyright owner of the Photographs.

C. Assume that the United States Copyright Office has issued Certificates of Registration for 50 of the Photographs to Brittney Gobble.

D. Assume that the information appearing on Brittney Gobble's copyright registrations is correct.[3]

E. Assume that the copyright registrations are valid.

F. Assume that actual and statutory damages for copyright infringement (if any) in the matters, are applicable only to the 50 registered photographs.

G. Assume that statutory damages for DMCA violations (if any) in the matters, are applicable to all 51 of the Photographs.

H. Assume that Johnny Gobble provided WENN Limited and USA Entertainment News Inc. ("WENN") with access to 55 total photographs, including the 51 Photographs at issue in the matters.

I. Assume that WENN provided Sinclair and the other Defendants through Sinclair with access to the Photographs.

J. Assume that the information provided by BGP in the "Table of Photographs," Exhibit E is correct.

K. Assume that the information provided by BGP in the "Table of Usages, by Usage Number" Exhibit F is correct.

L. Assume that BGP did not intentionally alter the copies made by BGP of usages of the Photographs, and that BGP neither manipulated nor altered the copies as included in the "Visual Index of Usages," Exhibit D

M. Assume that in November 2015, few photographs of Lykoi cats were available for licensing or use, and that the Photographs were both rare and scarce in the photography licensing marketplace.

N. Assume that attribution to Brittney Gobble was a condition of the license granted by BGP to WENN.

---

[2] See Section VI(J), "The Photographs."
[3] Registrations and Deposit Material.

O. Assume that Defendants did not attribute any of the Photographs to BGP prior to notification by BGP.

P. Assume that each instance of use of the Photographs by Defendants is a distinct violation of 17 U.S.C. 1202.

Q. Assume that Defendants' use of the Photographs on Defendants' websites infringed on BGP's copyrights in the Photographs.

R. Assume that Defendants' use of the Photographs was not innocent infringement.

S. Assume that Defendants publish photographs, text and other content on their websites in order to attract advertisers and to generate advertising revenue from advertisements, and that Defendants generate advertising revenue when advertisements are viewed and/or clicked by visitors to Defendants' web sites.

T. Assume that Defendants received revenue resulting from Defendants' placement of advertisements on Defendants' websites, on the web pages on which Defendants also displayed the Photographs, and on related web pages.

U. Assume that in each instance in which the Visual Index of Usages (Exhibit D) includes a depiction of a Usage indicating "Image not Available," a Usage occurred but was deleted by Defendants before BGP had the opportunity to capture a screenshot. Assume that the information in the Table of Usages, by Usage Number" (Exhibit F) corresponding to each such usage is accurate.


## V.   BACKGROUND

Brittney Gobble Photography, LLC is a limited liability company organized and existing under the laws of the State of Tennessee, and having a principal place of business at 511 Randolph Fridley Road, Sweetwater, Tennessee 37874-6035.[4]

---

[4] '3403 Complaint, ¶ 1

Defendant Sinclair Broadcast Group, Inc. ("Sinclair") is a corporation organized and existing under the laws of the State of Maryland and has a principal place of business within the District of Maryland.[5]


Each of defendants Sinclair Portland Licensee, LLC; KATV Licensee, LLC; Sinclair Bakersfield Licensee, LLC; Sinclair Boise Licensee, LLC; Sinclair Eugene Licensee, LLC; Sinclair Yakima Licensee, LLC; KEYE Licensee, LLC; KGBT Licensee, LLC; KHQA Licensee, LLC; Sinclair Lewiston Licensee, LLC; Sinclair Seattle Licensee, LLC; Sinclair Radio of Seattle Licensee, LLC; KRCG Licensee, LLC; KTUL Licensee, LLC; KTVL Licensee, LLC; KTVO Licensee, LLC; KUTV Licensee, LLC; KVII Licensee, LLC; WACH Licensee, LLC; WFXL Licensee, LLC; WGXA Licensee, LLC; WJAR Licensee, LLC; WKRC Licensee, LLC; Gray Televisions Licensee, LLC; WLUK Licensee, LLC; WNWO Licensee, LLC; WOAI Licensee, LLC; WPBN Licensee, LLC; WPDE Licensee, LLC; WSET Licensee, LLC; WSTQ Licensee, LLC; WTOV Licensee, LLC; WTVC Licensee, LLC; and WZTV Licensee, LLC is a limited liability company organized and existing under the laws of the State of Nevada.[6]

Each of defendants KMPH Licensee, LLC; KMTR Television, LLC; KPTM Licensee, LLC; HSH Flint (WEYI) Licensee, LLC; New Age Media of Gainesville Licensee, LLC; Deerfield Media (Rochester) Licensee, LLC; ACC Licensee, LLC; and Gocom Media of Illinois, LLC is a limited liability company organized and existing under the laws of the State of Delaware.[7]

Each of defendants KABB Licensee, LLC; KOKH Licensee, LLC; Chesapeake Television Licensee, LLC; Birmingham (WABM-TV) Licensee, Inc.; WGME Licensee, LLC; WICS Licensee, LLC; Portland (WPFO-TV) Licensee, Inc.; WSYX Licensee, LLC; and Columbus (WTTE-TV) Licensee, Inc. is a limited liability company or corporation organized and existing under the laws of the State of Maryland.[8]

---

[5] '3403 Complaint, ¶ 2
[6] '606 Complaint, ¶ 2-35.
[7] '559 Complaint, ¶ 2-9
[8] '3384 Complaint, ¶ 2-10

WENN Limited is a private limited company registered in the United Kingdom (Registered No. 04375163). The registered address for WENN Limited is 4a Tileyard Studios, Tileyard Road, London, England, N7 9AH.[9]

USA Entertainment News, Inc., d/b/a "WENN" and "World Entertainment News Network" is a corporation organized and existing under the laws of the State of New York that maintains places of business at 352 7th Avenue, Suite 1105, New York, New York 10001-5657 and at 7551 Melrose Avenue, Suite 10, Los Angeles, California 90046.[10]

Johnny and Brittney Gobble (the "Gobbles"), husband and wife, have established and bred the Lykoi cat as a new breed.[11] Johnny Gobble is a veterinarian. Brittney Gobble, a photographer, has created numerous photographs of Lykoi cats.[12]

On November 2, 2015, Dr. Gobble received an email message from WENN's representative Clare Penn.[13] On behalf of WENN, Ms. Penn solicited the Gobbles to supply WENN with photographs of Lykoi cats for editorial use in a "news/feature item."  Dr. Gobble responded by email on November 2, 2015,[14] forbidding WENN from distributing Brittney Gobble's photographs, but granting permission to WENN to use Brittney Gobble's photographs, subject to a number of requirements and conditions described in the email. Dr. Gobble informed Ms. Penn that attribution, in the form of a photo credit naming "Brittney Gobble" must be provided where possible. Dr. Gobble informed Ms. Penn that WENN must include certain specific statements in the feature/news item accompanying the photographs. Dr. Gobble further informed Ms. Penn that the photographs could not be used in association with derogatory statements about the breed. Dr. Gobble provided Ms. Penn with a

---

[9] First Amended Complaint (Doc 51), ¶ 2, *Brittney Gobble Photography, LLC v. WENN Limited and USA Entertainment News, Inc.*, United States District Court for the Eastern District of Tennessee, Knoxville Division, Case No. 3:16-cv-00306 ("the Tennessee Lawsuit")
[10] First Amended Complaint, ¶ 3, Tennessee Lawsuit
[11] '3403 Complaint, ¶ 9
[12] Id.
[13] Email message from Clare Penn to lykoicats@gmail.com, November 2, 2015 at 2:55 PM, BATES # BGP000001 - BGP000002
[14] Email message from Johnny Gobble to Clare Penn, November 2, 2015 at 9:16 PM, BATES # BGP000003 - BGP000004

hyperlink to a Dropbox album containing 55 of Brittney Gobble's photographs of Lykoi cats.

WENN then authored an article about Lykoi cats, illustrating that article with Brittney Gobble's photographs of Lykoi cats.[15] WENN also created a gallery of Brittney Gobble's photographs of Lykoi cats, and distributed the article and the gallery to WENN's subscribers and customers, including Sinclair.[16] Sinclair and certain of its radio and television stations then displayed the article and gallery on their respective websites.[17]

On or about November 8, 2015, Brittney Gobble discovered that copies of her photographs were displayed without attribution to her on one of the Sinclair television station websites at issue in the above lawsuits (www.komonews.com). Brittney Gobble immediately contacted that station and requested correct attribution.[18]  The station told Brittney Gobble that the attribution issue had been corrected.[19]  Brittney Gobble did not realize then that the photographs had been distributed by WENN without her permission.[20]

On or about November 12, 2015, Brittney Gobble discovered that despite the express prohibition on distribution of her photographs, WENN had distributed her photographs of Lykoi cats to WENN's subscribers and customers.[21] Brittney Gobble further discovered that despite the attribution requirement, WENN's subscribers and customers had published her photographs without attribution to Brittney Gobble.[22] Both Dr. Gobble and Brittney Gobble contacted WENN and asserted that WENN had infringed on Brittney Gobble's copyrights in the Lykoi photographs.[23]  WENN's representatives replied and denied the infringement, asserting that Dr. Gobble had

[15] First Amended Complaint (Doc 51), ¶¶ 45-384 & Exhibits 5-1857, Tennessee Lawsuit; '3404 Complaint, ¶¶ 36-89, Exhibits 12-78.
[16] Id.
[17] Id.
[18] Email exchange between Brittney Gobble and Scott Sistek, November 8, 2015, BATES # BGP003337 - BGP003340
[19] Id.
[20] Gobble Interview
[21] First Amended Complaint (Doc 51), ¶¶ 39, Tennessee Lawsuit.
[22] Gobble Interview
[23] First Amended Complaint (Doc 51), ¶¶ 39, Tennessee Lawsuit.

granted WENN a license sufficient to permit their usage and distribution of the photographs.[24] After an exchange of emails between the Gobbles, their attorney, Ms. Penn, and WENN's CEO Lloyd Beiny,[25] the parties were unable to resolve the dispute, and BGP filed a complaint against WENN Limited and USA Entertainment News, Inc. on June 7, 2016 in the United States District Court for the Eastern District of Tennessee, Knoxville Division, Case No. 3:16-cv-00306 ("the Tennessee Lawsuit"), alleging direct copyright infringement, contributory copyright infringement, falsification of copyright management information, and unfair competition.[26]

I was engaged by BGP as an expert in the Tennessee Lawsuit. After I submitted an expert report in that matter, WENN stopped participating in the litigation, and BGP then asked the Tennessee Court to enter default judgment against WENN.[27]  The Court relied on my opinions in awarding default judgment of $5,754,941.88 in actual damages for direct and contributory copyright infringement.[28]

In the Tennessee Lawsuit, BGP alleged infringement of BGP's copyrights in 55 photographs, including the 51 Photographs at issue in the four above-listed lawsuits addressed in this report, involving a number of the same Sinclair radio and television stations' websites at issue in the instant matters.[29]  As part of the discovery process in the Tennessee Lawsuit, BGP served a subpoena on Sinclair seeking discovery related to the alleged copyright infringements and false credits taking place on the Sinclair station websites ("Sinclair Subpoena").[30] BGP later filed the four above-listed lawsuits against Sinclair and 51 affiliated Sinclair radio and television station websites.

---

[24] Email message from Lloyd Beiny to lykoicats@gmail.com, November 12, 2015 at 5:49 PM, BATES # BGP000019.
[25] Email exchanges between parties, BATES # BGP000008 - BGP000022,  BGP000023 - BGP000035
[26] Complaint (Doc 1), Counts I, II, III and IV, Tennessee Lawsuit.
[27] Report and Recommendation (Doc. 103), BATES # BGP005433 - BGP005453; Order (Doc. 104) BATES # BGP005454 - BGP005458.
[28] Id.
[29] Tennessee Complaint, ¶¶ 45-384
[30] Subpoena to Sinclair Broadcast Group, Inc. dated September 25, 2017, BATES # BGP003391 - BGP003709

In addressing BGP's motion for default judgment filed in the Tennessee Lawsuit, the Court in that case considered the expert opinion that I submitted at the request of BGP. After examination of the methodology that I employed in calculating actual damages in the Tennessee Lawsuit, the Tennessee Court concluded: "*The Court has considered Sedlik's opinion, along with his professional experience, and finds his calculation to be reasonable under the circumstances.*"[31] In forming the below opinions, I employed the same methodology employed in the Tennessee Lawsuit.

## VI. DISCUSSION

### A.    General Background Regarding Image Copyright Licensing

In the image licensing industries, clients seeking to make use of images may either commission new images ("assignment images"), or acquire rights to existing images ("stock images").

1. Assignment Images

Artists create assignment images (also known as "commissioned images") when clients contract with artists or their agents to create new works. Artists typically retain copyright ownership of the images that they create. Artists often grant limited licenses to their clients in exchange for a license fee based in great measure on the scope of the rights granted. Artists often later engage in licensing such images to parties other than the commissioning client, throughout the copyright life of the images. In the alternative, artists may agree to assign copyright ownership to their clients, or may agree to create works under work-made-for-hire terms, whereby copyright ownership vests with the commissioning client upon creation.

---

[31] Report and Recommendation (Doc 103) at page 14, adopted by Order (Doc 104), Tennessee Lawsuit.

2. Stock Images

Artists often create stock images independently and speculatively, then offer these existing images for licensed usage by clients. This offering is typically made on stock image websites, either by the artist or by a "stock agency" acting as an authorized licensor for the artist's images.

Clients seeking stock images typically visit stock image websites, search for images meeting their requirements, and then purchase licenses and download the images for usage. Such purchases may be made via an automated process, or by communicating with sales staff at the stock agencies or an artist's office.

Clients may acquire rights to stock images under various "licensing models." While some vendors specialize in certain licensing models, many vendors offer images under several licensing models. Common licensing models include:

(a) Royalty Free ("RF"): This model allows a client to pay a single, one-time fee based on the size of the digital image file desired by the client. The client receives a license allowing broad usage of the image—typically in unlimited media, for unlimited time, at any size, in any quantities, worldwide, for nearly any purpose, including but not limited to the promotion of products and services. For example, such a license may allow a client to use an image on any number of websites in any and all countries, worldwide, forever. There may be any number of detailed restrictions on RF licenses but in general, the licenses allow broad usage. RF images are often professionally produced, and are typically less unique than many images offered under the Rights Managed model (see below).

(b) Microstock: A variant of RF licensing, microstock is a less expensive alternative. Like RF, microstock licenses provide broad rights for a low price, based on the size of the image file desired by

18

the client. Like RF, microstock licenses include restrictions but typically permit usage in unlimited media, unlimited quantities, unlimited sizes, unlimited countries, for an unlimited time. Whereas RF images are typically provided by professional artists and semi-pros, microstock images are provided by amateurs as well.

(c) Subscription models: Many licensors now offer subscription-based licensing schemes. Subscription licensing is a variant of RF licensing, under which clients pay a monthly or annual license subscription fee and receive a broad license permitting the downloading of a quantity of images during each subscription period—either per year, per month or per day. Such licensors nearly always employ a system of graduated pricing tiers under which clients pay an amount commensurate with a maximum quantity of images available for downloading during each subscription period. There are many variants on subscription licensing schemes, driven by competitive pressures.

(d) Rights Managed ("RM"): A long-standing licensing model, rights managed licensing remains a common form of stock image licensing. In RM licensing, usage fees are based not on file size, but upon the scope of usage desired by the client. In general, the greater the scope of usage desired, the greater the licensing fee required of the client. Scope is defined broadly by the general category of the use, whether commercial or editorial, and is defined more specifically by the type of media, the size and quantity of reproductions, the placement/s of the image, geographic regions in which the reproductions will be distributed, the duration of use, exclusivity desired, and other factors. The scope of use permitted under RM licenses spans the full spectrum, from very narrow, to very broad. RM images are primarily created by professional artists.

19

Fees associated with RM licenses are often (but not always) higher than fees for RF licenses.

Seeking to maximize profitability and sales, stock agencies have been experimenting with new, hybrid models, such as licenses requiring payment based on the quantity of viewers of images published online, or payment for advertising placement in or on an image published online. The market continues to evolve.

Based upon my review of the documents, information and materials provided to me in the matters, and with a reasonable degree of certainty, had BGP and Defendants engaged in one or more license agreements allowing Defendants to make use of the Photographs, the resulting license/s would have been "Rights Managed" licenses.

**B.      General Background Regarding Metadata in Digital Image Files**

Cameras, smart phones, scanners and other devices capable of capturing digital images record information known as "EXIF metadata" within each image file at the moment of capture. In simple terms, the word "metadata" means "data about data." Digital image files contain not only the data that comprises the digital image itself, but also contain extensive supplementary information such as text descriptions of the make, model, and serial number of the camera or scanner used to capture the image, the date on which the image was captured, the time at which the image was captured, any camera or scanner settings at the time of the image capture, and a host of additional technical information.

The acronym "EXIF" refers to "Exchangeable Image File Format," an industry standard for metadata stored by digital capture devices such as cameras and scanners. EXIF was created by the Japan Electronic Industry Development

Association ("JEIDA"), and is employed in nearly all digital cameras and other devices capable of capturing digital images.

When an image is captured, EXIF metadata is stored by the capture device. The EXIF metadata is not visible in the image itself, but may be accessed and viewed using computer programs that are capable of displaying EXIF metadata. Many programs used for viewing and editing images are also capable of displaying EXIF metadata. Most EXIF metadata is easily viewed in such applications by viewing the "properties" of the digital file. For example, in applications offered by Adobe, such as Adobe Photoshop, EXIF metadata may be accessed in the "File" menu by selecting "File Info," and then selecting the "Advanced," option, then selecting "EXIF" or "Camera Data." Metadata may also be accessed by anyone, without special software, by simply viewing the "properties" of an image file in Windows or Macintosh operating systems and built-in image browsers.

In addition to standard EXIF metadata, camera manufacturers often add "maker notes" to the metadata. These maker notes contain additional information, typically stated in proprietary codes, and most often used by the manufacturer to facilitate certain functions of the camera and camera accessories. Maker notes are generally not viewable in common software, but may be viewed in specialty software designed to allow access to all metadata stored in an image.

EXIF metadata may also include Copyright Management Information ("CMI"), such as the creator's name, copyright owner's name, copyright status, copyright notice and image identifier.

Software and devices may also record Extensible Metadata Platform ("XMP") metadata into an image file. This is a very common method of "embedding" copyright management and descriptive metadata into an image file. XMP metadata may be readily accessed in most applications used for viewing, editing or managing images. Several metadata standards, including International Press Telecommunications Council ("IPTC"), Picture Licensing

Universal System ("PLUS"), Visual Resources Association ("VRA Core") and others employ XMP metadata, which includes CMI, technical information and descriptive information.  The Metadata Working Group develops international standards for "preservation and seamless interoperability of digital image metadata," and for "interoperability and availability to all applications, devices, and services the implementation and use of metadata."

**C.     Use of Image Metadata to Identify, Protect or Manage Copyright Protected Images**

Image metadata is routinely used by authors and copyright owners to identify, protect or manage copyright protected works.  Image users and service providers must accommodate and not remove, alter or falsify image metadata, and must not interfere with technical measures employed by copyright owners to identify or protect copyrighted works.

CMI metadata includes any information that may be used to identify the work, the author of the work, the copyright owner, other rights holders, and rights information associated with the work. 17 U.S.C. §1202(c) provides the following definition for "copyright management information":

> *(c) Definition. As used in this section, the term "copyright management information" means any of the following information conveyed in connection with copies or phonorecords of a work or performances or displays of a work, including in digital form, except that such term does not include any personally identifying information about a user of a work or of a copy, phonorecord, performance, or display of a work:*
>
> > *(1) The title and other information identifying the work, including the information set forth on a notice of copyright.*

*(2) The name of, and other identifying information about, the author of a work.*

*(3) The name of, and other identifying information about, the copyright owner of the work, including the information set forth in a notice of copyright.*

*(4) With the exception of public performances of works by radio and television broadcast stations, the name of, and other identifying information about, a performer whose performance is fixed in a work other than an audiovisual work.*

*(5) With the exception of public performances of works by radio and television broadcast stations, in the case of an audiovisual work, the name of, and other identifying information about, a writer, performer, or director who is credited in the audiovisual work.*

*(6) Terms and conditions for use of the work.*

*(7) Identifying numbers or symbols referring to such information or links to such information.*

*(8) Such other information as the Register of Copyrights may prescribe by regulation, except that the Register of Copyrights may not require the provision of any information concerning the user of a copyrighted work.*

## D.    Orphan Works

The United States Copyright Office defines an "orphan work" *as "any original work of authorship for which a good faith prospective user cannot readily identify and/or locate the copyright owner(s) in a situation where permission from the copyright owner(s) is necessary as a matter of law."*

The removal, alteration or falsification of CMI metadata from images breaks the link between images and their copyright owners, resulting in orphaned works.

**E.      Types of Harm Attributable to Falsification, Removal or Alteration of CMI Metadata**

The act of removing, altering or falsifying CMI metadata from digital images can induce, enable, facilitate or conceal copyright infringement. The falsification of CMI metadata from digital images can induce, enable, facilitate or conceal copyright infringement. For example, in the situation where the CMI metadata for "Copyright Owner Name" has been intentionally changed from "John Smith" to "Jane Doe" and Jane Doe purports to grant rights to use the image, an infringer may be induced or enabled or facilitated based upon the false CMI metadata.

Unlicensed use of a copyrighted work can pose a quadruple threat to the sustainability of the photographer's business:

1)      Allows an infringer to benefit from the exploitation of the fruit of the photographer's time, skill and creative efforts without fairly compensating the photographer.

2)      Diminishes the value of the photographer's works.

3)      Eliminates the photographer's ability to fully exploit the photographer's exclusive rights.

4)      May directly compete with the photographer's efforts to license or sell works to others.

### F.    Embedded Rights Metadata is a Standard Technical Measure

Image creators and copyright owners routinely embed CMI into digital image files upon distribution to identify and protect their copyright protected works. Embedded CMI is currently the primary means by which image rights holders employ technology as a standard measure to protect their images and copyrights from unauthorized usage. The presence of embedded CMI in a digital image file allows any party encountering that file to readily determine the rights information associated with that image, thus directly facilitating compliance with copyright laws. The practice of embedding metadata into an image file is a widespread and common Standard Technical Measure employed to identify and protect images. The removal or alteration of embedded metadata without the permission of the party who embedded that metadata is a violation of widely adopted industry guidelines and can violate 17 U.S.C. 1202.

### G.    Metadata Standards are Developed Pursuant to a Broad Consensus of Copyright Owners and Users

Metadata standards organizations develop metadata "schemas" by an open, fair, collaborative, multi-industry process, that achieves broad consensus in order to spur broad adoption. For example, the PLUS standards for Copyright Management Information were developed collaboratively by over 2,000 volunteers from more than 30 countries, during a six-year standards development process. The resulting standards were then adopted by the IPTC and other organizations, and PLUS metadata properties may now be found in thousands of applications used to create, edit, distribute, manage, license and preserve images. Open any Adobe application and you will find PLUS metadata properties used for communicating CMI.

### H.    Image Metadata is Readily Available and Accessible

Most image metadata is accessible on a non-discriminatory basis to any person or machine, using broadly available software commonly used by

professionals and amateurs. Certain rights metadata (e.g.: author name, copyright, etc.) is accessible "natively" in the Macintosh and Windows operating systems, without the use of special software.

## I.      The Costs of Metadata

Embedded metadata is so critically important to the process of managing digital image files that industry guidelines and 17 U.S.C. Section 1202 require that CMI not be removed or altered. The primary cost and burden to image users and service providers of preserving CMI metadata is added hosting and storage costs. Preserving CMI metadata is required by law and thus does not impose substantial discretionary costs or burdens.

## J.      The Photographs

A total of 51 photographs are at issue in the matters. Representative examples are depicted below. For a complete visual reference of the Photographs, see "Visual Index of Photographs," Exhibit C. For a complete listing of the Photographs, see "Table of Photographs," Exhibit E.



The Photographs are of professional quality, evidencing careful attention to concept, styling, composition, pose, lighting, color, exposure and other aesthetic and technical qualities. Based on my knowledge and experience in licensing photography, each photograph has independent economic value.

**K.      BGP's Management and Exploitation of the Photographs[32]**

While Brittney Gobble has historically offered limited gratis licenses to publications featuring her photographs in articles on the Lykoi breed, Brittney

---

[32] Telephonic interview of Brittney Gobble, October 14, 2017 ("Gobble Interview")

Gobble, and now BGP, have intended, and do intend, to monetize the Photographs by offering paid limited licenses. As the copyright owner in the Photographs, BGP has sole discretion in determining the fee (if any) required of each licensee, based on the facts and circumstances of each usage. BGP exercises that discretion with each and every licensee.

BGP experimented with licensing through a stock photography agency, REX Features, and terminated BGP's agreement with REX after a brief test period, after REX offered BGP's photographs at rates below market values.[33]

### L.     WENN's Initial Solicitation of BGP

On November 2, 2015, Dr. Gobble received an email message from WENN's representative Clare Penn.[34] On behalf of WENN, Ms. Penn solicited the Gobbles to supply WENN with *"a selection of hi-res images"* of Lykoi cats, only *"to accompany editorial text,"* only in a single *"news/feature item for press,"* to be *"used in an editorial context only,"* only when *"accompanied by the relevant information regarding the breed,"* and never to be *"used out of context."* In this email message, Ms. Penn did not mention any other use of Brittney Gobble's photographs, nor did Ms. Penn request any other rights in the Photographs. Ms. Penn did not forward a WENN contributor agreement to the Gobbles, nor did Ms. Penn advise the Gobbles of WENN's contributor terms.

### M.     The License Granted by BGP to WENN

In response to Ms. Penn's solicitation, Dr. Gobble promptly replied with an email message to Ms. Penn on November 2, 2015, expressly forbidding WENN from distributing Brittney Gobble's photographs.[35] This prohibition on distribution was clearly and unambiguously stated: *"I do not give permission*

---

[33] Collection of Rex Features documents, BATES # BGP000504 - BGP000516, and BGP000588 - BGP000630
[34] Email message from Clare Penn to lykoicats@gmail.com, November 2, 2015 at 2:55 PM, BATES # BGP000001 - BGP000002
[35] Email message from Johnny Gobble to Clare Penn, November 2, 2015 at 9:16 PM , BATES # BGP000003 - BGP000004

for these images to be distributed...” Dr. Gobble also informed Ms. Penn of a separate and distinct express prohibition on derogatory use, clearly stating that the Photographs were not "*... to be used in an article (or other media) that is purposefully derogatory toward our breed…*" In addition, Dr. Gobble informed Ms. Penn that photo credit attribution to *"Brittney Gobble"* was required *"whenever possible."* Dr. Gobble then informed Ms. Penn of several express conditions of the license, which included (1) the article must *"state that we are breeding for health"* and (2) the article must state that "*the breed is a natural occurrence in the feral domestic cat population,"* and (3) the article must state that "*the first were born in Vonore, TN or Sweetwater, TN,"* and (4) the article must state that *"we love the publics (sp) positive response to the new breed."* As these statements were immediately preceded by the phrase "*If you are going to use our photos,"* Dr. Gobble unambiguously established that the license was conditioned on Defendants' satisfaction of all four conditions.

If the Court deems that Dr. Gobble's email message to Ms. Penn comprises a license, then Dr. Gobble's statements, considered in the context of the usage rights requested by Ms. Penn, result in the following license, based on my personal knowledge and experience:

Quantity of Photographs Licensed:

1. 55

License Permissions:

1. The photographs may only be used in a single editorial news/feature item, only for the purpose of accompanying editorial text.

License Constraints/Prohibitions:

1. The photographs may not be used for distribution.

2. The photographs may not be used outside of the editorial context of the news/feature item.

3. The photographs may not be used except when accompanied by relevant information regarding the breed.

License Conditions

1. The photographs must be accompanied by attribution to "Brittney Gobble," whenever possible.

2. The article must *"state that we are breeding for health"* and

3. the article must state that *"the breed is a natural occurrence in the feral domestic cat population,"* and

4. the article must state that *"the first were born in Vonore, TN or Sweetwater, TN,"* and

5. the article must state that *"we love the publics (sp) positive response to the new breed."*

The Gobbles granted no other rights to WENN. Under this license, WENN received no rights other than the rights described by Dr. Gobble, in the context of WENN's solicitation. Importantly, Dr. Gobble did not grant WENN the right to sub-license Brittney Gobble's photographs to third parties. Dr. Gobble emphasized that WENN may not distribute the Photographs.[36]

## N.   WENN Had Ample Opportunity to Negotiate with BGP

Upon receiving Dr. Gobble's email message describing a limited conditional license and expressly forbidding distribution of Brittney Gobble's photographs by WENN, Ms. Penn had every opportunity to reply to Dr. Gobble to request the removal of any prohibition, condition or requirement imposed by Dr. Gobble. Ms. Penn made no attempt to do so. Upon receiving the Photographs from Ms. Penn, WENN had every opportunity to contact the Gobbles and to

---

[36] Email message from Johnny Gobble to Clare Penn, November 2, 2015 at 9:16 PM, BATES # BGP000003 - BGP000004

negotiate for the removal of any prohibition, condition or requirement imposed by Dr. Gobble.  WENN chose to proceed with using, exploiting and broadly distributing the Photographs without seeking to further negotiate with the Gobbles.

**O.     WENN's Interpretation of the License**

WENN asserted that the prohibition on distribution applies only to distribution for the purpose of derogatory use.[37] Based on my knowledge and experience, WENN's assertion is unreasonable to the extreme. Dr. Gobble wrote to Ms. Penn:

> *"I do not give permission for these images to be distributed, or to be used in an article (or other media) that is purposefully derogatory toward our breed…"*

In the context of image licensing, and by any reasonable interpretation, the above sentence has the following meaning:

> "*I do not give permission for these images*"
>
> (1) *"to be distributed"*
>
> "OR"
>
> (2) *"to be used in an article (or other media) that is purposefully derogatory toward our breed."*

WENN further interpreted the license to apply to the use of the Photographs in multiple articles.[38]  This interpretation is inconsistent with the email solicitation sent by WENN's representative Clare Penn to Dr. Gobble in which Ms. Penn referred to a single news item:

---

[37] Answer (Doc 53), ¶ 27, Tennessee Lawsuit.
[38] Email message from Clare Penn to lykoicats@gmail.com, November 12, 2015 at 2:39 PM, BATES # BGP000011

*"I would like to create a feature/news item..."*

WENN also asserted that the terms of the license should be expanded to include broad distribution of the Photographs because WENN is in the business of broadly distributing content.[39]  WENN asserted that the Gobbles should have known that despite Dr. Gobble's expressly stated prohibition on distribution, WENN intended to broadly distribute the Photographs, because Ms. Penn's email solicitation to the Gobbles included a description of WENN's business.[40] Based on my knowledge and experience, the terms of a license are not determined by the nature of the licensee's business. The terms of a license are determined by the rights granted and reserved by the licensor.

WENN asserted that the license permitted WENN's customers to publish and distribute the Photographs without attribution to Brittney Gobble. Under the license Dr. Gobble specified that photo credit is required *"whenever possible."*[41] Dr. Gobble wrote:

*"Whenever possible, please credit images to Brittney Gobble."*

Based on my knowledge and experience, and based on my review of hundreds of instances of publications of the Photographs by WENN's customers and Defendants, photo credit to Brittney Gobble was possible in each and every instance of use of the Photographs.

## P.    Usage of the Photographs by WENN and Their Customers

WENN's subscribers and customers, including Sinclair, pay WENN a fee for access to photographs and other content distributed by WENN.[42] After promising BGP that WENN would only use the Photographs in the context of a single editorial news feature/item, WENN then broadly distributed the

---

[39] Id.
[40] Id.
[41] Email message from Johnny Gobble to Clare Penn, November 2, 2015 at 9:16 PM, BATES # BGP000003
[42] Documents produced by Sinclair in response to the Sinclair Subpoena, BATES # BGP003812 - BGP003836.

Photographs to WENN's subscribers and other customers, including Sinclair.[43]
BGP is not aware that any reproductions were correctly credited to Brittney
Gobble as required under the license before the Gobbles learned of the
infringement and contacted WENN.[44]  The Photographs appeared without
proper attribution to Brittney Gobble.[45]

Representative examples of Defendants' unauthorized usages discovered to
date by BGP are depicted below, each marked with an identifier correlating to
a complete listing of the usages contemplated by this Report, in "Table of
Usages, by Usage Number" (Exhibit F), and in "Table of Usages, by Station"
(Exhibit G). Also see "Visual Index of Usages," Exhibit D.



---

[43] First Amended Complaint (Doc 51), ¶ 43, Tennessee Lawsuit.
[44] Gobble Interview
[45] Website screenshots attached as Exhibits to the Sinclair Complaints.

## Q.    Infringement by Defendants

With a reasonable degree of certainty, based on my knowledge and experience, WENN failed to satisfy the conditions of the license, rendering the license null and void. As a result, each and every instance of reproduction, distribution or display of the Photographs by WENN and its customers, including Sinclair and the radio and television station defendants in the four above-listed lawsuits  (i.e., on the infringing websites listed in the Sinclair Complaints and shown in the website screenshots attached as Exhibits to the Sinclair Complaints), was unlicensed.  These unlicensed, unauthorized usages infringed on BGP's copyrights in the Photographs.[46]

## R.    Actual Damages

Actual damages are determined in part by the fee that a willing buyer would have been reasonably required to pay at the time of the infringement.[47] In the photography marketplace, each licensor sets his/her own fees, based upon criteria defining the scope of a license.

To arrive at a reasonable estimate of licensing fees applicable to the infringing usages, I obtained comparative stock photography license fee quotes from three stock photography agencies. I calculated total fees based on the information available to me, including some or all of these factors: the media in which the Photograph was reproduced, circulation, size, placement, and period of use. Where data for one or more criteria were unknown, I made the best approximation possible under the circumstances.

In addition to the license fee computations performed by obtaining reference fee quotes reasonably matching the alleged unauthorized usages to the greatest extent possible, I have relied on my personal knowledge and

---

[46] Assumption "Q"
[47] *Davis v. Gap, Inc.,* 246 F.3d 152, 166, 172 (2d Cir. 2001)

experience in image licensing and in the development and management of industry standards for image licensing.

I requested that BGP provide an accounting of the usages discovered to date. BGP provided an accounting, "Table of Usages, by Usage Number" attached as Exhibit F.[48] In the event that the usage data provided by BGP is determined to be incorrect, I will review and consider that information and make revisions to my calculations where appropriate.

Based on the information available to me as of this writing, and based on my personal knowledge, experience, and a review of the documents, materials, and testimony in the matters, reasonable actual damages, if applicable, would be as follows.

**License Fees (Base Actual Damages) by Media Category**

| Media Category | Base Actual Damages |
| --- | --- |
| Publishing and Editorial – Electronic (Web) | $6,212,215.82 |
| Total Base Actual Damages | $6,212,215.82 |

The total amount, $6,212,215.82, is the approximated 2015 fair market value of licenses of the Photographs for the alleged unauthorized usages by Defendants, prior to adjustment contemplating the scarcity of the Photographs in 2015.[49]  For a detailed accounting of the calculations supporting this total, See Exhibit L, "Table of Licenses and Actual Damages, by License Number," and additional supporting exhibits listed below.

I have attached the following tables and information as exhibits to the Report, documenting my calculations.

---

[48] Also see "Assumptions," Section IV.
[49] See Section S.

35

Table of Photographs (Exhibit E)

List of the Photographs, and supporting information.

Table of Usages, by Usage Number (Exhibit F)

List of instances of the usage of the Photographs, and supporting information.

Agency Stock Quotes Combined (Exhibit J)

Copies of market pricing survey documentation.

Market Rate Adjustment 2017 vs 2015 (Exhibit I)

Describes an adjustment of 2017 market rates to 2015 market rates. To arrive at a reasonable approximation of the differential between 2017 market rates and 2015 market rates, I compared sample 2017 license fees to sample 2015 license fees,[50] selecting the same image from the same vendor. I determined that the license fee in 2015 was 9.15% less than the license fee in 2017, and have adjusted the 2017 license fees to reduce those fees by 9.15%, to arrive at a reasonable approximation of market rates in 2015. This adjustment appears in "Table of Market Rate Calculations" (Exhibit J). The adjusted fees appear in "Table of Licenses and Actual Damages, by License Number" (Exhibit L), and "Table of Licenses and Actual Damages, by Image Number" (Exhibit M).

2017 and 2015 License Fee Samples for License Fee Adjustment 2017 vs 2015 (Exhibit K)

Provides screenshots of image vendor license fee quotes substantiating the Market Rate Adjustment detailed in Exhibit I, "Market Rate Adjustment 2017 vs 2015"

Table of Market Rate Calculations (Exhibit J)

List of license fees based on market rates for image licenses applicable to the license periods for the licenses listed in "Table of Licenses and Actual Damages, by License Number, Exhibit L. In 2017, I surveyed three vendors,

---

[50] Also see Exhibit K, "2017 and 2015 License Fee Samples for License Fee Adjustment 2017 vs 2015"

then averaged their license fees to determine the 2017 average market rate for each License Type. I then applied an adjustment to the 2017 average market rate to arrive at the 2015 adjusted market rate. See "Market Rate Adjustment 2017 v 2015," Exhibit I, for details regarding the adjustment.

Table of Licenses and Actual Damages, by License Number (Exhibit L)
List of licenses applied to the Usages appearing in "Table of Usages, by Usage Number" Exhibit F. Market rates are derived from "Table of Market Rate Calculations," Exhibit J. My actual damages calculations are based on one-year license periods.

Table of Licenses and Actual Damages, by Image Number, (Exhibit M)
Describes the total actual damages attributable to each photograph, spanning all usages identified in "Table of Usages, by Usage Number" Exhibit F and all licenses identified in "Table of Licenses and Actual Damages, by License Number," Exhibit L. 2017 fees were adjusted to 2015 fair market value per "Market Rate Adjustment 2017 vs 2015," Exhibit I, and "Table of Licenses and Actual Damages, by License Number," Exhibit L.

Table of Licenses and Actual Damages, by Station, (Exhibit N)
Sorts the data from Exhibit M by station.

Table of Actual Damages Totals, by Station (Exhibit O)
Summarizes the data from Exhibit N, providing total actual damages per station.

Table of Actual Damages Itemized by Station (Exhibit P)
Provides an itemization of the data from Exhibit N, with subtotals by station.

## S.    Actual Damages Multiplier for Scarcity

The actual damages estimated above do not contemplate the scarcity of Lykoi photographs in 2015. At that time, few if any other photographers or stock photo agencies offered quality photographs of Lykoi cats. This is

evidenced by Defendants' selection and exploitation of the Photographs. Scarce images typically demand much greater license fees than common images, often 3 to 5 times the fee for a common image. The application of the scarcity multiplier is not a punitive measure. The scarcity multiplier serves only to adjust the fair market value of generic, common cat photographs to the value of scarce Lykoi photographs in 2015. Below I provide a range of actual damages, adjusted for the scarcity of the Photographs in 2015.

| Base Actual Damages | With 3X Scarcity Multiplier | With 5X Scarcity Multiplier |
|---|---|---|
| $6,212,215.82 | $18,636,647.50 | $31,061,079.10 |

## T.    Profits

I understand that under 17 U.S.C. 504(b), BGP is entitled to seek disgorgement of Defendants' profits attributable to Defendants' infringements of BGP's copyrights that are not taken into account in computing actual damages.

Defendants' websites include advertisements.[51] Defendants publish photographs, text and other content on their websites in order to attract advertisers and to generate advertising revenue from advertisements. On information and belief, Defendants generate advertising revenue when advertisements are viewed, and/or clicked by visitors to Defendants' web sites.[52]

In order to attract visitors to their websites and to generate advertising revenue, Defendants published the Photographs on Defendants' websites. The web pages on which Defendants published the Photographs included advertisements. Defendants received revenue resulting from Defendants'

---

[51] '3403 Complaint, Exhibits 12-78
[52] Assumption "S"

38

placement of advertisements on Defendants' websites, on the web pages on which Defendants also displayed the Photographs, and on related web pages.[53] Based on the above, and with a reasonable degree of professional certainty, such advertising revenue received by Defendants is attributable to Defendants' display of the Photographs. A causal nexus therefore exists between Defendants' display of the Photographs, and Defendants' profits.

I understand that BGP is seeking to disgorge Defendants' profits attributable to Defendants' display of the Photographs on Defendants' websites.  BGP's counsel advised that BGP propounded discovery requests to Defendants, seeking discovery of Defendants' gross revenues received by Defendants as the result of advertisements appearing on Defendants' websites on which the Photographs were displayed, and any deductible expenses and elements of profit attributable to factors other than the Photographs. As of this writing, Defendants have yet to provide BGP with the requested information. It is Defendants' burden to prove their deductible expenses and elements of profit attributable to factors other than the Photographs.[54]

## U.    Copyright Registrations

I have reviewed copies of BGP's copyright registrations.[55] The effective dates of BGP's copyright registrations precede the dates on which Defendants commenced infringement.[56]

---

[53] Assumption "T"
[54]  17 U.S.C. 504(b)
[55] BATES # BGP000036 -BGP000037, BGP000057-BGP000074, BGP000375 -BGP000455, BGP000484 - BGP000503
[56] '3403 Complaint, ¶¶ 14-15

## V.     Statutory Damages for Copyright Infringement

BGP is entitled to seek statutory damages for copyright infringement.[57] The
range of statutory damages available to BGP is $750 to $30,000 per
photograph infringed, or $750 to $150,000 per photograph willfully infringed.
[58] Statutory damages within these ranges are summarized below, and
itemized in "Table of Statutory Damages for Copyright Infringements, Totals
by Station" (Exhibit Q).

| Quantity of Statutory Awards (All Stations) | Minimum Statutory Damages @ $750 | Maximum Statutory Damages @ $150,000 |
|---|---|---|
| 2,728[59] | $2,046,000.00 | $409,200,000.00 |

The statutory damages range for Sinclair is summarized below, and itemized
in "Table of Statutory Damages for Copyright Infringements, Totals by
Station" (Exhibit Q):

| Quantity of Statutory Awards | Minimum Statutory Damages @ $750 | Maximum Statutory Damages @ $150,000 |
|---|---|---|
| 50 | $37,500.00 | $7,500,000.00 |

## W.     Defendants' Knowledge, Intent and Willfulness

WENN first obtained the Photographs from the Gobbles on November 2,
2015. Within days, Defendants commenced reproduction and display of the

---

[57] 17 U.S.C. 412;  '3403 Complaint, ¶¶ 14-15
[58] 17 U.S.C. 504(c)
[59] This total, 2728, includes one statutory award per photograph allegedly infringed, per station.
Certain stations did not make use of certain of the Photographs. A detailed itemization is provided in
Exhibit Q, "Table of Statutory Damages for Copyright Infringements, Totals by Station," substantiating
the total of 2,728. Further itemization of the photographs used by each station is provided in Exhibit
G, "Table of Usages, by Station."

Photographs on Defendants' websites, as evidenced by BGP's screenshots of Defendants' websites, attached as exhibits to the Sinclair Complaints.[60]

On November 8, 2015, Mrs. Gobble discovered copies of the Photographs displayed on one of Defendants' websites (komonews.com) without credit to her, and sent a message to komonews.com via the website, requesting proper credit.[61] While Mrs. Gobble was aware of the false credit, she was not then aware of the ongoing infringements by WENN. On receipt of Mrs. Gobble's message, Scott Sistek responded to Mrs. Gobble and advised *"I've added your credit and put a link to your Facebook page on all of the captions now."* [62]

Printouts and screenshots of www.komonews.com web pages later captured by BGP on May 13, 2016 and October 26, 2017 prove that despite Mr. Sistek's assurances, Defendants continued to falsely attribute the Photographs to WENN after receipt of notice from BGP.[63]

On November 12, 2015, Mrs. Gobble first learned that WENN had distributed the Photographs without her authorization.[64] The Gobbles notified WENN of the infringements that same day, November 12, 2015.[65] On November 13, 2015, WENN sent a "kill notice" to its customers.[66]  Defendants assert that they did not receive the kill notice from WENN.[67]

During the Tennessee Lawsuit, BGP served the Sinclair Subpoena on Sinclair, dated September 25, 2017.[68]  The Sinclair Subpoena identified the Tennessee Lawsuit by the name of the court, the case number, the names of the

---

[60] '3403 Complaint, Exhibits 12-78.
[61] Email exchange between Brittney Gobble and Scott Sistek on November 8, 2015 and November 9, 2015, BATES # BGP003337 - BGP0033340.
[62] Email from Scott Sistek to Brittney Gobble dated November 9, 2015, BATES # BGP003339.
[63] See Tennessee First Amended Complaint (Doc 51), Exhibit 274; '3403 Complaint (Doc 1), Exhibits 32 and 33.
[64] '3403 Complaint (Doc 1), ¶ 31.
[65] Id.
[66] Email dated November 13, 2015 from Jonathan Forsyth to undisclosed-recipients, BATES # WENN0000061 - WENN0000063.
[67] Answers to Interrogatory No. 8 by defendants in '3403 and '3384 lawsuits.
[68] BATES # BGP003391 - BGP003709.

parties, and also attached an Exhibit 1 that included numerous web page printouts of many of the Sinclair web pages that displayed the Photographs. Sinclair produced documents to BGP in response to the Sinclair Subpoena, but neither corrected the false credit on the Photographs displayed by Defendants on their websites, nor removed the Photographs from any of Defendants' websites until after the four lawsuits were filed.

When Sinclair (and by extension, the Station Defendants) received the Sinclair Subpoena discussed above, Defendants were placed on notice of the Tennessee Lawsuit and BGP's allegations that Defendants' were both infringing BGP's copyrights in the Photographs and violating the DMCA by falsely crediting WENN for the Photographs.

On receipt of the Sinclair Subpoena, Defendants had ample opportunity to investigate and take necessary action to avoid continued infringement on BGP's copyrights. Despite that opportunity, Defendants failed to take adequate steps to affect timely removal of the Photographs from Defendants' websites.

As owners and operators of radio and televisions stations, Defendants are actively engaged in creating, using, licensing and managing copyright protected works (e.g., photographs, video, other news content, etc.). In my experience, companies in Defendants' class of business are knowledgeable concerning copyrights and the DMCA. With a reasonable degree of professional certainty, upon receipt of the Sinclair Subpoena, Defendants knew or should have known that Defendants' continued display of the Photographs was a potential infringement of BGP's copyrights, and that Defendants' continued display of false attribution in connection with alleged infringing use of the Photographs was a potential violation of the DMCA.

By failing to remove the Photographs from their websites upon receipt of the Sinclair Subpoena, Defendants acted with reckless disregard for BGP's copyrights, knowingly and willfully infringing on BGP's copyrights.

## X.      Defendants' DMCA Violations

As described in the above section, Defendants continued to display and distribute the Photographs with false attribution even after Defendants learned of Mrs. Gobble's request to correctly credit her for the Photographs, and after Defendants learned of BGP's Tennessee complaint alleging copyright infringement and DMCA violations. Defendants knowingly continued to provide false copyright management information with intent to induce, enable, facilitate or conceal infringement.[69]

Examples of Defendants' false credits for the Photographs are pictured below.

From '3403 Complaint, Exhibit 33: "Photo: WENN.com"



If you like the look of cats but prefer the personality of a dog the Lykoi feline could be the purr-fect cat for you! <br><Br> Photo: WENN.com

---

[69] 17 U.S.C. 1202(a).

From '3403 Complaint, Exhibit 27: "Photo: WENN.com" (Enlarged at right)



BGP has identified a total of 7207 alleged violations of Section 1202, as evidenced by the false credits pictured in the screenshots of Defendants' websites attached to the '3403 Complaint.[70]

## Y.    Statutory Damages for DMCA Violations

Under 17 U.S.C. 1203, the range of statutory damages available to BGP in the event that the Court finds that Defendants violated Section 1202 is $2,500 to $25,000 per violation.[71] As the total quantity of violations discovered to date is 7207, the range of statutory damages is between $18,017,500 (applying the $2500 minimum award to 7207 violations) and $180,175,000 (applying the $25,000 maximum award to 7207 violations). Statutory damages within these ranges are itemized in "Table of Statutory Damages for DMCA Violations, Totals by Station" (Exhibit R), and "Table of Statutory Damages for DMCA Violations, Itemized by Station" (Exhibit S), as summarized below:

| DMCA Violations - Quantity, All Stations | Minimum 1203 Statutory Damages @ $2,500 | Maximum 1203 DMCA Statutory Damages @ $25,000 |
|---|---|---|
| 7207 | $18,017,500.00 | $180,175,000.00 |

---

[70] '3403 Complaint, Exhibits 12-78.
[71] 17 U.S.C. 1203(c)(3)(B)

In the event that the Court holds Sinclair liable for Statutory Damages for DMCA violations by Station Defendants, the above totals apply to Sinclair.

### Z.        Damages Applicable to Image I26

As BGP has not registered copyright for Image #I26, I have excluded Image #I26 from my calculations of actual damages and statutory damages for copyright infringement. However, as statutory damages for DMCA violations under 17 U.S.C. 1203 do not require copyright registration, I have included Image #I26 in my calculations for statutory damages applicable to DMCA violations. See Exhibit T "Visual Index of Usages for Image I26 Only," Exhibit U, "Table of Usages, by Usage Number, for Image I26 Only," and Exhibit V, "Table of Usages, by Station, for Image I26 Only.

## VII. RIGHT TO SUPPLEMENT

I understand that Defendants may offer expert testimony to support Defendants' claims in the matters, and I expect that additional information and documents may come to light subsequent to my submission of the Report. If requested by BGP, I may offer supplemental reports and/or rebuttal testimony to the opinions expressed by Defendants and Defendants' experts, in accordance with the Court's scheduling order.

Respectfully Submitted,

_____   April 12, 2019

Professor Jeffrey Sedlik