IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND
NORTHERN DIVISION

| | |
|---|---|
| **BRITTNEY GOBBLE PHOTOGRAPHY, LLC,** | Case No. 1:18-cv-03403-SAG (Lead Case) |
| *Plaintiff,* | |
| v. | Case No. 1:18-cv-03384-SAG |
| | Case No. 1:19-cv-00559-SAG |
| **SINCLAIR BROADCAST GROUP, INC., *et al.,*** | Case No. 1:19-cv-00606-SAG |
| *Defendants/Third-Party Plaintiffs,* | |
| v. | |
| **USA ENTERTAINMENT NEWS, INC. d/b/a "WENN" and "WORLD ENTERTAINMENT NEWS NETWORK",** | |
| *Third-Party Defendant.* | |

**MEMORANDUM OF LAW IN SUPPORT OF DEFENDANTS' *DAUBERT* MOTION TO EXCLUDE OPINION TESTIMONY OF PLAINTIFF'S EXPERT – JEFFREY SEDLIK**

## TABLE OF CONTENTS

TABLE OF AUTHORITIES .................................................................................................. iii

I.  INTRODUCTION ................................................................................................. 1

II.  BACKGROUND ................................................................................................... 1

    A.  Parties and Claims. .................................................................................. 1

    B.  The Photographs. ..................................................................................... 2

    C.  Jeffrey Sedlik. .......................................................................................... 4

III.  ARGUMENT ......................................................................................................... 6

    A.  Legal Standard for Daubert Motion. ....................................................... 6

    B.  Legal Standard for Determining Actual Damages in Copyright Cases. ...................... 7

    C.  Sedlik's Methodology for Computing Actual Damages Is Unreliable. ...................... 9

        1.  Sedlik Ignores the Photographs' Actual Licensing History. ............................. 9

        2.  Sedlik's Novel and Unreliable Methodology. .................................................. 11

        3.  Sedlik's Scarcity Multiplier. ............................................................................. 13

        4.  Sedlik's Many Other Methodological Flaws. ................................................... 19

        5.  Sedlik's Methodology Was Never Properly Challenged in Prior Cases. ........ 20

    D.  Sedlik's Opinions That Constitute Legal Conclusions Should Be Excluded. .......... 22

    E.  Sedlik Is Not Qualified to Render Opinions on Disgorgement of Profits. ............... 24

IV.  CONCLUSION ..................................................................................................... 24

## <u>TABLE OF AUTHORITIES</u>

**CASES**

*Autozone, Inc. (In re)*, 2016 WL 4208200 (N.D. Cal. Aug. 10, 2016) ..........................................19

*Brittany Gobble Photography, LLC v. WENN Limited, et al.*, U.S. District Court for the
    Eastern District of Tennessee, No. 3:16-cv-00306 .............................................................4

*Brittany Gobble Photography, LLC v. WENN, Ltd.*, 2019 WL 2446997 (E.D. Tenn. Feb.
    19, 2019) ...............................................................................................................................21

*Dash v. Mayweather*, 731 F.3d 303 (4th Cir. 2013) ......................................................7, 8, 18, 19

*Daubert v. Merrell Dow Pharm.*, 509 U.S. 579, 113 S. Ct. 2786, 125 L.Ed.2d 469
    (1993) .............................................................................................................................. passim

*D. Pergo Custom Guitars, Inc. v. Sweetwater Sound, Inc.*, 2020 WL 60351 (D.N.H. Jan.
    6, 2020) ..................................................................................................................................21

*Edmondson v. RCI Hosp. Holdings, Inc.*, No. 16-CV-2242 (VEC), 2020 WL 2731968
    (S.D.N.Y. Mar. 26, 2020) .....................................................................................................20

*Edmondson v. RCI Hosp. Holdings, Inc.*, No. 16-CV-2242 (VEC), 2020 WL 1503452
    (S.D.N.Y. Mar. 30, 2020) .....................................................................................................19

*FedEx Ground Package Sys., Inc. v. Applications Int'l Corp.*, 695 F.Supp.2d 216 (W.D.
    Pa. 2010) ................................................................................................................................23

*Foraker v. Schauer*, 2005 WL 6000493 (D. Colo Sept. 8, 2005)..................................................14

*Gen. Elec. Co. v. Joiner*, 522 U.S. 136, 118 S. Ct. 512, 139 L. Ed. 2d 508 (1997) ...................1, 7

*Goyal v. Thermage, Inc.*, Civil No. WDQ-08-0020, 2011 WL 691185 (D. Md. Feb. 18,
    2011..........................................................................................................................................7

*Holesapple v. Barrett*, 5 F. App'x 177 (4th Cir. 2001)...............................................................6. 7

*JMJ Enter., Inc. v. Via Veneto Italian Ice, Inc.*, No. 97-CV-0652 1998 WL 175888 (E.D.
    Pa. 1998) ............................................................................................................................14, 16

*Kumbo Tire Co. v. Carmichael*, 526 U.S. 137, 119 S. Ct. 1167, 143 L.Ed.2d 238 (1999) .........6, 7

*Leonard v. Stemtech International, Inc.*, 843 F.3d 376 (3d Cir. 2016)..........................................20

*Linear Tech. Corp. v. Micrel, Inc.*, 2006 WL 8425047 (N.D. Cal. June 9, 2006).........................16

*Meterlogic, Inc. v. KLT, Inc.*, 368 F.3d 1017 (8th Cir. 2004) ..........................................................7

*Monolithic Power Systems, Inc.* v. *Micro Int'l Ltd.*, 476 F.Supp.2d 1143 (N.D. Cal. 2007) ..16, 17

*Navarro v. Procter & Gamble Co.*, No. 1:17-cv-406, 2021 WL 868586 (S.D. Ohio Mar. 8, 2021) ..........................................................................................................................21, 22

*Under a Foot Plant, Co. v. Exterior Design, Inc.,* 2017 WL 3593014 (D. Md. 2017)................21

*U.S. v. Berkeley Heartlab Inc.*, 2017 WL 3671562 (D.S.C. Aug. 22, 2017) ..............................23

*U.S. v. Bynum*, 604 F.3d 161 (4th Cir. 2010) ..............................................................................6

*U.S. v. McIver*, 470 F.3d 550 (4th Cir. 2006) ............................................................................23

*Westberry v. Gislaved Gummi AB*, 178 F.3d 257 (4th Cir. 1999) ..................................................7

**RULES**

Fed. R. Evid. 702 ..............................................................................................................6, 21, 22

**MISCELLANEOUS**

Digital Millennium Copyright Act, 17 U.S.C. § 1202............................................................2, 23

**MEMORANDUM OF LAW IN SUPPORT OF DEFENDANTS' *DAUBERT* MOTION TO EXCLUDE OPINION TESTIMONY OF PLAINTIFF'S EXPERT – JEFFREY SEDLIK**

Defendants, Sinclair Broadcast Group, Inc. *et al.* ("Sinclair") file their *Daubert* Motion to Exclude Opinion Testimony of Plaintiff's Expert – Jeffrey Sedlik, and state as follows:

## I.       INTRODUCTION

More than two decades ago, the Supreme Court cautioned that "nothing in either *Daubert* or the Federal Rules of Evidence requires a district court to admit opinion evidence that is connected to existing data only by the *ipse dixit* of the expert." *Gen. Elec. Co. v. Joiner*, 522 U.S. 136, 146, 118 S. Ct. 512, 519, 139 L. Ed. 2d 508 (1997). Yet, that is exactly what Plaintiff asks this Court to do. Plaintiff's expert calculated damages with a method that: 1) has no name; 2) has never been recognized or discussed in a treatise or professional literature; 3) is not generally accepted; 4) was created for litigation only; 5); cannot be replicated; 6) has no known error rate; 7) ignores the actual sales data of the photographs at issue; and 8) is based on data that simply does not exist. For this reason, Defendants have filed this motion.

## II.       BACKGROUND

### A.  Parties and Claims.

Plaintiff, Brittney Gobble Photography, LLC, owns the copyrights for numerous photographs of Lykoi cats (a new breed of domestic cat) created by Brittney Gobble. Ms. Gobble assigned the copyrights to Plaintiff in 2016 after creating the photographs at issue in this case and shortly before initiating suit to enforce related copyrights. Exhibit 16, Copyright Assignment. Plaintiff alleges that Sinclair improperly used 50 of the copyrighted photographs and one uncopyrighted photograph (the "Photographs") commencing in November 2015. *See* generally Second Amended Complaint (ECF 134) *(*"Compl.")*. Specifically, Plaintiff alleges that

1

Sinclair posted the Photographs to television and radio station websites without Ms. Gobble's permission.[1] Sinclair contends that the Photographs were obtained through lawful means, including a contract between Sinclair and a photo/news syndication company, USA Entertainment News, Inc. ("WENN") and licenses granted by Ms. Gobble. Plaintiff seeks damages that include actual damages, statutory damages and disgorgement, of profits from Sinclair for infringement and violation of the Digital Millennium Copyright Act, 17 U.S.C. § 1202.

### B.  The Photographs.

Ms. Gobble is married to a veterinarian named Johnny Gobble, who owns a veterinary hospital. Exhibit 12, Pl.'s 30(b)(6) Dep. 11:22-12:2; Exhibit 13, J. Gobble Dep. 15:8-14; 17:21-18:4. Through the veterinary hospital, the Gobbles bred and sold Lykoi cats. Exhibit 13, J. Gobble Dep. 15:15-21; 21:20-22:8. To promote sales of the Lykoi cats, Ms. Gobble took photographs of the kittens. Id. at 22:7-24:6; 38:10-16. She then displayed the photographs on social media accounts and websites. Exhibit 12, Pl.'s 30(b)(6) Dep. 56:4-17; 130:10-132:2. Additionally, for added publicity for the cat breeding business, Ms. Gobble also licensed the photographs to various news organizations, animal interest publications, and other organizations or individuals without charging a license fee. Id. at 123:4-18; Compl. ¶32, ECF 134 at 8. In fact, Ms. Gobble licensed Lykoi photographs for no fee at least 37 times during 2014-2015. Exhibit 7, Riley Supp. Rebuttal Report, p. 10.

Beginning in 2015, Ms. Gobble allowed a stock photography company named REX Features ("REX") to license some of her photographs of Lykoi cats, including the Photographs.

---

[1] The Defendants include Sinclair Broadcast Group, Inc., a publicly-traded media corporation, and multiple subsidiary entities that own and operate or provide services to local stations.

Exhibit 12, Pl.'s 30(b)(6) Dep. 37:22-38:12, 81:19-82:8. During the approximately 15 months that Ms. Gobble had a relationship with REX, Ms. Gobble earned $306.03 in fees paid to her by REX. Exhibit 6, Riley Rebuttal Report, p. 9. Ms. Gobble ended her relationship with REX in 2017 because she believed REX breached their agreement by allowing her images to be used without credit. Exhibit. 12, Pl.'s 30(b)(6) Dep. 48:11-49:6. Prior to ending her relationship with REX, Ms. Gobble did not try to renegotiate the license fees she was being paid by REX, nor did she ever tell REX that she believed that they were selling her images for less than they were worth. *Id.* at 166:10-22. Ms. Gobble does not earn a living as a professional photographer. In fact, the only money that she has earned from licensing her photography was the $306.03 paid to her by REX. *Id.* at 39:19-40:11.

Beginning in 2014, Sinclair contracted with WENN to obtain photos and articles for use throughout Sinclair's operations. Exhibit 17, WENN Agreement; Exhibit 14, Cotlove Dep. 62:10–13. Sinclair paid WENN $11,500 per month for the right to use 10,000 photos per month and ten articles per week from WENN's available stock. *Id.* WENN obtained photos from Ms. Gobble on November 2, 2015 as a result of an email exchange with Dr. Gobble. Exhibit 18, Penn/Gobble Email Exchange. Although not relevant to the instant motion, Defendant believes that Plaintiff granted WENN the right to syndicate the photographs to its customers, including Sinclair, but Plaintiff disputes that WENN was allowed to permit Sinclair to use the Photographs.

A few days later, Scott Sistek, an employee at KOMO (a television station owned by a Sinclair subsidiary), apparently downloaded Ms. Gobble's photographs from WENN. Exhibit 15, Sistek Dep. 25:21–26:15. Sistek posted 51 of the Photographs in a gallery on the website of KOMO and several other Sinclair stations, along with a short article about the Gobbles and the new cat breed. Exhibit 14, Cotlove Dep. 44:16–45:4. On November 8, 2015, Ms. Gobble emailed

3

KOMO, stating that her photos were being used without proper credit. <u>Exhibit 19</u>, Sistek/Gobble

Email Exchange. Sistek revised the photo credits and Ms. Gobble confirmed that she was

satisfied with the changes. <u>Exhibit 12</u>, Pl.'s 30(b)(6) Dep. 143:13–19. Another article about the

Gobbles with photographs from WENN was posted by Elizabeth Faugl, a producer at another

Sinclair station, in the same time frame. <u>Exhibit 14</u>, Cotlove Dep. 145:21-146:17. A third similar

article using the WENN photographs was posted by Amanda Ota, a producer at Sinclair's

National Desk, on November 9, 2015, and was pushed out to multiple station websites. *Id.*,

Cotlove Dep. 37:16-19; 96:20-21; 97:8-16; 99:20-100:3. Ota also corresponded directly with Dr.

Gobble and obtained permission to use Lykoi photos. *Id.*, Cotlove Dep. 98:4-6; <u>Exhibit 20</u>,

Ota/Gobble Email Exchange. The scope of that license is an issue in this case, although not

relevant for this motion.

      In 2016, Plaintiff sued third-party defendant WENN and a related entity for copyright

infringement and other claims in the United States District Court for the District of Tennessee

(the "Tennessee Litigation"). <u>Exhibit 23</u>, Complaint, *Brittney Gobble Photography, LLC v*

*WENN Limited, et al.*, U.S. District Court for the Eastern District of Tennessee, No. 3;16-cv-

00306. The majority of the claims asserted in the Tennessee Litigation related to uses of the

Photographs on Sinclair websites. *Id*. at pp. 40-134.WENN eventually defaulted in the Tennessee

Litigation, and the court entered judgment against WENN. <u>Exhibit 24</u>, Report and

Recommendation and <u>Exhibit 25</u>, Judgment, *Brittney Gobble Photography, LLC v WENN*

*Limited, et al.*, U.S. District Court for the Eastern District of Tennessee, No. 3:16-cv-00306.

    **C.  <u>Jeffrey Sedlik</u>.**

      To establish its damages in the Tennessee Litigation, Plaintiff retained Sedlik as its expert

witness. <u>Exhibit 4</u>, Expert Report of Professor Jeffrey Sedlik, October 17, 2018. Plaintiff has

continued to use Sedlik as its expert in the current case. Exhibit 3, Sedlik Dep. 75:24-76:12. Sedlik is an experienced photographer, with a background that includes negotiating licenses for photographs. *Id.* at 142:11-23. Sedlik holds a BFA degree in photography, with an honorary Masters of Fine Art. *Id.* at 146:25-147:20. Sedlik is not, however, an economist or a certified public accountant. *Id.* at 160:1-6.

Sedlik is an adjunct professor at the ArtCenter College of Design. *Id.* at 17:24-18:8. He teaches one course a year relating to copyright. *Id.* at 19:1-11; 21:16-23:5. Sedlik is also the president of a small nonprofit, named the PLUS Coalition. *Id.* at 25:20-26:3; 44:10-11. The PLUS Coalition developed a common set of terminology to be used when communicating about image rights. *Id.* at 56:14:59:22. Sedlik is the only employee of the PLUS Coalition. *Id.* at 31:17-19. In 2017, the PLUS Coalition reported on its tax return $8,609 in total revenue, and indicated that Sedlik worked 10 hours a week for the organization. *Id.* at 45:6-10; 47:10-14. In 2018, the PLUS Coalition reported $1,085 in total revenue, with Sedlik also working 10 hours a week for the organization. Exhibit 21, 2018 PLUS Tax Return. Sedlik issued two reports in this case containing his opinions, the details of which are discussed below. Copies of his reports are attached hereto as Exhibits 1 and 2.[2] Sedlik prepared a similar report in the Tennessee Litigation. Exhibit 4 hereto. Defendants also deposed Sedlik on November 13, 2019. *See generally* Exhibit 3, Sedlik Dep. Although Ms. Gobble never earned more than $306.03 in total from licensing her photography during her lifetime and frequently licensed her photographs for free, Sedlik has

---

[2] Sedlik's Preliminary Report attached multiple exhibits labeled A-V. Exhibit 1(J), Index to Exhibits. Many of the exhibits are hundreds of pages long. Some exhibits are duplicative, in that they contain the same information but are organized differently. A few exhibits do not relate to the matters at issue in this motion. Defendants have attached only the relevant and non-duplicative exhibits as Exhibits 1(A) – 1(I).

opined that Plaintiff is entitled to actual damages ranging from $18,636,647.50 to $31,061,079.10 to compensate Plaintiff for the license fees Plaintiff alleges it would have earned for the Defendants' use of the Photographs. Exhibit 1, Sedlik Report at 37-38.

## III.   ARGUMENT

### A.  Legal Standard for Daubert Motion.

A witness may be qualified as an expert "by knowledge, skill, experience, training, or education." Fed. R. Evid. 702. Expert testimony is admissible only if it will "help the trier of fact to understand the evidence or to determine a fact in issue," and (1) is "based on sufficient facts or data;" (2) is "the product of reliable principles and methods;" and (3) the principles and methods have been applied "reliably ... to the facts of the case." *Id.* The expert's opinions must also rest on a reliable foundation and be relevant. *Daubert v. Merrell Dow Pharm.*, 509 U.S. 579, 589, 113 S. Ct. 2786, 125 L.Ed.2d 469 (1993); *see also Kumho Tire Co. v. Carmichael*, 526 U.S. 137, 119 S. Ct. 1167, 143 L.Ed.2d 238 (1999) (extending *Daubert* to opinions of other experts who are not scientists). Where experiential expert testimony "does not rely on anything like a scientific method," it is admissible if the expert "'explain[s] how [his] experience leads to the conclusion reached, why [his] experience is a sufficient basis for the opinion, and how [his] experience is reliably applied to the facts." *United States v. Bynum*, 604 F.3d 161, 167 (4th Cir. 2010).

A court's inquiry into the reliability of an expert's testimony is "flexible," and focuses on "the principles and methodology employed by the expert." *Daubert*, 509 U.S. at 594-95, 113 S. Ct. 2786; *see also Holesapple v. Barrett*, 5 F. App'x 177, 179 (4th Cir. 2001). In determining whether expert testimony is sufficiently reliable, "the court has broad latitude to consider whatever factors bearing on validity that the court finds to be useful; the particular factors will

depend upon the unique circumstances of the expert testimony involved." *Westberry v. Gislaved Gummi AB*, 178 F.3d 257, 261 (4th Cir. 1999). Neither *Daubert* nor the Federal Rules of Evidence require a trial court "to admit opinion evidence that is [based merely on] the *ipse dixit* of the expert." *Gen. Elec. Co. v. Joiner*, 522 U.S. 136, 146, 118 S. Ct. 512, 139 L. Ed. 2d 508 (1997). Rather, "[r]eliability is to be determined by the 'principles and methodology' employed by the expert." *Holesapple*, 5 F. App'x at 179. Indeed, "[t]he district court must exclude expert testimony if it is so fundamentally unreliable that it can offer no assistance to the jury." *Goyal v. Thermage, Inc.*, Civil No. WDQ-08-0020, 2011 WL 691185, at *3 n.8 (D. Md. Feb. 18, 2011) (quoting *Meterlogic, Inc. v. KLT, Inc.*, 368 F.3d 1017, 1019 (8th Cir. 2004)).

In *Daubert,* the Supreme Court identified five factors that may be used to assess the relevancy and reliability of expert testimony: (1) whether the particular technique or theory "can be (and has been) tested;" (2) whether the technique or theory "has been subjected to peer review and publication;" (3) the "known or potential rate of error for a particular technique;" (4) the "existence and maintenance of standards controlling the technique's operation;" and (5) whether the technique has achieved "general acceptance" in the relevant scientific or expert community. *Daubert, 509 U.S.* at 593–94, 113 S. Ct. 2786. Rather than providing a definitive or exhaustive list, *Daubert* merely illustrates the types of factors that will "bear on the inquiry." *Id.* As *Daubert* emphasized, the analysis must be "a flexible one." *Id.; see also Kumho*, 526 U.S. at 141–42, 119 S. Ct. 1167 (testing for reliability should be flexible and *Daubert*'s five factors are not necessarily or exclusively applied to every expert).

### B.  Legal Standard for Determining Actual Damages in Copyright Cases.

"The fair market value of a copyrighted work is derived from an objective, not a subjective, inquiry." *Dash v. Mayweather*, 731 F.3d 303, 312 (4th Cir. 2013). Injury to a

copyrighted work's market value can be measured in a number of ways. *Id.* The first approach measures the amount of revenue that the copyright holder lost as a result of the infringement, such as his own lost sales of the work. *Id.* Another recognized measure is the fair market value of the licensing fee the owner was entitled to charge for the infringer's use of his copyrighted work. *Id.* This second approach is the one used by Plaintiff in this case. *See* Exhibit 1.

A copyright owner must show that the copyrighted work had a fair market value in order to recover actual damages. *Id.* Although the *nature* of actual damages may require a court to engage in some degree of speculation, the *amount* of damages sought cannot be based on undue speculation. *Id.* at 313.

Under the lost licensing fee approach, actual damages are calculated based on what a willing buyer would have been reasonably required to pay a willing seller for the copyrighted work. *Id.* The question is not what the owner would have charged, nor what the infringer might have been willing to pay. Rather, this objective analysis focuses on the fair market value of the work as negotiated between a willing buyer and a willing seller. *Id.*

Evidence of a copyright holder's prior sales or licensing history will satisfy a plaintiff's burden. *Id.* at 318. In some cases, evidence of "licensing fees paid to other artists for the use of other works" may be sufficient to establish the fair market value of a plaintiff's work, as long as the evidence is not too speculative. *Id.* at 319. Evidence of other copyright holders' licenses is not overly speculative when the benchmark licenses used by a plaintiff contemplate comparable uses of comparable works. *Id.* But, if the benchmarks relied on are inapposite, without more, they may be too speculative to support a claim for actual damages. *Id.*

**C.  <u>Sedlik's Methodology for Computing Actual Damages Is Unreliable.</u>**

Despite Ms. Gobble earning only $306.03 in licensing fees for Lykoi photographs during her life, Sedlik reaches the outrageous conclusion that Plaintiff is entitled to actual damages between $18,636,647.50 and $31,061,079.10. *See* Ex. A at 38. To reach this conclusion, Sedlik ignores Ms. Gobble's licensing history and invents a methodology that:

- has no name;

- was made up by Sedlik;

- is not recognized in any treatise or other professional literature;

- is not generally accepted within the relevant professional community;

- cannot be replicated or tested;

- has never been subjected to peer review;

- has no known error rate; and

- was created by Sedlik solely for use in litigation.

For these reasons, Sedlik's opinion on actual damages is neither reliable nor relevant.

**1.  Sedlik Ignores the Photographs' Actual Licensing History.**

To calculate its actual damages, Plaintiff attempts to prove what a willing buyer would have paid a willing seller for the use of the Photographs through the use of a hybrid benchmark methodology, despite the fact that Ms. Gobble has a history of licensing the actual Photographs. First, she licensed them at no charge to news organizations, other websites, and bloggers. <u>Exhibit 12</u>, Pl.'s 30(b)(6) Dep. 123:4-18. Additionally, she licensed them through REX and earned a total of $306.03. <u>Exhibit 6</u>, Riley Report, p. 9 and Ex. 2. One of the REX transactions was a license issued to ABCNews.com for use of four Lykoi images on broadcast station websites similar to Sinclair's. <u>Exhibit 10</u>, Elsner Report, Ex. 14; <u>Exhibit</u> 22, Statement of Sales. REX was

paid £16.14 for each photo license (about $32.41) and paid Ms. Gobble £13.07 (about $16.20) as the photographer's 50% share of the license payment. Exhibit 10, Elsner Report, pp. 24-26.

Oddly, however, Sedlik ignores this entire history and instead applies his own methodology that will be further discussed below. To justify his decision to ignore the license history of the Photographs, Sedlik asserts that Ms. Gobble only "experimented" with REX during the 15 months that she allowed them to sell licenses of her photographs to others and ended this experiment after a short period of time. Exhibit 1, Sedlik Report, p. 28; Exhibit 3, Sedlik Dep. 294:7-21. The fundamental flaw in this assertion is that there is no evidence to support it.

First, Sedlik conceded in deposition that Ms. Gobble never said that she "experimented" with licensing her photographs through REX. Exhibit 3, Sedlik Dep. 296:4-20. To the contrary, Ms. Gobble herself testified that she ended her relationship with REX because she believed that REX was allowing others to use her images without giving her proper credit. Exhibit 12, Pl.'s 30(b)(6) Dep. 48:11-49:2; 165:20-166:7. Thus, from the outset, Sedlik's opinion is unreliable because he ignored the actual licensing history of the Photographs based on an inaccurate assumption. Had this licensing history been considered, Plaintiff's actual damages would have been a maximum of only $1,652.91 for the Defendants' use of the Photographs, according to Defendant's industry expert, Gary Elsner. *See* Exhibit 10, p. 26, Elsner Report; Exhibit 9, Declaration of Gary Elsner.

Next, Sedlik's method is not even recognized as an acceptable technique for asset valuation. According to Riley,[3] "Sedlik seems to be attempting to use the comparable listings method, as described in the 2017 International Valuation Standards published by the International Valuation Standards Counsel. However, his application of this method is flawed and erroneous." Exhibit 7, p. 11, Riley Supplemental Report. Under the standards, the comparable listings method should not be used as the sole indication of value but can be appropriate for consideration together with other methods. *Id.* By ignoring Ms. Gobble's prior licensing history, according to Riley, Sedlik's analysis fails to comply with the foregoing standard.

### 2. Sedlik's Novel and Unreliable Methodology.

Because Sedlik wrongly concludes that there is no licensing history for the Photographs to use to calculate actual damages,[4] Sedlik employed the following methodology:

i)  In 2017, Sedlik selected three photographs of cats (not Lykoi kittens) that he found on stock photography websites (First Light, Getty Images, and Image Source). Exhibit 1(C), Sedlik Report, Ex. H. Sedlik asserts that the stock photos are "comparative" to the Photographs. Exhibit 1, Sedlik Report at 34.

ii)  Next, using the stock photography websites' online calculators, Sedlik entered various assumptions regarding the size of the images, the number of viewers, the type of license, etc. to obtain three quotes for one-year licenses that ranged

---

[3] Riley is a CPA and business valuation expert, specializing in intellectual property cases. She has been in practice for 22 years as a CPA and 15 years as a valuation and damages expert. Exhibit 5, Riley Declaration at ¶3.

[4] Sedlik testified, "But in this case I had to sample because I didn't have any historical license to base it on." Exhibit 3, Sedlik Dep. 224:17-18.

between $227.37 and $1,050.00 that he used as benchmarks (the "Benchmarks")

in his analysis. Exhibit 1(E), Sedlik Report, Ex. J.

iii)     Sedlik then averaged the quotes for each of the three Benchmarks ($649.12) and

adjusted the average downward to reflect his opinion that license fees in 2015

were 9.15% lower than in 2017. This calculation produced Sedlik's "Average

Market Rate, Per Year (2015)" of $589.73. Exhibits 1(D), 1(E), Sedlik Report,

Ex. I, J.

iv)     Sedlik determined that there were over 7,000 instances of use by the Defendants

("Usages") of the Photographs and that the Usages required 2,729 separate

Licenses. Exhibit 1(G), Sedlik Report , Ex. L. Sedlik explained that "I took each

of the stations and priced them as if they had each separately licensed the

images." Exhibit 3, Sedlik Dep. 244:18-20.

v)     Because Sedlik's Benchmarks were for one-year licenses (as opposed to multi-

year or unlimited licenses), Sedlik then multiplied the "Average Market Rate, Per

Year (2015)" figure by the number of years of alleged infringing use ("License

Units") for each of the alleged 2,729 Licenses to determine the "Base Actual

Damages." Totaling these calculations, Sedlik concluded that the Base Actual

Damages were $6,212,215.82. Exhibit 1(G), Sedlik Report, Ex. L.

vi)     Because Sedlik asserts that photographs of Lykoi cats were "scarce" in 2015,

Sedlik applied a "scarcity multiplier" with a range of 3 to 5 times the Base Actual

Damages to come up with a range for the fair market value to license the

Photographs of from $18,636,647.50 to $31,061,079.10. Exhibit 1, Sedlik Report.

at 37-38.

Sedlik's methodology is flawed for numerous reasons. First, Sedlik created this methodology solely for use in litigation. Exhibit 3, Sedlik Dep. 224:2-225:5. He does not use it when calculating the license fees outside of litigation. *Id*. For this reason alone, the reliability of Sedlik's methodology is suspect.

Next, his methodology has no name and is not recognized or described in any treatise or professional publication. *Id.* at 223:10–224:16. It is clear that Sedlik's method is simply a technique made up by Sedlik for use in litigation. There is no evidence of anyone else using it to determine the fair market value of anything. It is also not generally accepted in the relevant professional community. *Id.* at 224:19-225:5. And, his methodology has no known error rate. *Id.* at 225:8-10. For these reasons alone, Sedlik's opinions are unreliable and should be excluded.

### 3. Sedlik's Scarcity Multiplier.

Central to Sedlik's opinion is his belief that a 3-5 times scarcity multiplier should be applied to the Base Actual Damages because he asserts that photographs of Lykoi cats were scarce in 2015. Exhibit 3, Sedlik Dep. 240:10-241:8. According to Sedlik, the term "scarce" refers to a situation where the supply of an item is insufficient to meet the demand for that item. *Id.* at 278:13-24.

Sedlik noted in his initial report that he was instructed by Plaintiff's counsel to rely on certain assumptions and that the scope of his expert engagement did not include verifying those assumptions. Exhibit 1, Sedlik Report at 10. One of these assumptions was that "the Photographs were both rare and scarce in the photography licensing marketplace" in November 2015. *Id*. at 11, Assump. M; Exhibit 3, Sedlik Dep. 232:9-16. However, in deposition, Sedlik for the first time explained that after issuing his initial and surrebuttal reports, he obtained anecdotal information by speaking with three experienced photographers who all said that photographs of

13

Lykoi cats were scarce. *Exhibit 3*, Sedlik Dep. 175:3-176:7. (While Sedlik states in his June 2019 Surrebuttal Report that – in preparation of his Surrebuttal Report - he searched the Getty Images website, finding only 17 photos tagged with "lykoi," he has no data to support the "scarcity" of Lykoi cat photos in 2015 and presented no evidence of his search results. <u>Exhibit 2</u>, Sedlik Surrebuttal Report at 13.)

An expert is not permitted to simply accept an assumption given to him without verifying the assumption. *See, e.g.*, *JMJ Enter., Inc. v. Via Veneto Italian Ice, Inc.*, No. 97-CV-0652 1998 WL 175888 (E.D. Pa. 1998). Referring to guidelines from the American Institute of Certified Public Accountants, the *JMJ Enter.* court stated "The attention devoted to the appropriateness of a particular assumption should be commensurate with the likely relative impact of that assumption on the prospective results. Assumptions with greater impact should receive more attention than those with less impact." *Id.* at *8. Despite the dramatic impact scarcity has on Sedlik's opinion on fair market value, Sedlik has no data to back up his assertion of scarcity for 2015.

Sedlik also could not identify any factors that would indicate the appropriate range for a scarcity multiplier. <u>Exhibit 3</u>, Sedlik Dep. 240:15-241:8. Defendants are left to guess why he chose the range of 3-5 times, without any method to test his conclusion. An expert is not entitled to come up with numbers to use in computing damages "out of thin air." *Foraker v. Schauer*, 2005 WL 6000493 (D. Colo Sept. 8, 2005). Additionally, in deposition, Sedlik had difficulty explaining what scarcity actually meant in his methodology.. Eventually, he stated that an item is scarce when the supply of the item is insufficient to meet the demand. *See* <u>Exhibit 3</u>, Sedlik Dep. 277:21-280:7

The only evidence that Sedlik could point to that supported his assertion that the supply of Lykoi cat images was low in 2015 was the information he obtained when he spoke to the three photographers. *Id.* at 175:3-176:7. Yet, Sedlik could not have relied on the anecdotal comments from these three photographers that he simply regurgitated during his deposition because he learned this information long after he issued his reports with his opinions. *Id.* at 176:18-20. (Sedlik's 2018 report in the Tennessee Litigation also included a 3-5 scarcity multiplier, even though that report was issued *two years* before Sedlik's purported conversations with the photographers. Exhibit 4, 2018 Sedlik Report at p. 33.) In fact, he collected no data that Sinclair could review, including searches of stock photography companies online, to quantify the number of Lykoi cat images that were actually available. *Id.* at 175:3-178:23. Moreover, Sedlik's analysis of the availability of Lykoi cat photographs in 2015, without any documentation, is not repeatable or testable. Exhibit 7, Riley Supplemental Report at 12. This is exactly the type of *ipse dixit* that is inadmissible under *Daubert*.

Sedlik's data with respect to demand is even thinner. Sedlik has absolutely no data about the level of demand for Lykoi cat photographs. Exhibit 3, Sedlik Dep. 179:3-21. He conducted no studies and collected no information to support his assertion that demand for Lykoi cat photographs exceeded supply in 2015. *Id.* at 241:3-243:21. In fact, he conceded that he did not do the type of analysis that an economist would do. *Id.* at 183:20-184:14. This is not surprising considering that Sedlik is not an economist and has not taken any courses in economics since college. *Id.* at 146:17-24. According to Sedlik, we have to take his word for it because he has

been in the photography business for many years.[5] With no actual data to examine, Sedlik's methodology is not testable or repeatable. Therefore, his opinions are unreliable.

Related to demand, and further demonstrating the flaws in Sedlik's approach, at deposition, Sedlik exhibited a fundamental lack of understanding of the concept of elasticity of demand. Elasticity of demand refers to the impact on demand as the price of an item is increased. Generally speaking, demand for a product will decrease as the price for that product increases. *Linear Tech. Corp. v. Micrel, Inc.* 2006 WL 8425047, *50 (N.D. Cal. June 9, 2006) (expert's analysis unreliable where he did not perform any analysis of demand elasticity); *Monolithic Power Systems, Inc. v. Micro Int'l Ltd.*, 476 F.Supp.2d 1143, 1155–56 (N.D. Cal. 2007) (expert's report that "did not account for the law of supply and demand" deemed unreliable). "All markets must respect the law of demand." *Monolithic Power Sys.*, 476 F.Supp.2d at 1156.

When asked at deposition to define "elastic demand," Sedlik testified as follows:

Q:   I'd like for you to give us the definition - the economic definition of "elastic demand."

A:   It's demand that can change with - based on whatever factors might affect that demand - might affect it.

Q:   Such as?

A:   Current events, or events that occur.

Q:   Anything else?

A:   The economy.

Q:   Anything else?

A:   I'm sure I'm not thinking of everything, but that is a good set.

---

[5] "An expert cannot simply base his conclusions on his thirty-one years of experience." *JMJ Enters., Inc. v. Via Veneto Italian Ice, Inc.*, No. 97-CV-0652, 1998 WL 175888, *10 (E.D. Pa. 1998) (internal quotations omitted).

Q:      That's all you could think of as use it here right now?

A:      Right now.

<u>Exhibit 3</u>, Sedlik Dep. 180:21-181:13.

This exchange makes plainly evident that Sedlik does not understand the impact that *price* has on demand. Sedlik assumes that a hypothetical buyer will pay whatever he says the hypothetical license fee would be, regardless of its reasonableness. Just like the expert in *Monolithic Power Systems*, Sedlik does not "respect the law of demand." This is particularly relevant in this case because, if Sedlik's analysis is accurate, a willing buyer would have paid between $18,636,647.50 and $31,061,079.10 to license 50 photographs for an "offbeat" pet story.[6] <u>Exhibit 15</u>, Sistek Dep. 134:5-10. Sedlik offers no explanation of how there could possibly be any demand for a news organization to purchase licenses for cat photographs for that price range. When asked why any media organization would pay 18 to 30 million dollars to obtain photos from a photographer who had previously licensed the photos without charge, Sedlik stated that "Brittney Gobble controls the circumstances under which she would *offer up* a license of the images." <u>Exhibit 3</u>, Sedlik Dep. 252:1-13. (Emphasis added.) Sedlik testified as follows:

Q.      What evidence do you have to conclude that Sinclair or another hypothetical media company similar to Sinclair would have accepted a rights-managed license in this context along the lines of what you're proposing?

A.      *I don't have evidence that they would have accepted it.* I do have the scenario of a willing buyer and seller and what the seller could reasonably require of the buyer for use of the image.

<u>Exhibit 3</u>, Sedlik Dep. 244:7-16. (Emphasis added.)

---

[6] Sedlik assumes that actual damages may not be recovered for infringement of the one unregistered photograph. Exhibit 1, Sedlik Report at 11, Assump. F.

Reflecting the absurdity of his opinion, Sedlik testified that he could not identify even a single transaction where a news media organization paid between $18 million and $30 million for a set of photographs. Exhibit 3, Sedlik Dep. 222:20-223:9. His inability to identify even one transaction that resulted in a license fee in this range for a collection of photographs is directly related to the concept of demand elasticity. Simply put, Sedlik, as he admitted above, has no evidence that a hypothetical national media organization would agree to pay that much money to license 50 photographs of cats for a soft news story posted on its websites. *Dash* makes clear that the objective inquiry "focuses on the fair market value of the work as 'negotiat[ed] between a willing buyer and a willing seller' contemplating the use the infringer made." *Dash*, 731 F.3d at 313. Sedlik's method is not designed to produce a result that represents an objective, negotiated sale value and therefore does not produce a fair market value, as defined by *Dash*.[7]

To further illustrate the absurdity of his opinion, Sinclair could have hired Annie Leibovitz, one of the foremost photographers in the world, to spend an entire day photographing Lykoi cats for Sinclair for far less than the damages claimed by Sedlik. Ms. Leibovitz's daily rate is reportedly up to $250,000. Exhibit 26, Scott Mayerowitz, *Annie Leibovitz Reaches Settlement with Creditors*, ABC News (Sept. 8, 2009). According to Johnny Gobble's deposition testimony, Lykoi kittens sold for around $2,500. Exhibit 13, J. Gobble Dep. 88:6-8. Sinclair could have purchased 10 Lykoi kittens and hired Annie Leibovitz for a day for under $300,000, less than 2% of the low end of Sedlik's range of damages.

---

[7] Sedlik's woefully inadequate methodology, along with his lack of understanding of supply, demand and elasticity, raises very real questions about whether he is qualified to testify as an expert in this case, despite his many years of photography experience.

### 4. Sedlik's Many Other Methodological Flaws.

These are not the only flaws in Sedlik's methodology. Sedlik's conclusions rest on the validity of the Base Actual Damages that he computed using the three Benchmarks. However, Sedlik obtained "quotes" to license images from the stock photography websites, not the prices for actual transactions where the license sale was closed. He has no data that anyone ever purchased a license for any of the Benchmark amounts, much less that a transaction occurred for use of photos on media websites – the use contemplated in this case – at the quotes obtained by Sedlik. According to *Dash*, evidence of "licensing fees *paid* to other artists for the use of other works" may sometimes be sufficient to support a damages opinion, but Sedlik has no evidence of what fees were actually paid. *Dash*, 731 F.3d at 319. (Emphasis added.) For this reason, his Base Actual Damages figure is pure conjecture, rendering his entire analysis unreliable.

Next, Sedlik adjusted his fair market value figures based on the change in the market for license fees between 2015 and 2017. According to Sedlik, photography license fees increased between 2015 and 2017. Exhibit 1, Sedlik Report at 36. To reach this conclusion, Sedlik looked at the price for one stock photograph online and compared its license fee from 2015 to 2017. Exhibit 3, Sedlik Dep. 201:18-202:11. Based on this analysis, Sedlik concluded that 2015 photographic license fees were 9.15% less than 2017 fees. *Id.* at 199:8-200:11, 201:4-202:18. Thus, he concluded that the market rate for all photography licenses during this time period increased by that same amount based on the change in price for one Getty Images photograph. The fundamental flaw in Sedlik's methodology is that he relied on a sample size that was far too small to produce a statistically significant, reliable result. *See id.*, 204:22-206:7; Exhibit 7, Riley Supp. Rep. at 14;  *In re Autozone, Inc.*, 2016 WL 4208200, at *17 (N.D. Cal. Aug. 10, 2016) ("[A] sample must be sufficiently large to provide reliable information about the larger group.");

19

*see also Edmondson v. RCI Hosp. Holdings, Inc.*, No. 16-CV-2242 (VEC), 2020 WL 1503452, at *6 (S.D.N.Y. Mar. 30, 2020), *reconsideration denied*, No. 16-CV-2242 (VEC), 2020 WL 2731968 (S.D.N.Y. May 26, 2020). To compound this mistake, Sedlik collected no data to determine what if any changes occurred through 2019, the end date for his damages calculation. Exhibit 3, Sedlik Dep. 202:15-18. In fact, he made no adjustments to account for any changes between 2017 and 2019 although his method uses multiple one-year licenses to calculate Total Actual Damages. *Id*. Once again, Sedlik ignored basic principles of economics, rendering his opinion unreliable.

### 5. Sedlik's Methodology Was Never Properly Challenged in Prior Cases.

Plaintiff will likely argue in response that Sedlik has been permitted to offer opinions based on the same methodology in other cases. While this is true, Sedlik's methodology was not challenged in those cases as it is being challenged here. There is only one Circuit Court of Appeals case addressing Sedlik's methodology. In *Leonard v. Stemtech International, Inc.*, 834 F.3d 376 (3d Cir. 2016), the Third Circuit affirmed the trial court's order permitting Sedlik to testify using a similar methodology. However, the Third Circuit made clear that its opinion was based on the record before it. In that case, the defense chose not to cross-examine Sedlik at trial or present its own expert witness. *Leonard*, 834 F.3d at 385. After the magistrate judge denied the defendant's *Daubert* motion, the defendant failed to file objections with the District Court judge. Significantly, the defendant in that case also did not challenge Sedlik's use of a scarcity multiplier in its *Daubert* challenge or at trial. *Id*. at 393, n.13. In fact, the defendant never raised the multiplier issue until its motion for new trial. *Id.* Moreover, there is no discussion in the opinion of a paucity of data similar to that which exists in the case at bar. Therefore, the Third Circuit decided the case on a record significantly different from that which is before this Court.

20

In another case, from the District of Maryland, the trial court evaluated Sedlik's opinions based on a record significantly different from that which is before this court. In *Under a Foot Plant, Co. v. Exterior Design, Inc.*, 2017 WL 3593014 (D. Md. 2017), Magistrate Judge Gesner denied the defendant's motion for judgment following a four-day jury trial. *Id*. at *1. In that case, also a copyright infringement case involving photographs, Sedlik testified in support of the plaintiff's damages claim. The court issued a scheduling order establishing deadlines for submitting motions in limine. Prior to trial, defendants never filed a motion in limine or otherwise objected to Sedlik's qualifications or the reliability of his opinions. *Id.* at *2. Instead, at the close of evidence, the defendant orally moved for judgment, arguing that Sedlik's testimony was unreliable under Federal Rule of Evidence 702. *Id.* at *3. The court initially observed that the defendant's argument was, in fact, an untimely *Daubert* motion. *Id.* Nonetheless, the court appears to have rejected the defendant's argument on the merits. *Id.* The defendant never presented any rebuttal expert testimony of its own and never deposed Sedlik. *Id*. at *6. There is also no indication in the opinion of a similar challenge to Sedlik's methodology as is being made in this case, nor is there any indication of a similar lack of data as exists in our case. Thus, *Under a Foot Plant* is inapposite. There are also other trial level opinions that allowed Sedlik to offer opinions based on similar methodology, but they generally relied on *Leonard* or were similarly distinguishable to the instant case. *Brittney Gobble Photo., LLC v. WENN, Ltd.*, 2019 WL 2446997 (E.D. Tenn. Feb. 19, 2019) (default judgment); *D'Pergo Custom Guitars, Inc. v. Sweetwater Sound, Inc.*, 2020 WL 60351 (D.N.H. Jan. 6, 2020) (challenged on different grounds).

Recently, in *Navarro v. Procter & Gamble Co.*, No. 1:17-cv-406, 2021 WL 868586 (S.D. Ohio Mar. 8, 2021), the United States District Court for the Southern District of Ohio excluded

much of Sedlik's opinions in a *Daubert* challenge. In that case, Sedlik invented a methodology for determining damages that had never been used by any other expert and was not otherwise recognized in the literature. *Id.* at *8. The court held that his opinions were, therefore, unreliable and inadmissible under *Daubert*. In rejecting another set of his opinions, the trial court noted that they were "his mere subjective speculation." *Id.* at *10. Commenting on this, the court stated "red flags that caution against certifying an expert include reliance on anecdotal evidence, improper extrapolation, failure to consider other possible causes, lack of testing, and subjectivity." *Id.* (internal quotations omitted). Lastly, the *Navarro* court rejected other of Sedlik's opinions, finding that he was unqualified to render those opinions or they constituted legal conclusions. *Id.* at *11–12.

Although Sedlik used a different methodology in *Navarro*, in both *Navarro* and this case, Sedlik invented methodologies that had never been used by another expert, the methodologies are not generally accepted, and they have never been recognized by the relevant professional literature. Also, just as the *Navarro* court cautioned against relying on anecdotal evidence, Sedlik relied on anecdotal information in this case, such as the three photographers he asserts he spoke with about the supply of Lykoi cats. Thus, this Court should similarly exclude Sedlik's opinions on actual damages.

Based on the foregoing, Sedlik's opinions about Plaintiff's actual damages are unreliable, irrelevant and inadmissible under Federal Rule of Evidence 702.

### D. **Sedlik's Opinions That Constitute Legal Conclusions Should Be Excluded.**

Many of Sedlik's opinions actually constitute legal conclusions and are, therefore, inadmissible. These opinions are as follows:

a. Plaintiff has sole discretion to determine the license fee to be paid by licensees. <u>Exhibit 1</u>, Sedlik Report at 28.

b. In an email exchange between Johnny Gobble and WENN whereby WENN licensed the Photographs from Ms. Gobble, Dr. Gobble clearly and unambiguously prohibited WENN from distributing the Photographs. *Id.* at 28-29.

c. The license extended to WENN in this email exchange contained five conditions. *Id.* at 30

d. Dr. Gobble did not grant WENN the right to sublicense the cat photographs to third parties. *Id.* at 30.

e. Sedlik provided various interpretations as to the scope of the license on pages 31-32 of his report.

f. Sinclair infringed on Plaintiff's copyright. *Id.* at 34.

g. Sinclair recklessly, intentionally and willfully infringed on Plaintiff's copyrights. *Id.* at 40–42.

h. Sinclair knowingly committed a DMCA violation. *Id.* at 43.

i. Sinclair committed over 7,000 copyright violations. *Id.* at 44.

j. Sinclair was put on notice that it was infringing on Plaintiff's copyrights when Sinclair received a subpoena in 2017 in the Tennessee Litigation. <u>Exhibit 2</u>, Sedlik Surrebuttal Report at 12.

k. The purportedly false photo credits harmed Plaintiff. Sedlik Surrebuttal Report at 13-14. Watermarks are considered copyright management information under 17 U.S.C. 1202. *Id.* at 14.

l. Plaintiff is entitled to recover statutory damages at the highest rate. <u>Exhibit 1</u>, Sedlik Report at 40-45.

Opinion testimony that states a legal standard or draws a legal conclusion by applying law to the facts is generally inadmissible. *U.S. v. McIver*, 470 F.3d 550 (4th Cir. 2006); *FedEx Ground Package Sys., Inc. v. Applications Int'l Corp.*, 695 F.Supp.2d 216 (W.D. Pa. 2010) (expert's opinions that constituted legal conclusions deemed inadmissible in a copyright infringement case). An expert's opinion on the ultimate issue of a defendant's intent is inadmissible, as it constitutes a legal conclusion. *U.S. v. Berkeley Heartlab Inc.*, 2017 WL 3671562, at *5 (D.S.C. Aug. 22, 2017).

23

Based on the foregoing, this Court should exclude Sedlik's opinions that constitute legal conclusions.

**E.  Sedlik Is Not Qualified to Render Opinions on Disgorgement of Profits.**

Plaintiff is apparently offering Sedlik to testify to the amount of profits that Sinclair should disgorge to Plaintiff as part of Plaintiff's damages. Sedlik is not qualified to render such opinions. He is not a CPA, nor an economist. Exhibit 3, Sedlik Dep. 159:14-160:6. He has no training or experience in calculating lost profits or advertising revenue for a news media organization. *Id*. at 70:25:72:7. His experience is solely limited to the fields of photography and photography licensing. *Id*. at 160:16-161:14. Sedlik's preliminary report includes only summary comments and no calculations on this issue. Exhibit 1, Sedlik Report at 38-39. Further, in deposition, Sedlik acknowledged that he did not intend to render an opinion on Defendants' profits beyond the narrow comments included in his preliminary report, and that he would leave "calculations of attributable profits" to the economists. Exhibit 3, Sedlik Dep. at 159:19-160:6. Therefore, Sedlik is not qualified to render opinions on disgorgement of profits.

**IV.    CONCLUSION**

Sedlik's unreliable methodology has led to the exact type of *ipse dixit* opinions that the Supreme Court cautioned should not be accepted. In a case where the photographer never earned more than $306.03 for her work in total, Sedlik's fair market value opinion of $18,636,647.50 to $31,061,079.10 is unreliable and should be excluded.

WHEREFORE, Defendants request that this Court enter an order excluding the opinion testimony of Jeffrey Sedlik and granting such other and further relief as this Court deems just, equitable and proper.

Dated: July 20, 2021

Respectfully submitted,

/S/    Scott H. Marder
Francis R. Laws (Bar No. 02596)
flaws@tandllaw.com
Scott H. Marder (Bar No. 28789)
smarder@tandllaw.com
Margaret L. Argent (Bar No. 06132)
margent@tandllaw.com
THOMAS & LIBOWITZ, P.A.
25 S. Charles Street, Suite 2015
Baltimore, Maryland 21201
Telephone: (410) 752-2468
Facsimile: (410) 752-0979

*Attorneys for Defendants*

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY, that on this 20th day of July, 2021, a copy of the foregoing Memorandum in Support of Defendants' Motion to Exclude Expert Testimony of Jeffrey Sedlik was filed electronically. Notice of the filing will be sent to all parties who have appeared by operation of the Court's electronic filing system. Parties may access this filing through the Court's system.

I FURTHER HEREBY CERTIFY, that on the 21st day of July, 2021, I will cause a copy of the foregoing Memorandum in Support of Defendants' Motion to Exclude Expert Testimony of Jeffrey Sedlik (without exhibits) to be served as follows on Third-Party Defendant USA Entertainment News, Inc.:

Via First Class U.S. Mail, Postage Prepaid          Via First Class Airmail, Postage Prepaid

25

USA Entertainment News, Inc.
c/o Frankfurt Kurnit Klein & Selz, P.C.
488 Madison Avenue, 10th Floor
New York, NY 10022
Attn: Mike Dolan

USA Entertainment News, Inc.
c/o Lloyd Beiny, Registered Agent
4A Tileyard Studios
Tileyard Road
London N7 9AH
UNITED KINGDOM

/s/
Margaret L. Argent