**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND
NORTHERN DIVISION**

| | |
|---|---|
| BRITTNEY GOBBLE PHOTOGRAPHY, LLC,<br><br>*Plaintiff*,<br><br>v.<br><br>SINCLAIR BROADCAST GROUP, INC., *et al.*,<br><br>*Defendants*. | Case No. 1:18-cv-03403-SAG (Lead Case)<br><br>Case No. 1:18-cv-03384-SAG<br>Case No. 1:19-cv-00559-SAG<br>Case No. 1:19-cv-00606-SAG<br><br>**DECLARATION OF THOMAS P. BURKE JR. IN SUPPORT OF PLAINTIFF BRITTNEY GOBBLE PHOTOGRAPHY, LLC'S MOTION TO EXCLUDE DEFENDANTS' PROPOSED EXPERT, GARY ELSNER** |

**DECLARATION OF THOMAS P. BURKE JR. IN SUPPORT OF
PLAINTIFF BRITTNEY GOBBLE PHOTOGRAPHY, LLC'S MOTION
TO EXCLUDE DEFENDANTS' PROPOSED EXPERT, GARY ELSNER**

I, Thomas P. Burke Jr., declare and state as follows:

1.      I am an attorney at law duly licensed to practice before all courts of the State of California and am an associate at the law firm of Glaser Weil Fink Howard Avchen & Shapiro LLP, attorneys of record herein for Plaintiff Brittney Gobble Photography, LLC ("BGP"). I have been admitted *pro hac vice* to appear in this case. I made this declaration in support of BGP's Motion to Exclude Defendants' Proposed Expert, Gary Elsner. The facts set forth herein are true of my own personal knowledge, and if called upon to testify thereto, I could and would competently do so under oath.

2.      Attached hereto as **Exhibit 1** is a true and correct copy of the Expert Report of Gary Elsner, served by counsel for Defendants on September 18, 2020. Counsel for Defendants agreed to withdraw the "CONFIDENTIAL" designation of the Report by email dated July 19, 2021.

1

3.      Attached hereto as **Exhibit 2** are true and correct excerpts of the transcript of the deposition of Gary Elsner which took place on November 12, 2020, which took place in the matter of *D'Pergo Custom Guitars, Inc. v. Sweetwater Sound, Inc.*, Case No. 17-cv-747 (District of New Hampshire).

4.      Attached hereto as **Exhibit 3** are true and correct excerpts from Defendant Sinclair Broadcast Group, Inc.'s Supplemental Answers to Interrogatory Nos. 5, 6, 10, and 16, served by counsel for Defendant on July 11, 2019.

5.      Attached hereto as **Exhibit 4** is a true and correct copy of an email thread between Brittney Gobble and Scott Sistek, produced with the Bates range BGP003337 to BGP003340.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

Executed this 20th day of July 2021 in Los Angeles, California.


   _/s/ Thomas P. Burke Jr._
Thomas P. Burke Jr.

1935369.3

Exhibit 1

**CONFIDENTIAL**

## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MARYLAND DIVISION

**BRITTNEY GOBBLE**
**PHOTOGRAPHY, LLC,**

　　　　　*PLAINTIFF*

　　v.　　　　　　　　　Case No. 1:18-cv-03403-RDB
　　　　　　　　　　　Consolidated Case Nos.:
　　　　　　　　　　　1:18-cv-03384-RDB
　　　　　　　　　　　1:19-cv-00559-RDB
　　　　　　　　　　　1:19-cv-00606-RDB

**SINCLAIR BROADCAST**
**GROUP, INC., et al.,**

　　　　　*Defendants/Third-*
　　　　　*Party Plaintiffs*

　　v.　　　　　　　　　EXPERT REPORT

　　　　　　　　　　　GARY ELSNER

**USA ENTERTAINMENT NEWS,**　　September 18, 2020

**INC.  d/b/a "WENN" and**

**"WORLD ENTERTAINMENT**

**NEWS NETWORK",**

　　　　　*Third-Party*

　　　　　*Defendants*

## I.    SCOPE OF MY ENGAGEMENT

I have been engaged as an industry expert in the field of commercial photography as it relates to photo licensing with emphasis on stock photography licensing. I am being asked to review and opine on Jeffrey Sedlik's Reports and his deposition testimony in the matter referenced above involving Plaintiff, Brittney Gobble Photography, LLC, (Gobble LLC) and Defendant, Sinclair Broadcast Group, Inc., et al (Sinclair). In doing so I have reviewed all of the documents and exhibits referenced in my report. My report provides my opinion and calculations on an alternative Fair Market Value (FMV) for the alleged infringement uses by Sinclair.

## II.   DOCUMENTS AND SOURCE MATERIALS

In preparing this Report I have reviewed the following documents and information:

-   First Amended Complaint Brittney Gobble Photography LLC v. Sinclair Broadcast Group et al dated May 14, 2019
-   Ellen Boughn's Rebuttal Report dated May 23, 2019 opining on Professor Jeffrey Sedlik's Preliminary Report submitted April 12, 2019
-   Rebuttal Report of Michelle M. Riley dated May 24, 2019
-   Preliminary Expert Report of Professor Jeffrey Sedlik dated April 12, 2019
-   Surrebuttal Report of Professor Jeffrey Sedlik dated June 21, 2019
-   Deposition of Jeffrey Sedlik dated November 13, 2019 including exhibit numbers 1-24
-   Complaint Exhibits 1-9 – Copyright Registration documents.
-   Complaint Exhibit 10 – WENN's email dated Nov 2, 2015 to Lykoicats
-   Complaint Exhibit 11 – Gobble email dated Nov 2, 2015 to WENN
-   Complaint Exhibits 12 through 78 inclusive - Screen shots of various TV station web uses
-   Sedlik's Exhibit C - Visual Index of Photographs
-   Sedlik's Exhibit D - Visual Index of Usages
-   Sedlik's Exhibit E - Table of Photographs
-   Sedlik's Exhibit F - Table of Usages, by Usage Number
-   Sedlik's Exhibit G - Table of Usages, by Station
-   Sedlik's Exhibit H - Agency Stock Quotes Combined
-   Sedlik's Exhibit I - Market Rate Adjustment 2017 vs 2015
-   Sedlik's Exhibit J - Table of Market Rate Calculations
-   Sedlik's Exhibit K - 2017 and 2015 License Fee Samples for License Fee Adjustment 2017 vs 2015

- Sedlik's Exhibit L - Table of Licenses and Actual Damages, by License Number
- Sedlik's Exhibit M - Table of Licenses and Actual Damages, by Image Number
- Sedlik's Exhibit N - Table of Licenses and Actual Damages, by Station
- Sedlik's Exhibit O - Table of Actual Damages Totals, by Station
- Sedlik's Exhibit P - Table of Actual Damages, Itemized by Station
- Sedlik's Exhibit Q - Table of Statutory Damages for Copyright Infringements, Totals by Station
- Sedlik's Exhibit R - Table of Statutory Damages for DMCA Violations, Totals by Station
- Sedlik's Exhibit S - Table of Statutory Damages for DMCA Violations, Itemized by Station
- Sedlik's Exhibit T - Visual Index of Usages for Image I26 Only
- Sedlik's Exhibit U - Table of Usages, by Usage Number, for Image I26 Only
- Sedlik's Exhibit V - Table of Usages, by Station, for Image I26 Only
- BGP000001- BGP000022 Email string BGP & WENN Nov. 2 – Nov. 22,2015
- BGP000373 – BGP000374 Email String BGP & Paris Match
- BGP000456 – BGP000483 Infringement Demand Letter, Luedeka Neely dated Nov. 11, 2015
- BGP000504 – BGP000516 – Rex Features, Payments Form and Sales Reports Nov. 2015 – Feb. 2017
- BGP000588 – BGP000630 – Rex Features correspondence covering the history of relationship and queries about WENN uses Feb 2014 – Mar 2017
- BGP003291 – BGP003336 – Emails requesting free use of BGP images
- BGP003337 – BGP003340 – Email string BGP & Scott Sistek, KOMO News
- BGP003341 – BGP003347 – Email string BGP & Paradise.net regarding correction of attribution
- BGP003348 – BGP003353 – Email string BGP & ContactMusic.com (WENN client) regarding correction of attribution
- BGP009916 – BGP009926 - Emails requesting free use of BGP images
- BGP10076 – Email string with KHOU11 News Regarding use of BGP images and attribution requirements
- BGP10068 – BGP10069 Email String with Sinclair Broadcast Group regarding use of BGP images
- BGP10587 – BGP10590 – Termination email string to Shutterstock/Rex Features
- SBG_0000894,896,898 & 900 – WENN invoices
- SBG_0001535 – SBG_0001540 – WENN – Sinclair License Agreement
- WENN0000554 – Email string BGP – Contact Music regarding WENN transmission of caption

**CONFIDENTIAL**

- Google Analytics Report dated March 4, 2019
- Google Analytics Report dated July 17, 2019
- BGP003756 – BGP003811 5MB Files of The Images being litigated
- Deposition of Scott Sistek dated June 28, 2019 including exhibit numbers 2-6 and 9-26
- Deposition of Amanda Ota dated February 17, 2020 including exhibit numbers 51-53, 55, 56, 58, 62 and 63
- Deposition of Kevin Cotlove dated July 31, 2019 including exhibit numbers 2,3, 5-13 A-D, 15 & 16-33
- Deposition of Manny Fantis dated August 5, 2019 including exhibit numbers 46-49
- Deposition of Brittney M. Gobble, Corporate Designee dated June 18, 2019 including exhibits 2-4 & 6-16
- Deposition of Brittney M. Gobble, Individually Date June 18, 2019 including exhibits 2-4 & 6-16
- Deposition of Johnny R. Gobble dated June 25,2019 including exhibits 2-6
- Plaintiff's Third Amended Answers and Objections to Defendant Sinclair Broadcast Group, Inc's First Interrogatories dated June 10, 2019
- Defendant Sinclair Broadcast Group, Inc.'s Supplemental Answers to Interrogatory Nos. 3-7, 10,16 dated June 24, 2019
- Defendant Sinclair Broadcast Group, Inc.'s Supplemental Answers to Interrogatory Nos. 5, 6, 10 and 16 dated July 11, 2019
- Defendant Sinclair Broadcast Group, Inc.'s Supplemental Answers to Interrogatory 19 dated July 22, 2019
- Defendant Sinclair Broadcast Group, Inc.'s Supplemental Answers to Interrogatory 15 dated July 30, 2019
- Defendant Sinclair Broadcast Group, Inc.'s Second Supplemental Answers to Interrogatory 19 dated October 18, 2019
- Plaintiff's Responses and Objections to Defendants' Third Request for Production of Documents dated July 23, 2020
- Sedlik's Report Exhibits A & B – Sedlik's CV and List of Materials Reviewed
- ECF 113 – Court Memo and Order re Spoliation dated 4/9/20
- BGP003354-57 – Tennessee Articles of Organization docs
- BGP009927-010067 – Correspondence between Gobbles and multiple others permitting use of photos
- BGP010070-010075 – Correspondence between Gobbles and multiple others permitting use of photos
- BGP010077-010188 – Correspondence between Gobbles and multiple others permitting use of photos
- BGP010523-010526 – Correspondence between Gobbles and multiple others permitting use of photos
- BGP010537-010569 – Correspondence between Gobbles and multiple others permitting use of photos

- BGP010570-010576 – Correspondence between Gobbles and multiple others permitting use of photos
- BGP010579-010590 – Correspondence between Gobbles and multiple others permitting use of photos
- BGP010602-010632 – Correspondence between Gobbles and multiple others permitting use of photos
- SGB_0001541-0001542 – WENN invoices to SBG
- SBG_0001551-0001555 – WENN invoices to SBG
- SBG_0001558-0001559 – WENN invoices to SBG
- SBG_0001964-0001967 – WENN invoices to SBG
- Sistek deposition errata sheet
- Fantis deposition errata sheet
- www. sbgi.net
- www.wenn.com
- www.lykoikitten.com
- www. useplus.org
- www.google.com
- www.firstlight.com
- www.gettyimages.com
- www.imagesource.com
- https://www.facebook.com/BrittneyGobblePhotography/
- www.lykoikitten.com
- www.dreamstime.com
- www.petapixel.com
- www.merriam-webster.com
- www.cfa.org
- www.worldrecordacademy.com

## III    QUALIFICATIONS

To elaborate on my experience in commercial photography that qualifies me as an expert in this matter I would offer the following as a supplement to my Curriculum Vitae, which is attached as Exhibit 1.

I started my career in the stock photo industry in 1963, working for a small company called Freelance Photographers Guild ("Freelance"). My responsibilities included researching photo requests from their commercial customers and speaking with them about their orders.  I worked in this capacity until January 1966 when I took a leave of absence and entered the military to fulfill active duty requirements as I was drafted into the U.S. Army.

**CONFIDENTIAL**

Upon my separation from the service in January 1968, I reapplied to Freelance and was assigned to Alpha Photo Associates ("Alpha"), a company that had been acquired by Freelance. I spent the next year working there as a photo researcher and account executive.  I was promoted in 1969 to Alpha's Sales Manager, responsible for supervising the sales staff and personally handling the company's top clients' photo orders and licensing requests.

In 1971, Freelance and Alpha merged operations and eventually consolidated their libraries at one location. I was promoted to General Manager while also maintaining my position as Sales Manager. My responsibilities included both supervising the office staff as well as continuing to personally handle the company's key photographers and clients.

During the ensuing eight years I continued as the General Manager/Sales Manager while the company grew its revenues to over five million dollars and doubled its staff. My role with the company expanded and I began making both domestic and international trips in which I visited key clients of the company, key contributing photographers and, when traveling internationally, key marketing partners that represented our image products throughout the world.  I also assumed responsibility for hiring commercial photographers for photo assignments for our clients, recruiting new contributing photographers, negotiating and purchasing image collections and supervising the photography staff members involved in the editing of newly arriving images and dealing with corresponding photographer relations issues.

In 1979 the company fully merged the collections they owned and began operating under a new corporate identity, FPG International Corp. ("FPG").  I was promoted to the position of Vice President. My responsibilities did not change materially but we had now grown to a staff of more than sixty employees and our revenues had also increased substantially.

Copyright infringement was also becoming an important issue for both FPG and other stock photo agencies. In 1991, I was directed by the President to form a copyright enforcement department.  I moved one of our sales managers and a support staff member into a special department to enforce

CONFIDENTIAL

the infringements that we uncovered.  I was responsible for supervising their operation and approving any settlements that they were able to negotiate. Over the course of the next seven years this department successfully resolved at least three hundred infringement claims.

During the course of the six-year period starting in 1991, our sales grew three-fold and the sales department staff, for which I was personally responsible, grew to almost seventy account executives and sales associates.  Among my responsibilities was to create an ongoing continuing education program to be accomplished by bringing in professional sales training organizations as well as speakers to discuss industry trends on both the licensing and the supplier side as well as technical training regarding new automation systems. I was also responsible for sales training on pricing for licenses and reviewed and approved all licensing transactions.

When on occasion the company had to work with lawyers on legal issues related to copyright infringement claims, it was my responsibility to act as the company's liaison in such matters. Over the course of my career at FPG, I testified either in deposition or at trial on several such matters.

In 1997, FPG was sold to a British conglomerate that owned and operated a stock photo agency with offices in England, France and Germany. I was given a two-year employment contract with the new company.

In February of 1999, after leaving FPG and sitting out a six-month non-compete during which I built a business plan, I opened my consulting company – Gary Elsner Associates Inc.  One of my first consultancies was with SuperStock, a Jacksonville, Florida photo agency.  In the third month of my engagement, the owners offered me a contract to become their President and CEO and I agreed to take on the position while maintaining my New Jersey residence.   Under the terms of my agreement, I was able to continue my consulting business so long as it did not conflict with the business of SuperStock.

While this was all going on, I was also continuing my consulting work within the industry. In addition to alternative dispute resolution in copyright matters, as well as the expert witness services I occasionally provide, I have been involved in providing many different services to clients over the past

CONFIDENTIAL

twenty years, serving more than one hundred clients.  My consulting services have included:

- "Mystery shopping" for photo agencies and photographers;
- Recruitment of both royalty-free and rights-managed photographers;
- Website development work regarding design and promotional elements;
- Sales training for photo agencies;
- Development or enhancement of international distribution networks;
- Review of business practices and operating documents for photographers selling directly as well as for photo agencies;
- Helping photographers break into the stock photo industry by producing salable images as well as finding agency representation;
- Brokering the sale of stock photo collections;
- Valuation of stock photo collections as well as personal photography collections;
- Renewal contract negotiations for existing stock photographers;
- Obtaining additional rights for clients with licensed images;
- Providing continuing education course instruction for new photographers;
- Providing management services to various stock photo agencies; and
- General management training on budgeting, objectives and compensation packages for sales department teams.

In 2003 I approached Peter Arnold, Inc., a specialty stock photo agency located in New York City.  After some discussion we came to an agreement whereby, on a part-time basis, I became the company's General Manager, with the agreement allowing me to conduct my consulting business on an ongoing basis either from their offices or from my home office. The responsibilities I assumed under the agreement were:

- Training and supervision of the sales staff to include approving all licensing transactions;
- Pursuing all copyright infringement and lost photography claims on behalf of the company;
- Recruiting new photographer contributors;
- Establishing preferred vendor agreements with major company accounts;
- Supervising the upgrading and modification of the company's website;

CONFIDENTIAL

- Supervising the ongoing conversion of the company's image collection to digital files and establishing procedures for future digital submissions by the company's contributing photographers;
- Negotiating distributor agreements with marketing partners; and
- Administrative functions associated with being the General Manager.

In 2004, I was approached by Randy Taylor, an industry "player" that had formed a start-up and wanted me to become a partner in the endeavor. After viewing the offer, I agreed to come onboard as a partner.  The venture was called "Stockphotofinder."  The business model was to provide a searchable image website that could instantaneously aggregate imagery from participating photo agencies.  The website offered a photo buyer the ability to simultaneously search many different websites for the desired image.  The user experience then "moved" the buyer to the website of the agency that controlled the copyright.  My role with the company was to:

- Recruit and sign photo agencies to enable the company's website to link the images for search; and
- Demonstrate the website's functionality to large volume users of commercial photography such as publishing companies and ad agencies.

In 2007, while attending an industry conference, I was approached by the owner of Design Pics, a Canadian stock photo agency.  Design Pics had been formed in 2001 as a stock photo agency specializing in royalty-free imagery. I was offered a consulting engagement that would be ongoing.  I viewed this engagement as providing me with further experience in the royalty-free segment of the industry as well as permitting me to extend my international reach with photo agencies throughout the world.  While my work with Design Pics has changed over time, it is ongoing and includes the following functions:

- Management of the company's worldwide distribution network of agents;
- Hiring, supervising and training the company's sales staff;
- Organizing and participating in all national and international trade association meetings;
- Participated in creating the company's Microstock and subscription products and then working with RF and Microstock agencies worldwide to get the new products placed for licensing;

CONFIDENTIAL

- Involvement in the development of a new, fully integrated website which allows simultaneous search of all company imagery from six acquired photo agency collections along with the existing core collections;
- General business consulting relating to day-to-day operations; and
- Participation in the acquisition of six competitor libraries including all aspects of contract negotiation and due diligence.

While I do not advertise my consulting services (other than as they are described on my website), over the course of the past twenty-one years I have worked on approximately one hundred litigation projects where I provided expert witness and consulting services to companies and law firms throughout the country and abroad.

The following is a complete listing of matters in which I have testified at depositions and trials during the past four-plus years:

August 2012 – State of California, Superior Court – County of Los Angeles SINISHA NISEVIC, Claimant, vs. SAFECO INSURANCE COMPANY; THE CITY OF LOS ANGELES Respondents. I appeared at Trial on behalf of Plaintiff, Sinisha Nisevic. My testimony addressed the value of a collection of photos that were destroyed in a sewerage flood.

March 11, 2016 – State of New York, Case No. 15-cv-002 (GBD) (S.D.N.Y) McGraw-Hill School Education Holdings LLC and McGraw-Hill Global Education Holdings LLC v. Minden Pictures, Inc. I was subpoenaed to appear for Deposition but was not engaged by either party in the dispute. The matter involved charges of copyright infringement.

November 29, 2016 – United States District Court, Central District of California, Western Division. Evox Productions LLC v. Kayak Software Corporation Case No. CV15-05053-PSG-AGR. I appeared at Deposition on behalf of Defendants, Kayak Software Corporation. The matter involved charges of copyright infringement.

June 8, 2017 – Boston, Massachusetts, Photographic Illustrators Corp v. Osram Sylvania Inc.  Deposition testimony, I was deposed on behalf of my client, Osram Sylvania Inc. The matter involved charges of copyright infringement.

CONFIDENTIAL

June 23, 2017 – Boston, Massachusetts, Photographic Illustrators Corp v. Osram Sylvania Inc.  Arbitration hearing testimony. I testified on behalf of Defendant, Osram Sylvania Inc. The matter involved charges of copyright infringement.

I have never published in print or online any articles or publications regarding commercial photography or any other subject matter.

Over the course of my career, I have been recognized as an expert in matters involving commercial photography in many jurisdictions, including California (multiple times), Louisiana, Minnesota, Montana and New York (multiple times). I have been qualified as an Expert in Federal Court on matters involving Copyright Infringement in Louisiana and New York.

## IV.    COMPENSATION

My hourly rate for providing my services in this case is $650.00. I have reviewed the names of all the individuals and companies involved in this dispute and confirm that there are no conflicts due to prior or current business dealings.  I have no prior relationships or interactions with any of the participants.  As an expert, I am being compensated to review information and provide opinions on various aspects of the dispute. My compensation is in no way based on the outcome of this dispute.

## V.    SUMMARY OF CLAIM

As I understand it, Sinclair owns and operates a network of television and radio stations throughout the United States. Gobble LLC is a holding company that owns the copyrights to a series of photos produced by Brittney Gobble.  The fifty-one images of cats at issue in this case (the Images) were produced by Mrs. Brittney Gobble for marketing purposes in conjunction with the breeding and selling of cats by her husband's veterinary practice, in particular Lykoi cats. US Entertainment News Inc. is an English stock photo agency operating under the name "WENN".  WENN specializes in news photography covering a broad range of subject matters.

Sinclair entered into a licensing agreement with WENN whereby they were entitled to download images and articles from WENN's website in order to

**CONFIDENTIAL**

supply its network of TV and radio stations located throughout the United States with images and related captioning for each station's websites.

At a point in time after Sinclair began accessing images on WENN's website, Mrs. Gobble demanded that WENN remove her images and Gobble LLC eventually brought a copyright claim against WENN and later against Sinclair.

The above is a very brief statement of basic facts. Additional facts relating to my opinions are also contained throughout my report.

## VI    DEFINITION OF LICENSING TERMS USED IN THIS REPORT

Before embarking on an analysis of Gobble LLC's claims for damages and Sedlik's opinions in support of those claims it is useful to define and describe some of the different commercial photography products available for licensing and the history of various pricing models that have been used in licensing and use of commercial stock photography. I will refer to these models throughout the body of this report.

### Stock Photography

1. Stock Photography is photography generally made available during the period of this dispute via searchable websites that in general are operated by stock photography agencies.

2. Most users license images for one of two purposes:
   a. Commercial use: Some sort of advertising or promotional use such as an ad, a brochure or a direct mail piece where the image is being used to help sell a product.
   b. Editorial use: A use where the use of the photo is being made to educate or otherwise inform people about a topic in a way that is not intended to sell a product. Examples of uses that are editorial would include textbooks, magazines, blogs, newspapers and informational web site articles.

3. For the most part, the photo agency operates as an agent on behalf of the copyright holder and licenses the images it represents for the mutual benefit of both parties, paying a royalty to the copyright holder

CONFIDENTIAL

for each paid license that is accomplished. Typically a photo agency pays the copyright holder a maximum of fifty percent of the fee paid to the agency.

4. Other than for a small portion of a photo agency's image collection, the photo agency has no financial obligations or interests regarding the production of its library of available images.

5. Stock photo agencies such as Getty Images Creative, First Light and Image Source, agencies that offer a large range of general stock photography subject matter, provide a tightly edited selection of the photos of the photographers they represent that have been vetted through stringent selection and evaluative processes. WENN, Rex Features/Shutterstock, Getty Images Editorial, Associated Press and others that offer purely editorial subject matter that, for the most part, is news oriented, offer a more loosely edited selection of images. (See section IX C for an explanation on "editing".) In many cases, the images are submitted electronically by a direct feed from the location where the images have been shot.

6. Benefits that accompany licensing a stock photo include:
   a. The stock photo agency provides warrantees and representations regarding the images being licensed.
   b. An image can quickly be conveyed to the user.
   c. You know what you have as opposed to waiting for an assignment to be produced.
   d. With few exceptions licensing fees for stock photos generally are cheaper than the costs of acquiring a license for assignment photography as there are no production costs associated with the acquisition of a stock photo license.

A. **Stock Photo Agencies:** There are various types of stock photo agencies including:

1. Generalist Agencies that offer images of almost any imaginable subject matter.

2. Specialist agencies that offer a limited number of subjects with in-depth coverage of those subject categories.

**CONFIDENTIAL**

3. News agencies that either specialize in certain subject areas applicable to news photography (current and/or historic) or a broad range of subjects applicable to news photography. Buyers almost exclusively license all but historic images for editorial uses and the lion's share of historical licensing is also accomplished for editorial use.

## B. Assignment Photography

1. Photography accomplished under an agreement to produce photography based on specific requirements provided by the client paying for the assignment.

2. Assignment photographers will generally bill the client separately for their creative time, the rights being granted and expenses incurred during the assignment.

3. Normally assignment photography requires the client to pay for all extraordinary costs associated with the assignment including but not limited to: travel, costs of models and assistants needed for production, location fees and any required equipment rentals.

4. Assignment photography is either produced as Work-For-Hire or on a limited license basis whereby the client only acquires the right to use the images that are produced for the designated uses discussed during the negotiation of the fees and terms.

5. Based on payment of all production costs in addition to the Creative Fee charged by the photographer, Assignment Photography is usually far more expensive than the cost associated with acquiring a stock photo of the same subject matter as opposed to an image produced on assignment.

6. Benefits of licensing or acquiring Assignment Photography include:
   a. The user has the chance to create the perfect image for their project.
   b. The image will be exclusive and unique and not a stock photo that had been previously used.
   c. If accomplished as Work-For-Hire, the user will own the copyright to the image and have future use options available.

CONFIDENTIAL

> d. The user will negotiate the use fee portion of the fee the photographer charges and in some instances, the Creative Fee.

C. **Licensing Models:** Commercial Photography is licensed under different licensing models which are:

1. **Rights-Managed ("RM") Licensing:** This licensing model has been used in the industry where the proposed usage of an image, including the nature of the proposed usage, the marketplace in which the image will be used and proposed start and end dates, is well understood.  In such cases, a RM license will confer rights consistent with and limited to the proposed usage, such as stipulating the placement of an image on a website and the permitted size of the use.  RM licenses were in common use prior to the advent of the digital age but have largely been supplanted by various forms of royalty-free licenses.

   I sourced the definition of "Rights Managed" from the PLUS Glossary. Sedlik's CV explains that essentially PLUS is a not-for profit organization that seeks to create uniformity for the usage terms that are commonly used by licensors and licensees engaged in the licensing of commercial photographer.  PLUS maintains an online directory that enables users to enter their usage terms and see the PLUS approved definition for that term.

   The PLUS definition for "Rights Managed" (EXHIBIT 2) reads "A licensing model in which the rights to a creative work are carefully controlled by a licensor through use of exact and limiting wording of each successive grant of usage rights."
   Licensing Terms that control the license include:

   a. Type of use (website, book, ad)
   b. Term of use (one day, one year, five years)
   c. Size of use (quarter page, full page)
   d. Placement (home page, secondary page, cover, inside)
   e. Quantity (print runs or quantities of viewers where applicable)
   f. Size (quarter page, full page, home page, secondary page)
   g. Territory – U.S., North America, World

**CONFIDENTIAL**

In order to qualify as RM images for use by stock photography agencies, the copyright holder should typically accomplish the following:

1. Provide a unique identifier such as an identification number for each image so that each image can be defined uniquely when compared with other RM images.

2. Create or acquire and maintain a rights-management system whereby each license for each image can be recorded and maintained in a retrieval system that allows future referencing for all previous licenses for each image. Possible infringements as well as the granting of future licenses for any specific image requires a system that allows prior licensing information of each image to be recalled and viewed with all specific relevant licensing details.

3. So that there is a complete and accurate understanding of the licensing terms that will exist between the parties for a specific RM image, a licensing document (invoice or contract) should be issued that, at minimum, clearly defines the use components.

4. In order to avoid any possible conflicts with previously issued licenses for each RM image, the Licensor should "clear" each prospective use request for a license against previously issued licenses.

The term "Rights Managed" correctly implies - managing the rights of each license that is granted. There are multiple reasons that the management of rights for RM images must be maintained, those being:

1. Prospective clients may inquire about the availability of an exclusive license that would set limitations on future licensing.

2. Prospective clients may inquire about the availability of a license for an image and will require knowing its prior licensing history in order to make a decision about licensing the image.

3. If the licensing is being accomplished by a stock photo agency and should a contributing photographer terminate their agency

**CONFIDENTIAL**

agreement at the end of the agreement's period, the agency will need to have the ability to convey information about its existing licenses already being accomplished for the images being returned.

4. Stock photo agencies frequently have to deal with possible infringements for images under their control.  They will rely on specifics of any existing licenses for that image to determine if there was a licensing already issued for the matter being reviewed.

Photo agencies sometimes allow their contributing photographers to also independantly license the same images they have provided their agency.  In such cases, both parties need to have the ability to provide each other with existing licensing information about specific images.

Image licensing accomplished without addressing the requirements necessary to appropriately "manage" the rights of the images would not satisfy the requirements of traditional RM agencies. Generally, other than news agencies like Rex and WENN, stock photography agencies that license RM images wouldn't accept such images for representation under their RM licensing model.

2. **Traditional Royalty-Free ("RF") Licensing:** This licensing model is generally used when the buyer is uncertain of the length of time or the use applications for which an image is needed.  For most buyers, this license model allows the use of the image without limitation on the nature and duration of use - (See EXHIBITS 12 & 13). RF Sellers price their products based on the digital file size the user requires. The larger the file size – the larger the license fee. In 2015, the price range for RF photos would have generally been between about $29 and $499 depending on the digital file size required.

3. **Microstock – Royalty-Free ("MRF") Licensing:** This licensing model gives the buyer the same broad range of usage rights as a traditional RF license but at a fraction of the cost.  Certainly in 2015, the basic difference between the two licensing models was the quality of the images being offered and in some instances, the depth of subject availability. Less talented and experienced photographers using less sophisticated production equipment, props and locations were the main providers of imagery to this new entrant into the

**CONFIDENTIAL**

industry. In 2015, the range of pricing for this license that was offered by the four major Microstock photo agencies was between $1.00 and $20.00 with some exceptions.

4. **Subscription Licensing:** In 2003, Shutterstock entered the marketplace offering yet another variation on Royalty-Free Licensing. Rather than download and license one Royalty-Free image, the Subscription offered the buyer the option of purchasing a subscription to use Microstock Royalty-Free images with the subscription fee based on the duration of the subscription and the number of images the buyer wanted the right to use – which could run anywhere from five images to an "all you can eat" package. The rights granted are in most cases the same as both the MRF and RF licensing models. Today, Shutterstock is known to be the second largest licensor of imagery worldwide by sales volumes generated from those licenses.

5. **Enterprise Licensing:** This licensing model is a form of Subscription Licensing. The methodology as to how such licensing is accomplished varies greatly from company to company and even from agreement to agreement within a specific stock photo agency. Reasons for that include:

   a. In each instance, the stock photo agency's goal is to achieve the greatest sale possible and they will therefore customize each "deal".
   b. Each "deal" is unique based upon the specific needs of the company acquiring the Enterprise or Subscription product licenses.
   c. In some instances, the agreement only includes access to RF images. In other instances, the agreement includes access to RF and RM images.
   d. In some instances, the agreement enables employees and third-parties working on behalf of the client to download both RM and RF images directly from the photo agency's website without going through an actual ecommerce transaction. Alternatively, in some instances such licensing is either accomplished through vendor-provided technology or other external methods.
   e. In some instances, extended or unlimited "Seat Licenses" (the right to use or work with images) allowing a large number of users the ability to access and work with and use the same or different

**CONFIDENTIAL**

images included in the license rather than the normal limits allowed by other RF models. Seat Licenses are further defined in EXHIBITS 12 – 13 of my report.

Each photo agency refers to "Subscription or Enterprise licensing in any agreements they make involving the licensing of large amounts of imagery and its pricing in unique ways based on how they choose to brand and market those products and licensing tools and of course the client's requirements.

E  **Syndication:** In this instance, PLUS does not provide a definition for "Syndication" in its Glossary of Terms.  I provide the following explanations that are applicable to this dispute.

1. Photo agencies in the news and entertainment segment of the stock photography industry use the term "Syndication" to define agreements they enter into with their customers whereby the user of the images can access images on the photo agency's website in some form and manner for the purpose of gaining access to those images to publish them in whatever format they use to convey their product – which is news and information.

   i.   WENN is in the business of selling or otherwise providing Syndication services and Sinclair was clearly defined as a user of WENN's products and services.
   ii.  Under Terms of the contract between the parties (SGB1536-1564 & SBG1535) WENN provided such services to Sinclair.

2. Photo agencies enter into "Distribution Agreements" with other photo agencies both in the country they are located as well as around the world. I have personally created, negotiated and otherwise put into place hundreds of such distributor agreements during the course of my career.  In the stock photography industry, the term "distribute" refers to one agency sending their imagery to another agency for representation and license.

## VII.  STATE OF THE STOCK PHOTOGRAPHY MARKET IN 2015

Sinclair began using the Images on its websites in 2015. It is therefore appropriate to consider the state of the market for commercial stock photography in 2015. Based on my experience in the industry:

**CONFIDENTIAL**

A. Microstock licensing had surpassed Royalty Free as the dominant licensing model for the type of editorial use that is in issue in this case as well as for many commercial uses.

B. Image buyers that were licensing images for either commercial or editorial uses were being pressured by budgetary constraints to first seek availability of suitable Microstock images for licensing and if what they needed wasn't found, RF imagery was to be their next step in their search process. RM imagery was the last stop to be made in the search process. This was especially true of editorial users as their projects frequently required the licensing of large number of images.

C. New licensing hybrids of existing licensing models were created by agencies to offer alternatives to single download Microstock licensing products and were popular among large volume buyers. The two most popular hybrids were:

   1. Subscription Licensing: A company named Shutterstock was and still is the prevailing leader in this market segment.  The basic concept is – you decide on how long you are willing to commit to a Subscription Agreement, the amount of images you wish to have access to (anything from a few to an "all you can eat" option) and agree to pay the agency a pre-agreed upon amount for access to that number of images.  Under the subscription license, the use rights granted were the same as those defined for Microstock Royalty Free Licensing described in VI C above.

   2. Not to be outdone, Getty Images had already launched its bulk licensing option called "Premium Access."  The concept was essentially the same but rather than advertise their rate options for this product they chose to advertise the concept and invite customers to discuss their unique needs with them and in doing so, work out a bulk purchase agreement.  I'm quite familiar with this option, as one of my clients had their images included in this product option with the net result being – for a large percentage of the Premium Access license reported, after Getty's share was taken, the client received twenty-five cents ($.25).

D. Traditional Royalty Free was the third option and, as the rights being granted were the same for either Subscription or Microstock licensing models but the pricing was much higher.  Buyers wherever possible would

CONFIDENTIAL

choose this option over RM Licensing as the rights being received were far-more expansive than a limited right granted under a RM license.

E. Rights Managed licensing existed as the fourth option and was called upon by image users essentially either when a very unique type of image was required, exclusive rights protection was needed or when budgets didn't allow for purchasing an exclusive license but the buyer still needed to know who else was using the image.

F. Due to the growth and popularity of Microstock and Subscription licensing with its drastically lower licensing fees, there was extreme financial pressures on the RM and even RF products being offered by stock photo agencies.  Many in the industry commonly referred to these pressures as "the race to the bottom". Agencies offering RM and RF licensing resorted to four strategies to either stem or lessen the "blood-letting" and thereby slow the "race to the bottom".

1. Prior to stock photo agency websites offering ecommerce licensing, the only way a user could license an image was to call the stock photo agency or whomever had the image they wanted to use and negotiate the license fee. That negotiation initiated with the client telling the agency or sales person how they wanted to use the image.  The sales person would then quote a fee and wait for a response.  Most frequently the response would be something like – "I only have $X in my budget". The sales person would then offer a price close to but above that "budget amount" and eventually in most cases, a negotiated fee would be agreed upon.

   Once websites and ecommerce pricing calculators were available, the buyer would use the calculators as a starting point for negotiating the RM license fee and subsequently call the agency and do the same sort of negotiation that existed before the pricing calculator. It was well known to professional users seeking to license RM images that a call to the agency will almost always result in a substantial savings on the licensing fee of 20% to 50% off of the initially offered licensing fee.

2. Unique deals were entered into with large volume buyers whereby the buyer would call and say "I want to license these ten images for a certain use and I need a better price".  Based on the specifics and the

21

CONFIDENTIAL

relationship with the client and the volume of images being licensed, a "deal" would be struck, in some instances with even more aggressively discounted rates.

3. Large volume users would approach a stock agency such as Getty and agree to purchase a specified number of images over a specified period of time and in return, receive in some instances even more aggressively discounted rates. Under this arrangement, when the term of the agreement expired, even if the agreed-upon number of images hadn't been licensed, the amount of money remaining to fulfill the agreed-upon number of photos - would be payable. In such instances it would be common to see the pricing applied across the board to all RF and RM images available through the agency's website.

4. Many large volume image users came up with the concept of "Preferred Vendors." They presented their candidate agencies with a proposal. The concept was that the client would limit the number of agencies they would normally allow their employees or agents to work with, thereby creating a large pool of images to be licensed by a select group of suppliers.  The agencies in turn, should they desire to be included, had to agree to substantial license fee reductions from their normal rates they charged the client in the past as well as enhanced use rights to be acquired under what would become the standard preferred vendor license for that company and the agencies they worked with.  The users were allowed to go off the list of preferred vendors but only when they could justify it by not being able to find what they needed among the preferred vendor agency pool.

During the period 2011 – 2016, a goodly number of stock photo agencies that only provided RM licensing bailed out of "the race to the bottom" and sold out to one of the remaining stock photo agencies.  One of my clients was the "benefactor" of these sales, having acquired five such agencies during that period.

## VIII. FAIR MARKET VALUE (FMV)

Sedlik ignores the realities of the stock photography industry regarding licensing in this matter, for the many reasons I review in this report. I have

**CONFIDENTIAL**

been advised that the standards for developing FMV of a hypothetical license are stated in the following ruling in the U.S. Court of Appeals, Fourth Circuit:

> "The fair market value of a copyrighted work is derived from an objective, not a subjective, inquiry."

> "Under the lost licensing fee theory, actual damages are generally calculated based on 'what would have been reasonably required to pay to a willing seller for [the] plaintiffs' work.' a willing buyer"

> "The question is not what the owner would have charged,' nor what the infringer might have been willing to pay."

> "Rather, the objective inquiry focuses on the fair market value of the work as 'negotiate[ed] between a willing buyer and a willing seller' contemplating the use the infringer made."

> "Evidence of licensing fees paid to other artists for the use of other works may, in some cases, be sufficient to support the conclusion that a copyright holder would have been entitled to such a fee for the use of his work; however, such evidence may properly be rejected as a measure of damages if it is too speculative."

731 F.3d 303 United States Court of Appeals, Fourth Circuit. Anthony Lawrence DASH, Plaintiff–Appellant v. Floyd Mayweather, Jr., an individual; MAYWEATHER Promotions; Mayweather Promotions LLC, a/k/a Mayweather Promotions LLC; Philthy Rich Records Inc.; World Wrestling Entertainment Inc., Defendants–Appellees.

On page 195 of Sedlik's deposition he says that stock photo agencies are "Gasping their last breaths". I agree with that for many of them - they were during the period in which this dispute evolved. The hunger for sales revenues created a buyer's market and further confirms my position that the license fees paid for RM stock photos should not be determined from an ecommerce list price. This was true in 2015.

Accordingly, based on the information provided in this report and my overall industry experience, Sedlik's use of a stock photo list price under a RM license

CONFIDENTIAL

model to determine a license fee is wrong and resulted in an inflated value. More importantly, Sedlik ignores the sales history of the Images, which provides clear evidence of the license value of the Images for a use like Sinclair's. (For the sake of this analysis, I am assuming that the Images have a dollar value even though there is a long history of Mrs. Gobble giving away the Images without charge).

A. Based on my industry experience, the Rex Features license of four of the Images to ABC News.com provides an example that I feel should be used to establish FMV in this dispute. It has long been the practice in the industry to rely on actual licenses that have been accomplished by buyers to establish requested license fees when the use closely approximates the use being priced. As best as I can determine based on the information provided by Gobble LLC:

A review of Gobble LLC exhibits BGP000504- BGP000516, the Rex Payment Reports, provide the following insights:

1. In some instance Gobble LLC's images were licensed under Rex Feature's subscription offering to their large volume customers.

2. For those licenses that were provided as "subscription" it is impossible to determine how many images were sold.

3. One of the Rex Payment Reports (BGP000516) was for a transaction in which Gobble LLC's images were licensed to ABC News.com ("ABC"). I searched for this use and found the use still exists on ABC's website as well as the websites of its affiliates. EXHIBIT 14 provides my search results. Mrs. Gobble corresponded with ABC about the story (BGP10053-BGP10055). Mrs. Gobble referred to the sale in her deposition on page 168. The Rex Payment Report is dated in 2017 even though the article and license were accomplished in 2015. There are a number of possible reasons for the delay in payment including a delay in request for payment by Mrs. Gobble, delay in payment by ABC or an accounting error by Rex.

You'll note the following in the exhibits:

i. The credit line provides attribution to Brittney Gobble/Rex Shutterstock/REX USA. (EXHIBIT 14).

**CONFIDENTIAL**

    ii.  There are two of the Images, Gobble LLC #'s 21 & 22 that are included in the exhibits. One of the Images appears in a photo gallery, (EXHIBIT 14 page 3). The photo is not dated. The name on the jpeg contains the number 151028, which might be a relevant date. Based on the sequence of the photos in the gallery, the posting date appears to be concurrent with the date of the ABC article.

    iii.  The date on the article is Oct 30, 2015 (EXHIBIT 14), which is almost exactly the date Sinclair posted the Images.

    iv.  The exhibit was produced September 14, 2020 as evidenced by the current story links featured on the right side of the article.

    v.  The Social Media share is shown on EXHIBIT 15.

This license provides almost a duplication of Sinclair's use of the Images in that:

- The use appears on the websites of a large broadcast media company that also has local affiliates.
- The use was posted on the website of the purchaser and also on affiliate websites.
- The use was originally posted within days of when Sinclair originally posted the Images from WENN.
- The use is still available to viewers almost five years after the original posting.
- The use was shared to social media from the purchaser.
- I would also point out that five of Gobble LLC's images, which are among the Images, are still present on September 18, 2020 on Rex Features/Shutterstock's website. EXHIBIT 16 provides the search return accomplished on www.rexfeatures.com as well an enlargement of one of the Image's thumbnails. I contacted Rex Features to ask about the Images in order to get pricing and was directed to contact Shutterstock for pricing.  I contacted Shutterstock and received a request for more information which I supplied and as of September 16th I have not heard further from them despite several follow-up attempts that I made.

B. EXHIBITS 14 and 15 and EXHIBITS 17 and 18 of my report discuss Rex Features license of four of Gobble LLC's photos for use by ABC.  The actual use of Gobble LLC's images is the same type of use as alleged against Sinclair. As my exhibits demonstrate, the uses included use on ABC's website (EXHIBIT 14) and that ABC provided the images and captioning to some of their affiliates as shown on EXHIBITS 17  and 18. The use by ABC transpired only a

CONFIDENTIAL

few days prior to when Sinclair posted the Images. ABC's affiliates use occurred the same day:

| Station | Website | City | Date Posted |
|---|---|---|---|
| ABC News | Abcnews.com | NY, NY | 10/30/15 |
| KITV4 Island News | Kitv.com | Honolulu, HI | 10/30/15 |
| WHAS11 | Whas11.com | Louisville, KY | 10/30/15 |

Rex licensed each of the images on BGP000516 for the USD equivalent of $32.41 (26.14 GBP x conversion rate of $1.24/1 GBP). Rex Features provided the only licenses for Gobble LLC for which payment was accomplished. Accordingly, it is my opinion that FMV in this dispute should be based on the Rex Features transaction. Accordingly, the total amount due for the alleged uses of the Images would be $1,652.91 ($32.41 x 51 images).

In the event the court decides that FMV should be calculated based on the photographer's actual share of licensing sales made by a stock photo agency, that would be $826.46 ($1,652.91 /2), based on the 50% royalty paid by Rex Features.

B.   EXHIBIT 22 of my report provides a Microstock License that I created on Dreamstime.com. Dreamstime is one of the leading Microstock licensing companies and was one of the early companies exclusively formed to license Microstock price RF imagery in 2004. It is my opinion that an alternate FMV for a license for the Images can be determined by the Microstock Licensing Model because of the availability of images, reasonable pricing and flexibility of use rights in 2015. EXHIBIT 22 pricing is reflective of my industry experience regarding the licensing of Microstock images at that time.

I searched on Dreamstime for cats and selected a Lykoi cat. Page 1 of EXHIBIT 22 displays the enlarged version of the image.

Page 2 of the Exhibit displays my selection of the "Extra Large File Size and Unlimited Seat for the Seat License." After hitting the "Buy and Download" tab, you'll note that the price displayed was 50 Credits.

Page 3 of the exhibit displays the transactional values Dreamstime offers its buyers both today as well on November 6, 2015. You'll note

**CONFIDENTIAL**

that in order to purchase a sufficient number of credits to license the image (50 credits), the purchase price of the credits is the same today as it was back in November 2015.

For perfect clarity, many Microstock companies use the purchase of "credits" as a way to encourage continued and expanded uses.  It's akin to buying gambling chips in a casino but at least on Microstock website, some discounts are available for large purchases of credits.

In order to purchase 50 credits for the license, the buyer would buy 52 credits: two 11 credits packs @ $14.99 each and one 30 credit pack for $34.99 for a total purchase price of $64.97, for a net rate of $1.25/ credit.

Accordingly, if FMV is based on the Microstock/Enterprise licensing model, the total amount due for the alleged uses of the Images would be **$3,187.50** ($62.50 x 51 images).

Based on this and my experience with Microstock pricing, I am satisfied that licensing a Microstock license image would cost the buyer the same today as it would have in 2015.

In the event the court decides that FMV should be calculated based on the photographer's share of licensing sales made by a stock photo agency, at best, Gobble LLC's share of the licensing would be at most 50% of the total license fee or $1,593.75 ($3,187.50/2).

## IX.   THE IMAGES AND STOCK PHOTO AGENCIES

A  As discussed above Gobble LLC's photos were sold through Rex Features. I am familiar with Rex Features through my personal experiences with Rex Features. Additionally, on August 17, 2020 to confirm my understanding of Rex's operations and policies, I called London and spoke with Greg Watts, "Manager, Contributor Development & Archive," Rex Features/Shutterstock.  Mr. Watts was with Rex at that time but in a different position. Based on his current position and his earlier work with Rex as well as his general knowledge about Rex Features, he felt he could

**CONFIDENTIAL**

speak with authority as to answering several questions I posed to him, those being:

1. Would Rex Features in 2015 enter into a relationship with a photographer that they would be paying royalties to and not require that the photographer sign an agency agreement to cover the relationship when in fact, they did require completion of a document providing banking and tax information for such payments?

   Mr. Watts answered that it was Rex's policy to require completion of an agreement covering the relationship that would define terms and conditions and obligations for both parties and that the payment registration was part of the process for newly acquired photographers but not the actual photographer's agreement governing the relationship.

2. I then posed the following question to Mr. Watts.  Would Rex features agree to enter into an agreement with a photographer where the photographer absolutely required a specific credit line for all editorial uses and would consider any omissions therefore possibly an infringement on her copyright?

   Mr. Watts responded that they would not agree to work with a photographer under those conditions.  He went on to explain that Rex Features would not agree to such terms as frequently mistakes happen such as:

   a. The wrong photographer being credited for the image
   b. The name was spelled wrong
   c. The image only provided a credit to Rex
   d. There was no credit provided at all

   He went on to explain that sometimes with regular customers, image use occurred before being reported to Rex and in such instances, there would be no possible way to remedy the mistake.

B. Sedlik used the stock photo agency First Light as one of his exhibits in creating his pricing exhibit. I am familiar with First Light from my Industry experience.  To confirm my understanding of First Light's operations at that time, on August 17,2020 I spoke with Anne Bastarache, Director of Photography for First Light. Ms. Bastarache was in the same position in 2015. I worked with her in my capacity as a consultant operating at that time with the title of VP, Operations. Ms. Bastarache was able to speak specifically about First Light and

**CONFIDENTIAL**

therefore Design Pics' policies regarding acquiring new photographers and their images.  I posed the following questions to her:

1. Would First Light in 2015 enter into a relationship with a photographer that they would be paying royalties to and not require that the photographer sign an agency agreement to cover the relationship?

   Ms. Bastarache responded that "First Light would definitely require a signed contract before accepting any of the photographer's images for licensing."

2. I then posed the following question to Ms. Bastarache. Would First Light agree to enter into an agreement with a photographer where the photographer absolutely required a specific credit line for all editorial uses and would consider any omissions and therefore possibly an infringement on her copyright? I further said that if mistakes occurred the photographer would want to reserve the right to consider such omissions to be infringement on her copyright and want to reserve the right to pursue claims with their customers based on those omissions.

   Ms. Bastarache responded that "they would not agree to work with a photographer under those conditions."  She went on to explain that First light would not agree to such terms as frequently mistakes happen such as:

   a. The image only provided a credit to First Light
   b. There was no credit provided at all
   c. The wrong photographer was credited
   d. The name was spelled wrong

   She went on to explain that sometimes, with regular customers, image use occurred before being reported to First Light and in such instances, "there would be no possible way to remedy the mistake." Lastly, she specifically said "they wouldn't touch that photographer with a ten-foot pole".

C. Definition of Licensing Model for the Images

   1. In accordance with the definition of RM licensing as described in VI A above, Gobble LLC's images cannot be defined as RM images – at least insofar the term would apply to general stock photography agencies that Sedlik uses.

**CONFIDENTIAL**

2. In my opinion, it is very unlikely that the Images would have been accepted by a general stock photo agency similar to Getty Images, First Light or Image Source.  While Getty Images Editorial does offer news photos, they don't offer picture stories in bulk packages such as WENN or Rex Features do.

3. Getty and similar agencies are all licensing single images and while images of cats could be selected and licensed for an editorial use, for the most part, the uses applicable to cat photography would be commercial uses and commercial uses do not require credit lines. In almost all commercial use situations, the clients will not agree to allow a credit line to appear in the use product they are working on.

4. Whenever stock photo agencies receive images from a contracted photographer those images are reviewed by editors.  Because just about all major stock photo agencies have millions of images on their websites, new submissions are severely edited.  In doing so, the editors consider the type of subject matter and the photographer's treatment of the subject being portrayed.  They also consider the overall salability of the subject of the images as well as the quantity and caliber of that subject that is already in place on their website.

As the searching for images to be licensed will be accomplished in most instances by the client, the editor and the agency are sensitive to only presenting their best images and making the search process as easy as possible for the client.  If the client is either frustrated or disappointed with what they see for search returns they accomplish, they will simply close that browser and go to a different photo agency's website to continue their search.

Lastly, there is a cost per image to in-process new images into the agency's system including captioning, keywording and the actual upload process to be accomplished. Hence severe editing to limit unnecessary costs incurred by the agency.

I have substantial experience with getting images accepted by both Getty Images and First Light for both the RM and RF components of their websites. My experience is that Getty Images and First Light severely limit their selection of submitted images from their

CONFIDENTIAL

contributors for the reasons described above and therefore wouldn't consider Gobble LLC's submission of the Images.

### D. The Quality of the Images

1. After reviewing all images referenced in the Complaint (EXHIBIT 19), I find that some of them are borderline acceptable compared with the many thousands of images of cats that I've seen in stock photography libraries I've been involved with. They are certainly not exceptional or of extraordinary quality. Many of them were unacceptable as defined in EXHIBIT 19 and, had they been presented to any stock photo agency such as Getty Images, Image Source and First Light, they would have been rejected by their editing process.

2. They are rather pedestrian in their staging and with props and styling reminiscent of prior decades insofar as the production of pet photography and as such, they are certainly not unique.

3. Many of them are cropped too tightly for commercial use. Some of them have hands or fingers shown in them which would present problems for their commercial use. Additionally, some of them are inferior in quality due to lighting issues and are simply too dark for publication.

## X    SEDLIK'S ASSUMPTIONS REGARDING THE ALLEGED INFRINGEMENTS

I disagree with certain assumptions contained in Sedlik's report that he was told to rely on in forming and developing his opinion.

A.    Assumption K: Assume that the information provided by BGP in the "Table of Usages, by Usage Number" Exhibit F is correct.

Sedlik's Table of Usage assumes and utilizes pricing strategies that are improper in this case for the following reasons:  Sedlik's pricing model is based on the premise that a buyer looking at and considering the licensing of the Images would then have someone at each of his or her fifty-six stations seek out the images on the stock photography website and individually license the image for the alleged us. Putting aside the costs that would be incurred, in just considering the gross inefficiency

of such an approach you realize that no one would even begin to consider doing so when making one phone call to the agency would accomplish the task. Simply put – it's not how the industry works.

1. Sedlik is pricing the Images using pricing calculators of various general stock photography agencies as RM images. As I have explained in Section IX, one cannot categorize Gobble LLC's images as RM images.

2. The uses of the Images, if considered to be either stock photography, albeit either RF or RM images, is such that as many of his and my exhibits portray, the unique pricing elements require that the potential licensee must call the agency and discuss those details and therefore negotiate for such a license.

3. For RM pricing, the volume of images and the use specifics would dictate that a discussion on pricing would be required.

4. An Informed Buyer would surely see that RF pricing would be far-more favorable when compared with RM pricing.

5. Charging a unique license fee for each of Sinclair's website uses is not the industry standard procedure for pricing the uses in this dispute.

6. Charging for one-year licenses for each of the years of each images use is not the industry standard for establishing use fees in this dispute.

7. Charging for use by each of the fifty-six Sinclair stations for each of The Images is not industry standard for the use that is the subject of this dispute.

8. Charging each of the fifty-six Sinclair stations for each of the Images using the use component of 10 million viewers is inaccurate as the reported number of viewers as discussed on pages 8 & 9 of Ellen Boughn's Report provides information gleaned from SBG 000828-000883, Google Analytics Report, which shows that "only three of stations had between 70,000 and 140,000 while the remainder had

a view average of less-than 10,000." In doing so, Sedlik is grossly overcharging the web site calculations he has created.

B. Assumption M – That few Lykoi cat photographs were available in 2015 and therefore they were "rare and scarce."

1. Sedlik's definition of "scarce" as defined on page 278 of his Deposition when asked "where is the cutoff between an image being scarce and not scarce?, his testimony on lines 15 – 18 was "I don't know if there's a precise cutoff but where the demand or need is there for an image or images and there are few images to choose from, then the image would be scarce": As Gobble's licensing sales history establishes, the demand for Lykoi cats held by stock photo agencies is minimal at best.

2. Mrs. Gobble freely allowed use of the Images.

3. As far as licensing "scarce" images are concerned, the subject matter of Gobble LLC's images simply doesn't qualify.  This is further discussed in Section X of my Report where I discuss Sedlik's Proposed Actual Use Fees.

4. In Sedlik's Surrebuttal Report, on pages 11 & 12 he discusses searches he performed that established Getty Images had "130,000 images of cats."  Sedlik's method of determining the method of calculating the number of cat images was incorrect.

   Stock photo agencies keyword each image they select so that users can find them on their searchable website. A search for "cat" will produce results that lions, tigers, the Broadway hit Cats, and many other unrelated images.

5. Dr. Gobble in his email to Rex Features indicated that in additional to Gobble LLC's image on Gobble LLC's website there were images of Lykoi cats belonging to other photographers.  Additionally, Brittney Gobble in her communications with Rex features in various emails indicated that "she was producing new images regularly and as detailed in Section X, Gobble LLC testimony established that "around 7000 Lykoi cat images had been photographed" with "around 1500 having been place online." (Gobble LLC deposition testimony, pages 50 & 51).

**CONFIDENTIAL**

6. Web searches using Google Image search functionality revealed a goodly number of images of Lykoi cats. My Exhibits 26 – 29 were among hundreds of Lykoi image thumbnails I view.  These exhibits were among the first thumbnails I opened to confirm that these images existed during or before the period of this dispute.

7. When the Images were licensed by Rex over a multi-year period, the images created a little over $300 for Gobble proving that the supply was more than adequate for the demand.

8. In the overwhelming instances when users visit a stock photo agency website to search for cat photos, the project they need the images for is commercial in nature regardless of the breed of the cat. They review the available inventory for an image of a cat that is extremely cute, doing something interesting or has a unique expression that will work well with their needs for a cat image.  In short – they work backward from the available inventory and used their judgement to select the right candidate.

Accordingly, Sedlik's reasoning for declaring the Images as being considered unique and scarce must be ignored as that Assumption is false.

E. Assumption N – That attribution was a condition of the license granted to WENN.

Dr. Gobble's email to Claire Penn on November 2, 2015, states that that none of the uses should be "purposely derogatory toward the breed." The email provides no absolute requirements regarding attribution. The email further states that attribution should be provided "whenever possible".

F. Assumption P – That Defendants' use of the photographs is a violation of 17 U.S.C. 1202.

1. Sinclair's use of the Images was based on their normal business dealings through the agreement with WENN.

2. Gobble LLC offers no evidence to prove that there was a violation of U.S.C. 1202.

3. Some of the Images were credited either in the caption that was provided with the images or as a credit line. A credit that includes the photo agency is not improper.

H. Assumption R – that Defendants' use of the photographs was not an innocent infringement.

1. Sinclair's use of the Images as they had been provided to them by the agreement with WENN, to the best of Sinclair's knowledge was lawful based on the representations that were provided in WENN's Agreement.

2. Gobble LLC never sent a cease and desist letter to Sinclair. It is customary in the industry for the photographer who believes her photos are being infringed to send a Cease and Desist Letter. In conversations between Gobble LLC's attorney and Sinclair while the WENN litigation was ongoing, the attorney made no mention that Gobble LLC's claimed Sinclair was infringing.

3. BGP00068 – BGP0010069 is an email string between Sinclair's employee Amanda Ota and Gobble LLC that provides for use of the Images.

4. BGP003337 – BGP003340 is an email string between KOMO's employee Scott Sistek and Gobble LLC that provides for use of the Images.

5. It has always been industry standard for stock photography agencies and their photographers to acknowledge and accept that all existing licenses accomplished by the photographer's agency shall remain in effect when the photographer terminates their agreement with their agency or when the agency terminates the relationship.

## XI. THE PROPOSED ACTUAL USE FEES BEING DEMANDED BY SEDLIK

In reviewing Sedlik's analysis and justifications for his calculation of the FMV of Sinclair's use of the Images, I find that his reasoning and his examples ignore standard industry practices in 2015 and as they continue through today. A discussion of the alleged uses for which Sedlik has affixed a valuation follows.

**CONFIDENTIAL**

A. Use of website pricing and choice of licensing model

1.Sedlik ignores the reality of where the market was in 2015, so that in addition to the Microstock option that I have already discussed, traditional RF licensing would have been available. This option would have been fast, less expensive than seeking a RM images, and would have provided total flexibility on the image's use. Lastly, it would have eliminated the need to come back to acquire additional rights, should the need arise.

2.Alternatively, the "hypothetical buyer" could have called some of the stock photo agencies he or she worked with and asked for digital lightboxes to be prepared, providing appropriate RM images.  If the buyer had found appropriate images in one of the digital lightboxes, the buyer would then call the agency controlling the rights for the images to negotiate a license fee. On pages 14 & 16 of Boughn's report she discusses calls she made to Shutterstock and Getty images and the ensuing discussions regarding pricing for a use such as this dispute is dealing with. During my entire fifty-plus years of involvement with the licensing of commercial photography and specifically, during 2015, the time when the alleged infringements transpired, almost no one was purchasing RM images through ecommerce functionality, and it was extremely rare to call a rights holder and be forced to pay book price for the rights requested.

By way of further explanation, stock photo agencies for the most part do not own the photos they license.  They act as agents for the photographers that produce the image being licensed.  The photographer and the agency generally split any sales revenue according to an agreement that was entered into at the start of their collaboration.  Under these agreements, the photographer is generally responsible for the production costs associated with the creation of the photo and the agency licensing the image is responsible for the cost of generating the sale of the license.  Other than the agency's fixed overhead, which is amortized over all photo licenses sold – the agency has total flexibility in their pricing.  They are not in the same position as a store that acquires a product they are selling and has to account for the fixed amount they paid for that product.  Accordingly, it is my personal experience that in licensing negotiations, the achieved fee at the end of the negotiation may

CONFIDENTIAL

be reduced by as much as fifty percent of the price initially quoted for the license.

B. Since 2015, while a photo agency's website image search options existed to limit the search to either RF or RM images, the default for any stock photo agency that offers both products had almost always been to search by both licensing models.  Accordingly, the images that the client will see on a search will include images from both licensing models if available. Image buyers in 2015 as well in more recent times and for many years prior have in many instances selected the option to see only RF images when budget or the lack of information about use periods is an issue.

C. Sedlik improperly employs ecommerce functionality for the licensing of RM photography by incorrectly selecting a one-year license instead of the longest available term of use which would provide pricing for the actual period of the alleged infringement uses. Even assuming for a moment that the unlikely event that an informed buyer would use the ecommerce website functionality to make this "theoretical purchase of a license," most buyers would have certainly checked and realized that the difference in pricing between a one and two-year use was so scant that they would have surely opted for the longer term of use.

D. In Sedlik's pricing model he improperly and artificially increases his proposed FMV RM license fee by separately charging each of Sinclair's web sites for the use of the Images.  Any buyer of a RM image would ensure that the one license they acquired would cover use on all of their websites of all of their operations. As most licensing of this sort would be accomplished by personal interaction by email and or phone rather than ecommerce, the use would quickly become crystal clear during such discussions and if the agency felt it necessary to increase their standard fee for the website use, it would certainly not be a multiple that would be defined, according to Sedlik's pricing model as multiples of the normal fee – which is fifty six stations times the number of years of alleged use. Sedlik is improperly attempting to charge separately, full price, for each year of use.

>   Included with my Report are the following applicable exhibits corresponding to these comments.

a. EXHIBIT 5 (three-page exhibit) uses the same image Sedlik used in "Exhibit H of his report. I went to First Light's website, the agency Sedlik found the image on and then found the image which is identified as "TFA-BS-06304. I selected the same use components as Sedlik selected. Note the alternative option First Light presents to the customer as shown below. The price was $34.99 and the use period was for five years. The third print screen of this exhibit confirms I could license the image for $34.99 matching Sinclair's requirements. This licensing model was in effect during the 2015/2016 period.

For perfect clarity, you'll note this exhibit in the third print screen provided that this image is offered by First Light under its RM licensing model.

b. EXHIBIT 6 uses the same image and shows pricing when I selected the option to customize the license and used the same use component's Sedlik did, and I obtained the same price that Sedlik found when he created his exhibit - $670.

c. EXHIBIT 7 uses the same image and when I changed the use period to two years, the price did increase to $754, a 12.5% increase not the doubling of the one-year fee as Sedlik would propose.

d. EXHIBIT 8 uses the same image and when I changed the use period to five years, the price did increase to $922, a 38% increase over the one-year fee.

The percentage increase shown in EXHIBITS 7 & 8 are consistent with industry practices during the 2015 – 2016 period.

e. EXHIBIT 9 - Boughn's Exhibit C of her Report discusses an image of a cat she found on the AGE Fotostock web site. Her exhibit shows that AGE Fotostock offers a quick RM license for web site use at the same $34.99 price as Sedlik's choice from First Light which is discussed in my EXHIBITS 5 – 8 discussed above. I found that image still on AGE Fotostock's website. Note, my exhibit makes the offer as $34.99 for a five-year editorial web site use. This example is consistent with the license in EXHIBIT 5. EXHIBIT 5 and EXHIBIT 9 demonstrate that there were much cheaper RM options available than were selected by Sedlik.

f. EXHIBIT 10 - As I did for Sedlik's First Light image I then sought a custom license for this image. The exhibit shows AGE's pricing for a

one-year license to be $250, much higher than the EXHIBIT 9 license. This shows how using ecommerce list prices can be deceptive and can result in inflated value. You'll note the selections made available were different than on other web sites so I chose from what was available.  In order to confirm that price would not change by the state I selected, as well as the end-user industry and the products designation and in each instance the price did not change and tried various state and other selections for industry and product type.  In each instance when I made the changes there was no difference in pricing.

g. EXHIBIT 11 shows the same image but in this instance, I chose the longest use period offered, which was three years.  By doing so the price increased to $315, a $65 increase in price for the additional two years of use. It should be noted that I used the largest use size for the pricing, which was not the case for each of the Images actual use. This would be the way a client would most often make selection of the use elements to get a starting price for negotiations. As the alleged use could have been up to five years, and as AGE's price increased by $65 from one to three years, I have added another $65 to AGE's three-year rate of $315 so that for a five year-license, it is likely that AGE would have asked as a starting negotiation price no more than $380.00.

h. EXHIBIT 12 (nine-page exhibit) – Many RF licensing agencies require what the industry calls "Seat Licenses".  A Seat License is defined as a license to use the image that some agencies require when the licensee plans on providing the images being licensed to more than the number of users established as the limit by those agencies that required Seat Licenses. Traditionally the maximum number of users for the basic license is ten. It has been that number for many more than the past five years.

Pages 1-9 of the exhibit provides Getty Images RF Licensing terms that discuss their Seat License Policy.  Item#4 specifically addresses Seat License.

i. EXHIBIT 13 provides First Light's RF Licensing Terms. You'll note the highlighted portion at the bottom of the document that indicates their Seat License requirements. Traditionally the maximum number of users for the basic license is ten. It is has been that number for many more than the past five years.

**CONFIDENTIAL**

j. I would add the following comments about Seat Licenses as they would apply to the license fees I include in this report. Based on personal experience in dealing with Seat License policies and pricing, there is some question as to whether they were necessary, based on the way Sinclair operated its websites. Based on an overabundance of caution, I decided that my valuations for RF license fees applicable to the alleged use should include the cost of an expanded Seat License.

   i. With more than 50 TV station websites I would have to assume that the number of persons that could potentially access and use the Images would exceed the 10 limit that applies to a standard RF license. Therefore, a purchase price for seat licenses should be applied to any calculations for Sinclair's theoretical us of an RF image such as shown in EXHIBIT 3 and the Seat License in EXHIBIT 4.

   ii. Seat Licensing pricing can only be obtained by personally contacting the licensing agency. In fact, it is a negotiation. The factors that would be considered would be the number of users you would wish to access the images and the number of RF images you wish to license.

   iii. In my opinion, based on more than 50 years of dealing with license transactions for stock photography I can state that in such a negotiation, the before-seat license fee that would apply to each of the RF images, would be reduced considerably because just about all agencies offer volume discounts.

   iv. There is no standard price for a Seat License given the factors I have detailed. The worse-case scenario, based on my twenty years of experience in the licensing of RF images, where the user was a poor negotiator and rushed for time and the agency was being hard-nosed for whatever reason – the absolute highest fee that I believe would be charged in almost all cases would be a doubling of the website price for less than ten users.

This further demonstrates why in this instance, given the actual facts that pertain to the use of the Images, Sedlik's use of an ecommerce pricing calculator to establish his pricing model is inappropriate and without foundation and in contradiction to then-existing stock photography agency practices.

**CONFIDENTIAL**

E. Calculation of RF License:

As my EXHIBIT 3 provides, I found a RF image on First Light's web site, a site used by Sedlik to use as the basis for establishing FMV for the alleged uses of the Images.  I selected the 6MB file size, which would be more-than adequate for the actual size and type of use.  The license fee offered was $59.

In accordance with the licensing terms, it would be necessary to purchase a Seat License to provide for the fifty-six stations that might want to access the Images.  Based on my twenty years of experience in licensing RF images and my personal and direct knowledge of First Light's pricing and usage policies, it is my opinion that the maximum cost of a seat license for each of the Images would be $59, the same amount paid for the photo license for the file size of the image. If Sedlik going to rely on list stock photograph prices, and if he is not going to use Microstock pricing, he should have started his calculations with these figures and this RF licensing model. Based on my familiarity with First Light's licensing practices, this pricing would have been available in the 2015 – 2016 time-frame.  Accordingly, the price for the acquisition of a RF license for the 51 photos with a seat license would amount to a subtotal of $6,018 ($59 + $59 x 51 images).

Additionally, it is my experience that given the volume purchase of 51 images, it is my opinion that a negotiated discount of not less than twenty percent (20%) would be accomplished.  Based on that assumption, a negotiated FMV value payable to Gobble LLC for traditional RF images would be **$4,814.40.** ($6,018 x 80%). The portion paid to Gobble LLC by the stock photo agency would not be more than fifty percent value - $2,407.20.

F. Calculation of RM License:

Alternatively, although it is my opinion that a buyer seeking to use photos such as Sinclair did would not have used RM images, in the event that it is determined that the use fees for the alleged

CONFIDENTIAL

infringements of Gobble LLC's images would require obtaining a RM license, I calculate that amount as follows:

1. EXHIBIT 5 of my report shows a license fee of $34.99 offered by First Light for five-year website use. Sedlik makes no mention of this license option in his report. EXHIBIT 11 from AGE Fotostock as I explained has an adjusted price of $380 for a five-year license if the buyer didn't call and negotiate a better deal with the agency.

2. Therefore, in determining FMV for the RM alternative and assuming that it is appropriate to average stock photo list prices, then Sedlik should have used these list prices as a starting point. This would have resulted in a starting point of $207.50 for a five-year license.

3. The average price of the exhibits referenced is $207.50 ($34.99 + $380/2).  Accordingly, by multiplying that amount times the 51 images I arrive at a subtotal for a RM option in the amount of $10,582.50.

I would lastly add based on my years of experiences in arranging multiple image licenses, that a negotiated offer would have accomplished a reduction of not less than twenty percent (20%). Based on that assumption, a negotiated FMV value payable to the stock photo agency would be **$8,466.00.** ($10,582.50 x 80%), of which the photographer's royalty would be not more than fifty percent ($4,233.00).

G. Use of multipliers based on scarcity

1   Multipliers were commonly cited in their licensing agreements prior to 2004 by photo agencies who claimed that the license agreement had been breached. During that period, agencies I worked with as well as almost all photo agencies doing business in the U.S. tried to use multipliers to impose penalties on copyright infringers using their licensing agreement documents as a basis for such demands. The use of multipliers in conjunction with ecommerce pricing is not a proper tool for determining license fee for scare or unusual photos in the stock photography industry

**CONFIDENTIAL**

In 2004, Nancy Wolff, then House Counsel of the Picture Agency Council of America (recently renamed Digital Media Licensing Association), advised all member agencies of a court decision ruling against the industry's then standard practice of applying multipliers in instances of copyright infringement.

The ruling, Stehrenberger v J.R. Reynolds Tobacco Holdings Inc., 335 F.Supp.2d 466 (S.D.N.Y. 2004), in summary stated that the plaintiff could not rely on a multiplier to determine actual copyright damages.

Having been so advised, almost all agencies abandoned their efforts to penalize copyright infringers by using multipliers, at least beyond using them to negotiate a favorable settlement.

2. The Images do not meet the standards established by the industry over many years for unique and special treatment such as would be reserved for a photo of a President's assassination, the first photo of an important celebrity's child or the raising of the U.S. flag during the salvage operations after 9/11.  In such instances, those images would not be found among the "traditional stock photo inventories" on websites where images could be licensed through ecommerce.  Those rare images would be sheltered and handled uniquely through direct negotiations that would be tightly controlled by an agency executive. Sedlik is using the stock photo industry and its licensing models and ecommerce website functionality as a basis for his valuations and that makes no sense if in fact the images were scarce – which they weren't in any event.

Therefore, Sedlik is faced with the conundrum of either maintaining that the Image is scarce, unique and special and deserving of special handling and pricing considerations, or the choice of adhering to the approach of using stock photo agency websites with ecommerce functionality to select and implement his licensing model.  He cannot have it both ways.

I'm familiar with several examples of a unique photo licensing event when there was a clear example of scarcity combined with notoriety that created an extremely unique licensing sale.

CONFIDENTIAL

### EXHIBIT 20 – A World Record License Fee for twin babies

a.  In 2008, Angelina Jolie and Brad Pitt conducted negotiations for the exclusive right to publish photos of their twin babies Vivienne and Knox who were born that year.  People Magazine and Hello Magazine, a British publication, partnered to acquire exclusive publication rights to the photos for $14 million, which would be donated by Jolie and Pitt to charities of their choosing.   They conducted a private auction of sorts among interested publications and accomplished the astounding license fee that was paid for the use of the photo of the newborns. The fee remains a world's record for the most expensive baby photos. I should note that the photo shoot was arranged by Getty Images.

### EXHIBIT 21 THOMAS FRANKLIN'S PHOTO – FLAG RAISING IMMEDIATELY AFTER 9/11

a.  Thomas Franklin is a name you probably are not familiar with but you certainly know the photo he took when he rose to national acclaim for his coverage of the 9/11 terrorist attacks on New York. His now iconic image of three firemen raising a flag above the rubble of the World Trade Center taken hours after the attacks, is one of the most identifiable and powerful images in history. Life Magazine listed it as one of the "100 Photographs That Changed the World," and the photo is part of the permanent collection of the Library of Congress.

In 2002, the United States Postal Service introduced the "Heroes" stamp, featuring the flag-raising photo. Proceeds from the stamp have raised over ten million dollars to help families and rescue workers of 9/11.

In 2002, an autographed original print signed by Franklin and the three firemen pictured in the photo, sold for $89,625 at Christie's Auction House, with proceeds benefiting two 9/11 charities.

b.  During the course of my career I have personally accomplished or otherwise managed the licensing sale of not less than fifty photos where the license fee was in excess of

CONFIDENTIAL

$25,000.  In each instance the photos were licensed to large corporations, directly or through their advertising agency, and the licenses were for major consumer advertising uses.

c.  Pricing of stock photography has always followed the concept that the more a buyer would be willing to spend on using the photo they would license – the more they would be willing to spend to acquire the photo.  When a photo is licensed for a truly commercial use such as consumer magazine advertising, national TV commercials or product packaging – the advertiser is spending hundreds of thousands if not millions of dollars in production costs and advertising rates for publication or commercials and so, in comparison, to pay thousands of dollars for the license of an image to "dress-up" or otherwise assist in delivering a message is a drop in the bucket for buyers.  On the other hand, the licensing fees for images to be used in a magazine, textbook or a website where the use is purely editorial and not commercial commands the low end of the pricing spectrum for stock photography.

Whether or not a certain number of other Lykoi cat photos existed at that time, the photos that Mrs. Gobble and Gobble LLC was giving away for free and selling for a few dollars hardly compare with any of the examples I've provided. Based on examples provided above it should be crystal clear that a single photo of a Lykoi cat by comparison cannot be worth approximately $600,000.  ($31 - $35 million divided by 51), the amount Gobble LLC and Sedlik claim each of the Images are worth.

3  In Mrs. Gobble's deposition testimony on page 50 she states that she produced 7,000 images of Lykoi cats and on page 51 further states that she had placed 1,500 images of Lykoi cats online. In addition, on Pages 69-73 of her deposition she provides names of four photographers that she knows and has had contact with that also produce images of Lykoi cats.  Adding those images to the total along with the images of Lykoi cats that were available on stock photo

**CONFIDENTIAL**

agency websites during the 2015-2017 period certainly illustrate that images of Lykoi cats were not scarce.

My EXHIBITS 23 – 26 were accomplished via Google Image Searches using the search term "Lykoi cats." These exhibits were of photo uses of Lykoi cats between Oct of 2014 and November of 2015. The search return yielded hundreds of thumbnails of Lykoi cat images. It also provided an option for additional search on additional related searches titled "white Lykoi cat", down syndrome "Lykoi cat" and "Lykoi cat price".

H. Sedlik's use of ecommerce pricing calculators is flawed because the calculator is not and won't adjust for scarcity and would quote the same price for any and all photos.  He can't have it both ways – price by conversation or price by ecommerce but in either case, accept the way the process would work without interjecting multiples or pricing multiple uses by adding up each year and each web site.

I. The Images further established that they had almost no value based on being scarce or otherwise in the marketplace serviced by stock photography agencies as they only generated approximately $300 for Gobble LLC from their licensing by Rex Features.

Getty, First Light  and Image Source:

J. Based on extensive work I did with Getty regarding image editing and selection for their web site during the period of this dispute it is my opinion that Sedlik's use of Getty Images to produce the Getty pricing exhibits is without justification for the following reasons:

1. Getty critically edits all submissions from contract photographers. By that I mean, they only select images they feel are good enough, represent a style and treatment they deem is salable and offer subjects and treatment that aren't already "well stocked" on their website.

2. Getty in 2015 was extremely stingy in contracting with new photographers and would certainly not allow "experimenting" with their relationship.

3. Getty required exclusive agreements with most of its individual photographers submitting images for RM licensing consideration.

**CONFIDENTIAL**

4. Getty wouldn't accept a photographer's requirement for specific attribution criteria for all image licensing or even for just editorial licensing.

5. Getty wouldn't agree to accept images that the photographer required be exclusively placed in their RM product offering.

6. Getty wouldn't agree to accept images that the photographer was simultaneously giving away for free.

K. I provided extensive consulting services to First Light through my Design Pics relationship regarding image editing policies, procedures and selection for their web site during the period of this dispute. In conjunction with my report I interviewed the Director of Photography who was responsible for the work with their photographers from 2011 to and including the present period, Sedlik's use of First Light Images to produce the First Light pricing exhibits is without justification for the following reasons:

1. First Light critically edits all submissions from contract photographers and they only select images they feel are good enough, represent a style and treatment they deem is salable and offer subjects and treatment that aren't already "well stocked" on their website.

2. First Light in 2015 would not allow "experimenting" with photographer relationships.

3. First Light wouldn't accept images from a photographer without first having them sign their representation agreement.

4. First Light wouldn't accept a photographer's requirement for specific attribution criteria for all image licensing or even for just editorial licensing. In fact, when I posed the question, the response actually was – "wouldn't touch him with a ten-foot pole".

L. I personally knew the Image Source Director of Photography for many years both before he took on that position as well as while he was with Image Source. Aside from Getty Images, Image Source's reputation regarding the quality of their images during the period in this dispute was that they were highly regarded for the quality of their images.  Their RF pricing was among the highest in the industry. It is very unlikely that Image Source would have accepted the Images had they been submitted by Britney Gobble for consideration.

CONFIDENTIAL

## XII.  ACTUAL VIEWS OF THE IMAGE'S ON SINCLAIR'S WEBSITES

I reviewed several Google Analytics spreadsheet reports that were provided to me. I reviewed the report and provide the following website trafficking information as an example of the "hits" for the cat article and for the website.

A    In the report titled 3/4/19, which I understand records the hits for the Lykoi article, I selected abc7amarillo.com as a sample and report the following hits recorded for that website which was generally consistent with the other station websites.

   a. For 11/10/15 238 hits on the landing pages for the Images
   b. For 11/11 – 47 hits on the landing pages for the Images
   c. For 11/12 – 2 hits on the landing pages for the Images
   d. For 11/13 & 11/14 – 0 hits on the landing pages for the Images
   e. For 11/15 – 1 hit on the landing pages for the Images
   f. For 11/18 – 1 hit on the landing pages for the Images
   g. I stopped recording because with few exceptions no hits were captured beyond that point

B    In the second report I selected abc7amarillo.com as a sample and provided total hits for the website by day.

   h. 11/10 – 52,256
   i.  11/11 – 44,332
   j.  11/12 – 32,503
   k. 11/13 – 50,722
   l.  11/14 – 26,659
   m. 11/15 – 11,903
   n. 11/18 – 40,758

The conclusions gleaned from my viewing these reports confirm is consistent with my personal experience with stock photo agency web site marketing, namely:

1. The Images were used on Local TV news station websites.  They were intended to provide general interest information which wasn't news but otherwise might provide a potential viewer with a reason to check the

48

**CONFIDENTIAL**

website.  The primary reason a viewer would go to the web site was for the news the site might offer.

2. That being said, once a viewer has chosen to click and view the Images and read the corresponding story, there is no reason to do that all over again the following day or for any other day going forward.

3. As Sinclair is adding new articles with image content to Sinclair's websites on a regular basis, older stories and image content will fall lower in the queue as newer stories appear and become that day's new draw for website visitors.

4. While I understand that pricing and licensing is normally determined in advance of actual use, the anticipated viewership for these local station websites is not a secret. Sedlik offers no evidence to support his use of 10 million viewers in his pricing calculation. In this instance, Sedlik's selection of 10 million viewers is grossly inaccurate for the following reasons:

   a. According to SBG000828-SBG000883, Analytics summary per station, only three of stations that allegedly use the Images had viewer totals of between 70,000 and 140,000 while the remainder had a viewer average of less-than 10,000.
   b. The populations of just about every station area of coverage was less-than one million and in many cases under 100,000
   c. A partial list of the locations of Sinclair's affiliates include; Rochester NY, Charleston SC, San Antonio, Brownsville, Amarillo and Austin TX, Portland MA, Boise ID, Tulsa OK, Coos Bay, Medford and Eugene OR, Seattle and Yakima WA, Omaha NE, Quincy IL and Kirksville MO.
   d. Considering the use was intended to be accessed only once, there is no logic to any conclusion for the viewer to come back and view the story after it was already viewed.
   e. As a form of comparison to Sedlik's use of 10 million viewers to the Images on 56 Sinclair stations as a human interest insert, I researched some of the major TV events in the past.

| Event | Source | Viewers |
|---|---|---|
| Super Bowl 54 2/20 | Ad Week 2/12/20 | 113.5 million |

CONFIDENTIAL

| Last Episode of MASH 2/28/83 | Washington Post article dated 2/28/18 | 105 million |
| Last Episode of Friends | NY Times 5/8/04 | 52.5 million |
| Game of Thrones 5/19/19 | CNN.com | 19.3 million |

Conclusion: Sedlik has deliberately chosen to further inflate his already highly inflated use calculations by using the largest possible user total available on the stock photo agency calculators he accessed to determine his FMV amount of the alleged uses.

## XIII. SUMMARY

My report has undertaken to review all of the available relevant evidence and testimony in order to determine the appropriate license value for the Images as used by Sinclair.

I want to summarize the main reasons why my FMV figure is so radically different than that which was computed by Sedlik on behalf of Gobble LLC.

First, Sedlik refused to use the history of sales with Rex Features.

Sedlik's method is incorrect because:

A    Sedlik selected list pricing from generalist stock photo agencies that would not have accepted the Images.

B    Sedlik chose the most expensive stock photograph licensing model to calculate his FMV, a model that is not appropriate for the mages of for Sinclair's alleged use.

C    Sedlik chose to use List Pricing in an industry where paid fees are typically negotiated down from the list price via a conversation between buyer and seller.

D    Sedlik manipulated the stock photography pricing calculators that he used to artificially and improperly inflate his list prices.

E    Sedlik calculates multiple licenses for the various web sites and uses instead of determining one license value for each of the images that permits all uses.

CONFIDENTIAL

F    Sedlik used multipliers to further artificially inflate his FMV. The photos are not rare and scarce as Sedlik claims.  If they were, their value would not be determined by multiplying a stock photo list value for a non-scarce and non-rare value by three of five.

G    Sedlik ignored the fact that the photographer only receives at most, fifty percent of the selling price.

My report is based on the information provided to me.  I reserve the right to modify my findings if I am provided with additional information or documentation that would alter or significantly change the conclusions I have reached or to supplement them if I am asked to do so.

Sep 18, 2020

*Gary Elsner*

Date:                     _____

                             Gary Elsner

Exhibit 2



Kelli Norden and Associates
Court Reporters
310.820.7733 phone  310.820.7933 fax
11835 W. Olympic Boulevard  Suite 680E
Los Angeles, California 90064
kna@kellinorden.com  www.kellinorden.com

In the Matter Of:

D'Pergo

vs

Sweetwater

# GARY ELSNER

November 12, 2020

Volume I

Case No: 1:17-CV-000747-LM

1              UNITED STATES DISTRICT COURT

2          FOR THE DISTRICT OF NEW HAMPSHIRE

3

4

5    D'PERGO CUSTOM GUITARS,      )
     INC.,                        )
6                                 )
              PLAINTIFF,          )
7                                 )
       VS.                        )   CASE NO.
8                                 )   1:17-CV-000747-LM
     SWEETWATER SOUND, INC.,      )
9                                 )
              DEFENDANT.          )
10   _____)

11

12

13

14

15                    VOLUME I

16            VIDEOTAPED DEPOSITION OF:

17                   GARY ELSNER

18          THURSDAY, NOVEMBER 12, 2020

19

20

21

22

23
     Reported by:
24
     Kelli C. Norden
25   CSR No. 7200

**CERTIFIED COPY**

1              UNITED STATES DISTRICT COURT

2           FOR THE DISTRICT OF NEW HAMPSHIRE

3

4

5    D'PERGO CUSTOM GUITARS,       )
     INC.,                         )
6                                  )
                   PLAINTIFF,      )
7                                  )
       VS.                         )   CASE NO.
8                                  )   1:17-CV-000747-LM
     SWEETWATER SOUND, INC.,       )
9                                  )
                   DEFENDANT.      )
10    _____)

11

12

13

14                    VOLUME I

15

16

17        The deposition of GARY ELSNER, taken on

18   behalf of the Plaintiff, before Kelli C. Norden,

19   Certified Shorthand Reporter 7200, for the State

20   of California, commencing at 8:08 a.m., Thursday,

21   November 12, 2020, via Zoom.

22

23

24

25

```
 1    APPEARANCES OF COUNSEL:

 2

 3    FOR THE PLAINTIFF:

 4         GLASER WEIL FINK HOWARD AVCHEN & SHAPIRO, LLP
           By:  ROBERT ALLEN
 5              ATTORNEY AT LAW
           10250 CONSTELLATION BOULEVARD
 6         19TH FLOOR
           LOS ANGELES, CALIFORNIA  90067
 7         (310) 553-3000
           RALLEN@GLASERWEIL.COM
 8

 9
      FOR THE DEFENDANT:
10
           BERNSTEIN SHUR SAWYER & NELSON P.A.          08:10:02
11         BY:  RICHARD GAGLIUSO
                ATTORNEY AT LAW
12              NED SACKMAN (AT PAGES 81 - 139)
                ATTORNEY AT LAW
13         670 NORTH COMMERCIAL STREET
           SUITE 108
14         MANCHESTER, NEW HAMPSHIRE  03101
           (603) 623-8700
15         RGAGLIUSO@BERNSTEINSHUR.COM
           NSACKMAN@BERNSTEINSHUR.COM
16

17
      ALSO PRESENT:
18
           JACOB MAYEDA, VIDEOGRAPHER
19

20

21

22

23

24

25
```

DEPOSITION OF GARY ELSNER, Vol I

1          LOS ANGELES, CALIFORNIA, THURSDAY

2              NOVEMBER 12, 2020

3                 8:08 A.M.

4                                                    08:00:48

5          THE VIDEOGRAPHER:  Good morning.          08:08:40

6          Here begins videotape number one in the   08:09:07

7   deposition of Gary Elsner in the matter of D'Pergo 08:09:09

8   versus Sweetwater for the United States District  08:09:15

9   Court for the District of New Hampshire, case number 08:09:18

10  09538-0001 [sic].                                 08:09:21

11         Today's date is November 12th, 2020.  And  08:09:26

12  the time on the video monitor is 8:09 a.m.        08:09:29

13         This deposition is being taken remotely    08:09:33

14  via Zoom technology.                              08:09:36

15         Your videographer is Jacob Mayeda,         08:09:38

16  representing Kelli Norden and Associates.         08:09:40

17         Counsel and all present, please identify   08:09:42

18  yourselves and state whom you represent.          08:09:45

19         MR. ALLEN:  Hi.  Robert Allen, Glaser      08:09:49

20  Weil, for Plaintiff D'Pergo Custom Guitars.       08:09:52

21         MR. GAGLIUSO:  Richard Gagliuso.  It's     08:09:56

22  G-A-G-L-I-U-S-O, from Bernstein Shur Sawyer &     08:09:59

23  Nelson, representing Sweetwater Sound.            08:10:02

24         THE VIDEOGRAPHER:  Your court reporter is  08:10:06

25  Kelli Norden, and she will now swear in the witness. 08:10:07

```
 1                    GARY ELSNER,
 2          called as a witness and sworn in by
 3            the court reporter, was examined
 4                and testified as follows:
 5

 6            THE COURT REPORTER:  Mr. Elsner, would
 7   you raise your right hand.
 8            Do you solemnly affirm that the testimony
 9   you are about to give in the following proceeding
10   will be the truth, the whole truth, and nothing but
11   the truth?
12            THE WITNESS:  I do.
13            THE COURT REPORTER:  Thank you.
14

15                    EXAMINATION
16   BY MR. ALLEN:
17       Q.  Good morning, Mr. Elsner.  How are you      08:10:26
18   today?                                              08:10:28
19       A.  I'm fine.  Thank you, sir.                  08:10:33
20       Q.  And you're in Florida; is that correct?    08:10:34
21       A.  Naples, Florida.  Yes, sir.                 08:10:36
22       Q.  Weather okay?                               08:10:38
23       A.  So far today.                               08:10:39
24       Q.  Great.                                      08:10:43
25            Well, I just want to start off with some   08:10:43
```

1    So maybe they're another derivative of that.                08:35:34
2         Q.   All right.  So other than the four               08:35:37
3    categories of stock photography, assignment               08:35:39
4    photography, event photography and                        08:35:42
5    paparazzi-slash-news photography, are there any           08:35:45
6    other subcategories of photography that would come        08:35:47
7    under commercial photography?                             08:35:51
8              MR. GAGLIUSO:  Object to the form of the         08:35:53
9    question.                                                 08:35:54
10             You can answer it, Gary.                         08:35:54
11             THE WITNESS:  No, I don't think so.              08:36:03
12             I mean, I could talk about a portrait            08:36:04
13   photographer, but that's really an assignment             08:36:08
14   photographer of sorts.  So I think we just end up         08:36:10
15   titling the different types of photographers that         08:36:14
16   are out there.                                            08:36:17
17             So I think I -- I think the general              08:36:18
18   headings that I offered would cover the broad             08:36:19
19   spectrum of options.                                      08:36:23
20   BY MR. ALLEN:                                             08:36:26
21        Q.   And the work that you were doing as part        08:36:26
22   of Gary Elsner Associates -- and when I say "Gary         08:36:28
23   Elsner Associates," I'm going to include after you        08:36:32
24   closed the corporation and it was the dba.                08:36:35
25        A.   Fine.                                           08:36:38

DEPOSITION OF GARY ELSNER, Vol I

1    Q.   Okay.  The work that you were doing under      08:36:38
2  Gary Elsner Associates, that was all under the        08:36:42
3  subcategory of stock photography; is that correct?     08:36:44
4    A.   No.                                            08:36:48
5    Q.   Okay.  So what percentage of your work         08:36:48
6  under Gary Elsner Associates would you say came        08:36:53
7  under the subcategory of stock photography?            08:36:56
8    A.   I don't think you want me to guess, and I      08:37:01
9  don't -- I've never run a statistical analysis that    08:37:03
10 would allow me to answer that question succinctly.     08:37:06
11   Q.   Okay.  Would you say that most of the          08:37:10
12 work that you have done as part of Gary Elsner         08:37:11
13 Associates has been under the subcategory of stock    08:37:14
14 photography?                                           08:37:18
15       MR. GAGLIUSO:  Object to the form of the        08:37:18
16 question.                                              08:37:19
17       THE WITNESS:  I would say much of it.           08:37:23
18 BY MR. ALLEN:                                          08:37:24
19   Q.   And what are the other categories that --      08:37:25
20 subcategories of commercial photography have you       08:37:26
21 done work?                                             08:37:30
22   A.   Well, I believe I've previously answered       08:37:36
23 a question about that when I talked about being        08:37:36
24 hired by photographers for a variety of reasons, one   08:37:38
25 of which was, yes, to align themselves with a photo    08:37:43

DEPOSITION OF GARY ELSNER, Vol I

| | | |
|---|---|---|
| 1 | agency or to provide insights through mystery | 08:37:47 |
| 2 | shopping into how their images are being received in | 08:37:53 |
| 3 | the marketplace, et cetera. | 08:37:57 |
| 4 | Q. But aren't those both stock photography? | 08:37:59 |
| 5 | I mean, you said photo agency, but it's a stock | 08:38:01 |
| 6 | photo agency; correct? | 08:38:05 |
| 7 | A. Yes. | 08:38:06 |
| 8 | Q. Okay. So -- so the photographers that | 08:38:07 |
| 9 | you were working with and evaluating their work, you | 08:38:11 |
| 10 | were evaluating their work for the purposes of | 08:38:14 |
| 11 | identifying whether or not they were qualified to be | 08:38:16 |
| 12 | submitted to a stock photo agency; is that correct? | 08:38:19 |
| 13 | A. That was -- that was one of the functions | 08:38:22 |
| 14 | that I performed. | 08:38:23 |
| 15 | I performed the general function of | 08:38:31 |
| 16 | basically telling a photographer, based on my review | 08:38:32 |
| 17 | of their work that they had done, whether I felt | 08:38:35 |
| 18 | they had a chance to earn a living as a commercial | 08:38:37 |
| 19 | photographer, whatever part of the business they | 08:38:42 |
| 20 | went into. | 08:38:44 |
| 21 | Q. And -- | 08:38:45 |
| 22 | (Speaking simultaneously.) | 08:38:46 |
| 23 | THE WITNESS: And how I've -- | 08:38:46 |
| 24 | BY MR. ALLEN: | 08:38:48 |
| 25 | Q. -- happened? | 08:38:48 |

DEPOSITION OF GARY ELSNER, Vol I

| | | |
|---|---|---|
| 1 | THE COURT REPORTER:  I'm sorry.  Would | 08:38:51 |
| 2 | you repeat the question?  There was cross-talk. | 08:38:52 |
| 3 | MR. ALLEN:  Sorry. | 08:38:55 |
| 4 | BY MR. ALLEN: | 08:38:55 |
| 5 | Q.  How often did it happen that a | 08:38:56 |
| 6 | photographer would ask you to evaluate their work | 08:38:57 |
| 7 | for use in commercial photography, other than stock | 08:38:59 |
| 8 | photography? | 08:39:07 |
| 9 | MR. GAGLIUSO:  Objection to the form. | 08:39:07 |
| 10 | THE WITNESS:  As I answered previously, I | 08:39:10 |
| 11 | don't keep statistical records like that.  I've been | 08:39:12 |
| 12 | doing this for more than twenty years and I don't | 08:39:14 |
| 13 | have that information and I don't think you want me | 08:39:19 |
| 14 | to guess. | 08:39:22 |
| 15 | BY MR. ALLEN: | 08:39:22 |
| 16 | Q.  How many photographers, as you're sitting | 08:39:23 |
| 17 | here today, can you think of that you advise with | 08:39:26 |
| 18 | respect to commercial photography, other than stock | 08:39:32 |
| 19 | photography? | 08:39:39 |
| 20 | A.  Quite frankly, I can't answer that | 08:39:39 |
| 21 | question because that -- that part of the work that | 08:39:41 |
| 22 | I do was from my earliest period involved in the | 08:39:44 |
| 23 | consulting work that I do, and that's -- you're | 08:39:50 |
| 24 | talking fifteen to twenty years ago. | 08:39:52 |
| 25 | And I don't really remember -- I wouldn't | 08:39:55 |

| | | |
|---|---|---|
| 1 | begin -- I wouldn't want to begin to try to remember | 08:40:05 |
| 2 | the names and say, "Well, that's only two" and there | 08:40:07 |
| 3 | were forty. | 08:40:10 |
| 4 | I -- I just don't know. | 08:40:10 |
| 5 | Q.   Okay.  In the last ten years, can you | 08:40:12 |
| 6 | think of one photographer that you -- that hired you | 08:40:15 |
| 7 | to consult with with respect to commercial | 08:40:18 |
| 8 | photography, other than stock photography? | 08:40:21 |
| 9 | A.   As I just testified earlier, this aspect | 08:40:24 |
| 10 | of my work pretty much occurred during the first | 08:40:28 |
| 11 | four or five years that I was providing consulting | 08:40:33 |
| 12 | services. | 08:40:37 |
| 13 | So if you're talking about the last ten | 08:40:37 |
| 14 | years, as I sit here, I don't recall one.  I'm not | 08:40:41 |
| 15 | saying that I didn't, but I don't recall one. | 08:40:44 |
| 16 | Q.   In 2003, you worked for a company called | 08:40:55 |
| 17 | Peter Arnold, Inc. | 08:40:58 |
| 18 | Was that one of the companies that you | 08:40:59 |
| 19 | had mentioned in your description of the work of | 08:41:02 |
| 20 | Gary Elsner Associates? | 08:41:05 |
| 21 | A.   Yes. | 08:41:08 |
| 22 | Q.   And what were your -- and is Peter | 08:41:09 |
| 23 | Arnold, Inc. a stock photo agency? | 08:41:14 |
| 24 | A.   It was a stock photo agency, yes. | 08:41:17 |
| 25 | Q.   And what were your responsibilities at | 08:41:19 |

| 1 | photography; is that correct? | 09:02:43 |
| 2 | A.    Yes, sir. | 09:02:44 |
| 3 | Q.    Okay.  And have you provided any | 09:02:44 |
| 4 | consulting work for any photographers in the last | 09:02:50 |
| 5 | ten years related to their being commissioned to | 09:02:52 |
| 6 | create works on an assignment basis? | 09:03:01 |
| 7 | A.    Yes. | 09:03:05 |
| 8 | Q.    Okay.  Can you give me an example of -- | 09:03:06 |
| 9 | what -- what -- can you tell me the last | 09:03:08 |
| 10 | photographer that you worked with that fit that | 09:03:11 |
| 11 | description? | 09:03:15 |
| 12 | A.    This would be, I think, 2000 and either | 09:03:18 |
| 13 | '16 or '17, a photographer that had gotten a very | 09:03:26 |
| 14 | significant award regarding the loss of his imagery | 09:03:32 |
| 15 | through a catastrophic event, and he hired me to | 09:03:40 |
| 16 | guide him through the process of creating salable | 09:03:46 |
| 17 | imagery. | 09:03:51 |
| 18 | He was unsure as to whether he would open | 09:03:52 |
| 19 | his own business as a production company and license | 09:03:57 |
| 20 | the imagery -- imagery directly and/or give some of | 09:04:04 |
| 21 | the work to agents that would license it on his | 09:04:12 |
| 22 | behalf. | 09:04:15 |
| 23 | And for, oh, approximately a two-year | 09:04:15 |
| 24 | period, I worked with him on subject matter, on | 09:04:21 |
| 25 | style, on editing. | 09:04:29 |

DEPOSITION OF GARY ELSNER, Vol I

| | | |
|---|---|---|
| 1 | I actually hired, on his behalf, an | 09:04:32 |
| 2 | editor for some of his production work, critiqued | 09:04:36 |
| 3 | it, and so forth for -- I did that for about a | 09:04:41 |
| 4 | two-year period.  I think it was -- now that I think | 09:04:45 |
| 5 | of it, either '15 and '16 or '16 and '17. | 09:04:49 |
| 6 | Q.   But again, this is an example of creating | 09:04:55 |
| 7 | works for the purpose of licensing them to others. | 09:04:57 |
| 8 | I'm talking about instances where | 09:05:03 |
| 9 | photographers are engaged by a client.  And when I | 09:05:06 |
| 10 | say a "client," I don't mean a photo agency.  I mean | 09:05:10 |
| 11 | an actual company that is looking for the | 09:05:14 |
| 12 | photographer to take a specific photograph for that | 09:05:17 |
| 13 | company's use. | 09:05:21 |
| 14 | A.   Well, now, that's a different question, | 09:05:23 |
| 15 | and the answer to that question is:  Not that I can | 09:05:24 |
| 16 | recall. | 09:05:27 |
| 17 | Q.   So based upon what you just -- just said, | 09:05:55 |
| 18 | I'm trying to understand. | 09:05:58 |
| 19 | When -- when a person or a photographer | 09:06:00 |
| 20 | is going to monetize an image for other purposes, | 09:06:02 |
| 21 | it's really just licensing for stock photography, | 09:06:15 |
| 22 | isn't it? | 09:06:20 |
| 23 | A.   You're breaking up.  You're garbled. | 09:06:21 |
| 24 | Q.   Oh, I'm sorry. | 09:06:29 |
| 25 | A.   It's okay. | 09:06:29 |

DEPOSITION OF GARY ELSNER, Vol I

| | | |
|---|---|---|
| 1 | Is that the question or did I not -- did | 09:08:53 |
| 2 | I miss something in the question? | 09:08:55 |
| 3 | BY MR. ALLEN: | 09:08:57 |
| 4 | Q.   No.   It's close. | 09:08:57 |
| 5 | What is your experience in licensing | 09:08:58 |
| 6 | photographs, other than photographs being used in | 09:09:01 |
| 7 | stock photography? | 09:09:04 |
| 8 | MR. GAGLIUSO:  Same objection. | 09:09:06 |
| 9 | THE WITNESS:  I've already testified that | 09:09:15 |
| 10 | I've never licensed my own photographs. | 09:09:17 |
| 11 | I also believe that I've testified that I | 09:09:24 |
| 12 | have never been hired to produce an assignment for | 09:09:25 |
| 13 | someone which would result in the licensing of a | 09:09:35 |
| 14 | photograph. | 09:09:37 |
| 15 | I believe that answers the question. | 09:09:37 |
| 16 | BY MR. ALLEN: | 09:09:38 |
| 17 | Q.   Great.  Thank you. | 09:09:39 |
| 18 | You've served as an expert witness | 09:09:40 |
| 19 | before; correct? | 09:09:48 |
| 20 | A.   Yes, sir. | 09:09:50 |
| 21 | Q.   Since you opened your consulting | 09:09:52 |
| 22 | corporation, how many times have you been designated | 09:09:54 |
| 23 | as a testifying expert? | 09:09:57 |
| 24 | A.   Define "testifying" so I make sure I give | 09:10:04 |
| 25 | you a correct answer. | 09:10:07 |

1    and rather, goes by the lower, in terms of                    09:50:19
2    establishing what is fair market value in accordance          09:50:23
3    with the laws and rulings that have come from the             09:50:26
4    courts.                                                       09:50:29
5         Q.   Are you aware that many courts accept               09:50:31
6    multipliers that are used to determine fair market            09:50:33
7    value when it's not used as a penalty?                        09:50:36
8              MR. GAGLIUSO:   Objection.                          09:50:39
9              THE WITNESS:   No.                                  09:50:40
10   BY MR. ALLEN:                                                 09:50:40
11        Q.   You're not aware of any case where                  09:50:40
12   multipliers have been accepted for use to calculate           09:50:42
13   fair market value when not used as a penalty?                 09:50:46
14        A.   The only two that I'm aware of are the              09:50:50
15   two -- this one that -- the Barrera case that we've           09:50:53
16   discussed and the One Treasure case, which we                 09:50:56
17   discussed earlier.                                            09:50:58
18        Q.   All right.  You also were a witness in --           09:51:02
19   in Stehrenberger versus R.J. Reynolds; is that                09:51:10
20   correct?                                                      09:51:14
21        A.   No.                                                 09:51:14
22        Q.   Oh, you weren't?                                    09:51:14
23        A.   No.                                                 09:51:15
24        Q.   Oh, okay.                                           09:51:19
25             Were you -- were you a witness -- I'm               09:51:21

**DEPOSITION OF GARY ELSNER, Vol I**

| | | |
|---|---|---|
| 1 | key factor. | 15:05:24 |
| 2 | BY MR. ALLEN: | 15:05:34 |
| 3 | Q.   Sweetwater didn't take the D'Pergo photo | 15:05:35 |
| 4 | from a stock photo agency, did it? | 15:05:37 |
| 5 | A.   No.  To the best of my knowledge, no. | 15:05:40 |
| 6 | Q.   And D'Pergo is not a stock photo agency; | 15:05:43 |
| 7 | right? | 15:05:48 |
| 8 | A.   That is certainly correct. | 15:05:48 |
| 9 | Q.   And individual photographers almost | 15:05:49 |
| 10 | exclusively license their works on a -- in a | 15:05:52 |
| 11 | rights-managed basis; is that correct? | 15:05:55 |
| 12 | A.   No.  Nice try, but no, that's not at all | 15:05:56 |
| 13 | correct. | 15:06:00 |
| 14 | Q.   Individual photographers -- | 15:06:00 |
| 15 | (Speaking simultaneously.) | 15:06:01 |
| 16 | THE WITNESS:  Even back in 2004. | 15:06:01 |
| 17 | BY MR. ALLEN: | 15:06:02 |
| 18 | Q.   I'm sorry? | 15:06:02 |
| 19 | A.   Even in 2004. | 15:06:03 |
| 20 | Q.   You're saying that individual | 15:06:06 |
| 21 | photographers, when people came to them to license | 15:06:07 |
| 22 | works directly from them -- | 15:06:12 |
| 23 | A.   Oh, that isn't what you said. | 15:06:14 |
| 24 | All right.  Let's start again.  Give me a | 15:06:16 |
| 25 | question, please. | 15:06:19 |

DEPOSITION OF GARY ELSNER, Vol I

| | | |
|---|---|---|
| 1 | A.   It's a photo. | 15:46:22 |
| 2 | Q.   It's a photo.  And so if it's just a | 15:46:27 |
| 3 | photo, why -- why does the concept of additional | 15:46:30 |
| 4 | fees for exclusive -- exclusive licensing not apply? | 15:46:37 |
| 5 | A.   Because since it's not a rights-managed | 15:46:41 |
| 6 | photo per se, under this hypothetical licensing | 15:46:44 |
| 7 | scenario that Mr. Sedlik accomplished, you wouldn't | 15:46:49 |
| 8 | be able to get an exclusive license because there's | 15:46:57 |
| 9 | no way, as I previously testified, to control, | 15:47:00 |
| 10 | document and otherwise guarantee that exclusivity | 15:47:06 |
| 11 | will exist for the period involved. | 15:47:13 |
| 12 | Q.   So, again, I'm trying to understand this. | 15:47:17 |
| 13 | The -- the D'Pergo photo is not a stock | 15:47:20 |
| 14 | photo why? | 15:47:23 |
| 15 | A.   It's not offered through a stock photo | 15:47:24 |
| 16 | agency. | 15:47:28 |
| 17 | Q.   Well, if somebody approached Mr. D'Pergo | 15:47:30 |
| 18 | [sic] and said, "I'd like to license the use of your | 15:47:33 |
| 19 | photo on my website and I would like it to be | 15:47:36 |
| 20 | exclusive during a one-year period starting | 15:47:41 |
| 21 | tomorrow," could Mr. Dapergolas enter into a license | 15:47:44 |
| 22 | with that licensee for the use of the D'Pergo photo | 15:47:51 |
| 23 | in that way? | 15:47:56 |
| 24 | MR. GAGLIUSO:  Objection. | 15:47:56 |
| 25 | THE WITNESS:  My answer would be that | 15:48:06 |

Exhibit 3

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF MARYLAND**
**BALTIMORE DIVISION**

| | |
|---|---|
| **BRITTNEY GOBBLE PHOTOGRAPHY, LLC,** | |
| *Plaintiff,* | |
| v. | **Case No. 1:18-cv-03403-RDB** |
| **SINCLAIR BROADCAST GROUP, INC.,** *et al.,* | Consolidated Case Nos.: 1:18-cv-03384-RDB 1:19-cv-00559-RDB 1:19-cv-00606-RDB |
| *Defendants/Third-Party Plaintiffs,* | |
| v. | |
| **USA ENTERTAINMENT NEWS, INC. d/b/a "WENN" and "WORLD ENTERTAINMENT NEWS NETWORK",** | |
| *Third-Party Defendant.* | |

**DEFENDANT SINCLAIR BROADCAST GROUP, INC.'S**
**SUPPLEMENTAL ANSWERS TO INTERROGATORY NOS. 5, 6, 10, and 16**

Defendant Sinclair Broadcast Group, Inc. ("Defendant" or "SBG"), by counsel, and

pursuant to Rule 33 of the Federal Rules of Civil Procedure and Local Rule 104.6, supplements its

Answers to Plaintiff Brittney Gobble Photography, LLC's Interrogatories.

**PRELIMINARY STATEMENT**

1.      Insofar as Plaintiff's Interrogatories seek information from Sinclair Broadcast

Group, Inc. outside the purview of Defendant's corporate knowledge, Defendant objects to these

Interrogatories as unduly burdensome, irrelevant, and not likely to lead to the discovery of relevant

information. Specifically, to the extent Plaintiff's Interrogatories seek information from anyone

other than Defendant, Defendant objects.

1

the discovery of admissible evidence. These Answers are limited to properly discoverable information relevant to the allegations set forth in the pleadings. The word usage and sentence structure include input from Defendant's legal counsel and do not purport to be the exact language nor drawn from the personal knowledge of the person signing these Answers.

## SUPPLEMENTAL ANSWERS

INTERROGATORY NO. 5: State in detail the circumstances (who, what, when, where, why and how) regarding how the articles and Lykoi cat images shown in the WEBSITE EXHIBITS came to be shown on the STATION WEBSITES. For example, YOUR answer should include at least (a) the date that each article and image was received and/or obtained by YOU, (b) the IDENTITY of the person and/or ENTITY from whom each article and image was received and/or obtained, (c) the date that each article and image was added to each of the STATION WEBSITES, (d) the IDENTITY of each person involved in and/or having personal knowledge regarding where the article and images were obtained, and when and how they were added to each STATION WEBSITES, including YOUR role regarding same, (e) how each article and image was added to each STATION WEBSITE, and (f) the IDENTITY of all documents evidencing the foregoing.

ANSWER TO INTERROGATORY NO. 5: The photographs identified in the Complaint were provided by WENN pursuant to a written agreement between WENN and SBG, allowing SBG and its stations to publish photographs and other content provided by WENN for a monthly fee. See February 6, 2014 WENN Contract, as amended, and invoices produced. Photographs were collected and/or shared by SBG's national news desk and several of SBG's affiliated stations prior to their publication on or about November 6 2015. Typically, but not in every instance, images were published pursuant to "off beat news" coverage of the unique "Werewolf Cats" Lykoi breed and Dr. and Mrs. Gobble. Specific dates of creation, publication and unpublication as well as location of publication and other responsive information, to the extent that information exists, may be found in the following data sets produced pursuant to Plaintiff's discovery requests: story.xml; the Story Log previously produced (SBG 1 – 19); the Story Lines Data Base; and the Story Report Exports.

FIRST SUPPLEMENTAL ANSWER TO INTERROGATORY NO. 5: The "February 6, 2014 WENN Contract, as amended, and invoices produced" have been produced as follows: SBG 892, 894, 896, 898, 900, 1535-55, 1558-59, 1964-67, and BGP 3812, 3814-26, 3828-36.

## SECOND SUPPLEMENTAL ANSWER TO INTERROGATORY NO. 5:

Defendant supplements its previous answers as follows:

(a)   At present, Defendant is unable to state the exact date that each article or image

was received by Defendant except as set forth in the original Answer to Interrogatory No. 5, above.

3

The records in Defendant's possession do not track the exact date of download from WENN's portal or transfer from another station in Defendant's operations. Specifically, Defendant has not been able to determine whether it obtained the photos directly from WENN via the WENN portal, or indirectly from WENN via a posting made on a station website initiated by Scott Sistek, or via a combination of those two processes. Based on records that are available, Scott Sistek was working on the article at least as of November 5, 2017 (SBG 886). Based on StoryLine records, SBG 405-478, Amanda Ota at Defendant's National Desk published an article with 51 photos as of November 9, 2017. (Metadata for the 51 photos is included in the same document range, SBG 405-478, including but not limited to: caption; title; and photo identification.)

(b)     As set forth in the original Answer to Interrogatory No. 5, the photos with article were initially obtained from WENN.

(c)     Defendant's records at SBG 405-478 show that Defendant's National Desk pushed articles and images to websites set out at that page on November 9, 2017.

Mr. Sistek published photographs to KOMOnews.com and other websites identified in SBG 885 at least as of November 6, 2017 (SBG 885). From before November 2015 and into early 2016, Sinclair was engaged in migrating content from content management systems ("CMS") in use at some stations to Sinclair's "Storyline" CMS. The CMS previously in use at KOMO and other stations acquired from Fisher Communications was "Clickability." Mr. Sistek's original article and photos were posted via Clickability. The migration process often resulted in the creation of story records in StoryLine which did not contain a complete transfer of all fields due to differences in how fields were named in each system. The process for each transfer often required multiple attempts, as can be seen by the existence of multiple entries in the Story Report Exports SBG 24-89, 90-150, 156-270, 271-272, 273-338, 339-404, 484-562, 564-629, 630-656, 657-658,

4

659-724, 725-737, and 738-827. KOMO and the related Fisher stations were migrated out of Clickability and into StoryLine as of approximately late 2015. The extant record from Clickability that relates to the Sistek posting is the story.xml file, produced in native format and identified as SBG 885. That record documents all information relating to the original posting as well as the corrected caption credits made by Mr. Sistek (for example, file name, caption field, credit and copyrights fields, and create and edit dates).

Elizabeth Faugl, WSYX/WTTE published articles and four photos at abc6onyourside.com and myfox28columbus.com on November 10, 2017 (SBG 479-483).

(d)     Persons who may have personal information are those persons previously identified in Answer to Interrogatory No. 1, specifically, Scott Sistek, Amanda Ota, and Elizabeth Faugl, based on records available to Sinclair.

(e)     As to how each article and the photos were added to each **Station Website**, please see Second Supplemental Answer 5(c), above, incorporated herein.

(f)     The documents in Defendant's possession that relate to the above requested information are the documents identified in the original Answer to Interrogatory No. 5, the First Supplemental Answer to Interrogatory No. 5, and in this second supplemental answer.

INTERROGATORY NO. 6: State the facts concerning who was initially credited for each of the Lykoi cat images shown in each WEBSITE EXHIBIT and any subsequent changes thereto. For example, YOUR answer should at least, for each Lykoi cat image shown in each WEBSITE EXHIBIT, state who was credited for each such image when the image was first added to the corresponding STATION WEBSITE, and for each change that was later made to the credit for each such image, state the date of the change in credit, describe what change was made to the credit and why each change was made, and IDENTIFY each person involved in and/or having personal knowledge regarding the details of each such change. For context, the credit for most of the images in Exhibits 12-78 of the Complaint (dated in the October/November 2017 time frame) is to "WENN.com" or "Brittney Gobble Photography via WENN.com."

ANWER TO INTERROGATORY NO. 6: SBG continues to investigate the answer to this interrogatory and will promptly supplement its response upon completion of its efforts. See the Story Report Exports.

I solemnly affirm under the penalties of perjury that the contents of the foregoing paper are

true to the best of my knowledge, information, and belief.

**SINCLAIR BROADCAST GROUP, INC.**

July 11, 2019                    By:

David R. Bochenek
Authorized Signatory

AS TO OBJECTIONS:                    /S/   Margaret L. Argent
Margaret L. Argent (Bar No. 06132)
margent@tandllaw.com
THOMAS & LIBOWITZ, P.A.
100 Light Street, Suite 1100
Baltimore, Maryland 21202-1053
Telephone:  (410) 752-2468
Facsimile: (410) 752-0979

*Attorneys for Defendant*

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that on this 11th day of July 2019, I served a copy of Defendant

Sinclair Broadcast Group, Inc's Supplemental Answers to Interrogatory Nos. 5, 6, 10 and 16 by

email on:

C. Dale Quisenberry, Esq.                    Robert E. Allen, Esq.
Quisenberry Law PLLC                         Pierce Bainbridge Beck Price & Hecht LLP
13910 Champion Forest Drive, Suite 203       355 S. Grand Avenue, 44th Floor
Houston, Texas 77069                         Los Angeles, CA 90071

C. Justin Brown, Esq.
Brown Law
1 N. Charles Street, Suite 1301
Baltimore, MD 21201

and by U.S. Mail, first class, prepaid postage on:
USA Entertainment News, Inc.
c/o Frankfurt Kurnit Klein & Selz, P.C.
488 Madison Avenue, 10th Floor
New York, NY 10022
Attn: Mike Dolan

and by first class airmail, postage prepaid on:

USA Entertainment News, Inc.
c/o Lloyd Beiny, Registered Agent
4A Tileyard Studios
Tileyard Road
London N7 9AH
UNITED KINGDOM

and that I shall retain the original of all such discovery until this matter is completed, including

any trial and appeal.

*/s/   Margaret L. Argent*
Margaret L. Argent (Bar No. 06132)

Exhibit 4

 Gmail

**Brittney Gobble <bgobbleart@gmail.com>**

## RE: **IMPORTANT** woman wants proper credit for copyrighted pics on our website

**Scott Sistek** <ScottS@komotv.com>                                          Sun, Nov 8, 2015 at 11:45 PM
To: "bgobbleart@gmail.com" <bgobbleart@gmail.com>

Hi Brittney,
I apologize for that, we truncated the caption and turned it into a news article on the site which does credit your work, but I see the truncation it took your name off the photo captions. I will go back and add in credit on each photograph caption. If that is not sufficient, please let me know and again I apologize for truncating too much in the gallery caption :(

Sincerely,
Scott Sistek
KOMONews.com
(206) 404-4667

---

**From:** Cathy Rollins
**Sent:** Sunday, November 8, 2015 8:34 PM
**To:** Scott Sistek
**Subject:** **IMPORTANT** woman wants proper credit for copyrighted pics on our website

**From:** Brittney Gobble [mailto:bgobbleart@gmail.com]
**Sent:** Sunday, November 08, 2015 7:47 PM
**To:** &Seattle-KOMO-News-Tips
**Subject:**

Hello,

My images were used in an article on the Lykoi cat, shown here-

http://www.komonews.com/news/offbeat/Unique-breed-of-Werewolf-Cats-prove-popular-with-cat-and-dog-lovers-341312521.html

These images were not to be used without proper credits per the contract with which I allowed a stock website to use my images. I expect that the proper by line credit be given, or my images removed as all these images are registered with the copyright office and my copyright is being violated.

BGP003337

Thank you,

Brittney Gobble

Brittney Gobble Photography

BGP003338



**Brittney Gobble <bgobbleart@gmail.com>**

## RE: Web images on WENN

**Scott Sistek** <ScottS@komotv.com>                                          Mon, Nov 9, 2015 at 12:03 AM
To: Brittney Gobble <bgobbleart@gmail.com>

Thanks Brittney! Again, so sorry about that. I work in a lot of weather photography out here (in Seattle, where we're based) and should have known better :) I've added your credit and put a link to your Facebook page on all the captions now. Thanks for taking such great photos! Your story has been quite popular out here -- it was the most popular on our site for a while on Friday :)
_Scott

**From:** Brittney Gobble [bgobbleart@gmail.com]
**Sent:** Sunday, November 8, 2015 8:48 PM
**To:** Scott Sistek
**Subject:** RE: **IMPORTANT** woman wants proper credit for copyrighted pics on our website

I understand! That is absolutely fine! Thank you!
Have a great week!
Brittney

On Nov 8, 2015 11:45 PM, "Scott Sistek" <ScottS@komotv.com> wrote:
Hi Brittney,
I apologize for that, we truncated the caption and turned it into a news article on the site which does credit your work, but I see the truncation it took your name off the photo captions. I will go back and add in credit on each photograph caption. If that is not sufficient, please let me know and again I apologize for truncating too much in the gallery caption :(

Sincerely,
Scott Sistek
KOMONews.com
(206) 404-4667

**From:** Cathy Rollins
**Sent:** Sunday, November 8, 2015 8:34 PM
**To:** Scott Sistek
**Subject:** **IMPORTANT** woman wants proper credit for copyrighted pics on our website

**From:** Brittney Gobble [mailto:bgobbleart@gmail.com]
**Sent:** Sunday, November 08, 2015 7:47 PM
**To:** &Seattle-KOMO-News-Tips
**Subject:**

Hello,

BGP003339

My images were used in an article on the Lykoi cat, shown here-

http://www.komonews.com/news/offbeat/Unique-breed-of-Werewolf-Cats-prove-popular-with-cat-and-dog-lovers-341312521.html

These images were not to be used without proper credits per the contract with which I allowed a stock website to use my images. I expect that the proper by line credit be given, or my images removed as all these images are registered with the copyright office and my copyright is being violated.

Thank you,

Brittney Gobble

Brittney Gobble Photography

BGP003340