**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND
NORTHERN DIVISION**

| | |
|---|---|
| BRITTNEY GOBBLE PHOTOGRAPHY, LLC, | |
| *Plaintiff*, | |
| v. | Case No. 1:18-cv-03403-SAG (Lead Case) |
| SINCLAIR BROADCAST GROUP, INC., CHESAPEAKE MEDIA I, LLC, HARRISBURG TELEVISION, INC., KATV, LLC, KOKH, LLC, KTUL, LLC, SAN ANTONIO TELEVISION, LLC, SINCLAIR COMMUNICATIONS, LLC, SINCLAIR MEDIA III, INC., SINCLAIR MEDIA OF BOISE, LLC, SINCLAIR MEDIA OF OREGON, LLC, SINCLAIR MEDIA OF SEATTLE, LLC, SINCLAIR MEDIA OF WASHINGTON, LLC, SINCLAIR PROPERTIES, LLC, SINCLAIR RADIO OF SEATTLE, LLC, SINCLAIR TELEVISION OF FRESNO, LLC, SINCLAIR TELEVISION OF ILLINOIS, LLC, SINCLAIR TELEVISION OF OMAHA, LLC, SINCLAIR TELEVISION OF OREGON, LLC, SINCLAIR TELEVISION OF PORTLAND, LLC, SINCLAIR TELEVISION STATIONS, LLC, SOUTH WEST OREGON TELEVISION BROADCASTING CORPORATION, THE TENNIS CHANNEL, INC., WGME, INC. and WSMH, INC. | Case No. 1:18-cv-03384-SAG<br>Case No. 1:19-cv-00559-SAG<br>Case No. 1:19-cv-00606-SAG |
| *Defendants*. | |

**MEMORANDUM OF LAW IN SUPPORT OF PLAINTIFF
BRITTNEY GOBBLE PHOTOGRAPHY, LLC'S MOTION
FOR PARTIAL SUMMARY JUDGMENT AND SUMMARY ADJUDICATION**

## TABLE OF CONTENTS

I.      INTRODUCTION ...................................................................................................1

II.     STATEMENT OF UNDISPUTED FACTS .............................................................1

     A.     Johnny and Brittney Gobble Help Develop the Lyoki Breed; Brittney Gobble Creates and Registers the Copyrighted Works at Issue .............................1

     B.     WENN Limited Contacts the Gobbles About the Lykoi Images............................3

     C.     Scott Sistek of KOMO News—A Sinclair Subsidiary—Uses the Images and Corresponds with Brittney ...........................................................................4

     D.     Amanda Ota Republishes the Article Without Proper Credit ...............................5

     E.     The Gobbles Demand WENN Cease its Infringement and Eventually Sue WENN for Copyright Infringement.....................................................................6

     F.     Brittney Gobble Photography Sues Sinclair and the Station Defendants, But They Continue to Use the Images for a Month ............................................8

III.    SUMMARY JUDGMENT STANDARD ..............................................................8

IV.    ARGUMENT .......................................................................................................9

     A.     BGP Has Proved a *Prima Facie* Case of Direct Copyright Infringement Against All Defendants.....................................................................................9

          1.     Ownership ..............................................................................................9

          2.     Copying................................................................................................10

     B.     Each of Defendants' Affirmative Defenses Fail as a Matter of Law...................12

          1.     License ................................................................................................12

          2.     Fraud on the Copyright Office / Invalid Registrations .............................16

     C.     Sinclair is Liable for Contributory and Vicarious Copyright Infringement ..........19

     D.     Defendants' Infringements Were Willful ............................................................20

     E.     BGP Can Elect to Recover Statutory Damages and Will Be Entitled to Attorney's Fees ..............................................................................................21

     F.     Sinclair is Liable for DMCA Violations.............................................................22

          1.     Sinclair and the Stations have each violated the False CMI Prohibition............................................................................................23

       2.      Sinclair and the Stations have each violated the Removal/Alteration Prohibition............................................................29

       3.      Defendants Violated the Distribution Prohibition. ....................................32

**V.**     CONCLUSION...............................................................................................................34

## <u>TABLE OF AUTHORITIES</u>

### <u>Cases</u>

*Agence Fr. Presse v. Morel*,
  2014 WL 3963124 (S.D.N.Y. Aug. 13, 2014) ......................................................... 22, 24, 31

*Anderson v. Liberty Lobby, Inc.*,
  477 U.S. 242 (1986) ........................................................................................................... 9

*Archie MD, Inc. v. Elsevier, Inc.*,
  261 F. Supp. 3d 512 (S.D.N.Y. 2017) ............................................................................... 18

*Arista Records LLC v. USENET.com*,
  633 F. Supp. 2d 124 (S.D.N.Y. 2009) ............................................................................... 20

*Aro Mfg. Co. v. Convertible Top Replacement Co.*,
  377 U.S. 476 (1964) ......................................................................................................... 20

*Asset Mktg. Sys. v. Gagnon*,
  542 F.3d 748 (9th Cir. 2008) ............................................................................................ 14

*Avtec Sys., Inc. v. Peiffer*,
  21 F.3d 568 (4th Cir.1994) ............................................................................................... 14

*Bldg. Graphics, Inc. v. Lennar Corp.*,
  708 F.3d 573 (4th Cir. 2013) .......................................................................................... 9, 10

*Bouchat v. Baltimore Ravens, Inc.*,
  241 F.3d 350 (4th Cir. 2001) ............................................................................................ 10

*Brammer v. Violent Hues Prods., LLC*,
  922 F.3d 255 (4th Cir. 2019) ............................................................................................ 13

*Capital Concepts, Inc. v. Mountain Corp.*,
  2012 WL 6761880 (W.D. Va. Dec. 30, 2012) .................................................................. 18

*Carson v. Dynegy, Inc.*,
  344 F.3d 446 (5th Cir. 2003) ............................................................................................ 14

*Casey v. Geek Squad*,
  823 F. Supp. 2d 334 (D. Md. 2011) .................................................................................. 8, 9

*Chamberlain Grp., Inc. v. Skylink Techs., Inc.*,
  381 F.3d 1178 (Fed. Cir. 2004) ........................................................................................ 11

*CoStar Grp., Inc. v. LoopNet, Inc.*,
  373 F.3d 544 (4th Cir. 2004) .............................................................................................. 9

*Energy Intelligence Grp Inc. v. Kayne Anderson Capital Advisors LP*,
  948 F.3d 261 (5th Cir. 2020) ............................................................................................ 23

2034617.3

*Family Dollar Stores, Inc. v. United Fabrics Int'l, Inc.*,
  896 F. Supp. 2d 223 (S.D.N.Y. 2012) ................................................................. 17

*Gilliam v. Am. Broad. Cos.*,
  538 F.2d 14 (2d Cir. 1976) ................................................................................... 15

*Harris v. Emus Recs. Corp.*,
  734 F.2d 1329 (9th Cir. 1984) .............................................................................. 12

*Helton v. AT&T Inc.*,
  709 F.3d 343 (4th Cir. 2013) ......................................................................... 24, 27

*Humphreys & Partners Architects, L.P. v. Lessard Design, Inc.*,
  790 F.3d 532 (4th Cir. 2015), *as amended* (June 24, 2015) ................................. 9

*I.A.E., Inc. v. Shaver*,
  74 F.3d 768 (7th Cir. 1996) ................................................................................. 11

*Island Software & Computer Serv., Inc. v. Microsoft Corp.*,
  413 F.3d 257 (2d Cir. 2005) ................................................................................. 21

*Jobete Music Co. v. Media Broad. Corp.*,
  713 F. Supp. 174 (M.D.N.C. 1988) ...................................................................... 20

*Jules Jordan Video, Inc. v. 144942 Canada Inc.*,
  617 F.3d 1146 (9th Cir. 2010) .............................................................................. 19

*Kaseberg v. Conaco, LLC*,
  360 F. Supp. 3d 1026 (S.D. Cal. 2018) ................................................................ 19

*L.A. Printex Indus., Inc. v. Aeropostale, Inc.*,
  676 F.3d 841 (9th Cir. 2012) ......................................................................... 17, 19

*Leicester v. Warner Bros.*,
  1998 WL 34016724 (C.D. Cal. May 29, 1998), *aff'd*, 232 F.3d 1212 (9th Cir. 2000) ........... 13

*Louis Vuitton Malletier, S.A. v. Akanoc Sols., Inc.*,
  658 F.3d 936 (9th Cir. 2011) ............................................................................... 21

*Lowry's Reps., Inc. v. Legg Mason, Inc.*,
  271 F. Supp. 2d 737 (D. Md. 2003) ..................................................................... 21

*Lyons P'ship, L.P. v. Morris Costumes, Inc.*,
  243 F.3d 789 (4th Cir. 2001) ................................................................................. 9

*Mango v. Buzzfeed, Inc.*,
  356 F. Supp.3d 368 (S.D.N.Y. 2019) ....................................................... 29, 31, 32

*MGM Studios Inc. v. Grokster, Ltd.*,
  545 U.S. 913 (2005) ............................................................................................ 19

*Murphy v. Millennium Radio Grp. LLC*,
  650 F.3d 295 (3rd Cir. 2011) ............................................................................... 23

iv

*Nelson-Slabs, Inc. v. Morningside Dev.*,
    284 F.3d 505 (4th Cir. 2002) ................................................................................ 20

*Palmer/Kane LLC v. Gareth Stevens Publ'g*,
    2017 WL 3973957 (S.D.N.Y. Sept. 7, 2017) ......................................................... 18

*Photographic Illustrators Corp. v. Orgill, Inc.*,
    953 F.3d 56 (1st Cir. 2020) ................................................................................... 11

*PlayMedia Sys., Inc. v. Am. Online, Inc.*,
    171 F. Supp. 2d 1094 (C.D. Cal. 2001) ................................................................ 13

*Putsche v. Alley Cat Allies, Inc.*,
    2018 WL 784615 (D. Md. Feb. 8, 2018) ............................................................... 15

*Roberts v. Gordy*,
    877 F.3d 1024 (11th Cir. 2017) ............................................................................ 18

*Rottlund Co. v. Pinnacle Corp.*,
    452 F.3d 726 (8th Cir. 2006) ................................................................................ 10

*S.O.S. v. Payday, Inc.*,
    886 F.2d 1081 (9th Cir. 1989) .............................................................................. 15

*Sohm v. Scholastic Inc.*,
    2018 WL 1605214 (S.D.N.Y. Mar. 29, 2018) ...................................................... 18

*Sony Corp. of Am. v. Universal City Studios, Inc.*,
    464 U.S. 417 (1984) .............................................................................................. 19

*Sony Music Enm't v. Cox. Communs., Inc.*,
    2019 WL 6357963 (E.D. Va. Nov. 27, 2019) .................................................. 16, 18

*Tattoo Art Inc. v. TAT Int'l LLC*,
    498 F. App'x 341 (4th Cir. 2012) ..................................................................... 14, 15

*Unicolors, Inc. v. Urban Outfitters, Inc.*,
    853 F.3d 980 (9th Cir. 2017) ................................................................................ 18

*United Fabrics Int'l, Inc. v. C&J Wear, Inc.*,
    630 F.3d 1255 (9th Cir. 2011) .............................................................................. 19

*United States v. E. Brooke Matlack*,
    149 F. Supp. 814 (D. Md. 1957) ........................................................................... 25

*United States v. One Parcel of Land Located At 7326 Highway 45 North, Three Lakes,*
    *Oneida County, Wisconsin*,
    965 F.2d 311 (7th Cir. 1992) ................................................................................ 25

*United States v. T.I.M.E.-D.C., Inc.*,
    381 F. Supp 730 (W.D. Va. 1974) ........................................................................ 25

*Urban Textile, Inc. v. Cato Corp.*,
    2016 U.S. Dist. LEXIS 193921 (C.D. Cal. Apr. 1, 2016) ..................................... 17

v

**Statutes**

17 U.S.C. § 106(1) ........................................................................................ 11

17 U.S.C. § 106(3) ........................................................................................ 11

17 U.S.C. § 106(5) ........................................................................................ 11

17 U.S.C. § 1202 ..................................................................................... 22, 23

17 U.S.C. § 1202(a) ................................................................................. 22, 23

17 U.S.C. § 1202(b) ................................................................................. 22, 23

17 U.S.C. § 1202(b)(1) .................................................................................. 29

17 U.S.C. § 1202(c) ....................................................................................... 22

17 U.S.C. § 408(c)(1) ..................................................................................... 16

17 U.S.C. § 410(c) ..................................................................................... 10, 16

17 U.S.C. § 411(b) ......................................................................................... 18

17 U.S.C. § 411(b)(1) ..................................................................................... 16

17 U.S.C. § 412 .............................................................................................. 21

17 U.S.C. § 504(c) ......................................................................................... 22

17 U.S.C. § 505 .............................................................................................. 22

37 C.F.R. § 202.3(b)(10) (2015) .................................................................... 16

**Other Authorities**

2 Nimmer on Copyright § 7.20 (2018) ........................................................... 19

3 Nimmer on Copyright § 10.02[B][5] ........................................................... 13

U.S. COPYRIGHT OFFICE, COMPENDIUM OF U.S. COPYRIGHT OFFICE PRACTICES § 1103.4
    (3d ed. 2021) .............................................................................................. 2

William Meade Fletcher, 3 Fletcher Cyclopedia of Corporations § 790 (2006) .......... 25

**Rules**

Fed. R. Civ. P. 56(a) ........................................................................................ 8

2034617.3

## I.     INTRODUCTION

While Defendant Sinclair Broadcast Group, Inc. ("Sinclair") and its subsidiary station entities (collectively referred to as the "Station Defendants")[1] may have thought they had a license to display and distribute Plaintiff Brittney Gobble Photography, LLC's copyrighted photographs of Lykoi cats, the fact of the matter is that they were wrong and they should have known better. Any supposed rights that Defendants could have obtained could have come from only three possible sources: the syndication company WENN Limited, or the conversations of Scott Sistek or Amanda Ota—both Sinclair employees or agents—with the Gobbles. But Defendants could not have possibly derived rights from WENN because WENN never had the right to distribute the photographs in the first place. And Sistek and Ota both made promises that Defendants did not keep: foremost among them being that Defendants would properly credit Brittney Gobble when they used her photographs. With no valid license, Defendants are liable for violations of the Copyright Act and the Digital Millennium Copyright Act. Accordingly, Plaintiff respectfully requests that the Court grant its motion for partial summary judgment and enter judgment in its favor on all counts of the Second Amended Complaint.

## II.     STATEMENT OF UNDISPUTED FACTS

### A.     Johnny and Brittney Gobble Help Develop the Lyoki Breed; Brittney Gobble Creates and Registers the Copyrighted Works at Issue

Johnny Gobble is a veterinarian who, along with his wife Brittney, was among the first to successfully breed the Lykoi cat, a new breed of cat with a striking, werewolf-like appearance, in 2011. Ex. 1 ("J. Gobble Dep. Tr.") at 37:21–38:9. In 2012, the Gobbles began selling Lykoi cats to the public. *Id.* at 35:10–12. Brittney Gobble photographed the Lykoi to advertise and promote the breed and to help sell the cats that the Gobbles had bred. *Id.* at 38:10–39:7. Brittney Gobble was the sole author of various photographs of Lykoi cats, and she assigned all rights in the

---

[1] Attached hereto as Exhibit A is a table showing the relationships between the infringing websites at issue and the Defendant entities that own them, derived from data produced by Sinclair as SBG_000020-023.

2034617.3

photographs to Brittney Gobble Photography, LLC ("BGP"). *See* Exs. 2-5 (Copyright Registrations); Ex. 6 (Assignment Agreement). At issue in this case are 51 photographs of Lykoi cats, fifty of which were registered with the Copyright Office on October 30, 2015 (the "Photographs"). *See, e.g.*, Dkt. No. 134 ("Second Am. Compl.") at ¶ 37; Ex. 7 ("BGP Dep. Tr.") at 143:20–22.

The Photographs depict Lykoi cats in various settings and poses, and are of professional quality, evidencing careful attention to concept, styling, composition, pose, lighting, color, exposure and other aesthetic and technical qualities. Ex. 8 ("Sedlik Report") at p. 27. Further, at the time of the infringement in 2015, photographs of Lykoi cats were very rare, with most available at that time being of very poor quality, with many of the remainder being candid photographs inclusive of people, unlike the Images, which were staged orchestrations of the cats themselves. Ex. 9 ("Sedlik Surrebuttal Report") at p. 13, § J.

Brittney Gobble registered each of the Photographs in four registrations submitted to the Copyright Office on October 30, 2015: VA 2-031-117 ("'117 Registration"); VA 2-031-115 ("'115 Registration"); VA 1-987-108 ("'108 Registration"); and VA 1-976-214 ("'214 Registration"). *See* Exs. 2-5. The '117 Registration was for a single Image (Ex. 5), and two of the registrations make clear that they are group registrations. Exs. 2, 4. For the '108 Registration, the Copyright Office included a note that says "Basis for Registration: Unit of Publication." Ex. 3. The Copyright Office, not Brittney Gobble, made this designation (there is no place on the application where Gobble could have included this basis). *See* U.S. COPYRIGHT OFFICE, COMPENDIUM OF U.S. COPYRIGHT OFFICE PRACTICES § 1103.4 (3d ed. 2021) ("If the registration specialist determines that the component works are eligible for registration under the unit of publication option, he or she will add an annotation, such as: 'Basis for registration: Unit of publication.' This statement will appear on the certificate of registration and the online public record for the claim."). Instead, Brittney Gobble submitted the Photographs for group registration, which she was entitled to do. Ex. 50 at BGP005468.

**B.      WENN Limited Contacts the Gobbles About the Lykoi Images**

On November 2, 2015, Clare Penn, on behalf of WENN Limited, contacted the Gobbles by email. Ex. 10. Penn stated that she "source[s] photographs/images/features/news for WENN's A Different World of Photos department," that she would "like to create a feature/news item for press regarding this unique breed" and asked for permission to get "a selection of hi-res images to accompany editorial text." *Id.* Consistent with how they had allowed journalists to include copies of the Photographs in their articles about Lykoi cats, Johnny Gobble (on behalf of Brittney) replied to Penn and included a Dropbox link to high-resolution, watermark-free copies of the Photographs (the "Dropbox Images"). Ex. 11. Johnny Gobble was explicit on the permission that Brittney Gobble was granting to Penn:

> Here is a link to an album of some of my hi-res images that I give permission to be used. **I do not give permission for these images to be distributed**, or to be used in an article (or other media) that is purposefully derogatory toward our breed (we have a good sense of humor, so jokes are fine! Just not questioning ethics or being cruel). **Whenever possible, please credit images to "Brittney Gobble"**.

*Id.* (emphases added). The Gobbles did not grant the right to distribute the Dropbox Images because Brittney Gobble wanted to control who used them and only granted permission to those particular journalists who had personally asked beforehand and who she felt would write an article that was accurate and respectful toward the Lykoi cats. Ex. 51 ("Gobble Decl.") at ¶ 6. Penn had not clarified that she sought the right to distribute her article or the Dropbox Images to third parties; instead, she responded the next day: "Many thanks Johnny … I shall take a look at your website and let you know if I need any more information." Ex. 12. Penn never indicated that the inability to distribute the Dropbox Images was an issue. *See* Exs. 10-12. WENN (or Penn acting on its behalf) provided no consideration to the Gobbles in exchange for the right to use the Dropbox Images. *Id.*

C.      **Scott Sistek of KOMO News—A Sinclair Subsidiary—Uses the Images and Corresponds with Brittney**

On November 4, 2015, KOMO News employee Scott Sistek downloaded copies of each of the Dropbox Images from WENN. Ex. 13 ("Sistek Dep. Tr.") at 26:1–15; *see also* Ex. 14 ("Cotlove Dep. Tr.") at 20:5–8. WENN had added metadata to each of the Dropbox Images. *Id.* at 21:3–8. Sistek then used a tool called GeoSetter to adjust the metadata and extract the article text embedded in the digital files of the Dropbox Images from WENN, then uploaded the edited files to his station's content management system called Clickability. *Id.* at 20:18–21:10, 24:6–19; *see also* Ex. 15 (Second Supplemental Answer to Interrogatory No. 5, (c)). In Clickability, Sistek pasted the extracted article text and published an article titled "Unique Breed of Werewolf Cats Prove Popular With Cat and Dog Lovers" (the article, inclusive of the Dropbox Images, is referred to as the "Original Article"). *Id.* at 25:17–26:15, 44:24–45:7. High-resolution copies of the Images were attached to the Original Article and were displayed as part of the title page or in a gallery. *Id.* at 25:9–19. Brittney Gobble had only made the Dropbox Images, the high-resolution, watermark-free digital copies of the Photographs available through her Dropbox link. Ex. 7 ("BGP Dep. Tr.") at 78:16–79:22.

Brittney discovered on November 8, 2015 that each of the Dropbox Images was being displayed without her permission on the KOMO News website. *Id.* at 141:14–142:12. Brittney emailed the KOMO News station that day and explicitly stated that: (1) her images were being used on the KOMO News website; (2) the Images were not to be used without properly crediting her as the owner; (3) that the station either had to provide proper credit or remove the Images from the website; and (4) that the current uses of the Images violated her copyrights. Ex. 16 at BGP003340.

A few hours later, Sistek emailed Brittney Gobble to apologize for the improper credit, assured her that he would "add in credit on each photograph caption," and asked her to let him know if his changes were sufficient. *Id.* at '339. Brittney confirmed that such changes would be acceptable. *Id.* Sistek then thanked Brittney, apologized again, indicated that he had finished

4

adding the proper credit (i.e., Brittney Gobble Photography) to each of the Dropbox Images, and created a hyperlink of that proper credit to Brittney's Facebook page. *Id.*; *see also* Ex. 13 at 56:25–57:3. Brittney then reviewed the updated KOMO webpages and confirmed that the images now had proper credit and that this proper credit was hyperlinked to her Facebook page (the Original Article, as revised by Sistek to include the correct credits, is referred to as the "Revised Article"). Ex. 7 at 142:13–19.

Unknown to Brittney, however, was the fact that Sistek had posted the Original Article not only to the KOMO News website but also on the websites of twelve other Sinclair stations. Ex. 13 at 33:25–34:18, 35:14–36:11. Sistek never informed Brittney that the Original Article appeared on stations other than KOMO, nor received permission to copy any of the Dropbox Images in connection with any other station. *See* Ex. 16.

### D. Amanda Ota Republishes the Article Without Proper Credit

Another Sinclair employee, Amanda Ota, obtained the Revised Article from Sistek and then republished it the next day on November 9, 2015 (the "New Article"). Ex. 14 ("Cotlove Dep. Tr.") at 35:16–36:1. Ota distributed the New Article to all fifty of the Station Defendants' websites (including KOMO). *Id.* at 97:12–16; Ex. 17 ("Fantis Dep. Tr.") at 13:20–14:4; *see also* Ex. 20 (SBG 000405-478). The New Article appeared to be identical to the Revised Article, except that the proper credit from the Revised Article (i.e., Brittney Gobble Photography) had been replaced with false credits, specifically "By WENN.com" or "Brittney Gobble Photography via WENN.com." Ex. 15 (Second Supplemental Answer to Interrogatory No. 6). Further, the credit line no longer contained a hyperlink to Brittney's Facebook page. Ex. 7 at 144:5–11.

Before publishing the New Article and notwithstanding the purported grant of rights from WENN to Sinclair, Ota emailed lykoicats.com, the website for the Gobble's Lykoi cats, on November 9, 2015:

> I'm working on a write-up on your cats and was wondering if I may have permission for Sinclair to use the <u>photos shared on your site</u> across all platforms, please? We will be sure to credit you.

5

Ex. 18. The "photos shared on your site" was hyperlinked to www.lykoicats.com. *Id.*; *see also* Ex. 19.[2] Johnny immediately responded:

> You can use any photos from our face book and web page … My wife has the photos copyrighted , and will refuse any usage if the article is negative toward us or the breed in any way.

*Id.* The copies of the Photographs on lykoicats.com and on the lykoicats Facebook page were all low resolution and all but one contained a visible watermark. Ex. 7 at 78:16–79:22; Ex. 51 at ¶ 3. The low-resolution, watermarked copies of the Photographs are referred to as the "Social Media Images." Thirty-eight of the high-resolution, watermarked Dropbox Images were digital copies of Photographs that were also embodied in the low-resolution, watermarked Social Media Images, and thirteen were not. Ex. 51 at ¶¶ 4-5. But Ota did not copy any of Social Media Images, as confirmed by the fact that the New Article included copies of each of the Photographs embodied in the Dropbox Images. Ex. 15 (Second Supplemental Answer to Interrogatory No. 5); Ex. 20; Ex. 21 ("Ota Dep. Tr.") at 176:9–17. Instead, she copied the same digital files attached to the Revised Article—the high-resolution, unwatermarked Dropbox files, which she was never granted permission to use. *Id.* Another Sinclair employee, Elizabeth Faugl, also—and independently of Ota—published the Revised Article to two station websites on November 10, 2017. *See* Ex. 15 (Second Supplemental Answers to Interrogatories Nos. 5, 6); *see also* Ex. 40 (SBG 000479-483).

**E.      The Gobbles Demand WENN Cease its Infringement and Eventually Sue WENN for Copyright Infringement**

On November 12, 2015, the Gobbles corresponded with WENN, demanding that WENN cease its infringement. Ex. 22 at BGP000008. Brittney had never granted WENN the right to distribute any of the Dropbox Images, nor did she grant WENN the right to sublicense any of the granted rights. *Id.* at BGP000003-04. After receiving this demand, WENN sent a "kill notice"

---

[2] Exhibit 19 is a true and correct copy of the November 9, 2015 email between Amanda Ota and lykoicats@gmail.com recently obtained by counsel for Plaintiff which shows that the "photos shared on your site" hyperlink points to the URL "lykoikitten.com".

email to its affiliates that had received the infringing images, including Sinclair. Ex. 23 at WENN0000061; Ex. 52 ("Beiny Dep. Tr.") at 120:9–12, 137:7–13, 138:16–19. The kill notice informed the affiliates that WENN was "in a dispute with the photographer" and instructed them to "kill the images immediately and instruct any clients who have published them or are holding them to withdraw them." *Id.*

But Sinclair claims that it was not aware of its potential infringement until three years later, when it received the Complaint in this action in November 2018. Ex. 24 at p. 6 (Answer to Interrogatory No. 8). This claim is not credible, because Sinclair was served on September 25, 2017 with a subpoena in BGP's infringement action against WENN (the "Subpoena"). Ex. 25.[3] Eight of the eleven requests in the Subpoena were specifically directed toward the Photographs, and the sole exhibit to the Subpoena consisted of over 300 pages of screenshots of Station websites of the New Article, inclusive of each of the Dropbox Images. *Id.* The subpoena, as well as the related correspondence, made clear that BGP claimed it had not granted WENN the right to distribute any of the Dropbox Images to any of WENN's customers, and that the copyright management information ("CMI") was false and/or had been altered, thus placing Sinclair on notice that it and all of the Stations had been exploiting the Dropbox Images with false and altered CMI. *Id.* Despite such notice, Sinclair and each of the Stations continued to, at a minimum, display publicly each of the Dropbox Images on their respective websites with the altered and false CMI. Ex. 24 at p. 7 (Answer to Interrogatory No. 11); Ex. 26 at SBG 000001-19.

Sinclair has a two-year retention period with respect to the emails of Sistek, Ota, and Faugl. Ex. 27 ("Domozych Dep. Tr.") at 107:11–17. The key emails among these employees, including how they obtained the Images, copies of the kill notice sent by WENN, and the correspondence between Sistek and Ota that presumably would have discussed the proper CMI to be included with the Images, took place in November 2015. The Subpoena, requesting all of

---

[3] The Subpoena and its "Exhibit 1" totaled over 300 pages. Plaintiff has included only the first 15 pages of the Exhibit 1 as a representative sample.

these communications, was served less than two years thereafter. *See* Ex. 25. But not only did Sinclair not do an adequate search for these communications in response to the Subpoena, Sinclair *performed no search at all* and then misrepresented that it had to BGP's counsel. Ex. 14 ("Cotlove Dep. Tr.") at 126:10–12, 141:3–13; Ex. 27 ("Domozych Dep. Tr.") at 84:19–85:13.

Had Sinclair performed an adequate search when it received the Subpoena in September 2017, it would have found the kill notice and other relevant documents, including the correspondence between Sistek and Ota. If Sinclair had instituted a litigation hold or suspended its document-deletion protocols, it could find them today. But Sinclair did none of those things and now, through no fault of BGP, there is no direct evidence that Sinclair received the kill notice or that Ota was told about the correct CMI for the Images.

### F.     Brittney Gobble Photography Sues Sinclair and the Station Defendants, But They Continue to Use the Images for a Month

On October 31, 2018, BGP sued many of the Stations for copyright infringement of the Images in the District of Delaware and in the District of Maryland. *See* Case No. 1:18-cv-03384-SAG, Dkt. No. 1; Case No. 1:19-cv-00559-SAG, Dkt. No. 1. On November 1, 2018 BGP sued other Stations for copyright infringement of the Images in the District of Nevada (Case No. 1:19-cv-00606-SAG, Dkt. No. 1), and on November 2, 2018, BGP sued Sinclair for copyright infringement of the Images in the District of Maryland. Dkt. No. 1. Notwithstanding four copyright infringement lawsuits, Sinclair and the Stations did not cease displaying the Images on the Station websites until November 30, 2018, and on social media until May 2019. Ex. 14 ("Cotlove Dep. Tr.") at 187:5–9, 237:7–13.

## III.    SUMMARY JUDGMENT STANDARD

Rule 56(a) of the Federal Rules of Civil Procedure states that the court "shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). As the moving party, BGP bears the burden of showing that there is no genuine dispute of material fact. *See Casey v. Geek Squad*, 823 F. Supp. 2d 334, 348 (D. Md. 2011).

"If the party seeking summary judgment demonstrates that there is no evidence to support the nonmoving party's case, the burden shifts to the nonmoving party to identify specific facts showing that there is a genuine issue for trial. The existence of only a 'scintilla of evidence' is insufficient to defeat a motion for summary judgment. Instead, the evidentiary materials submitted must show facts from which the finder of fact reasonably could find in favor of the party opposing summary judgment." *Id.* (citing *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 251 (1986)).

"To satisfy this burden, the non-movant must produce competent evidence on each element of his or her claim. Although a court must draw all reasonable inferences in favor of the non-moving party when ruling on a summary judgment motion, that party may not create a genuine issue of material fact through mere speculation, or building one inference upon another." *Id.* at 348–49.

## IV.   ARGUMENT

### A.   BGP Has Proved a *Prima Facie* Case of Direct Copyright Infringement Against All Defendants

#### 1.   Ownership

"To establish a claim for copyright infringement, a plaintiff must prove that it owned a valid copyright and that the defendant copied the original elements of that copyright. Copying can be proven through direct or circumstantial evidence." *Humphreys & Partners Architects, L.P. v. Lessard Design, Inc.*, 790 F.3d 532, 537–38 (4th Cir. 2015), *as amended* (June 24, 2015) (citing *Lyons P'ship, L.P. v. Morris Costumes, Inc.,* 243 F.3d 789, 801 (4th Cir. 2001)); *Bldg. Graphics, Inc. v. Lennar Corp.,* 708 F.3d 573, 578 (4th Cir. 2013) (quotation marks omitted). "[T]he Copyright Act does not require that the infringer know that he is infringing or that his conduct amount to a willful violation of the copyright owner's rights." *CoStar Grp., Inc. v. LoopNet, Inc.*, 373 F.3d 544, 549 (4th Cir. 2004) (noting that while copyright infringement is a strict liability tort, "it nonetheless requires conduct by a person who causes in some meaningful way an infringement").

BGP has proven that it owns valid copyright registrations for 50 of the Photographs at issue in this case. Brittney Gobble's four copyright registrations—each with an effective date of October 30, 2015—"constitute prima facie evidence of the validity of the copyright and of the facts stated in the certificate[s]." 17 U.S.C. § 410(c); *see* Exs. 2-5. Each identifies "Brittney Michelle Gobble" as the author and copyright claimant of the registered works. Exs. 2-5. These facts are presumed to be true because Brittney registered the works within five years of their first publication. 17 U.S.C. § 410(c).

Brittney subsequently assigned all right, title, and interest in and to the registrations and the underlying works by written assignment dated April 18, 2016. Ex. 6. Therefore, BGP has proven ownership of valid copyright registrations for 50 of the Photographs at issue in this case.

2. **Copying**

"Copying can be proven through direct or circumstantial evidence." *Bldg. Graphics, Inc. v. Lennar Corp.,* 708 F.3d 573, 578 (4th Cir. 2013). "Direct evidence of copying … includes evidence such as party admissions, witness accounts of the physical act of copying, and common errors in the works of plaintiffs and the defendants." *Rottlund Co. v. Pinnacle Corp.,* 452 F.3d 726, 732 (8th Cir. 2006).

"Where direct evidence of copying is lacking, [the] plaintiff may prove copying by circumstantial evidence in the form of proof that the alleged infringer had access to the work and that the supposed copy is substantially similar to the author's original work." *Bouchat v. Baltimore Ravens, Inc.,* 241 F.3d 350, 353–54 (4th Cir. 2001).

Here, there is no doubt that Sinclair and the Station Defendants copied BGP's Photographs. Sinclair has admitted as much: "The photographs identified in the Complaint were provided by WENN pursuant to a written agreement between WENN and SBG, allowing SBG and its stations to publish photographs and other content provided by WENN for a monthly fee. … Photographs were collected and/or shared by SBG's national news desk and several of SBG's affiliated stations prior to their publication on or about November 6 2015. Typically, but not in

every instance, images were published pursuant to 'off beat news' coverage of the unique 'Werewolf Cats' Lykoi breed and Dr. and Mrs. Gobble." Ex. 15; *see also* Ex. 13 ("Sistek Dep. Tr.") at 26:1-15 ("Q So looking at this Exhibit 1, does this document appear accurate in the sense of your downloads of images and files from the WENN download server in connection with that article? A Yes. Q So you downloaded photos for the werewolf story, correct? A I don't recall actually going through the process, because it was a long time ago, but I've seen documents like this that would suggest that. Q Do you have any reason to believe that this is not accurate? A No.") (objections omitted).

Thus, Sinclair (via Sistek) downloaded digital copies of the Images from WENN. This alone violates one of the exclusive rights granted to copyright owners in the Copyright Act. *See* 17 U.S.C. § 106(1) ("[T]he owner of copyright under this title has the exclusive rights to do and to authorize any of the following: (1) to reproduce the copyrighted work in copies or phonorecords ….").

Sinclair's copying did not stop there, however. Sistek also published his article to twelve affiliated stations, violating the distribution right and the public display right. *See* 17 U.S.C. § 106(3) and (5) . Amanda Ota did the same thing, on an even grander scale, when she revised the article and published BGP's Images to fifty separate stations. The Images were posted by Ota on November 9, 2015, and remained online and available to the public until November 30, 2018.

BGP anticipates that Sinclair and Defendants will argue that it had a license to use the Images, either from WENN, Brittney, or both. However, "the existence of a license, exclusive or nonexclusive, creates an affirmative defense to a claim of copyright infringement." *I.A.E., Inc. v. Shaver*, 74 F.3d 768, 775 (7th Cir. 1996). As an affirmative defense, it is Defendants' burden to show that their use was authorized, not BGP's burden to show that it was not. *See Photographic Illustrators Corp. v. Orgill, Inc.*, 953 F.3d 56, 64 (1st Cir. 2020) ("A license (implied or otherwise) is an affirmative defense to copyright infringement."); *Chamberlain Grp., Inc. v. Skylink Techs., Inc.*, 381 F.3d 1178, 1193 (Fed. Cir. 2004) ("[A] plaintiff only needs to show that the defendant has used her property; the burden of proving that the use was authorized falls

squarely on the defendant.").

Thus, BGP has shown that it is entitled to judgment as a matter of law that Sinclair and Defendants directly infringed BGP's copyrights to the Photographs, unless Defendants are able to show that there are genuine issues of material fact on their affirmative defenses. They will not be able to do so.

**B.     Each of Defendants' Affirmative Defenses Fail as a Matter of Law**

      1.     **License**

Defendants assert various license-related affirmative defenses in their Answer to Second Amended Complaint. See Dkt. No. 139 at pp. 63, ¶¶ 3-7, 9, 12. Each is a variation on the theme that Defendants had the right to use the Dropbox Images in the manner that they did. There are three possible sources for such a license to Defendants: from WENN to Sinclair, from Brittney to Sistek, and from Brittney to Ota. However, the undisputed documentary record makes it clear that Defendants' use of the Dropbox Images was in excess of or inconsistent with any purported licenses. Defendants, therefore, will be unable to show that there is any genuine dispute of material fact which would allow a reasonable jury to find in their favor on these affirmative defenses.

      *a.     WENN-to-Sinclair License*

Sinclair may argue that it obtained the rights to use the Dropbox Images from WENN and WENN, in turn, obtained the rights to the Dropbox Images in the email exchange between Clare Penn and Johnny Gobble. This argument fails, however, for multiple reasons.

<u>One</u>, the November 2, 2015 email from Johnny Gobble stated that "I do not give permission for these images to be distributed," but that is exactly what WENN did. A licensee cannot grant to another rights greater than the licensee has. Further, a licensee cannot sublicense rights unless expressly provided, and there is nothing in the November 2 email that grants the right to sublicense. *See Harris v. Emus Recs. Corp.*, 734 F.2d 1329, 1333 (9th Cir. 1984) ("The transferability of a copyright license appears to be a question of first impression in this circuit.

2034617.3

There is, however, authority to support the proposition that such licenses are not transferable as a matter of law."); *Leicester v. Warner Bros.*, 1998 WL 34016724, at *3 (C.D. Cal. May 29, 1998), *aff'd,* 232 F.3d 1212 (9th Cir. 2000) ("Copyright law is such that the grant of the license may not be assigned or sublicensed by the licensee unless the grant of the license is exclusive."); *PlayMedia Sys., Inc. v. Am. Online, Inc.*, 171 F. Supp. 2d 1094, 1099 (C.D. Cal. 2001) ("A copyright license must be interpreted narrowly. Copyright licenses are presumed to prohibit any use not authorized. A non-exclusive licensee … has no right to re-sell or sublicense the rights acquired unless he has been expressly authorized to do so.") (citations and quotation marks omitted). Having never obtained the distribution right itself, WENN could not have sublicensed the right to distribute the Images to Sinclair. Since copyright infringement is a strict liability offense—*Brammer v. Violent Hues Prods., LLC*, 922 F.3d 255, 265 (4th Cir. 2019) ("As a basic matter, copyright infringement is a strict liability offense, in which a violation does not require a culpable state of mind.")—Sinclair's reliance on the purported WENN license is irrelevant to the question of liability. Sinclair will be unable to introduce competent evidence demonstrating that it had a valid license to use BGP's Images.

Two, even assuming that Sinclair and Defendants' use of the Images was originally lawful—and it was not—their use of the Images became an infringement shortly thereafter. On November 13, 2015, WENN sent a "kill notice" to its customers—including Sinclair—informing them that WENN had a dispute with the photographer of the Lykoi cat images and asking them to cease all use of the Images. Ex. 23. WENN's CEO confirmed that the kill notice was sent to Sinclair. Ex. 52 ("Beiny Dep. Tr.") at 120:9–12, 137:7–13, 138:16–19.

Three, BGP sued WENN for copyright infringement in 2016. Neither WENN nor Sinclair ever gave any consideration to the Gobbles or BGP in exchange for their use of the Images. Accordingly, BGP could revoke the license at any time. 3 NIMMER ON COPYRIGHT § 10.02[B][5] ("[N]onexclusive licenses are revocable absent consideration."); *Avtec Sys., Inc. v. Peiffer*, 21 F.3d 568, 574 n.12 (4th Cir. 1994); *see also Asset Mktg. Sys. v. Gagnon,* 542 F.3d 748, 757 (9th Cir. 2008). The filing of a lawsuit terminates a non-exclusive license for which no consideration

13

has been made. *Carson v. Dynegy, Inc.*, 344 F.3d 446, 451-52 (5th Cir. 2003).

     <u>Fourth</u>, in connection with its lawsuit against WENN, BGP served a subpoena on Sinclair in 2017. Included with the subpoena was an exhibit consisting of over 300 pages of screenshots of the Stations' websites, showing the Images. The exhibit, along with the request for documents, put Sinclair on notice that it did not have rights to the Dropbox Images and that its uses were infringing.

     <u>Fifth</u>, and finally, BGP sued Sinclair and Defendants in four separate lawsuits filed between October 31, 2018 and November 2, 2018, yet it took a month for Sinclair and the Stations to remove the Dropbox Images from their websites. Moreover, Sinclair continued to display several of the Dropbox Images on its social media through approximately May 2019.

### b.    *Brittney-to-Sistek License*

     Sinclair may also argue that Brittney Gobble granted a license to Scott Sistek in an email exchange dated November 8, 2015. On that date, Brittney contacted KOMO News—Sistek's employer and a subsidiary of Sinclair—and told it that (1) her photographs were not to be used without properly crediting her as the owner; (2) the station either had to provide proper credit or remove them from the website; and (3) the current uses of the copies of her photographs violated BGP's copyrights. While Sistek originally provided proper credit to Brittney's satisfaction, Sistek's correction did not last long, as the Revised Article was overwritten by Amanda Ota, a Sinclair national desk employee, the following day. Moreover, Sistek never informed Brittney that her photographs appeared on multiple Stations' websites beyond KOMO—in fact, he was personally responsible for the Dropbox Images appearing on 11 other Station websites.

     Any rights that Brittney granted to Sistek were personal to KOMO, then, and cannot support a license defense for Sinclair and the other Station Defendants. Additionally, once the proper credits were removed from the KOMO story—and the proper credits were posted for only a day—KOMO's use itself became infringing. *Tattoo Art Inc. v. TAT Int'l LLC*, 498 F. App'x 341, 346 (4th Cir. 2012) ("A licensee infringes the owner's copyright if its use exceeds the scope of its license. Thus, one who obtains permission to use a copyrighted work may not exceed the

specific purpose for which permission was granted ….") (cleaned up).

<i>c.</i>  <i><b>Brittney-to-Ota License</b></i>

As discussed in section II.D above, another Sinclair employee, Amanda Ota, obtained the Revised Article from Sistek and then republished it the next day on November 9, 2015 (the "New Article"). Ota distributed the New Article to all fifty of the Station Defendants' websites (including KOMO). The New Article appeared to be identical to the Revised Article, except that the proper credit that Sistek had included in the Revised Article (i.e., Brittney Gobble Photography) had been replaced with false credits, specifically "By WENN.com" or "Brittney Gobble Photography via WENN.com." Further, the credit line no longer contained a hyperlink to Brittney's Facebook page. Ota and Brittney Gobble corresponded before Ota posted the New Article (also detailed in section II.D above).

Once again, Ota's use exceeded the scope of the purported license and constitutes an infringement. *Tattoo Art*, 498 F. App'x at 346 ("A licensee infringes the owner's copyright if its use exceeds the scope of its license. Thus, one who obtains permission to use a copyrighted work may not exceed the specific purpose for which permission was granted ….") (cleaned up). Ota was granted a license only to use the Social Media Images, which were low-resolution, watermarked copies. This does not mean that she could choose to use high-resolution, unwatermarked copies if she had them available, whether from Sistek or WENN. Indeed, Ota never received a license to use the Dropbox Images at all, making the Defendants' copying of them straightforward copyright infringement. In the far-fetched theory that Ota received a license to use the Photographs as embodied in the Social Media Images, (1) sixteen of the Photographs were not embodied in Social Media Images and (2) the Defendants exceeded the scope of that license by reproducing, publicly displaying, and distributing the high-resolution, unwatermarked copies of those Photographs. *See, e.g., Putsche v. Alley Cat Allies, Inc.*, 2018 WL 784615, at *10 (D. Md. Feb. 8, 2018) ("[T]he license may not exceed the specific purpose for which permission was granted.") (internal citation omitted); *Gilliam v. Am. Broad. Cos.,* 538 F.2d 14, 20 (2d Cir. 1976); *S.O.S. v. Payday, Inc.*, 886 F.2d 1081, 1087-88 (9th Cir. 1989) ("A licensee infringes the

15

owner's copyright if its use exceeds the scope of its license … . The license must be construed in accordance with the purposes underlying federal copyright law. Chief among these purposes is the protection of the author's rights.") (citations omitted).

        2.      **Fraud on the Copyright Office / Invalid Registrations**

Defendants' next main collection of affirmative defenses relates to fraud on the Copyright Office or otherwise asserts that BGP's copyright registrations are invalid. *See* Dkt. No. 139 at pp. 64–66, ¶¶ 15, 27-29. These defenses also fail as a matter of law. Defendants will be unable to introduce any competent evidence showing that Brittney Gobble defrauded the Copyright Office or that the registrations for the works at issue are otherwise invalid.

        *a.*      *The '108 Registration Is Valid Because Brittney Did Not Include Any Inaccurate Information in the Application*

Sinclair may argue that because the Images subject to the '108 Registration were not a unit of publication, this registration is valid. That is false. Copyright registration certificates are presumed valid. 17 U.S.C. § 410(c). Inaccurate registrations are not invalidated without evidence that the inaccuracy was both material and made in bad faith. *Sony Music Enm't v. Cox. Communs.*, *Inc.*, 2019 WL 6357963, at *7 (E.D. Va. Nov. 27, 2019). Section 411(b)(1) requires Sinclair to prove both that "the inaccurate information was included on the application for copyright registration with knowledge that it was inaccurate" and "the inaccuracy of the information, if known, would have caused the Register of Copyrights to refuse registration."

With respect to the first prong, Brittney did not include any inaccurate information on the application. She did not attempt to register the '108 Photographs as a unit of publication, and she was entitled to register the '108 Photographs as a group registration. *See* 17 U.S.C. § 408(c)(1) (allowing for a single registration for a group of related works); 37 C.F.R. § 202.3(b)(10) (2015); *compare* Ex. 3 *with* Ex. 50; *see also* U.S. COPYRIGHT OFFICE, COMPENDIUM OF U.S. COPYRIGHT OFFICE PRACTICES § 1103.4 (3d ed. 2021).

There is also no evidence that Brittney knew anything was inaccurate on the '108

Application when she filed it. In fact, the evidence shows the opposite: after she received the '108 Registration Certificate, she was in discussion with the Copyright Office about the '115 and '117 Applications, and learned for the first time that she may have needed to include additional information on the '108 and '214 Applications (*see* Ex. 53 at BGP010724-745), and asked the examiner to reopen the '108 and '214 applications to add that information. *Id.* at pp. '724, '731, '733, '734, '738, '742, '743, '744, and '745. But the examiner confirmed that the '108 and '214 Registrations were fine, did not need to be amended, and that the Copyright Office was going to leave those registrations alone. Ex. 7 at 99:17-104:10.

The same evidence negates the second prong. There was no inaccurate information on the application, and the Copyright Office knew that the '108 and the '214 Applications were missing certain information, yet confirmed that the registrations did not need to be amended.

> ### b.   *The Registrations Are Not Invalid for Commingling of Published and Unpublished Works*

Sinclair may further argue that one or more of the registrations are invalid because BGP registered both published and unpublished photographs in the same application for published works. This argument is without merit because it would not affect the validity of the published works asserted in this litigation if they were registered alongside other, distinct unpublished works. *See, e.g., L.A. Printex Indus., Inc. v. Aeropostale, Inc.*, 676 F.3d 841, 854 (9th Cir. 2012) (inclusion of two previously published designs in an unpublished collection did not invalidate the registration of that collection as to the designs at issue in the infringement action, which were unpublished designs in that same collection.); *Urban Textile, Inc. v. Cato Corp.*, 2016 U.S. Dist. LEXIS 193921, at *13 (C.D. Cal. Apr. 1, 2016) ("Prior publication does not invalidate registration of the unpublished elements of the collection, but it does invalidate the registration as to the previously published designs, including the one in the case at bar."); *Family Dollar Stores, Inc. v. United Fabrics Int'l, Inc.*, 896 F. Supp. 2d 223, 231 (S.D.N.Y. 2012) (same). Indeed, BGP is unaware of any court holding the registration invalid as to the correctly registered works. On the contrary, many courts have recently held that the registration of a published work

17

in a group of unpublished works is still valid under 17 U.S.C. § 411(b) unless the defendant can demonstrate that the copyright owner knew of the inaccuracy at the time of registration. *Sohm v. Scholastic Inc.*, 2018 WL 1605214, at *7 (S.D.N.Y. Mar. 29, 2018), *aff'd in part, rev'd in part, and remanded,* 959 F.3d 39 (2d Cir. 2020); *Palmer/Kane LLC v. Gareth Stevens Publ'g*, 2017 WL 3973957, at *13-14 (S.D.N.Y. Sept. 7, 2017); *Archie MD, Inc. v. Elsevier, Inc.*, 261 F. Supp. 3d 512, 518-20 (S.D.N.Y. 2017). Consequently, even if there were a defect in the registration of one of the works not subject to this action, it would not affect the validity of the registration with respect to each of the copyrighted images subject to this action (i.e., the "Photographs").

Additionally, each of BGP's registrations involved groups of *published* works, and BGP has alleged that each of the Images were published. Accordingly, there is no legal basis to argue that BGP's registrations could somehow be invalidated, or that the registrations with respect to the Photographs (published works), could somehow be invalidated by inclusion of unpublished works when each of the registrations was for published works. Simply put, the dates of publication of other photographs in BGP's registrations cannot (and do not) affect the validity of the registrations as to the Photographs. This is true even if some dates were wrong, or if other photographs were unpublished at the time of the registration (which they were not).

Finally, courts require a showing that a registrant committed fraud or bad faith in order to invalidate a registration. *Sony Music Entm't v. Cox Communs.,* 2019 WL 6357963, at *7 (E.D. Va. Nov. 27, 2019) ("[S]ettled law across circuits states that inaccurate registrations are not invalidated without evidence that the inaccuracy was both material and made in bad faith"); *Capital Concepts, Inc. v. Mountain Corp.*, 2012 WL 6761880, at *2 (W.D. Va. Dec. 30, 2012) ("It is well-settled that a mistake or omission in a copyright application does not necessarily render the subsequent registration invalid. … Defendants would have to establish that Plaintiff committed fraud on the Copyright Office"); *Roberts v. Gordy*, 877 F.3d 1024, 1029 (11th Cir. 2017) ("While the district court correctly found material inaccuracies in the registrations, it erred by not applying the appropriate scienter for Fraud on the Copyright Office."); *Unicolors, Inc. v. Urban Outfitters, Inc.*, 853 F.3d 980, 991 (9th Cir. 2017) (good faith mistakes in copyright

18

applications do not preclude an infringement action."); *L.A. Printex Indus., Inc. v. Aeropostale, Inc.*, 676 F.3d 841, 853 (9th Cir. 2012) (mistakes will not invalidate a registration "unless the alleged infringer has relied to its detriment on the mistake, or the claimant intended to defraud the Copyright Office by making the misstatement."); *United Fabrics Int'l, Inc. v. C&J Wear, Inc.*, 630 F.3d 1255, 1259 (9th Cir. 2011) ("rejecting a challenge to a registration based on an error in the publication section "because, in the absence of fraud on the Copyright Office, such errors are not cause for invalidation."); *Jules Jordan Video, Inc. v. 144942 Canada Inc.*, 617 F.3d 1146, 1156 (9th Cir. 2010) (challenge to registration failed because there was no evidence that the plaintiff "ever intend[ed] to defraud the Copyright Office."); *see also Kaseberg v. Conaco, LLC*, 360 F. Supp. 3d 1026, 1034 (S.D. Cal. 2018) ("The legislative history for the [2008 changes to Section 411] explains that the amendment aims to close the loophole whereby 'intellectual property thieves' argue 'that a mistake in the registration documents, such as checking the wrong box on the registration form, renders a registration invalid and thus forecloses the availability of statutory damages.") (quoting 2 Nimmer on Copyright § 7.20 (2018)).

In short, Defendants will be unable to prove that any of the registrations for any of the Images at issue in this case are invalid. They will not be able to so because the registrations at issue are not inaccurate and, even if they were, there is no evidence that Brittney or BGP acted with bad faith or intent to deceive the Copyright Office. And there is no such evidence because it does not exist. Accordingly, Defendants' affirmative defenses related to the invalidity of BGP's registrations fail as a matter of law.

## C.     Sinclair is Liable for Contributory and Vicarious Copyright Infringement

To make out a claim for contributory infringement, a plaintiff must show that the defendant intentionally induced or actively encouraged direct infringement. *MGM Studios Inc. v. Grokster, Ltd.*, 545 U.S. 913, 930 (2005); *Sony Corp. of Am. v. Universal City Studios, Inc.*, 464 U.S. 417, 437 (1984) ("[T]he 'contributory' infringer was in a position to control the use of

copyrighted works by others and had authorized the use without permission from the copyright owner"). The liability of one found guilty of contributory infringement is joint and several with all of the infringers. *Aro Mfg. Co. v. Convertible Top Replacement Co.*, 377 U.S. 476, 500 (1964) ("[A] contributory infringer is a species of joint-tortfeasor, who is held liable because he has contributed with another to the causing of a single harm to the plaintiff."). "In order to establish vicarious liability, a copyright owner must demonstrate that the entity to be held so liable: (1) possessed the right and ability to supervise the infringing activity; and (2) possessed an obvious and direct financial interest in the exploited copyrighted materials." *Nelson-Slabs, Inc. v. Morningside Dev.*, 284 F.3d 505, 513 (4th Cir. 2002). Vicarious infringement "does not include an element of knowledge or intent on the part of the vicarious infringer." *Arista Records LLC v. USENET.com*, 633 F. Supp. 2d 124, 156 (S.D.N.Y. 2009).

Here, Sinclair is liable for both contributory infringement and vicarious infringement. Sinclair had the direct relationship with WENN, and intentionally induced and actively encouraged the Stations to include articles from WENN on the Station websites. *See* Ex. 56 (Sinclair-WENN Contract). Sistek, a KOMO employee, downloaded the Images from WENN, then posted the Original Article on twelve Station websites. Ex. 13 at 33:25–34:18, 35:14–36:11. Ota, a Sinclair employee, got the article from WENN then posted the Revised Article on all of the Station websites. Ex. 14 ("Cotlove Dep. Tr.") at 97:12–16; Ex. 17 ("Fantis Dep. Tr.") at 13:20–14:4. Additionally, Sinclair possessed the right and ability to supervise the posting of the Images on the Station websites, and possesses an obvious and direct financial interest in the exploitation of the Images in that it received revenue from the advertisements placed on the webpages containing the Images.

### D.    Defendants' Infringements Were Willful

The willfulness of an infringement may be decided on summary judgment. *See, e.g.*, *Jobete Music Co. v. Media Broad. Corp.*, 713 F. Supp. 174, 179 (M.D.N.C. 1988). Willfulness in the copyright infringement context "means that the infringer either had actual knowledge that it

was infringing the owner's copyrights or acted in reckless disregard of those rights." *Lowry's Reps., Inc. v. Legg Mason, Inc.*, 271 F. Supp. 2d 737, 753 (D. Md. 2003). Willful blindness toward the copyright owner's rights may supports a finding of willfulness. *See Island Software & Computer Serv., Inc. v. Microsoft Corp.*, 413 F.3d 257, 263 (2d Cir. 2005) (listing "willful blindness" toward copyright owner's rights as supportive of willfulness finding); *Louis Vuitton Malletier, S.A. v. Akanoc Sols., Inc.*, 658 F.3d 936, 944 (9th Cir. 2011) (same, citing *Island Software*).

The undisputed facts prove that Sinclair and the Station Defendants willfully infringed BGP's copyrights. While Defendants may argue that their use of the Dropbox Images was innocent when it first obtained them (i.e., when it downloaded the Dropbox Images from WENN in reliance on WENN's supposed rights), this defense evaporated as soon as Sistek and Ota began to correspond directly with the Gobbles. Their correspondence made it crystal clear that proper attribution was a condition of any license they may have obtained. When Sinclair and the Station Defendants decided, instead, that they would use the Dropbox Images without proper credit, that was willful infringement. Further evidence of the willfulness of Defendants' infringement includes (1) their continued use of the Dropbox Images after receiving the kill notice from WENN on November 12, 2015, (2) their continued use of the Dropbox Images after receiving the subpoena in the WENN lawsuit on September 25, 2017, (3) their continued use of the Dropbox Images on the Station websites for a month after they were sued in these consolidated actions, and (4) their continued use of the Dropbox Images on social media until May 2019.

E. **BGP Can Elect to Recover Statutory Damages and Will Be Entitled to Attorney's Fees**

BGP seeks an adjudication that it may elect to recover statutory damages and will be entitled to its attorney's fees in the event that it prevails at trial. Section 412 of the Copyright Act provides that "no award of statutory damages or of attorney's fees … shall be made for … any infringement of copyright commenced after first publication of the work and before the effective

date of its registration, unless such registration is made within three months after the first publication of the work."

In this case, the facts are simple. Each of BGP's registrations has an effective date of October 30, 2015. Exs. 2-5. The infringement by Defendants commenced, at the very earliest, when Scott Sistek began downloading the Images from WENN several days later, on or around November 4, 2015. Ex. 13 ("Sistek Dep. Tr.") at 26:1–15. Since the date of registration was before the infringement began, BGP may elect to recover statutory damages under 17 U.S.C. § 504(c) and may be entitled to its attorney's fees under § 505.

**F.    Sinclair is Liable for DMCA Violations.**

Falsifying, altering, removing copyright management information ("CMI"), or distributing false or altered CMI creates additional liability under the Copyright Act. CMI includes identifying information about a work, its title, author, owner, and the terms and conditions for a work's use. 17 U.S.C. § 1202(c). Section 1202 protects against any conveyance of false identifying information about a work or the author of the work, including by implying that the author was associated with an unauthorized distributor. *Agence Fr. Presse v. Morel,* 2014 WL 3963124, at *7 (S.D.N.Y. Aug. 13, 2014)

Section 1202 of the Copyright Act provides two separate protections to ensure the integrity of CMI. Section 1202(a)  provides that no person shall knowingly and with the intent to induce, enable, facilitate or conceal infringement either (1) provide CMI that is false or (2) distribute (or import for distribution) CMI that is false (the "False CMI Prohibition").

Section 1202(b), as relevant here, provides that no person shall, without the authority of the copyright owner or the law, knowing *or having reasonable grounds to know* that it will induce enable, facilitate, or conceal infringement of any right under the Copyright Act: (i) intentionally remove or alter any CMI (the "Removal/Alteration Prohibition"); (2) distribute CMI, knowing that the CMI has been removed or altered without authority of the copyright owner or the law; or (3) distribute or publicly perform works or copies of works, knowing that

CMI has been removed or altered without authority of the copyright owner or the law (subclauses (b)(2) and b(3), the "Distribution Provision"). A cause of action under Section 1202 lies whenever CMI, "conveyed in connection with copies … of a work … including in digital form," is falsified or removed. *Murphy v. Millennium Radio Grp. LLC*, 650 F.3d 295, 301 (3rd Cir. 2011) (holding that removal of author's name in "gutter credit" near image as printed in a magazine fell within protection of § 1202).

The Defendants have each violated the False CMI Prohibition of Section 1202(a) and both the Removal/Alteration Prohibition and the Distribution Prohibition of 1202(b) through their reproduction, public display, and distribution of the Photographs.

1. **Sinclair and the Stations have each violated the False CMI Prohibition.**

In order to show a violation of the False CMI Prohibition, Gobble must prove that one or more of the Defendants: (1) provided or distributed CMI that is false, and (2) did so knowingly and with the intent to induce, enable, facilitate or conceal infringement.

### a. *False CMI*

Each of the Photographs was authored by Brittney Gobble and owned by Brittney Gobble Photography pursuant to a written assignment from Brittney Gobble. Exs. 2-5. Accordingly, the correct CMI for each of the Photographs related to authorship and copyright ownership would specify that information. Additionally, Brittney Gobble gave each of the high resolution, unwatermarked copies of the Photographs (the "Dropbox Images") a unique file name that contained the title and other information identifying that Photograph. Ex. 51 at ¶ 2. Those file names also constitute CMI. *Energy Intelligence Grp Inc. v. Kayne Anderson Capital Advisors LP,* 948 F.3d 261, 277 (5th Cir. 2020) (a "file name may be CMI if it is 'conveyed in connection with copies' of the underlying work and contains a 'title and other information identifying the work.'")

### b. *Defendants Provided and Distributed False CMI*

The Defendants provided and distributed each of the Dropbox Images with the following

false CMI: (1) Photo: WENN.com; (2) copyright: Supplied by WENN.com; or (3) Photo: Brittney Gobble Photography via WENN. Adding "via WENN" to the Photo credit conveys information about copyright ownership and constitutes false CMI. *See Agence Fr. Presse v. Morel*, 934 F. Supp. 2d 547, 577 (S.D.N.Y. 2013) (adding "AFP" to the photo credit conveys information about copyright ownership). Additionally, the Defendants provided and distributed the Dropbox Images with new filenames that did not include or incorporate the actual file names. For example, "Lykoi1-nm(L14).jpg" was provided and distributed by Defendants as "151103_wenn23114587.jpg," and in some instances displayed that file name as the photo credit for the Dropbox Photograph. *See, e.g.*, Dkt. No. 1-12 (Ex. 12 to the Second Am. Compl.).[4]

Attached as Exhibit 31 is a spreadsheet listing the false photo credits for each of the Dropbox Images as contained on each of the screenshots of the Defendants' websites captured by Gobble and attached as exhibits to the operative complaint. Attached as Exhibit 28 is a spreadsheet listing the false photo credits for each of the Photographs as contained in Defendant Sinclair's Clickability Database that Defendant Sinclair distributed to each of the Station Defendants that utilized the Clickability platform. Attached as Exhibit 30 is a spreadsheet listing the false photo credits for each of the Photographs as contained in Defendant Sinclair's Storyline Database that Defendant Sinclair distributed to each of the Station Defendants that utilized the Storyline platform.

### c.      Defendants Knew The CMI Was False

Each of the Defendants, through their employees and agents, knew that the correct CMI for each of the Dropbox Images was "Brittney Gobble Photography" and that the CMI as provided and distributed by each of the Defendants was false. "Knowledge obtained by corporate employees acting within the scope of their employment is imputed to the corporation." *Helton v. AT&T Inc.,* 709 F.3d 343, 356 (4th Cir. 2013) (internal citation omitted); *see also United States*

---

[4] Pursuant to Local Rule 103.6(b), Plaintiff did not attach those exhibits that were filed with the original complaint (Dkt. No. 1) to its operative Second Amended Complaint (Dkt. No. 134). Since the exhibits remain the same, Plaintiff refers to the exhibits to the original complaint as if they were attached to and incorporated in the operative complaint.

*v. T.I.M.E.-D.C., Inc.*, 381 F. Supp 730, 738 (W.D. Va. 1974) ("In consequence, a corporation cannot plead innocence by asserting that the information obtained by several employees was not acquired by any one individual employee who then would have comprehended its full import. Rather, the corporation is considered to have acquired the collective knowledge of its employees and is held responsible for their failure to act accordingly."). This rule is not limited to employees, but also to a corporation's agents. *United States v. E. Brooke Matlack*, 149 F. Supp. 814, 819-820 (D. Md. 1957) ("A corporation can act only through its agents. Knowledge of notice to an agent of a corporation acting within the scope of his authority is notice to the corporation."); *United States v. One Parcel of Land Located At 7326 Highway 45 North, Three Lakes, Oneida County, Wisconsin*, 965 F.2d 311, 316 (7th Cir. 1992) ("Where a corporate agent obtains knowledge while acting in the scope of his agency, he presumably reports that knowledge to his corporate principal so the court imputes such knowledge to a corporation."); William Meade Fletcher, 3 Fletcher Cyclopedia of Corporations § 790 (2006).

Defendants knew the correct CMI for each of the Dropbox Images included Brittney Gobble's name from inception of the November 4, 2015 article (the "Original Article"). Scott Sistek, KOMO TV's senior digital web content producer and staff meteorologist, obtained the Dropbox Images from WENN and uploaded the story with each of the Dropbox Images on November 4, 2015. Sistek downloaded digital files from WENN and then upload them into photo editing software, where Sistek would edit the photos' metadata. Specifically, Sistek would remove the story itself from the photo caption field and use it for the body of the story. Ex. 13 ("Sistek Dep. Tr.") at 20:23-21:8; 24:6-19. Consequently, Sistek would have seen the photo credit as supplied by WENN in the digital file, which was contained in the caption field as "***Mandatory Credit: Brittney Gobble/WENN.com ***." Attached as Exhibit 29 is a spreadsheet, listing the metadata from the photograph digital files as provided by WENN (*see, e.g.*, the [IFD0] Image Description metadata from WENN0000491 as produced by WENN).

More importantly, Defendants knew on November 8, 2015 that the CMI posted with each of the Dropbox Images was false because Brittney specifically told Sistek that the credit was

wrong and that the correct credit was Brittney Gobble Photography. As the result of Brittney's email exchange, Sistek knew that the CMI in the metadata in each of the Dropbox Images on Defendants' Clickability server was false. Ex. 16. Indeed, Sistek changed the credit "on each photograph caption" to the correct CMI (i.e., Brittney Gobble Photography) and actually created a hyperlink to Brittney's Facebook page. Ex. 7 at 141:15-147:4; Ex. 13 at 50:23-57:3 (the Original Article, as revised by Sistek to include the correct credits, is referred to as the "Revised Article").

Another Sinclair employee and agent for each of the stations, Amanda Ota, obtained the Original Article from Sistek and then republished it the next day on November 9, 2015 (the "New Article"). Ex, 14 at 35:16-36:1. Ota distributed the New Article with each of the Dropbox Images to all fifty of the Stations (including KOMO) on November 9, 2015. *Id*. at 97:12-16; Ex. 17 at 13:20-14:4; Ex. 20 at SBG000405-429. Ota (or another Sinclair employee) distributed the New Article with each of the Dropbox Images to all fifty of the Stations (including KOMO) again on November 10, 2015. Ex. 54 at SBG000429-454. The New Article appeared to be identical to the Revised Article, except that the proper CMI from the Revised Article (i.e., Brittney Gobble Photography) had been replaced with false CMI on each of the webpages featuring one of the Dropbox Images, specifically with either "By WENN.com" or "Brittney Gobble Photography via WENN.com." Ex. 15 at p. 6 (Second Supplemental Answer to Interrogatory No. 6). Further, the credit line no longer included a hyperlink to Brittney Gobble's Facebook page. Ex. 7 at 144:5-11.

Both Sistek and Ota are employees and agents of the Defendants, and both were working in the scope of their employment. Sistek, although an employee at KOMO TV, is responsible for posting content to not only KOMO but also twelve other Sinclair stations. Ex. 13 at 34:7-37:4. Sistek also worked closely with Kevin Cotlove, who is a "member of *our* corporate digital team." *Id.* at 39:15-20 (emphasis added). Cotlove confirmed that he "oversee[s] digital operations for Sinclair." Ex. 14 at 7:9. Ota worked at the Sinclair national desk and was responsible for distributing articles, including the Revised Article, to each of the Defendants. Ex.

26

14 at 97:12-16; Ex. 17 at 13:20-14:4. Ota also worked with Sistek, who would send her stories he thought the national desk might be interested in posting as well. Ex. 21 at 61:16-63:13. Accordingly, everything that Sistek and Ota knew is imputed to each of the Defendants.

Further, each of the Defendants is charged with the knowledge of the contents of the information in their corporate books and records. *Helton*, 709 F.3d at 356 ("[C]orporate entities also have constructive knowledge of the contents of their records."). After Sistek altered the metadata for each of the Dropbox Images attached to the Original Article to include the correct CMI in the Clickability server, which Sinclair and at least twelve stations used, those Defendants had constructive knowledge of the correct CMI and consequently knew that the CMI in the New Article was false.

### d.     *Defendants' Intent to facilitate and conceal its own infringement*

The Defendants also provided and distributed the false CMI with the intent to facilitate and conceal their own infringement. Upon learning from Brittney Gobble that the Original Article contained false CMI, Sistek corrected it, and he did so because he knew that, based on Brittney's email, he needed to give her proper attribution in order to avoid a violation of copyright. Ex. 13 at 127:16-25. Sistek confirmed that photo credit was a mandatory requirement, that photographs are entitled to copyright protection, and that if someone uses a copyrighted photograph without permission they are liable for damages. *Id.* at 41:18-23; 126:5-25. Sistek also confirmed that it was company policy not to take a photo off of Facebook. *Id.* at 135:20-136:1; *see also* Ex. 55 at SBG_0002338-348; Ex. 17 at 45:18-47:20; 86:6-91:15.

Ota, on the other hand, did not have permission to copy any of the Dropbox Images—she only obtained permission to use the copies of the Photographs from the Lykoikitten website and Facebook page (the "Social Media Images"). In fact, Ota only requested permission to use

photos shared on the www.lykoikitten.com/home webpage Ex. 18; Ex. 21 at 59:2-7.[5] Nevertheless, after consulting with her editor Manny Fantis, she reproduced, displayed publicly, and distributed to each of the Station Defendants the Dropbox Images in connection with the Revised Article. Ex. 21 at 19:17-20:12. Regardless of whether she obtained the Dropbox Images from Sistek or from WENN, she knew she did not copy any of the Social Media Images even though she only had authorization to copy the Social Media Images. *Id.* at 176:9-17; 208:9-14.

Furthermore, Ota was clear that she obtained permission to use the Social Media Images from Brittney, who she knew from the mail exchange owned them. Ota also testified that she "always" checked the metadata attached to the photographs in her stories to ensure its accuracy. *Id.* at 111:18-112:5. Yet none of the credits she included in the New Article attributed the photograph to "Brittney Gobble," the person she knew was the owner of each of the Photographs. Instead, as stated above, all of the credits for the Photographs in the Revised Article were the false CMI: (1) Photo: WENN.com; (2) copyright: Supplied by WENN.com; or (3) Photo: Brittney Gobble Photography via WENN. And with respect to the third one, *Brittney Gobble Photography was not even mentioned in Ota's correspondence with Brittney.* This is not only contrary to what Ota knew but to Sinclair's corporate policy, which requires proper attribution to the name of the person *who took the photo.* Ex. 17 at 78:2-8. Additionally, per Sinclair's corporate policy, for Ota to use any of the Social Media Images, she was required to have Brittney email her, indicating that she was the sole owner of each of them. *Id.* at 91:1-15. But as Ota's email chain shows, she never did that.

Additionally, the timing of Ota's email is suspect. Although Sistek posted the Original Article on November 4, 2015, it was not until November 9, the day *after* Brittney emailed Sistek, that Ota emailed Brittney to obtain the permissions that Sistek had not been granted—consent to

---

[5] As discussed previously, *no one* had permission to use the Dropbox Images from WENN— Gobble specifically did not grant WENN the right to distribute any of the Dropbox Images, nor the right to sublicense any of the rights she granted to WENN. A licensee cannot grant to another rights greater than the licensee has, nor can a licensee sublicense rights unless expressly provided. Consequently, Defendants' copying of the Dropbox Images constituted copyright infringement, no matter how the Defendants obtained them.

distribute the Dropbox Images to each of the stations. The only basis then for Ota to include the false CMI with each of the Dropbox Images was to facilitate and conceal the fact that Defendants were reproducing and distributing the Dropbox Images, photographs that neither she nor any of the Defendants had permission to copy beyond KOMO.

      **2.**    **Sinclair and the Stations have each violated the Removal/Alteration Prohibition.**

The elements of a violation of the Removal/Alteration Prohibition are: (1) the existence of CMI on the work; (2) removal and/or alteration of that information; (3) that the removal and/or alteration was done intentionally; and (4) knowing or having reasonable grounds to know, that it will induce, enable, facilitate or conceal an infringement of any rights under copyright. 17 U.S.C. § 1202(b)(1). *Mango v. Buzzfeed, Inc.*, 356 F. Supp.3d 368, 376 (S.D.N.Y. 2019).

        *a.*    *Existence of CMI on each of the Photographs*

There is no dispute that each of the Dropbox Images, as obtained from WENN, contained CMI (although Defendants may dispute what CMI was contained). In fact, Defendants' own records confirm that there was CMI in each of the Photographs. *Compare* Ex. 29 (CMI from WENN); Ex. 28 (CMI in Clickability); Ex. 30 (CMI in Storyline); Ex. 31 (CMI in the photographs as displayed by the Defendants).

        *b.*    *Removal and/or Alteration of the CMI*

On November 4, 2015, Sistek published each of the Dropbox Images with False CMI. As the result of Brittney's email exchange on November 8, 2015, Sistek altered the CMI on each of the Dropbox Images as displayed in the Original Article. Consequently, Sistek altered the CMI for each of the Dropbox Images to display the correct CMI—Brittney Gobble Photography.

Ota obtained the Revised Article from Sistek and then republished the New Article the next day on November 9, 2015. (Cotlove Dep.) at 35:16-36:1. As Defendants' records confirm, Ota either altered or removed the CMI in the Dropbox Images attached to the New Article so it was no longer consistent with the CMI in the Dropbox Images attached to the Revised Article (i.e, Brittney Gobble Photography), nor was the CMI consistent with the CMI contained in the

29

Dropbox Images as obtained by WENN (Brittney Gobble/WENN.com). Ex. 32 at SBG0000405-429; *compare* Ex. 29 (CMI from WENN); Ex. 28 (CMI in Clickability); Ex. 30 (CMI in Storyline); Ex. 31 (CMI in the photographs as displayed by the Defendants).

### c.    Removal and/or Alteration was done Intentionally

Defendants removed and/or altered the CMI intentionally in many different ways. First, Sistek admitted that he edited the metadata in the Dropbox Images as obtained by WENN. Ex. 13 at 20:23-21:8; 24:6-19. The CMI in the Dropbox Images from WENN credited Brittney Gobble/WENN.com. Ex. 29 (CMI from WENN). Sistek admitted altering the CMI in his email exchange with Brittney Gobble. Ex. 16; Ex. 13 at 50:23-57:3; Ex. 33.

Ota also admitted that she either manually edited the metadata in each of the Dropbox Images or "always" verified that the metadata imported to Defendants' Storyline database was accurate. Ex. 21 at 108:18-109:1; 110:20-112:5. But the CMI in the Storyline database, "WENN.com" or "Brittney Gobble Photography via WENN.com," does not match either (1) the CMI from the Dropbox Images as obtained by WENN (Ex. 29); or (2) the CMI from the Dropbox Images as contained in the Revised Article as modified by Sistek *Compare* Ex. 28 (CMI from Clickability) *and* Ex. 33 *with* Ex. 30 (CMI from Storyline). Nor does the CMI in Storyline match with Ota's knowledge that the Photographs were owned by Brittney Gobble individually (and not Brittney Gobble Photography). Accordingly, the only logical conclusion is that Ota also altered the CMI in each of the Dropbox Images attached to the Revised Article, listing either "WENN.com" or "Brittney Gobble Photography via WENN.com."

### d.    Defendants' Reasonable Grounds to Know of Their Facilitation and Concealment Of Infringement

As described above in connection with the False CMI Prohibition, the Defendants knew or had reasonable grounds to know that their removal or alteration of the CMI would facilitate and conceal their own infringement. Upon learning from Brittney Gobble that the Dropbox Images attached to the Original Article contained false CMI, Sistek corrected them. Sistek confirmed that photo credit was a mandatory requirement, that photographs are entitled to

30

copyright protection, that if someone uses a copyrighted photograph without permission, he or she would be liable for damages. Ex. 13 at 41:18-23; 126:5-25. Sistek also confirmed that it was company policy not to take a photograph from Facebook. *Id.* at 135:20-136:1. Ota also confirmed that she received training on the corporate policy on using copyrighted photographs, and that she needed to obtain appropriate credits before posting any photographs. Ex. 21 at 206:19-207:10.

Sistek and Ota's confirmations that they each understood from their training and experience that they were required to get permission to use photographs provides a sufficient basis in establishing that that each should have reasonably known that altering the CMI to include a false attribution to WENN instead of Brittney Gobble (or Brittney Gobble Photography) would have wrongfully implied that the Defendants had permission to use the Photographs, thus concealing their infringement. *Mango v. Buzzfeed, Inc.,* 970 F.3d 157, 173 (2d Cir. 2020) ("Hayes's testimony that he 'understood from his training and experience that he was required to get permission to use photographs' provided a sufficient basis for the conclusion that Hayes 'should have reasonably known that altering the gutter credit to include a false attribution to Fisher's law firm would have wrongfully implied that BuzzFeed had permission to use the Photograph, thus concealing its infringement.'") (citation omitted).

Further, Defendants' alteration of the CMI to include "via WENN," as well as the fact that it is Defendants' business to provide stories and pictures for use by its viewers, are each sufficient to conclude that Defendants' CMI alterations would facilitate or conceal their infringement. *Agence Fr. Presse v. Morrel*, 934 F. Supp. 2d at 578 (adding "AFP" to a caption could "include, enable, facilitate, or conceal" infringement). Indeed, Defendants are sophisticated entities with a robust copyright policy that makes clear that it is required to get permission to use photographs. Therefore, the Defendants knew that altering the CMI to include false attribution to WENN would have wrongfully implied that Defendants had permission to use the Photographs or that Brittney Gobble was affiliated with WENN—which she was not—thus concealing infringement.

31

But Defendants did not just have reasonable grounds to know, they actually knew that their alterations would facilitate and conceal their infringement. Ota knew she did not have permission to copy any of the Dropbox Images—she only obtained permission to use the Social Media Images—in fact, she only requested permission to use photographs shared on the www.lykoikitten.com/home. Ex. 18; Ex. 21 at 59:2-7. Nevertheless, after consulting with her editor Manny Fantis, she reproduced, displayed publicly, and distributed to each of the Station Defendants the Dropbox Images in connection with the Revised Article. Ex. 21 at 19:17-20:12. Regardless of whether she obtained the Dropbox Images from Sistek or from WENN, she knew she did not copy any of the Social Media Images even though she only had authorization from Brittney Gobble to copy the Social Media Images, not any of the Dropbox Images. *Id.* at 176:9-17; 208:9-14.

Consequently, Defendants knew, or a minimum had reasonable grounds to know, that their alteration of the CMI on each of the Photographs would facilitate or conceal Defendants' infringement of the Dropbox Images.

3.   **Defendants Violated the Distribution Prohibition.**

The elements to prove a violation of the Distribution Prohibition are: (1) the existence of CMI in connection with a copyrighted work; (2) that a defendant distributed works or copies of works; (3) while knowing that CMI has been removed or altered without permission; and (4) while knowing, or having reasonable grounds to know, that such distribution would induce, enable, facilitate, or conceal an infringement. *Mango*, 970 F.3d at 171. The first and fourth elements are basically the same as for the Removal/Alteration Prohibition discussed above.

*a.*   ***Defendants Distributed The Photographs***

There is no dispute that the Defendants distributed copies of each of the Photographs. Sistek distributed the Original and Revised Articles to twelve of the Stations Ex. 13 at 34:7-37:4. Ota distributed the New Article to each of the Defendants. Ex. 14 at 97:12-16; Ex. 17 at 13:20-14:4; Ex. 20 at SBG000405-429; Ex. 33. Indeed, Sinclair distributed the New Article and each of

the Photographs numerous times to the Station Defendants. *See* Exs. 32-48 (Story Reports).

Additionally, once Sinclair distributed the New Article and the accompanying Photographs to each of the Stations, the Stations then duplicated and uploaded each of the Photographs to their website, with many of them duplicating them to multiple pages on their website. For example, Sinclair Television of Oregon, LLC uploaded the same Photograph to three separate webpages: (1) http://nbc16.com/features/pets/gallery/unique-breed-of-werewolf-cats-prove-popular-with-cat-and-dog-lovers-11-20-2015#photo-2; (2) http://nbc16.com/news/entertainment/Unique-breed-of-Werewolf-Cats-prove-popular-with-cat-and-dog-lovers-341312521.html?tab=gallery&c=y&img=2; and (3) /http://nbc16.com/sponsored/huntsman/gallery/unique-breed-of-werewolf-cats-prove-popular-with-cat-and-dog-lovers-11-09-2015-235312404#photo-2. Ex. 49.[6]

### b.    Defendants Knew that CMI had been removed or altered

Each of the Defendants, through their employees and agents, knew that the correct CMI for each of the Photographs was Brittney Gobble Photography and that the CMI distributed by the Defendants had necessarily been altered. As stated above, knowledge obtained by corporate employees or agents is imputed to the corporation. In consequence, Defendants cannot plead innocence by asserting that the information obtained by several employees was not acquired by any one individual employee who then would have comprehended its full import. Rather, each of the Defendants is considered to have acquired the collective knowledge of its employees and agents and is held responsible for their failure to act accordingly.

Defendants knew the correct CMI for each of the Photographs included Brittney Gobble's name from inception of the Original Article. Sistek obtained the Photographs from WENN and uploaded the story with each of the Photographs on November 4, 2015. Sistek downloaded digital files from WENN and then upload them into editing software, where Sistek would have seen the credit as supplied by WENN in the digital file, which was "***Mandatory

---

[6] Exhibit 49 is an excerpt of a spreadsheet produced in native format, printed as a PDF.

Credit: Brittney Gobble/WENN.com***"

More importantly, Defendants knew on November 8, 2015 that the CMI posted with each of the Photographs was false because Brittney Gobble specifically told Sistek that the credit was wrong and that the correct credit was Brittney Gobble Photography. As the result of Brittney's email exchange, Sistek knew that the CMI in the metadata in each of the Dropbox Images on Defendants' Clickability server was false. Indeed, Sistek changed the credit "on each photograph caption" to the correct CMI (i.e., Brittney Gobble Photography) and actually created a hyperlink to Brittney Gobble's Facebook page.

Another Sinclair employee and agent for each of the stations, Ota, obtained the Original Article from Sistek and then republished it the next day on November 9, 2015 (the New Article) with CMI that she knew had been altered. She knew from her email exchange that "Brittney Gobble"—not WENN and not even Brittney Gobble Photography—was the correct CMI for each of the Photographs. Ota reviewed the photo credits in the New Article, which credits she knew were false. The Defendants, having both the knowledge of Sistek and Ota imputed to them, knew that the CMI had been altered from Brittney Gobble Photography to WENN or Brittney Gobble Photography via WENN. Further, the Defendants also had knowledge of the contents of: (1) the metadata in the Photographs as downloaded from WENN; and (2) the data in the Clickability database, which indicated, after being edited by Sistek, the correct CMI. Accordingly, Defendants' own records confirm that it knew that the CMI in each of the Photographs was altered from what was contained in the copies of the Photographs from WENN and the Clickability database compared with the CMI in the copies of the Photographs stored in the Storyline database and distributed by the Defendants.

## V.      CONCLUSION

For the foregoing reasons, Plaintiff Brittney Gobble Photography, LLC, respectfully requests that the Court enter judgment on the issue of liability in its favor on all counts of the Second Amended Complaint.

2034617.3

Respectfully submitted,

July 27, 2021

By:   */s/ Robert E. Allen*
     Robert E. Allen

C. Justin Brown
Maryland State Bar No. 28110
brown@cjbrownlaw.com
Brown Law Firm
1 N. Charles St., Suite 1301
Baltimore, Maryland 21201
Telephone: (410) 244-5444
Facsimile: (410) 934-3208

Robert E. Allen (admitted *pro hac vice*)
Cal State Bar No. 166589
rallen@glaserweil.com
Thomas P. Burke Jr. (admitted *pro hac vice*)
Cal. State Bar No. 288261
tburke@glaserweil.com
Glaser Weil Fink Howard Avchen & Shapiro LLP
10250 Constellation Blvd., 19th Fl.
Los Angeles, CA 90067
Telephone: (310) 282-6280

*Counsel for Brittney Gobble Photography, LLC*

## **CERTIFICATE OF SERVICE**

I HEREBY CERTIFY, that on this 27th day of July 2021, a copy of the foregoing document was filed electronically. Notice of the filing will be sent to all parties who have appeared by operation of the Court's electronic filing system. Parties may access this filing through the Court's system.

*/s/ Robert E. Allen*
Robert E. Allen