**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF MARYLAND**
**NORTHERN DIVISION**

| | |
|---|---|
| BRITTNEY GOBBLE PHOTOGRAPHY, LLC, | |
| *Plaintiff*, | |
| v. | Case No. 1:18-cv-03403-SAG (Lead Case) |
| SINCLAIR BROADCAST GROUP, INC., CHESAPEAKE MEDIA I, LLC, HARRISBURG TELEVISION, INC., KATV, LLC, KOKH, LLC, KTUL, LLC, SAN ANTONIO TELEVISION, LLC, SINCLAIR COMMUNICATIONS, LLC, SINCLAIR MEDIA III, INC., SINCLAIR MEDIA OF BOISE, LLC, SINCLAIR MEDIA OF OREGON, LLC, SINCLAIR MEDIA OF SEATTLE, LLC, SINCLAIR MEDIA OF WASHINGTON, LLC, SINCLAIR PROPERTIES, LLC, SINCLAIR RADIO OF SEATTLE, LLC, SINCLAIR TELEVISION OF FRESNO, LLC, SINCLAIR TELEVISION OF ILLINOIS, LLC, SINCLAIR TELEVISION OF OMAHA, LLC, SINCLAIR TELEVISION OF OREGON, LLC, SINCLAIR TELEVISION OF PORTLAND, LLC, SINCLAIR TELEVISION STATIONS, LLC, SOUTH WEST OREGON TELEVISION BROADCASTING CORPORATION, THE TENNIS CHANNEL, INC., WGME, INC. and WSMH, INC. | Case No. 1:18-cv-03384-SAG<br>Case No. 1:19-cv-00559-SAG<br>Case No. 1:19-cv-00606-SAG |
| *Defendants*. | |

<u>**MEMORANDUM OF LAW IN SUPPORT OF PLAINTIFF'S OPPOSITION TO DEFENDANTS' *DAUBERT* MOTION TO EXCLUDE OPINION TESTIMONY OF PLAINTIFF'S EXPERT – JEFFREY SEDLIK**</u>

## **TABLE OF CONTENTS**

I.     INTRODUCTION ..................................................................................................1

II.    BACKGROUND ...................................................................................................1

III.   ARGUMENT .......................................................................................................6

     A.    Defendants Disagreements Over Sedlik's Methodology Go to the Weight of the Testimony not its Admissibility .................................................6

     B.    Gobble's Licensing History Is Irrelevant to Whether Sedlik's Methodology is Reliable ...............................................................................8

     C.    Sedlik Explains His Methodology in Detail and Applies it to the Facts .................9

     D.    Sedlik Applies a Scarcity Multiplier to a Generic Photograph to Arrive at a Range for the Fair Market Value of the Photographs .............................12

     E.    Sedlik's Calculation of the Fair Market Value of a Hypothetical License is Objective, Reasonable and Reliable ................................................15

     F.    Sedlik's Methodology Has Been Accepted By Numerous Courts .......................16

     G.    Sedlik's Opinions Do Not Constitute Legal Conclusions....................................19

     H.    Sedlik's Opinions on Disgorgement of Profits ...................................................20

IV.   CONCLUSION....................................................................................................20

2047508.3

**MEMORANDUM OF LAW IN SUPPORT OF PLAINTIFF'S OPPOSITION TO
DEFENDANTS' *DAUBERT* MOTION TO EXCLUDE OPINION TESTIMONY OF
PLAINTIFF'S EXPERT – JEFFREY SEDLIK**

Plaintiff Brittney Gobble Photography, LLC ("BGP") files its Opposition to Defendants'
*Daubert* Motion to Exclude Opinion Testimony of Plaintiff's Expert – Jeffrey Sedlik, and state
as follows:

## I.     INTRODUCTION

This case relates to Defendants' infringement of BGP's copyrighted photographs (the
"Photographs") taken by Brittany Gobble ("Gobble"). In order to include expert testimony
related to its damages, Plaintiff hired Jeffrey Sedlik ("Sedlik") to testify regarding a number of
issues. Sedlik is a world-renowned specialist, with decades of experience as a photographer,
photography licensing and licensing transactions expert, and academic. Sedlik has spent years
teaching courses and giving lectures on copyright law and its application to visual arts to law
students and legal professions at institutions such as Duke University and New York University
Law School. Additionally, and most relevant to Defendants' motion, Sedlik and his
methodologies have been accepted and affirmed as reliable for copyright infringement damages
by a litany of courts throughout the United States, including by this court.

Despite all of this, Defendants argue that Sedlik is not qualified to testify in this case and that
his methodologies do not meet the requirements of the Federal Rules of Evidence and applicable
caselaw. Regardless of Defendants' lengthy attempt at excluding Sedlik's opinions, this Court
should deny Defendants' motion in its entirety.

## II.     BACKGROUND

Professor Jeffrey Sedlik's Preliminary Expert Report (the "Report") was submitted on
April 12, 2019. (Exhibit 1). At the time, and as noted by Sedlik in the Report, there were 52
Defendants in the four consolidated lawsuits—Sinclair Broadcast Group, Inc. ("Sinclair") "and
51 entities corresponding to 51 radio or television station websites on which some or all of the
Photographs were displayed[.]" (Report at 1). Since the time that the Report was submitted,
Plaintiff BGP amended its operative complaint so that it now asserts claims against Sinclair and

25 "Station Defendants"—that is, the entities that owned or operated the websites on which BGP's Photographs were copied. Regarding the possible amendment of BGP's operative complaint to identify different defendants, Sedlik stated in his Report as follows:

> I understand that as of this writing, the complaints in the four above lawsuits are being amended to name additional defendants. I understand that the new defendants were identified during discovery as the owners and operators of the radio and television stations corresponding to the website screenshots shown in the Exhibits to the above-listed complaints. As my opinions expressed herein are based on the images and false credits shown in those website screenshots, my opinions will apply to the new defendants with respect to their corresponding station websites on the assumption that those new defendants are found to be liable for the alleged copyright infringements and DMCA violations alleged in the matters.

Sedlik noted in the Report that this opinions "are based in part on more than 25 years of service in high-level positions in trade associations and standard-setting bodies in the photography, advertising, product marketing, technology, and design industries." (Report at 2). He then detailed his qualifications, which are preeminent. Defendants do not appear to challenge Sedlik's qualifications. Nevertheless, highlights include:

- President and CEO, PLUS Coalition
- Past National President, Advertising Photographers of America
- Member, Photo Metadata Working Group for the International Press Telecommunications Council
- Guest Speaker or Instructor: US Copyright Office, US Patent Office, US Department of Commerce, Stanford Law School, American Law Institute, Duke University Law School, New York University Law School, Copyright Society of the United States
- Faculty Member and Professor, Art Center College of Design
- 30 years of experience as a commercial photographer and studio owner
- Forensic image analysis, consulting services, and expert witness testimony in dozens of cases

(Report at 3-10).

2

Before beginning his analysis, Sedlik laid out the assumptions that he had been instructed to rely upon in forming his opinions. (*Id*. at 10-12). He noted that "[a]s the scope of my engagement does not include verification of the accuracy of the assumptions, my reliance on the assumptions does not reflect a lack of rigor in the formation of my opinions. If any assumption is determined to be incorrect, I may revise my opinions. If later asked to verify the accuracy of the assumptions, I will do so where possible." (*Id*. at 10). These assumptions are primarily legal in nature, and include the type of legal conclusions that would generally be inappropriate for a damages expert to offer.

After giving an overview of the allegations at issue, Sedlik began his analysis with a discussion of background regarding image copyright licensing, then proceeded to discuss metadata, the photographs at issue, and WENN and Defendants' solicitation and use of the Photographs.

Sedlik's analysis of actual damages—the opinion primarily challenged by Defendants in their motion—starts on page 34 of his Report. His analysis began by noting that "[a]ctual damages are determined in party by the fee that a willing buyer would have been reasonably required to pay at the time of the infringement." This was and is an accurate statement of the law, supported by citation to *Davis v. Gap, Inc.*, 246 F.3d 152, 166, 172 (2d Cir. 2001).

To calculate this reasonable license fee, Sedlik proceeded thusly: first, Sedlik requested that BGP provide him with an accounting of all of Defendants' uses that had been discovered to date. (Exhibit 1, Report at 35 and Exhibit F to the Report). This Table of Usages included over 7,000 separate uses by Defendants. *Id*. After his careful review, Sedlik used the Table of Usages to develop hypothetical licenses for the over 7,000 separate uses by the Defendants. In order to calculate hypothetical license fees, Sedlik obtained "comparative stock photography license fee quotes from three stock photography agencies." Then, based on "the media in which the Photograph was reproduced, circulation, size, placement, and period of use," he calculated the total license fees that a willing buyer or buyers would have been required to pay a willing seller at the time of the infringement. In addition to the license fee quotes that he obtained, Sedlik also

3

relied on his "personal knowledge and experience in image licensing and in the development and management of industry standards for image licensing." (Exhibit 1, Report. at 34-35). The exact methodology by which Sedlik went from license fee quotes to the amount of actual damages suffered by BGP is detailed in Exhibit L to the Report. To summarize briefly, Sedlik obtained license fee quotes from three stock photography agencies in 2017.[1] The three agencies were Getty Images, Image Source, and First Light, all prominent photo agencies, with Getty Images being the largest in the world. Sedlik obtained quotes from these agencies for rights managed licenses with the following constraints: publishing and editorial use, on the web or in an app, up to 10 million views, for up to 1 year, repeated use. The quotes he obtained ranged from $227.37 on the low end from Image Source, and $1,050 on the high end from Getty Images. The average of the quotes was $649.12.

Sedlik then adjusted this average *downward* by 9.15%, since the hypothetical negotiation would have taken place in 2015 (i.e., just before the infringement began). He arrived at this percentage by comparing quotes from Getty in 2017 and 2015 and calculating that the quotes from 2015 were, on average, 9.15% less than those in 2017. With this 9.15% reduction, the average quote for the license described above became $589.73.

Sedlik then applied this $589.73 market rate license on a Photograph by Photograph, station by station, and year by year basis. Sedlik's methodology takes the infringements as it receives them: for each and every one of BGP's registered Photographs that were copied on a Defendants' website, Sedlik calculated the fair market license fee for each separate license, which, depending on the circumstances, may include repeated uses of the same Photograph as part of a single license.

Taking "L1" from Exhibit L to the Report as an example, the station KATU displayed photograph "I25" in six different locations or usages (i.e., U01, U03, U139, U190, U30, and U82). Since the license fee quotes included "repeated use," despite there being six separate

---

[1] Sedlik obtained these quotes in 2017 as part of his report in *Brittney Gobble Photo., LLC v. WENN, Ltd.*, Case No. 3:16-cv-306-HSM-DCP (E.D. Tenn.).

usages, KATU required only one license for image I25. The image was displayed for at least part of two years, so two one-year "license units" were required. Thus, the station KATU—in a hypothetical negotiation between a willing buyer and a willing seller, before the infringement began and contemplating the use that KATU actually made of I25—would have been required to pay $1,179.45 in license fees for it use of I25.

Throughout their motion, Defendants repeated Sedlik's bottom line damages figure several times, usually along with a dismissive remark: $18,636,647.50 to $31,061,079.10. Indeed, that is the range of actual damages that Sedlik reaches after applying a scarcity multiplier. In their motion, however, Defendants dismiss or ignore the granular licenses that constitute the actual damages total. Exhibit L to Sedlik's Preliminary Report lays out each and every license, 2,729 in total. (Exhibit 1). Not a single constituent license is for more than $2,358.92, and the average license fee is for $2,276.37. The total "base actual damages" determined by Sedlik were therefore $6,212,215.82.  Further, Defendants ignore the fact that they reproduced and displayed publicly the Photographs on at least 31,400 separate webpages. (SBG_000828-SBG_000883).

These figures are, however, before Sedlik adjusted the license fees to account for the scarcity of photographs of Lykoi cats in 2015. At that time, the Lykoi was a nascent breed, with few specimens in existence and, correspondingly, few photographers creating or selling high-quality photographs of Lykoi cats. The quotes that Sedlik had obtained from the three stock photography agencies, discussed above, were for generic cat photographs. Based on Sedlik's decades of experience, and in his expert opinion:

> Scarce images typically demand much greater license fees than common images, often 3 to 5 times the fee for a common image. The application of the scarcity multiplier is not a punitive measure. The scarcity multiplier serves only to adjust the fair market value of generic, common cat photographs to the value of scarce Lykoi photographs in 2015.

(Exhibit 1, Report at 38). Thus, Sedlik arrived at the ultimate range of $18,636,647.50 to $31,061,079.10 for the total amount of actual damages for which all Defendants may be liable.

5

This range is based on an expert opinion grounded in fact, and every single step that Sedlik took to arrive at it is detailed in his reports and his deposition testimony.

## III.   ARGUMENT

### A.   Defendants Disagreements Over Sedlik's Methodology Go to the Weight of the Testimony not its Admissibility

Defendants moved to exclude the opinion testimony of Sedlik as fundamentally unreliable under, *inter alia*, *Daubert v. Merrell Dow Pharm.*, 509 U.S. 579 (1993) and Federal Rule of Evidence 702. They argue that "nothing in either *Daubert* or the Federal Rules of Evidence requires a district court to admit opinion evidence that is connected to the existing data only by the *ipse dixit* of the expert," citing *Gen. Elec. Co. v. Joiner*, 522 U.S. 136, 146 (1997). First, Sedlik does not present an *ipse dixit* argument. Sedlik carefully analyzed the data and set forth his methodology in reaching his conclusion. Defendants are certainly free to challenge Sedlik's methodology, but have provided no basis on which to conclude that Sedlik's methodology is unreliable. In fact, it is Defendants who make the *ipse dixit* argument that Sedlik's methodology is unsound because his damages range is just too high. This is insufficient to show that an expert's opinion should be excluded, as even case law cited by Defendants confirm this. *Navarro v. Procter & Gamble Co.*, 2021 WL 868586, *10-11 (S.D. Ohio Mar. 8, 2021) ("[Defendants] complains that Sedlik's damages estimates are too high, and thus must be unreliable. But this is a challenge to Sedlik's results, not his methods. The Court cannot exclude Sedlik's opinions solely because his damages estimates are too high in Defendants' eyes.").

Additionally, Defendants argue that Sedlik's methodology for calculating actual damages is irrelevant and unreliable because it ignores BGP's actual licensing history and "has no name; was made up by Sedlik; is not recognized in any treatise or other professional literature; is not generally accepted within the relevant professional community; cannot be replicated or tested; has never been subjected to peer review; has no known error rate; and was created by Sedlik solely for use in litigation." (Exhibit 2, Defendants' Motion to Exclude Sedlik (the "Mot.") at 9). Defendants argue mostly against a straw man—they argue as if Sedlik was testifying as an

6

economist or accountant—while ignoring the fact that he is testifying as a photographer and licensing expert based on decades of experience in the commercial photography industry. This is not the sort of scientific expert testimony to which each and every *Daubert* factors strictly applies. *Kumho Tire Co. v. Carmichael*, 526 U.S. 137, 138 (1999) ("The *Daubert* factors do *not* constitute a definitive checklist or test, and the gatekeeping inquiry must be tied to the particular facts. Those factors may or may not be pertinent in assessing reliability, depending on the nature of the issue, the expert's particular expertise, and the subject of his testimony." (internal citations omitted)).

Ultimately, Defendants' arguments for excluding Sedlik's opinions revolve around their dislike for his opinions and conclusions. However, an expert's opinion cannot be excluded based on a defendant's apprehension towards the expert's conclusions. *See Atanassova v. Gen. Motors LLC*, 2021 WL 672929, at *5 (D.S.C. Feb. 22, 2021) (Court refusing to exclude an expert's opinion as his conclusions were based on an acceptable methodology and Defendant's exclusion arguments were based on their disagreement with his conclusions); *see also Cavallo v. Star Enter.*, 100 F.3d 1150, 1158-59 (4th Cir. 1996) (noting the court need not determine that the proffered expert testimony is irrefutable or certainly correct). As Defendants' simply attack Sedlik's conclusions (e.g. arguing that Sedlik must be excluded because his damages figure is absurd), Defendants' Motion should be denied outright. The proper avenue for Defendants' arguments is on either cross-examination of Sedlik or in their closing arguments to the jury.

In short, Sedlik's opinions are objective and reality based, beginning with quotes from a robust and efficient marketplace for rights-managed photography licenses and then accounting for the infringing uses actually made by Defendants and finally adjusting—based on Sedlik's decades of experience—to account for the scarcity of comparable images at the time of infringement. If Defendants consider the range of damages he reaches are "too high," they shouldn't have chosen to infringe over 50 photographs on over 50 separate websites, on over 31,400 webpages, owned and operated by dozens of separate subsidiary entities. If there were fewer Defendants, fewer photographs, and fewer websites, Sedlik's figures would be accordingly

7

lower. That, however, is not the reality of the situation. Because Sedlik has reliably applied sound methodology to the facts before him, if Defendants believe the damages figures he reaches are too high, the appropriate remedies are ""[v]igorous cross-examination, presentation of contrary evidence, and careful instruction on the burden of proof," not exclusion. *Westberry v. Gislaved Gummi AB*, 178 F.3d 257, 261 (4th Cir. 1999) (citing *Daubert*, 509 U.S. at 596). Defendants' motion to exclude the opinion testimony of Sedlik should be denied in its entirety.

> **B.      Gobble's Licensing History Is Irrelevant to Whether Sedlik's Methodology is Reliable**

Defendants emphasize throughout their Motion that Brittney Gobble and BGP licensed the photographs at issue for free to news organizations and other website and bloggers and that Gobble earned a total of $306.03 by licensing the photographs through the stock photography agency REX Features. (Exhibit 2, Mot. at 9-11). Defendants also accuse Sedlik of "ignoring" this licensing history because he did not base his actual damages calculations on it. (*Id*. at 10-11). However, Sedlik did not ignore the licensing history of the Photographs. Rather, Sedlik discounted the licensing history because there is persuasive evidence that Gobble was dissatisfied with REX's licensing practices. (Exhibit 3, Deposition of Brittney Gobble Photography, LLC ["BGP Depo."] at 165:2-9; Exhibit 5, Deposition of Johnny Gobble ["J. Gobble Depo."] at 89:22-90:5; Exhibit 6, Deposition of Jeffrey Sedlik ["Sedlik Depo."] at 296:5-20). Indeed, Gobble terminated the REX license on January 19, 2017 because of her dissatisfaction. (Exhibit 6, BGP000627) Additionally, while determining actual damages, Sedlik did not place significance on the fact that there were instances when BGP did not charge a fee for use of the Photographs. Sedlik explained in his report and testified that BGP issued licenses without requiring payment of a cash fee with the understanding that these uses would promote the Lykoi breed and, thus, increase sales and generate profit for her husband's business. (Exhibit 7, Sedlik Surrebuttal Report at 11; Exhibit 6, Sedlik Depo.at 248: 2-18). Since these aspects of BGP's licensing history still constitute consideration and value received, it is incorrect for Defendants to argue that BGP received no consideration for the licenses that she issued.

This is not a matter of an expert witness ignoring material facts, but rather an entirely unsurprising instance of competing experts assigning different weights to the facts at hand. Indeed, Defendants admit that this is the case in their Motion by noting that "[h]ad this licensing history been considered, Plaintiff's actual damages would have been a maximum of only $1,652.91 for the Defendants' use of the Photographs, *according to Defendant's industry expert, Gary Elsner*" and "[b]y ignoring Ms. Gobble's prior licensing history, *according to Riley*, Sedlik's analysis fails to comply with" a certain asset valuation standard. (Exhibit 2, Mot. at 10-11 (emphasis added)). Defendants' Motion confirms that these are topics about which reasonable experts can and do differ and that they will be prepared to present "contrary evidence" at trial.

Moreover, "there is no requirement that actual damages be calculated based on a plaintiff's own history of licensing fees." *Leonard v. Stemtech Int'l Inc*, 834 F.3d 376, 391 (3d Cir. 2016); *see also id.* at 390 (noting that defendant "asks us to use the past licensing fee method but cites no authority requiring the use of this method as opposed to the fair market value approach, and case law on this subject supports using the fair market value."). While it is clear that Defendants very much wish that Sedlik—and ultimately the jury—would give substantial weight to Gobble and BGP's dissimilar past licensing practices, there is no legal requirement that they do so. This point is punctuated by the fact that this section of Defendants' Motion—section III.C.1 at pages 9 to 11—contains not a single legal citation. Instead, it contains several citations to Defendants' experts' reports and declarations, indicating that this is an area where competing experts can reasonably disagree, not that Sedlik's opinions are fundamentally unreliable.

## C.     Sedlik Explains His Methodology in Detail and Applies it to the Facts

Defendants recount Sedlik's methodology over about one-and-a-half pages (Exhibit 2, Mot. at 11-12), then dismiss it with two short paragraphs without any supporting legal authority. (*Id*. at 13). First, Defendants claim that Sedlik's methodology is "suspect" because he allegedly "created this methodology solely for use in litigation." (*Id.* at 13). In support of this statement,

9

Defendants cite Sedlik's deposition at 224:2-225:5. (Exhibit 5). This portion of Sedlik's deposition, however, does not support this proposition:

> Q. Well, when determining rights-managed licenses, I assume that you're not going to stock photo companies picking images or a set of them and then applying multipliers for a normal transaction; is that fair to say?
>
> A. Right, that's correct. The word "multiplier" would not be used regularly. It's a term of convenience that I have applied to the adjustment for scarcity of an image, in the same way that when somebody comes to me as a licensing representative for the Phil Stern estate and they might go pick a generic image for a certain usage for $50, and I negotiate $6,000 because of the scarcity of the image, and I define the criteria for the license, I'm -- I'm not going out and sampling. But in this case I had to sample because I didn't have any historical license to base it on.
>
> Q. Is the method that you used to determine the value of the license fees in this case a generally accepted method that's used to determine license fees for photographs?
>
> A. I don't really get the -- get the question. Because obviously you're not having to go – if you've got an actual image that somebody's requesting, you don't have to go out to the industry and sample rates in order to come to an average rate and then apply an adjustment for scarcity; you offer the rate, just like I -- in the example I just spoke of.

At most, this exchange stands for the intuitive and unremarkable proposition that in a *non-infringement* context, when someone obtains a license from a stock photography website for a particular photograph, there is no separate application of a multiplier to the license fee to account for the image's scarcity because the license fee for that particular photograph reflects that photograph's fair market value—the effect of the image's scarcity on the price of the license is already included in the license fee. This is what Sedlik is referring to when he discusses negotiating a $6,000 license for a scarce image: scarcity is taken into account, but no "scarcity multiplier" is applied, because he is able to set an appropriate price as licensor to reflect fair market value.  But here, Sedlik is starting with the license fees of generic photographs, not the

10

particular photographs at issue, so he must account for the Photographs' scarcity in arriving at its
fair market value.

It is also vague and misleading when Defendants say that Sedlik created "this
methodology" solely for use in litigation. He certainly did not create the calculators on the stock
photography websites that he used to determine the baseline license type described in Exhibits H
and J to his Report. These quotes represent actual market rates charged by stock photography
agencies for rights-managed licenses. (Exhibit 5, Sedlik Depo. at 182:10-19; 223:20-224:18).
The foundation of Sedlik's methodology, then, consists of rates charged by independent third
parties—not anything "invented" by Sedlik.

Next, Defendants state that Sedlik's opinions should be excluded as unreliable because
his methodology: has no name, is not recognized or described in any treatise or professional
publication, is not generally accepted in the relevant professional community, and has no known
error rate. It is as if Defendants have simply run through the factors listed in *Daubert* like a
checklist, and decided that since Sedlik's methodology does not check certain boxes, it cannot be
reliable. Of course, the *Daubert* Court itself cautioned against such rote reasoning: "Many
factors will bear on the inquiry, and we do not presume to set out a definitive checklist or test."
509 U.S. at 593; *see also id.* at 594 ("The inquiry envisioned by Rule 702 is, we emphasize, a
flexible one.").

Indeed, Defendants challenge is basically that Sedlik's methodology does not conform to
the criteria courts have used for hard scientific experts, even though experts may testify about
many subjects that do not fall squarely in the scientific realm.  Defendants' checklist, which
consists of the four, non-exhaustive guideposts provided by *Daubert,* is "'neither necessarily nor
exclusively applies to all experts or in every case,' as the relevance of some factors can
'depend[] on the nature of the issue, the expert's particular expertise, and the subject of his
testimony.'" *Sardis v. Overhead Door Corp.*, 2021 WL 3699753, at *6 (4th Cir. Aug. 20, 2021)
(quoting *Kumho Tire*, 526 U.S. at 141, 150).

In their own Motion, Defendants acknowledge that "[w]here experiential expert

11

testimony 'does not rely on anything like a scientific method,' it is admissible if the expert 'explain[s] how [his] experience leads to the conclusion reached, why [his] experience is a sufficient basis for the opinion, and how [his] experience is reliably applied to the facts.'" (Exhibit 2, Mot. at 6 (quoting *United States v. Bynum*, 604 F.3d 161, 167 (4th Cir. 2010)). *See also Kumho Tire*, 526 U.S. at 156 ("[N]o one denies that an expert might draw a conclusion from a set of observations based on extensive and specialized experience."). This is why this very Court has previously found that Sedlik's methodology, drawn from his experience, is reliable. *Under a Foot,* 2017 WL 3593014, at *5 ("Rule 702 permits an expert to draw conclusions based primarily on experience, and the court concludes that Professor Sedlik's testimony is sufficiently reliable in this regard to support the jury's verdict.")

Sedlik has fulfilled all of these requirements, yet Defendants seek to muddy the analysis by improperly running checklist-style through the science-oriented *Daubert* factors. Such analysis should not be credited by the Court.

### D. Sedlik Applies a Scarcity Multiplier to a Generic Photograph to Arrive at a Range for the Fair Market Value of the Photographs

Defendants next appear to argue that there is no factual basis for Sedlik's application of a "scarcity multiplier" to the base actual damages in order to account for the scarcity of the Photographs in 2015. (Exhibit 2, Mot. at 13-15).

Their arguments are difficult to follow: first, Defendants appear to fault Sedlik for taking steps to confirm the assumption that high-quality Lykoi photographs were scarce in 2015, such as interviewing photographers and searching Getty Images. (*Id*. at 13-14). Then, in the next paragraph, they argue that "[a]n expert is not permitted to simply accept an assumption given to him without verifying the assumption." (*Id*. at 14). While it is true that "[i]t is an abuse of discretion to admit expert testimony which is based on assumptions lacking any factual foundation in the record," *Stecyk v. Bell Helicopter Textron, Inc.*, 295 F.3d 408, 414 (3d Cir. 2002), if there is indeed factual foundation for an assumption, then admitting an expert opinion based on that assumption is appropriate. *See Glass v. Anne Arundel Cty.*, 38 F. Supp. 3d 705, 715

12

(D. Md. 2014) *aff'd,* 716 F. App'x 179 (4th Cir. 2018) (Court allowed expert testimony based on assumptions, as the assumptions were supported by facts in the record); *see also McKiver v. Murphy-Brown,* LLC, 980 F.3d 937, 1012 (4th Cir. 2020) ("["[Q]uestions regarding the factual underpinnings of the expert witness' opinion affect the weight and credibility of the witness' assessment, not its admissibility." (quoting *Bresler v. Wilmington Trust Co.*, 855 F.3d 178, 195 (4th Cir. 2017)). And there is ample support in the record for the proposition that high-quality photographs of Lykoi were scarce in 2015, 2019, and remain scarce today.

Brittney Gobble and her husband, Johnny Gobble, developed the breed of Lykoi in 2012. (Exhibit 3, BGP Depo. at 49:13-50:5). The breeding program for the cats was designed by Johnny Gobble and the couple began selling the cats in 2012. (Exhibit 3, BGP Depo. at 203:10-204:7; Exhibit 5, J. Gobble Depo. at 35:10-12). This was an entirely new bread of cats that no one had ever seen before. (Exhibit 4, J. Gobble Depo. at 39:8-13). Since the Gobble's were the creators and one of the only people breeding the cats, people interested in purchasing a cat would buy a particular cat based on one of their photographs. (Exhibit 4, J. Gobble Depo. at 38:19-39:2). Breeding these cats was extremely exclusive, there were only fifteen breeders word-wide in 2015. (Exhibit 3, BGP Depo. at 125:5-14). Given this exclusivity, Brittney Gobble testified that photographs of the breed were scarce in 2015. (Exhibit 3, BGP Depo. at 148:14-19). Even into 2019, the breed of Lykoi itself and photographs of the breed were still scarce. (Exhibit 4, J. Gobble Depo. at 86:11-14; Exhibit 4, BGP Depo. at 150:6-9; Exhibit 6, Sedlik Depo. at 233:6-25). Additionally, Sedlik performed his own research to verify the scarcity of Lykoi photographs. Specifically, Sedlik conducted a search of at least three major stock photography agencies for quality photographs of Lykoi. (Exhibit 7, Sedlik Surrebuttal Report at 13; Exhibit 6, Sedlik Depo. at 234:10-235: 5 and 236:16-24). These searches confirmed that images of Lykoi remained scarce even today. *Id*. Sedlik also conducted a survey of the three most prominent cat photographers, each of who confirmed that photographs of Lykoi were very scarce in 2015. (Exhibit 5, Sedlik Depo., 232:19-233:25).

Based on testimony in the record and Sedlik's actions to confirm this accuracy, there is

13

significant support to show that quality photographs of Lykoi were scarce in 2015. Additionally, the fact that photographs of Lykoi remain scarce today reasonably shows that photographs were even more rare in 2015. The proper outlets for Defendants' arguments that the Lykoi photographs at issue in this case were not, in fact, scarce are cross-examination, competing evidence, and closing argument—not a motion to exclude Plaintiff's expert from testifying. *Atanassova,* 2021 WL 672929, at *4-5 (Court denying Plaintiff's *Daubert* Motion, stating that Plaintiff's arguments for exclusion were based on their disagreement with his conclusions, which go to the weight of his testimony not admissibility).

Defendants then fault Sedlik for not performing an economic analysis of demand and not being able to provide answers to their satisfaction when quizzed on the definition of economic terms at his deposition. (Exhibit 2, Mot. at 15-17). As Defendants concede, it is no surprise that Sedlik did not perform any economic analysis because he is "not an economist and has not taken any course in economics since college." (*Id* at 15). (Defendants surely would have criticized Sedlik if he had performed economic analysis of demand that Defendants seek by then attacking him for lacking the qualifications to do so). As stated above, there is ample evidence in the record to support a finding that high-quality photographs of Lykoi cats were scarce in 2015 at the time Defendants began to infringe BGP's copyrights. Should Defendants wish to argue that, to the contrary, there was abundant supply or a dearth of demand, they can certainly do so at trial. But the evidence does not support such an argument. That is likely why Defendants are so anxious to exclude Sedlik, but that is not a proper ground for exclusion.

Finally, Defendants offer a few scenarios that purport to demonstrate the "absurdity" of Sedlik's opinions. In reality, what these scenarios demonstrate is Defendants' failure to fully grasp Sedlik's methodology and its nuances. Defendants note that "Sedlik testified that he could not identify even a single transaction where a news media organization paid between $18 million and $30 million for a set of photographs." (Exhibit 2, Mot. at 18). Of course, Sedlik has not offered an opinion that a "single transaction" is appropriate in this case. As discussed above, Sedlik opines that 2,729 separate licenses would be required to account for all the infringing uses

14

by Defendants. (*See* Opposition, *supra*, p. 3-4; Exhibit 1, Report at Ex. L). The fact that these 2,729 licenses add up to a single, very large number is the result of Defendants' decisions to (1) infringe over 50 photographs (2) on over 50 different websites (3) on over 31,400 webpages and (4) to run their business through dozens of subsidiary entities—not because of any lack of analytical or methodological rigor by Sedlik. If there were fewer Defendants, or if Defendants had infringed fewer photographs on fewer websites, Sedlik's aggregate damages numbers would be smaller, but Defendants do not challenge the basic facts of what, how and where they infringed the copyrights in the Photographs.

Defendants' hypothetical involving the hiring of Annie Leibovitz and the purchase of ten Lykoi kittens is glib and uninformative. First, the evidence of Leibovitz's daily rate is inadmissible hearsay. Second, it only contemplates paying Leibovitz for her time, not for the rights-managed licenses that would likely be required to exploit the photographs on over 50 websites for multiple years. (Exhibit 8, Declaration of Jeffrey Sedlik (the "Sedlik Decl.")).

 **E.** **Sedlik's Calculation of the Fair Market Value of a Hypothetical License is Objective, Reasonable and Reliable**

Defendants' argue that Sedlik's Base Actual Damages opinion is "pure conjecture" as it relies on quotes from stock photography websites. To argue this, Defendants' cite to *Dash v. Mayweather*, stating that evidence of licensing fees paid to other artists for the use of other works may sometimes be sufficient to support a damages opinion. (Exhibit 2, Mot. at 19).  Since Sedlik does not provide any evidence of fees actually paid to other artists for licensing of their works, Defendants' argue that Sedlik's entire analysis is unreliable. (*Id.*)

However, nothing in *Dash* requires a plaintiff to show evidence of actual fees paid to other artists in order to successfully opine on damages, as Defendants' suggest. In fact, the Court in *Dash* expressly stated that "courts have recognized several methods for calculating the compensable loss suffered by a copyright owner as a result of infringement." 731 F.3d 303, 312 (4th Cir. 2013). In line with the method that Sedlik has used (and has been accepted) in numerous copyright infringement cases, Sedlik considers the general nature of the parties

15

involved (e.g. a similarly situated news organization and similarly situated photographer) in order to determine the applicable hypothetical licensing transaction based on the comparative stock photography license fee quotes in order to arrive at fair market value. To ensure objectivity and the most accuracy, Sedlik bases the license fee quotes  on comparative factors, such as the media in which each Photograph was reproduced, circulation, size, placement, and period of use. Further, as discussed below, numerous courts have substantively assessed Sedlik's use of fee quotes for generic photographs and then adjustments for scarcity to compute fair market value and have accepted and affirmed such method as admissible and reliable under Rule 702. As such, Sedlik's Base Actual Damages figure is far from "pure conjecture."

Next, Defendants argue that Sedlik improperly calculated the adjustment for fair market value for 2015 and 2017 based on a change in the market for license fees. However, Sedlik testified that he analyzed the price changes for sample licenses fees for 2015 and 2017 for the same image from the same vendor. (Exhibit 1, Report at 36; Exhibit I of Report; Exhibit 6, Sedlik Depo. at 196:17-201:24). Sedlik specifically chose a generic image from Getty Images and sampled licenses for comparative mediums (e.g. advertising, marketing). (Exhibit 1, Exhibit I of Report). Sedlik testified that he chose a stock image from Getty Images because all of the other image agencies watch how Getty's changes its pricing and then adjust their pricing accordingly. (Exhibit 5, Sedlik Depo. at 196:17-23). As the market follows the pricing of Getty Images, Sedlik's reliance on a stock photograph from Getty Images is clearly reliable. If Defendants have issues with Sedlik's choice of Getty Images, they are more than free to cross-examine Sedlik on his choices during trial. In addition, Sedlik has decades of experience in photography licensing and licensing transactions. Sedlik is capable and qualified to opine on changes in the market for licenses fees from 2015 to 2017.

### F.    Sedlik's Methodology Has Been Accepted By Numerous Courts

Defendants also argue that Sedlik's methodologies employed in this case have never been "properly challenged." Specifically, Defendants cite to the copyright infringement cases where

16

Sedlik's current methodologies have been used and accepted by courts. *See Leonard v. Stemtech International, Inc.*, 834 F.3d 376 (3d Cir. 2016), *Under a Foot Plant, Co. v. Exterior Design, Inc.*, 2017 WL 3593014 (D. Md. 2017), *Brittney Gobble Photo., LLC v. WENN, Ltd.*, 2019 WL 2446997 (E.D. Tenn. Feb. 19, 2019), and *D'Pergo Custom Guitars, Inc. v. Sweetwater Sound, Inc.*, 2020 WL 60351 (D.N.H. Jan. 6, 2020). Contrary to Defendants' argument, however, Sedlik's methodology in calculating the fair market value of a hypothetical license has survived repeated challenges, including in this Court. *See, e.g., Under a Foot*, 2017 WL 3593014, *4-5 (D. Md. 2017) (court denied defendant's *Daubert* challenge of Sedlik's methodology); *D'Pergo*, 2020 WL 60351, at *6-8 (same).

In arguing this, Defendants cite a number of procedural differences in the ways that Sedlik's methodologies have been challenged and argue that, because this case is procedurally distinct from these cases, Defendants' objections are different. However, the only difference between some of those cases and the current case is that Defendants are attempting to exclude Sedlik's opinion early on through a *Daubert* Motion (while Defendants in other cases waiting until trial or post-trial). The fact that Defendants are using a *Daubert* motion to attempt to exclude Sedlik's opinion does not change the fact that courts have performed the "gatekeeping" function of Rule 702 and, time and time again, have accepted the methods being used by Sedlik in the current matter as reliable and Defendants cite no authority to support such a distinction. More importantly, Sedlik's methodology has indeed survived pre-trial motion attacks. *See, e.g., D'Pergo*, 2020 WL 60351, at *6-8; *Navarro*, 2021 WL 868586, at *10-11.

In *Leonord*, the District Court specifically denied the Defendant's *Daubert* motion and held that Sedlik's method of using quotes received from stock photography agencies and averaging them to determine the fair market value was reliable. *Leonard v. Stemtech Health Scis., Inc.*, No. 08-067-LPS-CJB, 2013 WL 5311295, at *6 (D. Del. Sept. 23, 2013). The Third Circuit then affirmed the District Court's denial of Defendant's *Daubert* Motion, stating that Defendant's arguments go to the weight of Sedlik's opinion, rather than admissibility. *Leonard*, 834 F.3d at 391. Additionally, the Third Circuit substantively addressed Sedlik's use of a

17

scarcity multiplier and accepted such a method as a proper means to opine on the full fair market value, as the Court found it was not used for punitive measures. *Id*. at 393-94.

The Court's decision in *Navarro* is also illustrative and, despite Defendants' arguments, directly applicable to this case. Defendants' argue that Sedlik used a different methodology in *Navarro*. (Exhibit 2, Mot. at 22). However, Sedlik actually used the very same methodology as used in this case, and the Court accepted this methodology. In *Navarro*, Sedlik opined on the actual damages for the copyright infringement of photographs. *Navarro*, 2021 WL 868586 at *1-2. In order to determine actual damages, Sedlik obtained fee quotes from photographers and then averaged the quotes to produce the fair market value. *Id*. at *5. Although the Court excluded some of Sedlik's alternative methods as unreliable (the methods described by Defendants on page 22 of the Motion), the Court specifically accepted Sedlik's method of determining fair market value – the same method used in this case. *Id*. at *7.

Perhaps most persuasively, this Court accepted the very same methodologies that Sedlik employs in this matter. In *Under a Foot*, Sedlik was disclosed by the Plaintiff as its damages expert in a photography copyright infringement case. 2017 WL 3593014, at *1-2. Just as in *Navarro*, Sedlik obtained fee pricing from three reputable stock photography agencies to determine the fair market value. *Id*. at *5. In addition, Sedlik used a "competitive use multiplier" to determine the full fair market value of the photographs for a willing buyer's competitive use. *Id*. The District of Maryland Court held that Sedlik's methodology in determining actual damages was reliable and that Sedlik's use of a multiplier was acceptable due to Sedlik's reliance on his own professional and academic experience. *Id*. at *5-6.

Ultimately, Defendants attempt to amplify the procedural differences in each case to argue that this Court should not follow the many Courts that have accepted the very same methodologies employed by Sedlik in this case. As the methodologies used by Sedlik in this case have been accepted by numerous courts, this Court should reject Defendants' Motion.

### G.      Sedlik's Opinions Do Not Constitute Legal Conclusions

Defendants next argue that Sedlik's opinions on a number of issues equate to legal conclusions and are, thus, inadmissible. (Exhibit 2, Mot. at 22-23). These issues range from specifics regarding licenses to notice of infringement by Sinclair. By arguing that Sedlik is not capable of opining on these issues, Defendants fail to recognize Sedlik's qualifications and that he is not offering legal conclusions. Sedlik has been deemed a distinguished expert on photography licensing, licensing transactions, and copyright damages by numerous courts. See *Navarro*, 2021 WL 868586 at *3-4, *Leonard*, 2013 WL 5311295, at *5, *Karol W. Corp. v. Smith News Co., Inc.*,  2013 WL 12084485, at *4 (C.D. Cal. Aug. 23, 2013). Additionally, Sedlik is an academic who has taught courses to law students and legal professions on practical applications of copyright law in the visual arts and has been a frequent lecturer on copyright law at institutions such as Duke University and NYU Law School. (Exhibit 1, Report at 4). Most recently, Sedlik has been summoned by both the United State House of Representatives and United States Senate to testify on copyright law, copyright licensing, copyright management information, and online infringement. Additionally, the Librarian of Congress, Carla Hayden, has appointed Sedlik as an advisor on the modernization of the Copyright Office.

In addition to providing these opinions based on assumptions provided by counsel (as discussed below), Sedlik is using his education and academic background and decades of professional experience as a photographer and expert on licensing transactions to form his opinions. For example, Defendants argue that Sedlik should not be allowed to testify that Dr. Gobble clearly and unambiguously prohibited WENN from distributing the Photographs. (Exhibit 2, Mot. at 23). It seems quite absurd that Sedlik, who is the world's leading expert on the definitions and terms of art used in photograph licenses (his organizations created the standards used in the industry), the scope of those licenses, and the industry custom and practice on how photograph licenses are implemented and what rights are conveyed depending on the language of the license would not be permitted to opine on these issues.

Even if Sedlik was not qualified to testify to such opinions as listed in Defendants'

19

Motion, Sedlik is further offering these opinions based on assumptions provided by counsel, which counsel will then prove with evidence at trial. As such, Sedlik's opinions listed on pages 22-23 of Defendants' Motion should not be excluded and the Court should deny Defendants' Motion out right.

### H.     Sedlik's Opinions on Disgorgement of Profits

Defendants' final argument is a strawman. Defendants begin this section of their Motion by arguing that "Plaintiff is apparently offering Sedlik to testify to the amount of profits that Sinclair should disgorge to Plaintiff as part of Plaintiff's damages." (Exhibit 2, Mot. at 24). Then, five sentences later, Defendants contradict themselves and concede that Sedlik has acknowledged that he will not be testifying about the amounts of profits for disgorgement. *Id*.

Ultimately, Sedlik will only be narrowly testifying about a casual nexus between Defendants' infringement and profits received from advertisements on Defendants' websites. (Exhibit 1, Report at 38-39). Sedlik has explicitly rejected Defendants' notion that he will be testifying as to the amount of profits for disgorgement. As such, Defendants' final section of their Motion is moot and should be denied.

## IV.     CONCLUSION

Each and every one of Defendants' arguments fails to provide valid legal reasoning for Sedlik's opinions to be excluded.

WHEREFORE, Plaintiff requests that this Court enter an order denying Defendants' *Daubert* Motion to Exclude the Opinion Testimony of Jeffrey Sedlik in its entirety.

August 27, 2021

By:   */s/ Robert E. Allen*
Robert E. Allen

C. Justin Brown
Maryland State Bar No. 28110
brown@cjbrownlaw.com
Brown Law Firm
1 N. Charles St., Suite 1301

20

Baltimore, Maryland 21201
Telephone: (410) 244-5444
Facsimile: (410) 934-3208

Robert E. Allen (admitted *pro hac vice*)
Cal State Bar No. 166589
rallen@glaserweil.com
Thomas P. Burke Jr. (admitted *pro hac vice*)
Cal. State Bar No. 288261
tburke@glaserweil.com
Glaser Weil Fink Howard Avchen & Shapiro LLP
10250 Constellation Blvd., 19th Fl.
Los Angeles, CA 90067
Telephone: (310) 282-6280

*Counsel for Brittney Gobble Photography, LLC*

21

## **CERTIFICATE OF SERVICE**

I HEREBY CERTIFY, that on this 27th day of August 2021, a copy of the foregoing document was filed electronically. Notice of the filing will be sent to all parties who have appeared by operation of the Court's electronic filing system. Parties may access this filing through the Court's system.

*/s/ Robert E. Allen*
Robert E. Allen

2047508.3