IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND

|  |  |  |
|---|---|---|
| | * | |
| BRITTNEY GOBBLE PHOTOGRAPHY, LLC | * | |
| | * | |
| | * | |
| Plaintiff, | * | |
| v. | * | Civil Case No.: SAG-18-03403 (Lead Case) |
| | * | SAG-18-03384 |
| SINCLAIR BROADCAST GROUP, INC., *et al.*, | * | SAG-19-00559 |
| | * | SAG-19-00606 |
| | * | |
| Defendants/Third-Party Plaintiffs, | * | |
| v. | * | |
| | * | |
| USA ENTERTAINMENT NEWS, INC. d/b/a "WENN" and "WORLD ENTERTAINMENT NEWS NETWORK", | * | |
| | * | |
| | * | |
| Third-Party Defendant. | * | |
| | * | |

\*   \*   \*   \*   \*   \*   \*   \*   \*   \*   \*   \*   \*   \*   \*   \*

## MEMORANDUM OPINION

Brittney Gobble Photography, LLC ("BGP" or "Plaintiff") filed these lawsuits against Sinclair Broadcast Group, Inc. ("Sinclair") and several of its subsidiaries and affiliate stations (individually, the "Station Defendants" and collectively with Sinclair, "Defendants") for copyright infringement and violations of the Digital Millennium Copyright Act ("DMCA") under 17 U.S.C. §§ 1202(a) and (b).  Sinclair also filed a Third-Party Complaint against USA Entertainment News, Inc. d/b/a "WENN" and "World Entertainment News Network" ("WENN").  ECF 19.  The parties have filed cross-motions for summary judgment, which are now fully briefed.  ECF 168 (BGP's Motion), ECF 171 (Defendants' Opposition and Cross-Motion), ECF 183 (BGP's Reply and Opposition to Defendants' Cross-Motion), ECF 185 (Defendants' Reply).

Each side has also filed a *Daubert* motion—BGP's seeks to exclude Defendants' proposed expert, Gary Elsner, and Defendants' seeks to exclude BGP's proposed expert, Jeffrey Sedlik. ECF 163 (Defendants' motion to exclude Mr. Sedlik), ECF 166 (BGP's motion to exclude Mr. Elsner). Those motions are now fully briefed. ECF 169, 170, 181, 182. The Court has considered all of the pending motions, oppositions, replies, and the exhibits attached thereto. No hearing is necessary. *See* Loc. R. 105.6 (D. Md. 2021). For the reasons explained below, BGP's motion for summary judgment, ECF 168, will be DENIED except with respect to its argument on the Defendants' Fraud on the Copyright Office affirmative defense, which will be held in abeyance. Defendants' motion for summary judgment, ECF 171, will be GRANTED in part and DENIED in part as set forth herein. Further, the Court will GRANT in part and DENY in part Defendants' motion to exclude Mr. Sedlik's testimony and DENY BGP's motion to exclude Mr. Elsner's testimony.[1]

## I.     FACTUAL BACKGROUND

Johnny Gobble, a veterinarian, and his wife Brittney Gobble, a photographer, were among the first people to successfully breed a Lykoi cat. ECF 168-1 at 1; ECF 171-1 at 2. The Lykoi breed is a relatively new breed of cat with a distinctive, werewolf-like appearance. ECF 168-4 at 37-38 (Dr. Gobble Deposition); Second Am. Compl. ¶ 33 (Lykoi Cat Photographs). As the Gobbles began selling their Lykoi cats, Ms. Gobble would photograph them in order to advertise and promote the breed. ECF 168-4 at 37-38 (Dr. Gobble Deposition). In October, 2015, Ms. Gobble received copyright protection for various groups of photographs she had taken of the Lykoi

---

[1] Much of Plaintiff's briefing on the motions appears to be less than double-spaced and, therefore, in violation of Local Rule 102.2(b). As a result, several of those briefs are significantly over the page limits imposed by the local rules and this Court's orders. In the future, the parties should adhere to the rules and orders that govern the form and length of court documents, and if they anticipate a need to exceed an allotted page limit, they should file a motion for leave.

cats.  ECF 168-5-8.  According to BGP, that copyright protection covered 50 of the 51 photographs

at issue in this case.  ECF 168-1 at 2.  Ms. Gobble assigned her rights to the photographs to BGP.

ECF 171-36.

On November 2, 2015, Clare Penn, on behalf of WENN, contacted the Gobbles by email.

ECF 168-13.  Ms. Penn's email stated:

> I am contacting you on behalf of the World Entertainment News Network.  One of
> the world's leading press agencies, with offices based in London, New York, LA
> and Germany, we syndicate news/features/images to publications worldwide.
>
> I source photographers/images/features/news for WENN's A Different World of
> Photos department; here we focus on stories that are strong pictorially.
>
> I recently came across information regarding the Lykoi breed of cats; I would like
> to create a feature/news item for press regarding this unique breed . . . and wondered
> if it would be possible to get a selection of hi-res images to accompany editorial
> text? . . .
>
> Any images published are used in an editorial context only and accompanied by the
> relevant information regarding the breed; we do not allow images to be used out of
> context.

*Id.*  Dr. Gobble responded with the following email:

> I am writing for my wife's photos.  Here is what she sends to all requests for
> pictures:
>
> Here is a link to an album of some of my hi-res images that I give permission to be
> used.  I do not give permission for these images to be distributed, or to be used in
> an article (or other media) that is purposefully derogatory toward our breed . . . .
> Whenever possible, please credit images to "Brittney Gobble". . . .
>
> If you are going to use our photos, I would like you to state that we are breeding
> for health, the breed is a natural occurrence in the feral domestic cat population, the
> first w[]ere born in Vonore, TN or Sweetwater, TN (the towns are real close), and
> we love the public[']s positive response to the new breed.

ECF 168-14.  Ms. Penn responded: "Many thanks Johnny . . . I shall take a look at your website

and let you know if I need any more information."  ECF 168-15.

WENN took the photographs in the Dropbox link Dr. Gobble sent to Ms. Penn and made them available to its network of paying subscribers, including Sinclair.  On November 4, 2015, Scott Sistek, a reporter for KOMO News, downloaded copies of the photographs in the Drobpox folder.  ECF 168-16 at 26-27 (Sistek Deposition).  Mr. Sistek testified that WENN often put large amounts of substantive content in photographs' metadata fields, and that it was his practice to edit out that content to "put the text content of the story in a body field."  *Id.* at 21.  He did that here using a content management system called "Clickability" and published an article on the KOMO News website, ECF 171-35 (KOMO News Article), along with 12 other websites associated with stations that Sinclair had acquired from Fisher Communications.  ECF 168-16 at 33-37.  The article included an accompanying gallery of photographs that were credited to "WENN.com."  ECF 171-35.

On November 8, 2015, Ms. Gobble emailed KOMO's email address, writing:

> These images were not to be used without proper credits per the contract with which I allowed a stock website to use my images.  I expect that the proper by line credit be given, or my images removed as all these images are registered with the copyright office and my copyright is being violated.

ECF 168-19.  Mr. Sistek responded:

> I apologize for that, we truncated the caption and turned it into a news article on the site which does credit your work, but I see the truncation it took your name off the photo captions.  I will go back and add in credit on each photograph caption.  If that is not sufficient, please let me know and again I apologize for truncating too much in the gallery caption[.]"

*Id.*  Ms. Gobble responded: "I understand!  That is absolutely fine!  Thank you!"  *Id.*  Mr. Sistek replied, thanking Ms. Gobble, and indicating that he "added your credit and put a link to your Facebook page on all the captions now."  *Id.*  Ms. Gobble saw the revised captions.  ECF 168-10 at 143 (BGP 30(b)(6) Deposition).

On November 9, 2015, Amanda Ota, a producer at Sinclair's National Desk, emailed the

Gobbles requesting permission for Sinclair to use Ms. Gobble's photographs.  She wrote:

> My name is Amanda Ota and I'm an online news writer at Sinclair Broadcast
> Group.  I'm working on a write-up of your cats and was wondering if I may have
> permission to use the photos shared on your site across all platforms please?  We
> will be sure to credit you.

ECF 171-33.  Dr. Gobble responded the same day:

> You can use any photos from our face book and web page as long as your article
> portrays the Lykoi and the breeders in a positive way.  My wife has the photos
> copyrighted, and will refuse any usage if the article is negative toward us or the
> breed in any way.

*Id.*

On November 9, 2015, Ms. Ota published an article to the websites of fifty Sinclair stations

using the same body text and photographs that had appeared in Mr. Sistek's article.  ECF 168-35.

Thus, according to BGP, Ms. Ota used the photographs from the Dropbox link, rather than the

watermarked, low-resolution, photographs from BGP's Facebook page or website.  *Id.*  Sixteen of

the photographs included credit to "Brittney Gobble Photography via WENN.com[,]" and the

remaining photographs credited "WENN.com."  ECF 171-39.

On November 10, 2015, Elizabeth Faugl, an employee of Sinclair Communications, LLC,

independently re-published the same article Ms. Ota had published to two Sinclair station websites.

ECF 168-43.  These articles included four of the photographs with credit to "Brittney Gobble

Photography via WENN.com."  *Id.*

On November 12, 2015, the Gobbles wrote to WENN, demanding that WENN cease its

infringement.  ECF 168-25.  Shortly thereafter, WENN sent a "kill notice" email to a list of

"undisclosed recipients" directing "WENN Agents" to remove the images.  ECF 168-26.  The

parties dispute whether any of the Defendants received this email.  Ultimately, BGP sued WENN

in the United States District Court for the Eastern District of Tennessee and was eventually awarded a default judgment in the amount of $5,754,941.88. *Brittney Gobble Photography, LLC v. WENN Limited*, No. 3:16-CV-306-HSM-DCP, 2019 WL 2446997, at *11 (E.D. Tenn. Feb. 19, 2019). In November, 2018, BGP sued the Defendants here in four separate lawsuits, which are now consolidated.

## II.   ANALYSIS

The Court will first resolve the parties' *Daubert* motions before turning to the motions for summary judgment. At the outset, however, the Court recognizes that Defendants have raised a host of evidentiary objections (separate from their *Daubert* motion). *See* ECF 185-14. Because none of this Court's analysis relies on or references those contested pieces of evidence, however, the Court declines to address them at this time. The parties are, of course, free to raise these and any other proper objections as the case progresses, and the Court will address them if and when they become relevant.

### A. *Daubert* Motions

#### i. Legal Standard

Federal Rule of Evidence 702 governs the admissibility of expert witness testimony. A qualified expert may give testimony if:

> (a) the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue;
> (b) the testimony is based on sufficient facts or data;
> (c) the testimony is the product of reliable principles and methods; and
> (d) the expert has reliably applied the principles and methods to the facts of the case.

Fed. R. Evid. 702. In essence, the trial court must ensure the proposed expert testimony "both rests on a reliable foundation and is relevant to the task at hand." *Daubert v. Merrell Dow Pharm.*,

*Inc.*, 509 U.S. 579, 597 (1993).  In *Daubert*, the Supreme Court provides five nonexhaustive factors a court may weigh in making this assessment: (1) "whether a theory or technique . . . can be (and has been) tested," (2) "whether the theory or technique has been subjected to peer review and publication," (3) "the known or potential rate of error," (4) "the existence and maintenance of standards controlling the technique's operation," and (5) whether the technique or theory has gained "general acceptance."  509 U.S. at 592–94; *Pugh v. Louisville Ladder, Inc.*, 361 F. App'x 448, 452 (4th Cir. 2010).  However, ultimately, the inquiry is "a flexible one" and relevant factors can vary with the needs of each case.  *Daubert*, 509 U.S. at 594.

For the proffered evidence to be sufficiently reliable it "must be derived using scientific or other valid methods" and not based on mere "belief or speculation."  *Casey v. Geek Squad Subsidiary Best Buy Stores, L.P.*, 823 F. Supp. 2d 334, 340 (D. Md. 2011) (first quoting *Oglesby v. Gen. Motors Corp.*, 190 F.3d 244, 250 (4th Cir. 1999); then quoting *Bryte ex rel. Bryte v. Am. Household, Inc.*, 429 F.3d 469, 477 (4th Cir. 2005)).  The court's analysis focuses on experts' methods, not their conclusions, but an expert opinion that relies on "assumptions which are speculative and not supported by the record," is inadmissible.  *Tyger Const. Co. Inc. v. Pensacola Const. Co.*, 29 F.3d 137, 142 (4th Cir. 1994); *see also Gen. Elec. Co. v. Joiner*, 522 U.S. 136, 146 (1997) ("[N]othing in either *Daubert* or the Federal Rules of Evidence requires a district court to admit opinion evidence that is connected to existing data only by the *ipse dixit* of the expert.  A court may conclude that there is simply too great an analytical gap between the data and the opinion proffered.").  For the proffered opinion to be relevant, it "must be 'sufficiently tied to the facts of the case that it will aid the jury in resolving a factual dispute.'"  *Casey*, 823 F. Supp. 2d at 340 (quoting *Daubert*, 509 U.S. at 591).  Expert testimony "is presumed to be helpful unless it concerns matters within the everyday knowledge and experience of a lay juror."  *Anderson v. Home Depot*

*U.S.A., Inc.*, No. GJH-2615, 2017 WL 2189508, at \*4 (D. Md. May 16, 2017) (quoting *Kopf v. Skyrm*, 993 F.2d 374, 377 (4th Cir. 1993)).

The proponent of the expert testimony bears the burden of establishing admissibility, or "coming forward with evidence from which the trial court could determine that the evidence is admissible under *Daubert*." *Anderson*, 2017 WL 2189508, at \*3 (quoting *Main St. Am. Grp. v. Sears, Roebuck, & Co.*, No. CIV JFM-08-3292, 2010 WL 956178, at \*3 (D. Md. Mar. 11, 2010)); *see also Casey*, 823 F. Supp. 2d at 340; *Daubert*, 509 U.S. at 592 n. 10 (explaining admissibility must be established by a "preponderance of proof").

In determining the admissibility of expert testimony, the court considers two "guiding, and sometimes competing, principles." *Westberry v. Gislaved Gummi AB*, 178 F.3d 257, 261 (4th Cir. 1999). On the one hand, Rule 702 was "intended to liberalize the introduction of relevant expert evidence," and the court need not ensure the expert's proposed testimony is "irrefutable or certainly correct." *Id.* (explaining that admissible expert testimony can still be vigorously tested before the jury by "cross-examination, presentation of contrary evidence, and careful instruction on the burden of proof" (quoting *Daubert*, 509 U.S. at 596)). On the other hand, "due to the difficulty of evaluating their testimony, expert witnesses have the potential to 'be both powerful and quite misleading.'" *Id.* (quoting *Daubert*, 509 U.S. at 595). The court must determine whether the disputed expert testimony "has greater potential to mislead than to enlighten." *Id.* If so, the testimony should be excluded. *Id.*; *see also Casey*, 823 F. Supp. 2d at 340 (noting such testimony would be barred by Federal Rule of Evidence 403).

### ii. Jeffrey Sedlik

Although the Court has no doubt about Mr. Sedlik's qualifications, or that his testimony may have been appropriately admitted in other infringement cases, the Court finds that his

methodology was not reliably applied to the facts of this case and that, therefore, aspects of his proffered testimony must be excluded under Federal Rule of Evidence 702 and the *Daubert* standard. Although BGP had a long history of licensing the photographs at issue here for free, or for nominal fees, Mr. Sedlik proposes to tell a jury that, in his expert opinion, the fair market value of the licensing fees BGP lost as a result of Defendants' infringement is between $18,636,647.50 and $31,061,079.10. ECF 163-3 at 38 (Sedlik Report). That conclusion defies common sense. And while courts may not (and this Court will not here) exclude an expert simply because they disagree with the expert's conclusion, *Daubert*, 509 U.S. 595, a close look at Mr. Sedlik's methodology reveals that it was not reliably applied to the facts at issue here.[2] At bottom, Mr. Sedlik makes two fundamentally flawed assumptions in applying his methodology to this case. First, he assumes that in order for the Defendants to license the photographs at issue from BGP, they would have needed to purchase at least 2,729 separate, one-year, licenses from BGP. And second, he assumes that because there were relatively few Lykoi cats in existence at the time the articles were published, and relatively few available pictures of them, that the fair market value of those photographs would have been between three and five times the price of a non-Lykoi cat photograph. Those assumptions, along with several others described below, are unsupported by the facts, and therefore require the Court to exclude Mr. Sedlik's testimony as to BGP's actual damages.

### 1. Lost Licensing Fee Approach to Actual Damages

"The Copyright Act entitles a copyright owner to recover 'the actual damages suffered by him or her as a result of the infringement[.]'" *Dash v. Mayweather*, 731 F.3d 303, 312 (4th Cir.

---

[2] As explained below, there are also aspects of Mr. Sedlik's methodology itself that the Court finds flawed—or, at least, that are insufficiently explained in his report.

2013) (quoting 17 U.S.C. § 504(b)).  While there are several methods of calculating actual damages in copyright infringement cases, "the primary measure of recovery is the extent to which the market value of the copyrighted work at the time of the infringement has been injured or destroyed by the infringement."  *Fitzgerald Publishing Co., Inc. v. Baylor Publishing Co., Inc.*, 807 F.2d 1110, 1118 (2d Cir. 1986).  That is an objective inquiry, not a subjective one.  *Dash*, 731 F.3d at 312.

One frequently used method to calculate a copyrighted work's fair market value at the time of the infringement is called the lost licensing fee approach.  Under that approach, actual damages are calculated by evaluating "what a willing buyer would have been reasonably required to pay a willing seller for [the] plaintiffs' work."  *Id.* at 313 (quoting *Jarvis v. K2 Inc.*, 486 F.3d 526, 533 (9th Cir. 2007)) (alteration in original).  "'The question is not what the owner would have charged,' nor what the infringer might have been willing to pay.  Rather, the objective inquiry focuses on the fair market value of the work as 'negotiated between a willing buyer and a willing seller' contemplating the use the infringer made."  *Id.* (quoting *On Davis v. The Gap, Inc.*, 246 F.3d 152, 166, 172 (2d Cir. 2001)).

### 2.  Mr. Sedlik's Methodology

Mr. Sedlik attempts to calculate BGP's actual damages using the lost licensing fee approach.  ECF 163-3 at 34 (Sedlik Report).  He first found three different photographs of non-Lykoi cats and "obtained comparative stock photography license fee quotes from three stock photography agencies."[3]  *Id.*  He then averaged those quotes and adjusted the average downward

---

[3] Defendants' experts dispute the reasonableness of several assumptions made by Mr. Sedlik to obtain those quotes—for example, his assumptions on circulation, size, placement, and period of use, each of which affected the ultimate license fee quote.  *See, e.g.*, ECF 169-4 at 16-18 (Riley Report).  For purposes of deciding this motion, though, the Court assumes that, even if Defendants' experts are correct, those assumptions were not so unreliable that they justify Mr. Sedlik's exclusion.

by 9.15% because, in Mr. Sedlik's view, the 2017 market in which he obtained the quotes was 9.15% more expensive than the 2015 market in existence at the time of Defendants' alleged infringement.[4]  *Id.* at 36-37.  This calculation produced Mr. Sedlik's "Average Market Rate, Per Year (2015)," which he determined was $589.73 for a single, one-year, license to use one of the photographs.  ECF 163-8.  Then, Mr. Sedlik determined that Defendants would have needed 2,729 separate one-year licenses to use BGP's photographs as they did.  ECF 163-10.  But since many of the Defendants used the photographs for more than one year, Mr. Sedlik then multiplied the price of each license unit ($589.73) by the number of years of alleged infringing use for each of the 2,729 licenses (in other words, this was measuring the number of times each one-year license would need to have been renewed).  *Id.*  Those calculations yielded a base actual damages figure of $6,212,215.82.  *Id.*  By the Court's count, that means that Mr. Sedlik concluded that Defendants would have needed to purchase 10,534 "license units" (6,212,215.82 divided by 589.73) in order to permit their uses of BGP's photographs.

Next, Mr. Sedlik applied a "scarcity multiplier" because in his view, "few if any other photographers or stock photo agencies offered quality photographs of Lykoi cats."  ECF 163-3 at 37 (Sedlik Report).  According to Mr. Sedlik, "[s]carce images typically demand much greater license fees than common images, often 3 to 5 times the fee for a common usage."  *Id.* at 38.  Therefore, Mr. Sedlik multiplied $6,212,215.82 by three and five, to reach an actual damages range of between $18,636,647.50 and $31,061,079.10.  *Id.*

---

[4] Defendants also contest the reliability of the methodology Mr. Sedlik used to determine that the 2017 market was more expensive than the 2015 market because he compared the 2015 value of a single stock photograph to the 2017 value of the same photograph.  ECF 163-1 at 19-20.  While the Court has concerns about the reliability of such a conclusion based on Mr. Sedlik's sample size of a single photograph, the Court again assumes without deciding that this method was not so unreliable that it, on its own, justifies Mr. Sedlik's exclusion.  In any event, in this instance his market assumption ultimately worked in Defendants' favor.

### 3.   Reliability of the Application of Mr. Sedlik's Methodology

#### a.   Licensing Structure

As explained above, Mr. Sedlik purports to use the lost license fee approach to attempt to calculate BGP's actual damages.  His task, therefore, was to determine "what a willing buyer would have been reasonably required to pay a willing seller" for the images at issue.  *Dash*, 731 F.3d at 313.

A major flaw in Mr. Sedlik's approach is his incorrect assumption that each of the Defendants would have separately licensed each of the photographs.  This simply ignores the business model of a global media company—or, for that matter, any "willing buyer."  *See Concord Boat Corp. v. Brunswick Corp.*, 207 F.3d 1039, 1057 (11th Cir. 2000) (holding that an expert's testimony should have been excluded because the expert had not considered the economic realities of the relevant market).  Clearly, an administrative catastrophe would ensue if each of Sinclair's subsidiaries and affiliates were responsible for negotiating its own licensing agreements for each image it uses.  As Mr. Sedlik's calculations aptly demonstrate, the sheer cost of such a model would preclude its utility.  Put simply, no willing buyer (or related group of willing buyers) would agree to purchase 2,729 separate licenses costing a total of between 18 and 31 million dollars (over several years) for permission to use 50 photographs of Lykoi cats.  At that cost, any media company would forego the photographs (or the entire article).

Of course, if a group of related corporate defendants approached BGP seeking a bulk license to allow the use of all the photographs at issue across many stations' platforms, it would be perfectly reasonable for BGP to demand more compensation than the cost of a single license for use of a single photograph.  However, it would be equally unreasonable for BGP to demand separate one-year licenses, at full cost, for each station's use of each image.  The lost license fee

approach is meant to determine the *reasonable* fair market value of the license fees that would have been required to use the injured plaintiff's work.  Because Mr. Sedlik has simply multiplied the assumed fair market value of a single license by the number of separate licenses that would be needed for each station's use of each photograph, his conclusion is categorically *unreasonable*.

Accordingly, Mr. Sedlik has not reliably applied the lost license fee approach because he has not come remotely close to determining "what a willing buyer would have been reasonably required to pay" BGP for the use of these images.  *Dash*, 731 F.3d at 312.  Mr. Sedlik's actual damages conclusions, therefore, violate Rule 702 and the *Daubert* standard.

### b.  Licensing History

Because Mr. Sedlik attempted to use the lost license fee approach to determine BGP's actual damages, he did not base his analysis on BGP's long history of distributing the images at issue for free, ECF 163-24 at 123 (BGP 30(b)(6) Deposition), or its history of licensing the photographs through REX Features, which generated a total of $306.03 over approximately 15 months.  ECF 163-3 at 28 (Sedlik Report); ECF 163-15 at 296 (Sedlik Deposition); ECF 170 at 8. The parties, therefore, dispute the reliability of Mr. Sedlik's methodology insofar as it disregards BGP's actual licensing history.  *See* ECF 163-1 at 9-11; ECF 170 at 8-9.

There is "no requirement that actual damages be calculated based on a plaintiff's own history of licensing fees."  *Leonard v. Stemtech International, Inc.*, 834 F.3d 376, 391 (3d Cir. 2016).  And per-use approaches can be acceptable methods of determining actual damages. *Navarro v. Proctor & Gamble Co.*, No. 1:17-cv-406, 2021 WL 868586, at *6 (S.D. Ohio Mar. 8, 2021).  For example, under the lost license fee approach, "calculating the 'fair market value' of a license for each unauthorized use is a 'recognized approach for calculating damages,' that is only inappropriate if there is 'no realistic prospect whatsoever' that the plaintiff could have negotiated

a per-use licensing fee." *Id.* (quoting *Bruce v. Weekly World News, Inc.*, 310 F.3d 25, 29-30 (1st Cir. 2002)) (internal citations and alterations omitted).

At this stage, the Court does not have enough information before it to determine whether there was any "realistic prospect" that BGP "could have negotiated a per-use licensing fee." *Id.* While Mr. Sedlik has not reliably applied the lost license fee approach here, the Court does not, at least at this point, conclude that it was unreliable to use some version of that approach as a method of calculating BGP's actual damages. In other words, Mr. Sedlik's actual damages conclusions must be excluded because he has not reliably applied the lost license fee approach, not because that approach is, itself, unreliable. Accordingly, the fact that Mr. Sedlik did not use BGP's licensing history as a baseline for his actual damages conclusions is not a basis on which to exclude his testimony.

### c. Scarcity Multiplier

Aside from simply asserting that scarce images are "often 3 to 5 times" more valuable than non-scarce images, Mr. Sedlik's report contains no explanation for why he uses three to five, rather than any other numerical range. Moreover, Mr. Sedlik testified that he understands the term "scarce" to refer to a situation where "there's not enough images to satisfy demand[.]" ECF 163-15 at 279. His report contains no explanation for his apparent conclusion that there was an imbalance between the supply of Lykoi cat photographs and the demand for them, let alone any explanation for why that purported imbalance justified an increase in their value of three to five times the value of a non-scarce cat photograph. While those omissions are likely the result of Plaintiff's counsel's instruction to Mr. Sedlik to assume that the photographs were both rare and scarce, ECF 163-3 at 11 (Assumption M), experts must verify the assumptions they are given—especially assumptions like this one, which had a monumental impact on Mr. Sedlik's calculation

14

of BGP's actual damages. *FedEx Ground Package Sys. v. Applications Int'l Corp.*, 695 F. Supp. 2d 216, 224 (W.D. Pa. 2010) (excluding an expert report based on assumed facts the expert "could have and should have independently verified."); *JMJ Enterprises, Inc. v. Veneto Italian Ice, Inc.*, No. 97-CV-0652, 1998 WL 175888, at *8 (E.D. Pa. Apr. 15, 1998) (excluding an expert's testimony regarding a company's projected future sales because he "did nothing to bridge the 'analytical gap' between [plaintiff's] actual sales and his projection."); *Mosaid Techs. Inc. v. LSI Corp.*, No. 10-192-RGA, 2014 WL 807877, at *2-3 (D. Del. Feb. 28, 2014) (excluding expert testimony on lost profits because the expert relied on assumptions in a business plan provided to him by the plaintiff, without independently verifying those assumptions).

Mr. Sedlik offers two ways in which he purportedly verified the assumption that photographs of Lykoi cats were both rare and scarce. First, he writes in his surrebuttal report that a search for "lykoi" on www.gettyimages.com yielded only 17 photographs, whereas a search for "cat" returned over 400,000 photographs. ECF 163-14 at 13 (Sedlik Surrebuttal Report). This search occurred on June 21, 2019—two months after Mr. Sedlik issued his initial report—so it could not have supported the conclusions he reached in his initial report. *Id.* Regardless, though, Mr. Sedlik's search demonstrates nothing about the demand for the respective photographs and, correspondingly, their value. Second, Mr. Sedlik testified at his deposition that, after he issued his reports in this case, he spoke to three photographers who confirmed his belief that photographs of Lykoi cats were rare. ECF 163-15 at 176 (Sedlik Deposition). Putting aside the fact that these anecdotal conversations occurred after Mr. Sedlik formed his opinions and issued his reports in this case, the conversations also do not shed any light on the images' value. At best, they show that other industry experts agreed that there were few available Lykoi cat photographs in 2015.

But that does not mean that the photographs at issue here were, therefore, three to five times more valuable than the non-Lykoi cat images Mr. Sedlik used to obtain the license fee quotes.

To make matters worse, it does not appear to the Court (at least at this stage) that there is any evidence in the record to support Mr. Sedlik's conclusion that the demand for Lykoi cat photographs outpaced the supply of them so significantly that their value was three to five times what it otherwise would have been.  For example, in *Leonard*, a Third Circuit case affirming the denial of a motion for new trial that challenged the district court's admission of Mr. Sedlik's testimony, there was evidence in the record that the photographs at issue were "unique and sought after because there were very few photographers who had the technical skill necessary to produce such work."  834 F.3d at 382.  Even the defendant in that case had admitted that the photos were "extremely valuable."  *Id.*  In contrast, here not only did Mr. Sedlik fail to independently verify the assumption given to him by Plaintiff's counsel, but, on the present record, that assumption appears baseless.  BGP may, of course, try to prove this at trial, but the Court cannot allow an expert to testify that the images are three to five times more valuable than any other image when neither he nor anyone else has provided any basis for that conclusion.

Mr. Sedlik's conclusions that the images at issue were "scarce"—and that their scarcity justified a three to five time increase in their value—appears to rest on nothing more than his "subjective belief or unsupported speculation."  *Daubert*, 509 U.S. at 590.  Because those opinions fall short of the standards set forth in Rule 702 and *Daubert*, they must be excluded.

### 4.   Legal Conclusions

Defendants object to many of Mr. Sedlik's opinions because they "actually constitute legal conclusions and are, therefore, inadmissible."  ECF 163-1 at 22.  The Court agrees.

"[O]pinion testimony that states a legal standard or draws a legal conclusion by applying law to the facts is generally inadmissible."  *United States v. McIver*, 470 F.3d 550, 562 (4th Cir. 2006).  Legal conclusions are identified by "determining whether 'the terms used by the witness have a separate, distinct and specialized meaning in the law different from that present in the vernacular.'"  *Id.* (quoting *United States v. Barile*, 286 F.3d 749, 760 (4th Cir. 2002)).

Defendants point to the following list of Mr. Sedlik's opinions that, they argue, constitute inadmissible legal conclusions:

- Plaintiff has sole discretion to determine the license fee to be paid by licensees. ECF 163-3 at 28 (Sedlik Report).

- In an email exchange between Johnny Gobble and WENN whereby WENN licensed the Photographs from Ms. Gobble, Dr. Gobble clearly and unambiguously prohibited WENN from distributing the Photographs. *Id.* at 28-29.

- The license extended to WENN in this email exchange contained five conditions. *Id.* at 30.

- Dr. Gobble did not grant WENN the right to sublicense the cat photographs to third parties. *Id.*

- Sedlik's various interpretations of the scope of the purported license. *Id.* at 31-32.

- Sinclair infringed on Plaintiff's copyright. *Id.* at 34.

- Sinclair recklessly, intentionally and willfully infringed on Plaintiff's copyrights. *Id.* at 40-42.

- Sinclair knowingly committed a DMCA violation. *Id.* at 43.

- Sinclair committed over 7,000 copyright violations. *Id.* at 44.

- Sinclair was put on notice that it was infringing on Plaintiff's copyrights when Sinclair received a subpoena in 2017 in the Tennessee Litigation. ECF 163-14 (Sedlik Surrebutal Report).

- The purportedly false photo credits harmed Plaintiff. *Id.* at 13-14.

- Watermarks are considered copyright management information under 17 U.S.C. § 1202. *Id.* at 14.

- Plaintiff is entitled to recover statutory damages at the highest rate (*i.e.* statutory damages that are triggered by proof of the defendant's "willfulness"). ECF 163-3 at 40-45 (Sedlik Report).

ECF 163-1 at 23. The Court agrees that each of these opinions constitutes an impermissible legal conclusion.

Plaintiff argues that "[i]t seems quite absurd that Sedlik, who is the world's leading expert on the definitions and terms of art used in photograph licenses . . ., the scope of those licenses, and the industry custom and practice on how photograph licenses are implemented and what rights are conveyed depending on the language of the license would not be permitted to opine on these issues." ECF 170 at 19. Plaintiff misunderstands the nature of Mr. Sedlik's conclusions. Mr. Sedlik is free to testify about his knowledge and expertise on photograph licenses, the typical scope of those licenses, and industry customs and practices. What he may not do, however—and what his report impermissibly does at times—is apply the facts in this case to the law. For example, the conclusion that the license between BGP and WENN contained five conditions, or that "Defendants acted with reckless disregard for BGP's copyrights, knowingly and willfully infringing on BGP's copyrights," are not "factual opinions but rather bald conclusions" about the ultimate legal issues in this case. *Navarro*, 2021 WL 868586, at *11. Mr. Sedlik may testify to his industry expertise, but he may not simply parrot BGP's legal arguments and lend them the imprimatur of expert testimony.

### 5. Disgorgement of Profits

Plaintiff also seeks Mr. Sedlik's expert testimony on the "causal nexus between Defendants' infringement and profits received from advertisements on Defendants' websites." ECF 170 at 20. Because the Court will grant Defendants' motion for summary judgment on the

issue of profit damages, the Court need not address the issue of whether Mr. Sedlik should be permitted to testify on the causal nexus between the Defendants' alleged infringement and the advertising revenue they collected in connection with the articles at issue.

*       *       *

In sum, Mr. Sedlik may testify about the methodology he used to arrive at the fair market value of a license to use one of the images at issue.  He may not, however, testify: that the fair market value of BGP's lost licensing fees is between $18,636,647.50 and $31,061,079.10; that the Defendants would have needed 2,729 separate licenses to use the images; that the images were scarce; or that the images were three to five times more valuable than the stock photographs Mr. Sedlik used to obtain his license fee quotes.  Additionally, while he may testify about his expertise in the photography industry, and the common norms and practices in that industry, he may not draw legal conclusions by applying the facts in this case to the law as he understands it.

### iii.  Gary Elsner

Defendants' expert Gary Elsner was retained to rebut the proffered testimony of Mr. Sedlik.  ECF 169 at 4-5.  BGP now asks the Court to exclude Mr. Elsner's testimony because it "is unhelpful and irrelevant because it relates entirely to the licensing and valuation of stock photographs" (Mr. Elsner's area of expertise), whereas, according to BGP, the photographs in this case are not stock photographs.  ECF 166 at 2.

As an initial matter, while BGP argues that Mr. Elsner's testimony would be "irrelevant" because it would only relate to the licensing and valuation of stock photographs, Mr. Sedlik's methodology also relies exclusively on the valuation of stock photographs.  ECF 163-3 (Sedlik Report).  Thus, although the Court has substantially limited Mr. Sedlik's proffered testimony, if

he testifies, Mr. Elsner's uncontested expertise in stock photography licensing and valuation is unquestionably relevant to rebut Mr. Sedlik's methodology.

The parties also dispute whether the photographs at issue here are stock photographs. ECF 166 at 5; ECF 169 at 9-10.  Because BGP argues they are not, BGP argues Mr. Elsner is unqualified to testify about them.  No matter which side is correct, it is simply not true that Mr. Elsner's expertise is limited to the valuation and licensing of stock photographs.  ECF 169 at 12-13 (listing cases on which he has worked in the last 10 years that do not involve stock photography); ECF 169-12 at 8 (Elsner Report: "My consulting services have included . . . Valuation of stock photo collections *as well as personal photography collections*.") (emphasis added).

Regardless, these disputes are red herrings.  As BGP has made clear in its advocacy on Mr. Sedlik's behalf, and as explained above, it is perfectly permissible under the lost licensing fee approach to use the fair market valuation of stock photographs to approximate the actual damages caused by infringing uses of non-stock photographs.  Both sides have hired experts to try to do just that.  ECF 163-3 (Sedlik Report using license fee quotes for stock photographs as the basis for his actual damages calculations); ECF 169-12 at 26-27 (Elsner Report attempting to calculate the fair market value of the photographs based on (1) their actual history of being licensed as stock photographs and (2) a hypothetical "microstock" licensing model).  Therefore, whether or not Mr. Elsner's expertise is limited to stock photography, his testimony is unquestionably relevant and potentially helpful to the jury.[5]

---

[5] While it may be moot given this Court's limitations on Mr. Sedlik's proffered testimony, the only substantive aspect of Mr. Elsner's report that BGP challenges is his opinion on the use of scarcity multipliers.  ECF 166 at 7.  The only basis for that challenge is "Elsner's knowledge of multipliers . . . is based upon caselaw from over fifteen years ago[,]" and that he "ha[s] not kept current with the legal developments regarding multipliers[.]"  *Id.* at 7-8.  Whether a damages multiplier is

Accordingly, BGP's motion to exclude his testimony will be denied.[6]

### B.  Motions for Summary Judgment

The parties have filed cross-motions for summary judgment on BGP's copyright infringement claims and its DMCA claims.  This Court will grant in part and deny in part each motion and will address the copyright infringement claims before turning to the DMCA claims.

### i.  Legal Standard

Under Rule 56(a) of the Federal Rules of Civil Procedure, summary judgment is appropriate only "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  The moving party bears the burden of showing that there is no genuine dispute of material facts.  *See Casey*, 823 F. Supp. 2d at 348 (citing *Pulliam Inv. Co. v. Cameo Props.*, 810 F.2d 1282, 1286 (4th Cir. 1987)).  If the moving party establishes that there is no evidence to support the non-moving party's case, the burden then shifts to the non-moving party to proffer specific facts to show a genuine issue exists for trial.  *Id.* The non-moving party must provide enough admissible evidence to "carry the burden of proof in [its] claim at trial."  *Id.* at 349 (quoting *Mitchell v. Data Gen. Corp.*, 12 F.3d 1310, 1315-16 (4th

---

legally appropriate under prevailing caselaw is a question for this Court, not for Mr. Elsner or any other expert.  Mr. Elsner's citation to *Stehrenberger v. J.R. Reynolds Tobacco Holdings Inc.*, 335 F. Supp. 2d 466 (S.D.N.Y. 2004) was to discuss that decision's impact on the stock photography industry, not to opine on the legal propriety of damages multipliers.  ECF 169-12 at 43.  In any event, to the extent the issue of a multiplier remains relevant after the exclusion of Mr. Sedlik's anticipated testimony, Mr. Elsner may testify about whether, in his opinion, a multiplier is necessary to approximate the actual damages BGP suffered in this case, and his allegedly deficient knowledge of the caselaw or legal developments on that topic has nothing to do with whether he is qualified to value those damages.

[6] The parties dispute the admissibility of a transcript of Mr. Elsner's testimony in his deposition in the case of *D'Pergo Custom Guitars, Inc. v. Sweetwater Sound, Inc.*, No. 1:17-CV-000747-LM (D.N.H.).  Because this Court has not relied on that testimony, the Court declines to resolve the question of its admissibility.

Cir. 1993)).  The mere existence of a scintilla of evidence in support of the non-moving party's position will be insufficient; there must be evidence on which the jury could reasonably find in its favor.  *Id.* at 348 (citing *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 251 (1986)).  Moreover, a genuine issue of material fact cannot rest on "mere speculation, or building one inference upon another."  *Id.* at 349 (quoting *Miskin v. Baxter Healthcare Corp.*, 107 F. Supp. 2d 669, 671 (D. Md. 1999)).

Additionally, summary judgment shall be warranted if the non-moving party fails to provide evidence that establishes an essential element of the case.  *Id.* at 352.  The non-moving party "must produce competent evidence on each element of [its] claim."  *Id.* at 348-49 (quoting *Miskin*, 107 F. Supp. 2d at 671).  If the non-moving party fails to do so, "there can be no genuine issue as to any material fact," because the failure to prove an essential element of the case "necessarily renders all other facts immaterial."  *Id.* at 352 (quoting *Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23 (1986); *Coleman v. United States*, 369 F. App'x 459, 461 (4th Cir. 2010) (unpublished)).  In ruling on a motion for summary judgment, a court must view all of the facts, including reasonable inferences to be drawn from them, "in the light most favorable to the party opposing the motion."  *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587-88 (1986) (quoting *United States v. Diebold, Inc.*, 369 U.S. 654, 655 (1962)).

### ii.  Copyright Infringement (Count I)

#### 1.  Prima Facie Elements of Direct Copyright Infringement

"To establish a claim for copyright infringement a plaintiff must prove that it owned a valid copyright and that the defendant copied the original elements of that copyright."  *Humphrys & Partners Architects, L.P. v. Lessard Design, Inc.*, 790 F.3d 532, 537 (4th Cir. 2015).  The Court addresses these elements in turn.

22

### a. Ownership

Under 17 U.S.C. § 410(c), "[i]n any judicial proceedings the certificate of a registration made before or within five years after first publication of the work shall constitute prima facie evidence of the validity of the copyright and of the facts stated in the certificate."

BGP has proven that it owns valid copyright registrations for 50 of the 51 photographs at issue in this case.  BGP has four copyright registrations, each effective October 30, 2015, which was within five years of the photographs' stated first publication.  ECF 168-5-8.  Each of the registrations issued in Ms. Gobble's name, but she then assigned the rights, title, and interest in and to the registrations and underlying works to BGP.  ECF 168-9.  While Defendants challenge the validity of one of the copyright registrations (that challenge is addressed below), they do not dispute that the four registrations, valid or not, encompass 50 of the 51 photographs at issue here.  Accordingly, for 50 of the 51 photographs at issue here, BGP has satisfied the ownership prong.

### b. Copying

"Copying can be proven through direct or circumstantial evidence." *Humphrys & Partners Architects*, 790 F.3d at 537.  "[T]he Copyright Act does not require that the infringer know that he is infringing or that his conduct amount to a willful violation of the copyright owner's rights." *CoStar Grp., Inc. v. LoopNet, Inc.*, 373 F.3d 544, 549 (4th Cir. 2004).  However, copyright infringement "nonetheless requires conduct by a person who causes in some meaningful way an infringement." *Id.*  In the context of the Internet, that volitional requirement is distinct from "passive ownership and management of an electronic Internet facility[.]" *Id.*  In other words, the Copyright Act requires a level of volition that goes beyond serving as a mere "*conduit* of information and data that connects users over the Internet." *Id.* at 550-51 (emphasis in original).  Rather, "[t]here must be actual infringing conduct with a nexus sufficiently close and causal to the

illegal copying that one could conclude that the machine owner himself trespassed on the exclusive domain of the copyright owner." *Id.* at 550.

Defendants argue that, with respect to 22 defendants, there is no evidence that they engaged in volitional activity sufficient to constitute direct infringement. Plaintiff responds that "the word 'volition in the copyright context does not really mean an 'act of willing or choosing' or 'an act of deciding,' but merely the unremarkable proposition that proximate causation historically underlies copyright infringement liability no less than other torts." *Bell v. Wilmott Storage Servs., LLC*, 12 F.4th 1065, 1081 (9th Cir. 2021) (quotations and citations omitted). While that statement is true, the volition requirement is not a nullity—it requires some conduct sufficient to demonstrate that the alleged infringer proximately caused the alleged harm to the copyright owner. Thus, on the one hand "a website or service that provides only a platform for third-party users to upload, download, and share content, *i.e.*, merely using the platform as a vehicle, has not engaged in volitional conduct . . . because it is the users who cause infringement." *Id.* On the other hand, "one who 'exercised control' or 'selected any material for upload, download, transmission, or storage' has acted volitionally." *Id.* (quoting *VHT, Inc. v. Zillow Grp., Inc.*, 918 F.3d 723, 732 (9th Cir. 2019)). In *Bell* for example, the plaintiff met the volition requirement by demonstrating that the defendant "hosted the . . . photo on its servers in a manner that was accessible to the public." *Id.* In *CoStar*, by contrast, the Fourth Circuit held that an internet service provider did not engage in volitional conduct where a third-party user posted copyrighted images that were displayed on the defendant's website. *CoStar*, 373 F.3d at 550.

Plaintiff acknowledges that the only people who actively posted the articles were Mr. Sistek (an employee of Sinclair Media of Seattle, LLC), Ms. Ota (an employee of Sinclair), and Ms. Faugl (an employee of Sinclair Communications, LLC). ECF 168-1 at 5 ("Sistek had posted

24

the Original Article not only to the KOMO News website but also on the websites of twelve other Sinclair stations."); ECF 168-1 at 5 ("Ota distributed the New Article to all fifty of the Station Defendants' websites[.]"); ECF 168-1 at 6 ("Faugl . . .published the Revised Article to two station websites[.]").  The question here, then, is whether any Defendants other than Sinclair Media of Seattle, LLC, Sinclair, and Sinclair Communications, LLC engaged in volitional conduct sufficient to be held liable for direct infringement.  In other words, did those Station Defendants function more like an independent website that stored and displayed copyrighted works (as in *Bell*), or more like a conduit where third parties posted the infringing material (as in *CoStar*)?

Plaintiff has not put forward any evidence that would allow a reasonable jury to conclude that the other 22 Defendants engaged in the requisite volitional conduct to be held liable for direct infringement.  Plaintiff argues that these Station Defendants are "not 'third parties' or 'third-party users[,]' [r]ather, they are employees of parent or sister entities, posting on each other's websites for their mutual benefit."  ECF 183 at 2-3.  And, without citation to any evidence, Plaintiff asserts that they "assumed responsibility for and maintained the server from which BGP's Infringing photographs were publicly displayed."  *Id.* at 3.  None of that demonstrates the requisite volitional conduct.  The fact that the Station Defendants assumed responsibility for the content on their websites says nothing about whether that content was posted or maintained by virtue of their volitional acts.  The Defendants' evidence, which BGP leaves uncontested, suggests it was not.

Sinclair's Chief Digital Officer, Kevin Cotlove, testified that, with respect to the stations where Sistek initially published the photographs, the images were stored on a server owned and controlled by Clickability.  ECF 185-2 at 45-46 (Cotlove Deposition).  When asked whether they were "also stored locally on hard drives at each of the stations[,]" he responded "[n]ot that we have records of."  *Id.* at 46.  Counsel for BGP followed up, "But you don't know?[,]" and Mr. Cotlove

responded, "Don't know." *Id.*  Similarly, with respect to the stations where Ota and Faugl published the photographs (via the Storyline software), the images were stored on servers in the Amazon Web Services "ecosystem." *Id.*  When asked whether these stations stored the images locally, Mr. Cotlove testified that, like the images published through Clickability, he did not know for sure but that Defendants had no records showing the stations stored the photographs locally. *Id.* at 46, 49-50.

The facts show, then, that just three actors—Mr. Sistek, Ms. Ota, and Ms. Faugl—published the articles and images across all the Defendants' websites.  BGP has not marshalled any evidence to demonstrate that any of the Defendants (other than those that employed Mr. Sistek, Ms. Ota, and Ms. Faugl) engaged in any volitional conduct in connection with the alleged infringement.  Therefore, while BGP has demonstrated a prima facie case of direct copyright infringement against Sinclair Media of Seattle, LLC, Sinclair, and Sinclair Communications, LLC, the Defendants' motion for summary judgment must be granted with respect to the other 22 Station Defendants.[7]

## 2.  Affirmative Defenses

### a.  License

Defendants argue that their use of the photographs was permitted by two separate licenses granted by BGP—the first, from BGP to WENN, and the second from BGP to Ms. Ota.  ECF 171-1 at 12-23.  BGP argues that Defendants' use of the images "was in excess of or inconsistent with

---

[7] While some of the Station Defendants shared links to the photographs on their social media accounts, ECF 171-1 at 12 n.4, the Second Amended Complaint does not allege that this conduct constituted infringement, and BGP does not argue here that such conduct satisfies the volitional conduct requirement.

any purported licenses." ECF 168-1 at 12. As explained below, the parties have raised a factual dispute as to the scope of both potential licenses.

### i. WENN License

#### 1. Preclusion

Plaintiff first argues that Defendants are barred by both claim and issue preclusion from arguing that the WENN license was a valid license because a federal court in Tennessee "found that WENN had not obtained any license from Gobble and was, thus, a copyright infringer." ECF 183 at 3.

Issue preclusion (or collateral estoppel) bars "successive litigation of an issue of fact or law actually litigated and resolved in a valid court determination essential to the prior judgment, even if the issue recurs in the context of a different claim." *Hatley v. Watts*, 917 F.3d 770, 777 (4th Cir. 2019) (quoting *Taylor v. Sturgell*, 553 U.S. 880, 892 (2008)).

Plaintiff's issue preclusion argument fails. The question of whether WENN had obtained a license from BGP was not "actually litigated" in the Tennessee litigation because the court there merely accepted the truth of the allegations in the Complaint after WENN defaulted. *Brittney Gobble Photography, LLC*, 2019 WL 2446997, at *6; *see Russell v. Atl. Cas. Ins. Co.*, No. RDB-06-2162, 2007 WL 9780535 (D. Md. July 30, 2007) (holding under Maryland law that a previous default judgment had no preclusive effect because the relevant issue had not been "actually litigated" and there had been no evidentiary development or fact-finding); *In re O'Quinn*, 401 B.R. 739, 743 (M.D.N.C. 2009) ("Ordinarily under federal law, a judgment entered by default will not support the application of collateral estoppel because '[i]n the case of a judgment entered by . . . default, none of the issues is actually litigated.'") (alteration in original) (quoting Restatement (Second) of Judgments § 27 cmt. E (1982)) (collecting cases).

Plaintiff's argument for claim preclusion fares no better.  Claim preclusion applies when there is: "(1) a final judgment on the merits in a prior suit; (2) an identity of the cause of action in both the earlier and later suit; and (3) an identity of parties or their privies in the two suits."  *Martin v. American Bancorporation Retirement Plan*, 407 F.3d 643, 651 (4th Cir. 2005) (quoting *Pueschel v. United States*, 369, F.3d 345, 354-55 (4th Cir. 2004)).

Clearly the defendant in the Tennessee litigation (WENN) is not identical to Defendants here, and, therefore, claim preclusion may only apply if there is privity between WENN and these Defendants.  For purposes of claim preclusion, "[t]here are three generally recognized categories of non-parties who will be considered in privity with a party to the prior action and who will therefore be bound by a prior adjudication: (1) a non-party who controls the original action; (2) a successor-in-interest to a prior party; and (3) a non-party whose interests were adequately represented by a party to the original action."  *Id.*  Defendants here did not control the original action, they are not WENN's successor-in-interest, and WENN certainly did not adequately represent Defendants' interests because it defaulted.

Accordingly, neither claim preclusion nor issue preclusion bars Defendants' argument that they received a license from WENN to use the photographs at issue.

### 2.  Scope of the WENN License

The parties dispute whether the WENN license permitted Defendants' eventual use of the images.  ECF 171-1 at 12-15; ECF 183 at 6-8.  Ultimately, the dispute turns on whether BGP knew, or should have known, that WENN was asking permission to syndicate the photographs in a way that made them available to its network of subscribers.  BGP argues that Dr. Gobble's November 2, 2015 email stating "I do not give permission for these images to be distributed"

clearly prohibited WENN's eventual circulation of the images to its subscribers, including Sinclair. ECF 183 at 7.

The parties agree that, because Dr. Gobble was located in Tennessee when he responded to Clare Penn's initial email request for the images, Tennessee law applies to the construction of the license agreement.[8]  ECF 183 at 6; ECF 171-1 at 13 n.5.  "Under general principles of contract law, a contract must result from a meeting of the minds of the parties in mutual assent to the terms." *Sweeten v. Trade Envelopes, Inc.*, 938 S.W.2d 383, 386 (Tenn. 1996).  "[W]hether a meeting of the minds occurred is a question of fact."  *Hazlett v. Family Dollar Stores of Tenn., Inc.*, No. 3:20-cv-00804, 2021 WL 663665, at \*6 (M.D. Tenn. Feb. 19, 2021) (quoting *Wofford v. M.J. Edwards & Sons Funeral Home Inc.*, 490 S.W.3d 800, 807 (Tenn. Ct. app. 2015)).

It is unclear here whether the parties reached a meeting of the minds and, if they did, on what terms they agreed.  Defendants argue Dr. Gobble should have known that WENN's business model included syndicating photographs to a network of subscribers, especially because Ms. Penn stated in her initial email that "we syndicate news/features/images to publications worldwide." ECF 171-1 at 13.  On the other hand, BGP argues that, whatever WENN's business model, it should have interpreted Dr. Gobble's response as a prohibition on circulating the images to its

---

[8] Although this dispute does not appear to depend on what law is applied, the Court agrees that Tennessee law is likely applicable.  In a federal question case where a state law issue arises, the district court "applies the choice-of-law rules of the state in which it sits unless a compelling federal interest directs otherwise."  *Baker v. Antwerpen Motorcars Ltd.*, 807 F. Supp. 2d 386, 389 n.13 (D. Md. 2011).  Maryland "follows the doctrine of *lex loci contractus*, applying the substantive law of the place where the contract was formed."  *RaceRedi Motorsports, LLC v. Dart Mach., Ltd.*, 640 F. Supp. 2d 660, 665 (D. Md. 2009).  Under Maryland law, "the place of formation is said to be the state 'where the last act necessary to make the contract binding occurs.'" *Baker DC, LLC v. Baggette Constr., Inc.*, 378 F. Supp. 3d 399, 406 (D. Md. 2019) (quoting *Montage Furniture Servs., LLC v. Regency Furniture, Inc.*, 966 F. Supp. 2d 595, 523 (D. Md. 2013)).

subscribers.  ECF 183 at 7.  And to the extent WENN had any confusion about Dr. Gobble's response, BGP argues it should have sent a clarifying email.  *Id.*

Accordingly, a jury needs to decide whether a license was formed, when it was formed, and on what terms it was formed.

### 3.   Revocability and Consideration

Underscoring the parties' dispute about whether a license was formed, and, if so, what its terms were, BGP argues that assuming a license was granted, it was not supported by consideration and was, therefore, revocable at will.  Specifically, the parties argue about whether WENN's acceptance of Dr. Gobble's restriction that WENN could not use the images in an article "that is purposefully derogatory toward our breed" constituted consideration for use of the images.  ECF 183 at 9-10.

Under Tennessee law, "consideration exists when the promisee does something that it is under no legal obligation to do or refrains from doing something which it has a legal right to do." *Brown Oil Co. v. Johnson*, 689 S.W.2d 149, 151 (Tenn. 1985).  "Any consideration, however small, will support a promise."  *Smith v. Riley*, No. E2001-00828-COA-R3-CV, 2002 WL 122917, at *3 (Tenn. Ct. App. Jan. 30, 2002).

Again, a factual dispute exists as to whether a license was formed and, if so, what its terms were.  The Court will note, however, that an agreement not to disparage the Lykoi breed can certainly constitute consideration for use of BGP's photographs.  BGP argues that, "by abiding by the non-disparagement condition, WENN did not actually refrain from doing something that it had a legal right to do: WENN was and is still free to disparage the Gobbles or the Lykoi breed as much as it wants—just not while using the Photographs."  ECF 183 at 9-10.  This argument misses the point; of course WENN was and is free to disparage the Lykoi breed without using the

photographs. But assuming a license was created, WENN was presumably foregoing the legal right it would have had in the absence of this restriction to disparage the Lykoi breed *while* using the photographs. While a jury will need to sort through the factual issues of whether a license was created and what its terms were, that promise can constitute consideration on WENN's behalf.

### 4.   Sistek's Revisions and Ratification

The parties agree that after communicating with Ms. Gobble, Mr. Sistek added her name back to the photographs, along with a link to her Facebook page, after he had initially published them without credit to her. BGP argues that those corrections only lasted for one day, ECF 183 at 12, whereas Defendants argue they lasted for much longer. ECF 171-1 at 19. The competing evidence on both sides of this issue is thin, at best, but as far as the Court can tell, the parties have raised a factual dispute on this question which they can seek to resolve at trial.

Further, Defendants argue that when Ms. Gobble was communicating with Mr. Sistek about these credits, she "must have realized . . . that KOMO had obtained the Photographs from WENN. Ms. Gobble never expressed to Sistek that WENN had no authority to provide her images to KOMO or that he must remove the name 'WENN.com' from the photo credits." *Id.* Accordingly, Defendants argue that Ms. Gobble ratified Defendants' publishing the photographs after having received them from WENN. Ms. Gobble testified, however, that on November 8, 2015, she "contacted [KOMO] because my credit was not given. I had not made the connection of who WENN was. I assumed they had licensed through REX Features and had done the licensing and all that correctly and I said it needs to be corrected." ECF 168-10 at 142 (BGP 30(b)(6) Deposition).

Again, this dispute raises questions of Ms. Gobble's state of mind and her credibility that must be decided by a factfinder. There is undisputed evidence in the record that Ms. Gobble

communicated with Mr. Sistek about the credits attached to the photographs, including while those credits attributed the photographs to "WENN.com."  *Id.*; ECF 171-35 at 5 (showing original posting of the article with photograph credit to "WENN.com.").  The jury may well believe Ms. Gobble that she did not realize KOMO received the photographs from WENN.  But a reasonable jury could also find that she must have known that fact, and that her failure to tell Mr. Sistek that WENN had no authority to provide BGP's photographs to KOMO ratified KOMO's publication of them.

### ii.  Ota License

BGP argues that Ms. Ota exceeded the scope of the license it granted to her by using the non-watermarked, high-resolution, photographs that were contained in the Dropbox link Dr. Gobble sent to WENN, rather than the watermarked, low-resolution, photographs Dr. Gobble had given her permission to use.  Moreover, BGP argues that although Ms. Ota had promised to give BGP credit for the photographs, she changed the credits from Mr. Sistek's revised article (giving credit to BGP), replaced them with either "By WENN.com" or "Brittney Gobble Photography via WENN.com," and deleted the link to Ms. Gobble's Facebook page.  ECF 168-1 at 5-6.

The parties have raised multiple factual disputes regarding the Ota License.  First, the parties disagree whether the license granted to Ms. Ota conferred any meaningful rights at all—in other words, if Defendants already had license (via WENN) to use the photographs Ms. Ota used, then the scope of the license granted to her is irrelevant.  ECF 183 at 12.  As explained above, that issue depends on questions of fact that must be resolved by a jury.  Second, the parties disagree as to how many of the photographs Ms. Ota used also appeared (in low-resolution and watermarked copies) on Ms. Gobble's website and Facebook page.  ECF 171-1 at 20; ECF 168-1 at 15.  As Defendants point out, Ms. Gobble has been inconsistent on that question.  *Compare* ECF 168-1 at

15 ("[S]ixteen of the Photographs were not embodied in Social Media Images[.]") *with* ECF 168-54 (Decl. of Brittney Gobble ¶ 5: "13 of the Photographs embodied in the Dropbox Images were not embodied in the Social Media Images.").   For their part, Defendants argue that 43 of the photographs Ms. Ota used also appeared on Ms. Gobble's website and Facebook pages, leaving just 8 that did not.[9]  ECF 171-1 at 20.

The resolution of that dispute matters, because it relates to an important legal question raised by the Defendants: whether, as a matter of copyright law, BGP had the ability to grant a license to use only certain *copies* (*i.e.* the low-resolution, watermarked, copies of the images) of copyrighted works, or whether that requirement was merely a contractual covenant, the violation of which would not give rise to an infringement claim.  ECF 185 at 10 (collecting cases).  Plaintiff's briefing ignores this issue completely.  The cases on which Defendants rely, however, appear persuasive.  *Graham v. James*, 144 F.3d 229, 236-37 (2d Cir. 1998) (requirement to provide authorship credit was a covenant, limiting the plaintiff to a breach of contract claim); *Davis v. Tampa Bay Arena, Ltd.*, 8;12-CV-60-T-30MAP, 2013 WL 3285278, at *7-9 (M.D. Fla. June 27, 2013) (requirement that licensee only use low-resolution photographs was a covenant, limiting the plaintiff to a breach of contract claim); *Yellowpages Photos, Inc. v. YP, LLC*, 418 F. Supp. 3d 1030, 1049 (M.D. Fla. 2019) *aff'd sub nom Yellow Pages Photos, Inc. v. YP, LLC*, 856 F. App'x 846,

---

[9] Defendants argue that they are entitled to summary judgment because, "[t]here is no evidence that the other Photographs at issue were *not* also on her website, or that unwatermarked versions of the Photographs were not on her website.  Plaintiff cannot say what was on the website because Plaintiff didn't keep a copy before she sold it and did not keep a record of which photos were posted and taken down."  ECF 171-1 at 20 (emphasis in original).  While there is certainly no *proof* of these facts, there is *evidence* that could allow a reasonable jury to determine that the photographs on BGP's website and Facebook page were different, in both number and quality, than those in the Dropbox folder obtained from WENN.  *See, e.g.*, ECF 168-10 at 79 (BGP 30(b)(6) Deposition: Q: "The pictures that were in your Dropbox folder, did you ever display them on your website? A: Not those same versions.  Only the watermarked low resolution versions would have been displayed on my website.").

863 (11th Cir. 2021) (license provision requiring copyright notice was a covenant).  Nonetheless,

because the relevance of this legal question depends on several factual findings—for example, that

Ms. Ota did not already have permission via the WENN license to use the photographs from the

Dropbox folder, and that, assuming she did not, she used photographs that did not appear on BGP's

website or Facebook page—the Court will defer resolution of this question until the factual record

establishes its relevance.

### b.  Willful Infringement

In order to demonstrate that an infringement under Section 504(c)(2) was willful, the

plaintiff must show that the infringer "'either had actual knowledge that it was infringing the

owner's copyrights or acted in reckless disregard of those rights.'"  *Patrick Collins, Inc. v.*

*Gillispie*, No. 11-CV-01776-AW, 2012 WL 666001, at *3 (D. Md. Feb. 23, 2012) (quoting

*Lowry's Reports, Inc. v. Legg Mason, Inc.*, 271 F. Supp. 2d 737, 753 (D. Md. 2003)); *Lyons P'ship,*

*L.P. v. Morris Costumes, Inc.*, 243 F.3d 789, 799-800 (4th Cir. 2001).  Accordingly, willfulness

"'hinges on the alleged infringer's state of mind—whether the infringer knew that its particular

use violated the owner's copyrights or willfully ignored the possibility.'"  *Patrick Collins, Inc.*,

2012 WL 666001, at *3 (quoting *Lowry's Reports, Inc.*, 271 F. Supp. 2d at 753).

BGP argues that Defendants' infringement was willful for five primary reasons: (1) that

Defendants were put on notice of their alleged infringement when WENN allegedly sent a "kill

notice" to Sinclair; (2) that a 2017 subpoena sent to Sinclair in connection with the Tennessee

litigation put Sinclair on notice of Defendants' alleged infringement; (3) that the Defendants did

not promptly remove the infringing photographs from public display; (4) that Ms. Ota intentionally

removed credits to the Plaintiff on the photographs; and (5) that Defendants continued to use the

photographs on their social media pages until May, 2019. The Court addresses these issues in turn.

### i. Kill Notice

According to BGP, after the articles had been posted to the Station Defendants' websites, Ms. Gobble contacted WENN on November 12, 2015 to demand that WENN cease its infringement. ECF 168-1 at 6. That conversation apparently prompted WENN to distribute a kill notice to "its affiliates that had received the infringing images, including Sinclair." *Id.* at 7. Defendants deny ever receiving the kill notice.

This issue was previously litigated in the parties' discovery dispute over whether Sinclair should be sanctioned for spoliating emails that, according to BGP, would have shown that it received the kill notice. Then-Magistrate Judge Deborah L. Boardman wrote a detailed opinion concluding that "[t]here is no evidence that the emails at issue actually existed, and there is an inference that they did not exist." ECF 113 at 1. As Judge Boardman noted, "it is not apparent from the face of the kill notice exactly who received it." *Id.* at 11-12. BGP relied there, as it does here, on deposition testimony from WENN's CEO Lloyd Beiny purporting to state that WENN sent the kill notice to Sinclair. Judge Boardman ruled, though, that Mr. Beiny's testimony was not admissible, and that, even if it were, his statements "would not support more than the possibility that Sinclair may have received the notice." *Id.* at 14. Finally, Judge Boardman found that Sinclair had put forth "credible evidence that it never received the Kill Notice." *Id.* at 14-15.

The only evidence that was not before Judge Boardman on which BGP now relies is an interrogatory response from WENN stating that "on or around November 12, 2015, WENN removed the Article from its inventory of content and sent an urgent 'kill notice' to media outlets

and agents with instructions to delete the Article."[10]   ECF 183 at 10 n.3.   Like the deposition testimony discussed above, this response is not evidence that Sinclair *received* the kill notice.   And in the absence of any evidence to support that assertion, no reasonable jury could find that Sinclair received the notice.

### ii.   2017 Subpoena

The parties do not dispute, however, that Sinclair received a subpoena in September, 2017, in connection with BGP's lawsuit against WENN in Tennessee.   BGP argues that the subpoena should have put BGP on notice that it was infringing Ms. Gobble's copyrights.   Defendants argue that "[t]he Subpoena did not state that Sinclair or any of the other defendants were violating Plaintiff's copyrights."   ECF 171-1 at 18.   Moreover, Defendants argue that when "Sinclair's paralegal called Plaintiff's counsel . . . to find out 'what this was all about,' he did not tell her that Sinclair had violated Plaintiff's copyrights, that Sinclair's use of the Photographs was infringing, or that Plaintiff might sue Sinclair and its stations."   *Id.*   Finally, Defendants suggest that Judge Boardman already ruled that the subpoena did not put Sinclair on notice of their alleged infringement.   *Id.*

The Court disagrees with Defendants' characterization of Judge Boardman's ruling with respect to the subpoena.   Judge Boardman was deciding a spoliation dispute and, thus, whether the subpoena "should have put Sinclair on notice of possible *litigation* against it" such that Sinclair should have known it had an obligation to preserve certain evidence.   ECF 113 at 17 (emphasis added).   Here, however, the question is whether the subpoena put Sinclair on notice that its use of BGP's images was infringing.   To be sure, Judge Boardman recognized that Sinclair "believed it

---

[10] Defendants argue this response is inadmissible.   ECF 185 at 8.   Because the response is not evidence that Sinclair received the notice, the issue of its admissibility is irrelevant.

had permission—indeed had paid WENN to obtain permission—to print the Images." ECF 113 at 17. And Sinclair is, of course, free to prove that at trial. The question whether the subpoena put Sinclair on notice of its alleged infringement, however, involves questions about Sinclair's credibility and state of mind that must be decided by a factfinder.

### iii.   Prompt Removal

BGP argues that it took several months for Defendants to remove the allegedly infringing photographs even after they had been sued in this case. ECF 168-1 at 14. Defendants argue, however, that it only took a few weeks. ECF 171-1 at 19. According to Defendants, "Sinclair required time to retain outside counsel, investigate the allegations in the complaint and determine how to properly remove the Photographs so that no metadata would be lost and evidence would be preserved." *Id.* Competing evidence could support either side's position. *See* ECF 171-1 at 19; ECF 185 at 10-12; ECF 183 at 11. Therefore, the promptness with which Defendants removed the allegedly infringing photographs—and what that says about Defendants' level of willfulness— is a factual dispute that must be decided by the jury.

### iv.   Ota's Alterations

BGP argues that before Ms. Ota posted the article to each of the Station Defendants' websites, she intentionally removed the credits to BGP, including the link to Ms. Gobble's Facebook page. ECF 183 at 27. BGP argues that 35 of the photographs were credited to "WENN.com," whereas sixteen were credited to "Brittney Gobble via WENN.com." *Id.* They argue, therefore, that Ms. Ota must have knowingly falsified the credits. *Id.* Defendants, however, argue that the changed credits were the result of a technical error when the photographs and their metadata were migrated from the Clickability platform to Storyline that was not discovered until

discovery in this case. ECF 171-1 at 37. A factfinder must, therefore, decide what happened, and whether any of Ms. Ota's actions are indicative of Defendants' alleged willfulness.

### v.   Defendants' Social Media Pages

According to BGP, Defendants continued to display the allegedly infringing images on their social media pages until May, 2019. ECF 168-1 at 21. Defendants argue that "the Complaint does not allege infringement . . . because of any social media posts by Defendants." ECF 171-1 at 19. Defendants are correct that that Complaint does not allege that these social media posts constitute separate acts of infringement. However, BGP is free to attempt to prove to the jury that the fact that Defendants did not remove the photographs from their social media pages until May, 2019 is somehow indicative of Defendants' willfulness.

### c.   Distribution of Copyrighted Material

The Copyright Act recognizes distribution as one of the exclusive rights of copyright, which includes the rights to "distribute copies . . . of the copyrighted work to the public by sale or other transfer of ownership, or by rental, lease, or lending." 17 U.S.C. § 106(3). "[T]o establish 'distribution' of a copyrighted work, a plaintiff must show that an infringed work was disseminated 'to the public.'" *Hotaling v. Church of Jesus Christ of Latter-Day Saints*, 118 F.3d 199, 203 (4th Cir. 1997) (quoting 17 U.S.C. § 106(3)). Distribution of a work is distinct from "displaying" that work. *See Advance Magazine Publishers, Inc. v. Leach*, 466 F. Supp. 2d 628, 637 (D. Md. 2006).

BGP relies on the Fourth Circuit's decision in *Hotaling* to argue that Defendants should be held liable for distributing BGP's photographs. ECF 183 at 14. In *Hotaling*, the Fourth Circuit held that "[w]hen a public library adds a work to its collection, lists the work in its index or catalog system, and makes the work available to the borrowing or browsing public, it has completed all the steps necessary for distribution to the public[.]" *Hotaling*, 118 F.3d at 203. BGP analogizes

the facts in *Hotaling* to the facts here, arguing that Defendants have "downloaded copies of the Photographs from WENN (added the Photographs to their collection), created articles with the Photographs on their Clickability and Storyline content management systems (listed them in their index or catalog system), and posted the articles for the public to access (made the Photographs available to the browsing public)."  ECF 183 at 14.

"While this Court is bound by Fourth Circuit precedent, the Court does not read *Hotaling* as broadly as [BGP] urges."  *BMG Rights Mgmt. (US) LLC v. Cox Communications, Inc.*, 149 F. Supp. 3d 634, 666 (E.D. Va. 2015), *aff'd in part, rev'd in part*, 881 F.3d 293 (4th Cir. 2018). Courts around the country "have struggled to define the scope of the holding in *Hotaling*."  *Sony Music Entertainment v. Cox Communications, Inc.*, 464 F. Supp. 3d 795, 810 (E.D. Va. 2020); *see Atlantic Recording Corp. v. Howell*, 554 F. Supp. 2d 976, 982 (D. Ariz. 2008) (collecting cases). However, courts in this Circuit, and outside of it, have held that "*Hotaling* did not announce a rule of general applicability, but instead articulated a principle that applies only in cases where it is impossible for a copyright owner to produce proof of actual distribution."  *Sony Music Entertainment*, 464 F. Supp. 3d at 810 (quoting *BMG Rights Mgmt. (US) LLC*, 149 F. Supp. 3d at 666); *see Arista Records, Inc. v. MP3Board, Inc.*, No. 00 Civ. 4660, 2002 WL 1997918, at *4 (S.D.N.Y. Aug. 29, 2002) ("While a copyright holder may not be required to prove particular instances of use by the public when the proof is impossible to produce because the infringer has not kept records of public use, *see Hotaling*, 118 F.3d at 204, in the present case there has been no showing that the record companies did not have access to such data.").  Here, of course, "proof of actual distribution" would not be impossible for BGP to demonstrate, if any such distribution occurred.

"The general rule, supported by the great weight of authority, is that infringement of the distribution right requires an actual dissemination of either copies or phonorecords." *BMG Rights Mgmt. (US) LLC*, 149 F. Supp. at 666 (quoting *Atlantic Recording Corp.*, 554 F. Supp. 2d at 981 (internal quotations and alteration omitted)) (collecting cases).  Numerous courts have recognized that this reading of the distribution right comports with Section 106(3)'s explanation of that right, whereas *Hotaling*'s "making available" standard does not.  *Id.* (collecting cases); *Atlantic Recording Corp.*, 554 F. Supp. 2d at 983 (collecting cases).  Thus, "Section 106(3) requires a distribution 'by sale or other transfer of ownership, or by rental, lease, or lending.'"  *Id.*  BGP does not even attempt to offer such evidence.  This Court must, therefore, grant summary judgment in Defendants' favor on the issue of distribution.

### d.  Fair Use

Defendants argue that, even if they infringed BGP's copyrights, their use of the copyrighted works should be considered "fair use."  Under 17 U.S.C. § 107, "the fair use of a copyrighted work . . . for purposes such as criticism, comment, news reporting, teaching . . . scholarship, or research is not an infringement of copyright."  The statute provides four factors to evaluate when considering whether a use of a copyrighted work constitutes a "fair use": (1) the purpose and character of the use, including whether such use is of a commercial nature or is for nonprofit educational purposes; (2) the nature of the copyrighted work; (3) the amount and substantiality of the portion used in relation to the copyrighted work as a whole; and (4) the effect of the use upon the potential market for or value of the copyrighted work.  17 U.S.C. § 107(1)-(4).  These factors must be "weighed together, in light of the purposes of copyright."  *Campbell v. Acuff-Rose Music, Inc.*, 510 U.S. 569, 576 (1994).  While the Supreme Court recently emphasized that "fair use depends on the context[,]" *Google LLC v. Oracle America, Inc.*, 141 S. Ct. 1183, 1199 (2021),

historically, the first and fourth factors have received primary focus. *Philpot v. Media Research Center, Inc.*, 279 F. Supp. 3d 708, 714 (E.D. Va. 2018) (explaining that Fourth Circuit precedents have placed primary focus on the first factor and that the Supreme Court has emphasized the importance of the fourth factor). Ultimately, the test of whether a secondary use of a copyrighted work is "fair" is "whether the progress of human thought 'would be better served by allowing the use than by preventing it.'" *Brammer v. Violent Hues Productions, LLC*, 922 F.3d 255, 262 (4th Cir. 2019) (quoting *Cariou v. Prince*, 714 F.3d 694, 705 (2d Cir. 2013)).

### i. Purpose and Character

In assessing the first factor, "the primary inquiry is whether the use communicates something new and different from the original or otherwise expands its utility, that is, whether the use is transformative." *Id.* (quoting *Fox New Network, LLC v. v. Tveyes, Inc.*, 883 F.3d 169, 176 (2d Cir. 2018)) (internal quotations and alterations omitted). If the secondary use is of a commercial nature, it is less likely to be considered "fair" than if it is for an educational or nonprofit purpose. *Id.* "The 'central purpose' of the first factor's transformation inquiry is to determine 'whether the new work merely 'supersede[s] the objects' of the original creation." *Id.* (quoting *Campbell*, 510 U.S. at 579 (alteration in original)). A transformative work does "something more than repackage or republish the original copyrighted work." *Id.* at 263 (quoting *Authors Guild, Inc. v. HathiTrust*, 755 F.3d 87, 96 (2d Cir. 2014)). The more transformative a work, the more likely it is that the transformed use of it will be considered a "fair use," and the less significant the other factors will be. *Id.*

The transformation inquiry is largely objective and involves comparing the original work to the secondary use of it. *Id.* However, the transformation inquiry also considers the context in which the work appears. "[E]ven a wholesale reproduction may be transformed when placed in a

'new context to serve a different purpose,' but the secondary use still must generate a societal benefit by imbuing the original with new function or meaning." *Id.* (quoting *Perfect 10, Inc. v. Amazon.com, Inc.*, 508 F.3d 1146, 1165 (9th Cir. 2007)).   Secondary uses of copyrighted photographs have been considered "fair use" when the secondary use has journalistic value. *Id.* at 264 (citing *Núñez v. Caribbean Int'l News Corp.*, 235 F.3d 18, 23 (1st Cir. 2000) (modeling photograph transformed when published as part of newspaper coverage of a related controversy)). However, when considering whether the wholesale reproduction of a copyrighted photograph constitutes "fair use," the Fourth Circuit has been primarily concerned about whether the use of the copyrighted photograph is "important to the accurate representation[] of historical events." *Id.* That is because "absent fair use, a copyright holder could 'exert enormous influence over new depictions of historical subjects and events' and effectively remove certain historical moments from the public domain." *Id.* (quoting *Bouchat v. Baltimore Ravens Ltd. P'ship*, 737 F.3d 932, 944 (4th Cir. 2013)).

In *Bouchat*, for example, the Fourth Circuit held that a secondary use of a football team's logo "was transformed through its appearance in a documentary-like television program and in a display case featuring memorabilia from the team's history." *Id.*  In *Brammer*, by contrast, the Fourth Circuit held that it was not fair use for a film festival operator to use a copyrighted picture of the Adams Morgan neighborhood in Washington, D.C. on the website's list of nearby tourist attractions. *Id.*  There, the court held that, unlike in the *Bouchat* case, "Violent Hues' ability to accomplish its purpose of communicating information about area tourist attractions would not be hindered if it had to comply with Brammer's copyright.  And society would not be left the poorer for it." *Id.*  Moreover, the court found it "telling" that the website operator "d[id] not contest that

its use provide[d] any distinct sort of 'public benefit' that furthers the 'development of art, science, and industry.'"  *Id.* (quoting *Sundeman v. Seajay Soc'y, Inc.*, 142 F.3d 194, 203 (4th Cir. 1998)).

Here, Defendants reproduced BGP's photographs without making any changes to them and for a commercial purpose.  Those facts weigh against fair use.  Nonetheless, Defendants' use here was more like the secondary use at issue in *Bouchat* than the one in *Brammer*—that is, Defendants used the photographs to accompany a newsworthy story documenting the creation of a new, visually-distinctive breed of cats.  *See Núñez*, 235 F.3d at 23 (the "transformation of the works into news—and not the mere newsworthiness of the works themselves—[weighed] in favor of fair use under the first factor of § 107.").  Because the articles focused, primarily, on the cats' distinctive look, the photographs were a critical piece of the story.  Thus, unlike in *Brammer*, Defendants' ability to "accomplish its purpose of communicating" the information contained in the articles *would* have been hindered if it had to comply with BGP's copyrights.  *Brammer*, 922 F.3d at 264.  Accordingly, the first factor weighs in favor of fair use.

### ii.  Nature of the Copyrighted Work

In assessing the second factor, courts must evaluate "the thickness or thinness of the author's exclusive rights and ask[] whether or not the work had been published at the time of secondary use."  *Id.* at 266 (internal quotations and alterations omitted).  "When determining the thickness of a photograph's copyright, a court weighs the 'range of creative choices available in selecting and arranging the photo's elements,' examining aspects like 'lighting, camera angle, depth of field, and selection of foreground and background elements.'"  *Id.* (quoting *Rentmeester v. Nike, Inc.*, 883 F.3d 1111, 1120-21 (9th Cir. 2018)).  As the Fourth Circuit has explained, "[t]he ultimate task is to separate the 'facts or ideas set forth in a work,' which are not protected, from the 'author's manner of expressing those facts and ideas,' which is protected."  *Id.* at 266-67

(quoting *Authors Guild v. Google, Inc.*, 804 F.3d 202, 214 (2d Cir. 2015)).  Photographs, however, "have long received thick copyright protection[,]" even where they depict reality.  *Id.* at 267

Ms. Gobble clearly made creative choices when taking the photographs here.  The cats are often posed, dressed up with jewelry and clothing, they are photographed at different angles, and they appear in settings curated with props, backgrounds, and lighting.  Those choices demonstrate that the photographs are entitled to "thick" copyright protection.

The parties also appear to agree that the photographs had been published before.  ECF 183 at 16.  However, "[t]he Supreme Court has never suggested that publication status is relevant to *all* invocations of fair use."  *Brammer*, 922 F.3d at 267 (emphasis in original).  Because photographs are "visual works . . . created, and sold or licensed, usually for repetitive viewing[,]" their publication status has been considered less consequential in the fair use analysis than, for example, literary works where the "'right of first publication' is particularly significant because such works, unlike photographs or melodies, are often considered only once."  *Id.* (first quoting *Harper & Row Publishers, Inc. v. Nation Enterprises*, 471 U.S. 539, (1985), then quoting *Ringgold v. Black Entertainment Television, Inc.*, 126 F.3d 70, 79 (2d Cir. 1997)).  Accordingly, "the published status of the [photographs] has no relevance here[,]" and their "thick" copyright protection weighs against a finding of fair use.  *Id.*

### iii.   Amount and Substantiality of the Portion Used

The key question with respect to the third factor is "whether 'no more was taken than necessary' to accomplish the secondary user's purpose."  *Id.* at 267-68.  Here, there is no dispute that Defendants published the photographs at issue in their entirety, without changing them in any way.  The third factor, therefore, weighs against fair use.

### iv.   Effect of the Use on the Potential Market

The fourth factor requires courts to consider "not only the extent of market harm caused by the particular actions of the alleged infringer, but also whether unrestricted and widespread conduct of the sort engaged in by the defendant would result in a substantially adverse impact on the potential market for the original." *Id.* at 268 (quoting *Campbell*, 510 U.S. at 590).

The Court needs additional factual development in order to properly evaluate the extent of the market harm that was actually caused by the Defendants' conduct, and whether "widespread conduct of the sort engaged in by the defendant would result in a substantially adverse impact on the potential market" for these photographs. *Id.*  Defendants have put forth evidence that BGP licensed its photographs for free at least 37 times, ECF 163-19, and that even when BGP partnered with REX Features to sell the photographs, BGP only generated $306.03.  ECF 163-3 at 28 (Sedlik Report).  Those facts appear undisputed.  However, although the Court is convinced that the market for BGP's photographs is not between $18-31 million as BGP and its expert Mr. Sedlik suggest, even Defendants' experts discuss scenarios in which the market for BGP's photographs may have exceeded the licensing fees BGP has collected in the past. *See, e.g.*, ECF 169-12 at 25-27 (Elsner Report).  The Court is, therefore, satisfied that a factual dispute exists, and that summary judgment is not appropriate at this stage.

The Court will note, however, that while it is ultimately Defendants' burden to prove the fair use defense, BGP will need to do more than show that its photographs generated a mere $306.03 in licensing fees in order to rebut Defendants' evidence and avoid the defense's application.  BGP must prove either actual market harm, or that the widespread availability of the photographs would suppress a demand for the photographs that would have existed absent that

availability.  *Bouchat*, 737 F.3d at 943 (evaluating whether the secondary use of the logo at issue would have "act[ed] as a market substitute for" the logo itself) (quotation omitted).

### e.  Fraud on the Copyright Office

Defendants argue that BGP's copyright for 38 of its photographs is invalid.  ECF 171-1 at 26.  BGP registered those 38 photographs together as a "unit of publication."  ECF 168-6.  To qualify for registration as a "unit of publication," however, "[a]ll of the works claimed in the application must be first published as a single unit on the same date."  United States Copyright Office, *Compendium of U.S. Copyright Office Practices*, § 1107.2.  The parties appear to agree that the 38 photographs were not "first published as a single unit on the same date."  ECF 171-1 at 27-28; ECF 183 at 18-19.

Under the Copyright Act, a registration is valid unless "inaccurate information was included on the application . . . with knowledge that it was inaccurate[,]" and it contains information that "if known, would have caused the Register of Copyrights to refuse registration." 17 U.S.C. § 411(b)(1).  "In any case in which inaccurate information . . . is alleged, the court shall request the Register of Copyrights to advise the court whether inaccurate information, if known, would have caused the Register of Copyrights to refuse registration."  17 U.S.C. § 411(b)(2).

Defendants rely on a Ninth Circuit case that rejected the notion that "the knowledge inquiry is . . . whether [the plaintiff] knew that [the registration] would run afoul of the single-unit registration requirements[.]"  *Unicolors, Inc. v. H&M Hennes & Mauritz, L.P.*, 959 F.3d 1194, 1200 (9th Cir. 2020).  Instead, the Ninth Circuit held that because the plaintiff knew "that certain designs included in the registration were confined and, therefore, were each published separately to exclusive customers[,]" the knowledge requirement was satisfied, triggering the district court's requirement to refer the case to the Copyright Office.  The Supreme Court has granted certiorari

in that case to answer the question whether Section 411 "requires referral to the Copyright Office where there is no indicia of fraud or material error as to the work at issue in the subject copyright registration." *Unicolors, Inc. v. H&M Hennes & Mauritz, L.P.*, 20-915 (Jan. 4, 2021) (Petition for Writ of Certiorari); *Unicolors, Inc. v. H&M Hennes & Mauritz, L.P.*, 141 S. Ct. 2698 (2021) (granting certiorari). The Court heard oral argument in the case on November 8, 2021.

Accordingly, it is likely that the Supreme Court will soon clarify the knowledge standard in Section 411 and the prerequisites for referral to the Copyright Office. The Court will, therefore, hold this issue in abeyance pending the Supreme Court's decision in *Unicolors*.

### 3. Contributory Copyright Infringement (Count II)

Count Two of the Second Amended Complaint asserts a claim for Contributory Copyright Infringement against Sinclair. "When analyzing a contributory infringement claim, courts assess two elements: participation and knowledge." *Levi v. Twentieth Century Fox Film Corp.*, No. 3:16CV129, 2017 WL 1227933, at *8 (E.D. Va. Mar. 31, 2017). Defendants argue that "[i]n its contributory infringement claim, Plaintiff disregards a crucial element of contributory infringement—that the defendant must have 'knowledge *of the infringing activity*.'" ECF 171-1 at 30 (quoting *CoStar Grp. Inc. v. Loopnet, Inc.*, 164 F. Supp. 2d 688, 696 (D. Md. 2001), *aff'd* 373 F.3d 544 (4th Cir. 2004)). However, there is a factual dispute related to Sinclair's knowledge of the alleged infringing activity. Thus, for the same reasons that the Court has denied the parties' motions for summary judgment with respect to the Defendants' willfulness (explained above), those motions will also be denied on the issue of contributory infringement.[11]

---

[11] Of course, BGP's contributory infringement claim depends on an ultimate finding that a third party (*i.e.* a Defendant other than the one to be held contributorily liable) is liable for direct infringement. *A&M Records, Inc. v. Napster, Inc.*, 239 F.3d 1004, 1013 n.2 (9th Cir. 2001) ("Secondary liability for copyright infringement does not exist in the absence of direct infringement by a third party.").

#### 4.   Vicarious Copyright Infringement (Count III)

In Count Three, BGP asserts a claim for vicarious copyright infringement against all Defendants.  To establish vicarious copyright infringement, "a copyright owner must demonstrate that the entity to be held so liable: (1) possessed the right and ability to supervise the infringing activity; and (2) possessed an obvious and direct financial interest in the exploited copyrighted materials."  *Nelson-Salabes, Inc. v. Morningside Development, LLC*, 284 F.3d 505, 513 (4th Cir. 2002).

Whether or not Sinclair possessed the right and ability to supervise the Station Defendants' alleged infringement, BGP's argument fails on the "direct financial interest" prong.[12]  This element requires "a causal relationship between the infringing activity and any financial benefit a defendant reaps[.]"  *BMG Rights Mgmt. (US) LLC*, 149 F. Supp. 3d at 665.  "Such a direct financial interest arises where the infringing activity is a 'draw' for customers and significant financial benefits 'flow directly' from the infringing activity that the defendant helps to facilitate."  *Goldstein v. Metropolitan Regional Information Systems, Inc.*, No. TDC-15-2400, 2016 WL 4257457, at *5 (D. Md. Aug. 11, 2016).

BGP's only argument with respect to the "direct financial interest" prong is that, "[t]he Station Defendants' websites contain advertisements, and Defendants earn income from those advertisements based on the number of impressions."  ECF 183 at 23.  First, BGP's purported support for that argument—citations to less than two pages of deposition testimony by Sinclair's corporate designee, David Bochenek—does not stand for the proposition for which it is cited.  In the first excerpt, Mr. Bochenek was testifying, in broad terms, about how "O&O" (owned-and-

---

[12] BGP's assertion of vicarious copyright infringement against all Defendants is perplexing, as the Second Amended Complaint does not make clear how the Station Defendants, who presumably did not supervise anyone, could be liable for vicarious infringement.

operated) advertising revenue is "typically" generated.  ECF 183-21 at 37:1-2.  In the second excerpt, Mr. Bochenek testifies that the revenue listed on Exhibit 37 "represents the cat revenue from the different ads[,]" *id.* at 41:13-15, but then says just one page later that he does not recall what the revenue listed on Exhibit 37 represents.  *Id.* at 42:16-20.  Second, even if BGP is correct that Defendants receive advertising revenue on a per-impression basis, that fact does nothing to show that "the availability of infringing photographs . . . drew customers to" Defendants' websites, or even that BGP's photographs drew them to click on the articles at issue here.  *Id.*

In *Goldstein,* Judge Chuang explained, for example, that, "vicarious liability can exist against a landlord who charges rent to vendors at a swap meet where pirated music was sold, [*Fonovisa, Inc. v. Cherry Auction, Inc.*, 76 F.3d 259, 263 (9th Cir. 1996)], or the owner of a chain of department stores at which counterfeit recordings were sold by a concessionaire, *Shapiro, Bernstein and Co. v. H.L. Green Co.*, 316 F.2d 304, 307 (2d Cir. 1963)."  *Id.*  But the court distinguished those cases because the defendant's "website ha[d] as its main purpose the posting of real estate listings, a purpose distinct from trafficking in infringing material[,]" and, therefore it was not "reasonable to conclude that the availability of infringing photographs . . . drew customers to subscribe" to the defendant's service.  *Id.*  The same is true here.  The purpose of Defendants' websites is to provide news, not to display infringing materials.  Plaintiff has not presented any evidence to the contrary, nor have they even attempted to present evidence that connects Defendants' alleged infringement to viewers' interest in the articles.  Defendants' motion for summary judgment must, therefore, be granted on BGP's vicarious infringement claim.

### 5.  Profit Damages for Copyright Infringement

For very similar reasons, the Defendants' motion for summary judgment must be granted on BGP's claim for profit damages.  The Copyright Act allows successful plaintiffs to recover

profit damages "that are attributable to the infringement and are not taken into account in computing the actual damages." 17 U.S.C. § 504(b). The Fourth Circuit has held that "whether at the summary judgment stage or at trial, a plaintiff seeking profit damages . . . must prove (1) the amount of the claimed revenue streams, and (2) that there is some reasonable relationship 'between the infringement and those particular profit streams.'" *Dash*, 731 F.3d at 329-30 (quoting *Bonner v. Dawson*, 404 F.3d 290, 294 (4th Cir. 2005)) (alterations omitted). The reasonable relationship element "requires the plaintiff to (1) allege a 'conceivable connection' between the infringement and the claimed revenues, and (2) offer nonspeculative evidence that a causal link exists." *Id.* (quoting *Bouchat v. Baltimore Ravens Football Club, Inc.*, 346 F.3d 514, 522-23 (4th Cir. 2003)).

Like its vicarious infringement claim, BGP's sole argument on its entitlement to profit damages is that "Defendants' website[s] [that] display[] the photographs contain[] advertisements that paid based on the number of impressions." ECF 183 at 34. Plaintiff cites to the same two pages of Mr. Bochenek's deposition testimony described above. *Id.* at 35. Thus, Plaintiff has not even attempted to identify an amount of revenue to which it claims it is entitled (aside from presumably claiming all of it). And it does not put forth any "non-speculative evidence" that Defendants' alleged "infringement could reasonably be viewed as one of the causes of the claimed revenues." *Dash*, 731 F.3d at 330-31. Defendants' motion for summary judgment will, therefore, be granted with respect to profit damages.

### iii.  DMCA (Count IV)

In Count 4, Plaintiff argues that the Defendants have violated Sections 1202(a) and 1202(b) of the DMCA. Section 1202(a) of the DMCA prohibits a person from "knowingly and with the intent to induce, enable, facilitate or conceal infringement provide copyright management information that is false." 17 U.S.C. § 1202(a). Similarly, Section 1202(b) makes it unlawful for

a person, "without the authority of the copyright owner or the law," either to "intentionally remove or alter any copyright management information," 17 U.S.C. § 1202(b)(1), or to "distribute" work "knowing that copyright management information has been removed or altered," 17 U.S.C. § 1202(b)(2)-(3).

Copyright management information ("CMI") is defined, in relevant part, as "any of the following information conveyed in connection with copies . . . of a work . . . including in digital form . . .":

(1) The title or other information identifying the work, including the information set forth on a notice of copyright.

(2) The name of,  and other identifying information about, the author of a work.

(3) The name of, and other identifying information about, the copyright owner of the work, including the information set forth in a notice of copyright.

17 U.S.C. § 1202(c).  BGP argues that Defendants falsified and distributed the CMI attached to the photographs by changing their file names and the credit information associated with them. ECF 168-1 at 24.  Defendants do not dispute that this information qualifies as CMI under Section 1202(c).

### 1.  17 U.S.C. § 1202(a)

To prove a violation of Section 1202(a), a plaintiff must establish three elements: "(1) the provision or distribution of CMI; (2) that the defendant knew that the CMI was false; and (3) that the Defendant acted with the intent to conceal copyright infringement."  *Michael Grecco Prods. v. Alamy, Inc.*, 372 F. Supp. 3d 131, 137 (S.D.N.Y. 2019) (citing *Krechmer v. Tantaros*, 747 F. App'x 6, 9 (2d Cir. 2018); *Aaberg v. Francesca's Collections, Inc.*, No. 17-CV115 (AJN), 2018 WL 1583037, at *6 (S.D.N.Y. Mar. 27, 2018)).

Even if BGP could prove that Defendants knowingly distributed false CMI (which is far from clear), they do not present evidence that could allow a reasonable jury to conclude that any Defendant was "act[ing] with the intent to conceal copyright infringement."  *Michael Grecco Prods.*, 372 F. Supp. 3d at 137.  BGP argues that Ms. Ota intended to conceal an infringement because she knew that Ms. Gobble owned the photographs, yet she attributed them to "WENN.com," "By WENN.com," or "Brittney Gobble Photography via WENN."  The fact that some of the photographs attached to the article Ms. Ota published were attributed to "Brittney Gobble Photography via WENN" is strong evidence that she was *not* acting to conceal any infringement.  While the attribution may have been incorrect, it strains credulity to argue that someone attempting to conceal copyright infringement would do so by including the rightful copyright owner's name (whose name includes the name of the photographer who took the photographs) in the attribution attached to the photographs.

BGP next argues that Ms. Ota's intent can be inferred because she violated Sinclair's corporate policy by failing to "have Brittney email her, indicating that she was the sole owner of each of [the photographs]."  ECF 168-1 at 28.  That fact also indicates nothing about Ms. Ota's intent.  As explained, prior to publishing the photographs, Ms. Ota emailed Dr. Gobble to obtain permission to use them.  To be sure, there are disputed factual questions about whether Ms. Ota had permission to publish the photographs from the Dropbox folder, and whether she properly attributed them, but the undisputed evidence suggests that Ms. Ota knew who the rightful owner of the photographs was and sought the Gobbles' permission to use them.  She may have violated corporate policy, and she may even have infringed BGP's copyrights, but her effort to contact the Gobbles to obtain their permission undermines BGP's argument that she was intentionally trying to conceal copyright infringement.  Similarly, BGP baselessly argues that the timing of Ms. Ota's

email to Dr. Gobble is "suspect" because it was one day after Ms. Gobble had emailed Mr. Sistek to complain about his improper attributions. *Id.* But BGP presents no evidence that Ms. Ota knew about Mr. Sistek's communication with Ms. Gobble, nor any other reason why the timing of her email was indicative of her intent to conceal infringement.

Simply put, there is no evidence that Ms. Ota, or anyone else, was intentionally trying to conceal copyright infringement. The Court must, therefore, grant Defendants' motion for summary judgment on BGP's Section 1202(a) claim.

### 2.   17 U.S.C. § 1202(b)

Section 1202(b)(2) prohibits "intentionally remov[ing] or alter[ing] any copyright management information, . . . knowing, or . . . having reasonable grounds to know, that it will induce, enable, facilitate, or conceal an infringement[.]" 17 U.S.C. § 1202(b).

With respect to Ms. Ota, there is no evidence that she, in fact, altered or removed any CMI. BGP argues that the CMI on the photographs Ms. Ota published was different from the CMI on the photographs in the Dropbox folder. But that is not evidence that Ms. Ota altered or removed any CMI, and it certainly is not evidence that she did so with "actual knowledge" that the removal or alteration was "without authority of the copyright owner or the law," or that she was intending to "induce, enable, facilitate, or conceal an infringement." *Id.* As explained above, even if she did alter or remove CMI, the evidence strongly suggests she *did not* have actual knowledge that those alterations were unlawful or unauthorized, and that she *did not* intend to "induce, conceal, or facilitate" any infringement.

With respect to Mr. Sistek, although he admitted to editing the metadata associated with the photographs in the Dropbox folder, he also explained to Ms. Gobble that it was a mistake, he explained the cause of that mistake, and then he changed the metadata back to an attribution that

was acceptable to her (undermining BGP's argument that he intended to "induce, facilitate, or conceal" infringement).  ECF 168-19 at 4-5.  Defendants' motion for summary judgment must, therefore, be granted on BGP's Section 1202(b)(2) alteration/removal claim.

A similar lack of evidence forecloses BGP's claim that Defendants violated Section 1202(b)(3)'s distribution provision.  That provision requires proof of four elements: "(1) the existence of CMI in connection with a copyrighted work; and (2) that a defendant distributed works or copies of works; (3) while knowing that CMI has been removed or altered without authority of the copyright owner or the law; and (4) while knowing, or having reasonable grounds to know that such distribution will induce, enable, facilitate, or conceal an infringement."  *Mango v. BuzzFeed, Inc.*, 970 F.3d 167, 171 (2d Cir. 2020) (alterations and quotations omitted).  "Section 1202(b)(3) contains a so-called 'double scienter' requirement: the defendant who distributed improperly attributed copyrighted material must have actual knowledge that the CMI 'has been removed or altered without authority of the copyright owner or the law,' as well as actual or constructive knowledge that such distribution 'will induce, enable, facilitate, or conceal an infringement.'"  *Id.* (quoting 17 U.S.C. § 1202(b)).

For the same reasons explained above, no reasonable jury could find that BGP can meet this double-scienter requirement.  Even if BGP could show that any of the Defendants distributed CMI "while knowing that CMI ha[d] been removed or altered without authority of the copyright owner or the law[,]" they have no evidence that would support a jury's finding that they knew or had reasonable grounds to know that "such distribution [would] induce, enable, facilitate, or conceal an infringement."  *Id.* Summary judgment is therefore warranted for Defendants on the entirety of Count IV.

### 3.   Vicarious Violations of the DMCA (Count V)

Although the parties do not independently address it, the Second Amended Complaint asserts a claim for vicarious violations of the DMCA.  However, because there is no evidence of any direct violation of the DMCA, the Court will grant Defendants' motion for summary judgment with respect to BGP's vicarious DMCA claim.

## III.    CONCLUSION

For the reasons set forth above, Defendants' motion to exclude Mr. Sedlik's testimony, ECF 163, will be GRANTED in part and DENIED in part.  BGP's motion to exclude Mr. Elsner's testimony, ECF 166, will be DENIED.  BGP's motion for summary judgment, ECF 168, will be DENIED except with respect to its argument on the Defendants' Fraud on the Copyright Office affirmative defense, which will be held in abeyance.  Defendants' motion for summary judgment, ECF 171, will be GRANTED in part and DENIED in part as to Count I, DENIED as to Count II, and GRANTED as to Counts III, IV, and V.  Judgment will be ENTERED in favor of all Defendants except Sinclair Broadcast Group, Inc., Sinclair Communications, LLC, and Sinclair Media of Seattle, LLC.  A separate order follows.


Dated: November 17, 2021                                      _____/s/_____
                                                             Stephanie A. Gallagher
                                                             United States District Judge